McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
88 Pine Street
24th Floor
New York, New York 10005
Telephone: (212) 483-9490
Facsimile: (212) 483-9129
Attorneys for Respondent-Defendant,
Stewart's Mobile Concepts, Ltd.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PENROD MANAGEMENT GROUP, INC.,

        Plaintiff-Petitioner,

v.

STEWART'S MOBILE CONCEPTS, LTD.,

        Defendant-Respondent.

Civil Action No.

---

**TRIAL BRIEF OF DEFENDANT-RESPONDENT, STEWART'S MOBILE CONCEPTS, LTD., ON THE ISSUE OF WHETHER THE CORPORATE FORM SHOULD BE DISREGARDED TO REQUIRE PLAINTIFF-PETITIONER, PENROD MANAGEMENT GROUP, INC., TO CONTINUE THE ARBITRATION PROCEEDING BEFORE THE AMERICAN ARBITRATION ASSOCIATION**

---

Of Counsel and on the Brief

Ryan P. Mulvaney, Esq.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ....................................................................... 1

STATEMENT OF FACTS .............................................................................. 3

    A.   The Underlying Agreement Between SMC and NBAC ........................... 3

    B.   NBAC Breached the Agreement ........................................................ 4

    C.   PMG Exercised Dominion and Control Over NBAC, and Used NBAC to Cause Harm .............................................................................................. 5

    D.   PMG Closes NBAC ......................................................................... 7

CAUSES OF ACTION AND DEFENSES ....................................................... 7

LEGAL ARGUMENT ................................................................................... 7

    POINT I ....................................................................................................... 7

    THE CORPORATE VEIL SHOULD BE PIERCED TO HOLD PMG LIABLE FOR THE OUTSTANDING BALANCE OWED TO SMC ....................................... 7

    A.   Choice of Law Issues ...................................................................... 7

    B.   New York Standard for Piercing the Corporate Veil ........................... 10

    C.   PMG Dominated and Controlled NBAC ........................................... 12

        1.   Absence of Corporate Formalities ........................................... 12

        2.   Undercapitalization of NBAC .................................................. 12

        3.   Overlap in Ownership, Officers, Directors and Overall Blurring of Lines of Corporate Control and Responsibility ........................... 13

        4.   Financial Transactions Reveal Intermingling ............................. 15

        5.   The Amount of Business Discretion Displayed by the Allegedly Dominated Corporation and Whether PMG Dealt with NBAC at Arm's Length ...................................................................... 16

        6.   Whether the Corporations are Treated as Independent Profit Centers .... 17

7.    The Payment or Guarantee of Debts of the Dominated Corporation by Other Corporations in the Group...............................................17

D.    SMC Suffered A Harm As A Result of PMG's Dominion and Control Over NBAC..................................................................................17

1.    Breach of Contract..........................................................18

2.    Rendering Subsidiary Judgment Proof....................................18

3.    Preferential or Otherwise Fraudulent Transfer to Creditor...............19

CONCLUSION........................................................................................20

## TABLE OF AUTHORITIES

**CASES**                                                                                              **PAGE**

American Fuel Corp. v. Utah Energy Development Co.,
    122 F.3d 130 (2d Cir. 1997)............................................................................10

Carte Blanche (Singapore) PTE, Ltd. v. Diners Club International, Inc.,
    758 F. Supp. 908 (S.D.N.Y. 1991) ..............................................................18

Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.,
    230 F. Supp. 2d 439 (S.D.N.Y. 2002)..........................................................18

Freeman v. Complex Computing Co., Inc.,
    119 F.3d 1044 (2d Cir. 1997)........................................................................11

Gilchinsky v. Naional Westminster Bank N.J.,
    159 N.J. 463 (interpreting New Jersey's fraudulent transfer statute)...........19

I/M/O of EAC of New York v. Capri 4000, Inc.,
    853 N.Y.S.2d 419 (N.Y.A.D. 3d Dep't 2008)...............................................19

Kiernan v. Davis,
    132 N.J. Eq. 245 (Ch. Div. 1942) ................................................................20

Krauss v. Manhattan Life Insurance Co.,
    643 F.2d 98 (2d Cir. 1991)..............................................................................8

Oil Trading Ltd. v. Interpetrol Bermuda Ltd.,
    774 F. Supp. 840 (S.D.N.Y. 1991) ..............................................................19

P.A. Building Co. v. Silverman,
    298 A.D.2d 327..............................................................................................19

Sahu v. Union Carbide Corp.,
    2006 WL 3377577 (S.D.N.Y. Nov. 20, 2006)..............................................18

Tri-State Employment Services, Inc. v. The Mountbatten Surety Co., Inc.,
    295 F.3d 256 (2d Cir. 2002)............................................................................8

United States v. Funds Held ex rel. Wetterer,
    210 F.3d 96 (2d Cir. 2000)............................................................................11

Ventron Corp.,
    94 N.J. 475 (1983) ........................................................................................10

<u>Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.</u>,
    933 F.2d 131 (2d Cir. 1991).................................................................................9, 11

<u>Zurich Insurance v. Shearson Lehman Hutton</u>,
    84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994)........................................9

## STATUTES

28 U.S.C. § 1332.............................................................................................................8

New Jersey Business Corporations Act, NJSA § 14A:1-1, <u>et</u> <u>seq</u>....................................12

New Jersey Limited Liability Act, NJSA § 42:2B-1, <u>et</u> <u>seq</u>...........................................12

## PRELIMINARY STATEMENT

This trial brief is submitted on behalf of Defendant-Respondent, Stewart's Mobile Concepts, Ltd. ("SMC"), in support of its claim that Plaintiff-Petitioner, Penrod Management Group, Inc. ("PMG"), should be directed to continue the currently pending but stayed[1] arbitration proceedings in the American Arbitration Association ("AAA") because it is, through piercing the corporate veil, a party to an agreement between SMC and Nikki Beach Atlantic City, LLC ("NBAC"), a now defunct entity, which contains an arbitration clause. The claim asserted against PMG in the arbitration arises out of an agreement between SMC and NBAC pursuant to which SMC agreed to lease certain mobile kitchen equipment and trailers (the "Equipment") to NBAC for use at a bar and restaurant at the Resorts Casino and Hotel in Atlantic City, New Jersey (the "Agreement"). The terms of the Agreement were negotiated, and initial payments in consideration and furtherance of the Agreement were made, by PMG.

Substantively, PMG, together with its affiliates, own and operate exclusive nightclubs and beach bars throughout the world under the "Nikki Beach" trade name. There are seemingly endless entities operating under the "Penrod" and "Nikki Beach" names, such as PMG; Penrod Brothers, Inc.; Penrod Management Co., International, LLC; Penrod Property Management, Inc.; and Nikki Marina, LLC, Nikki Beach Club, Nikki Beach At Sea, LLC, Nikki Beach Music, LLC, Nikki Beach Publishing, LLC, Nikki Beach Holdings, LLC, and Nikki Midtown, to name but a few. The maze of corporations – all under the name "Penrod" and "Nikki" – is so convoluted that not even Michael Penrod, an officer of many if not all of the entities and the son of Jack Penrod, the founder and sole shareholder of many of not all of these companies, can keep them

---

[1] After PMG filed its Order to Show Cause, the parties argued the issue of arbitrability, namely whether PMG, a non-signatory, is a party to the Agreement that contains an arbitration clause. The parties consented to magistrate jurisdiction for the purposes of determining whether PMG, through piercing the corporate veil, is a party to the Agreement such that it must attend arbitration. The arbitration proceedings have been stayed until this Court resolves the issue of arbitrability.

straight as evidenced by his deposition testimony in <u>Mr. John, Inc. v. PMG and NBAC</u>, a case commenced by another vendor against PMG and NBAC that involved the very same claims asserted by SMC here. Mr. Penrod was either confused, or his deposition testimony about the companies that his father started and for which he serves as an officer and employee was intentionally evasive. Not surprisingly, PMG does not intend to subject Mr. Penrod to cross-examination. Rather, PMG offers the testimony of John Michael Register, the same person who was barred from testifying in the <u>Mr. John, Inc.</u> case because he refused to appear for his deposition. The fact-finder here will determine the credibility of Mr. Register's intended and Mr. Penrod's previous testimony.

Using the shields and weapons behind which most corporations hide when trying to avoid obligations, PMG argues that its complex set of corporate structures and affiliates have laundered out any contractual obligation or legal liability it could possible have to SMC. Not so, however. The record shows that PMG exercised control over NBAC and, as a result, harmed SMC. Indeed, the record reveals that, contrary to PMG's contentions, it – not any other entity – negotiated the Agreement, and paid hundreds-of-thousands-of-dollars to SMC and other vendors and suppliers to induce their performance. Because the record reveals that PMG and NBAC shared, among other things, the same officers, directors, shareholders, telephone numbers, addresses, and ultimate decision-makers, they are the mere alter egos of each other. Moreover, PMG's representatives acknowledged the outstanding balance owed to SMC and repeatedly assured SMC that it would be paid. Never once did PMG advise SMC to stop sending invoices and demand letters to PMG in Florida, communicate with PMG regarding the outstanding balance, or otherwise inform SMC that PMG was not responsible for the outstanding balance.

Perhaps even more significant is Mr. Register's May 22, 2008, revelation that NBAC "reimbursed" PMG for the series of wire transfers made by PMG to SMC in furtherance of the Agreement. Aside from providing yet another factor for the "wrong" analysis under the standard for piercing the corporate veil, Mr. Register's surprising revelation provides SMC's basis for its statutory preferential and fraudulent conveyance claim that SMC will now pursue. Indeed, on behalf of PMG, Mr. Register repeatedly testifies for the first time that: (1) that the wire transfers from PMG to SMC were "loans" to NBAC; and (2) NBAC, despite having "expenses that far exceeded its revenues," somehow managed to reimburse PMG – whose officers, directors and general counsel were also the officers, directors and general counsel of NBAC – yet could not afford to pay bona fide creditors including SMC. That, under even the most restrictive review of the facts and interpretation of governing statutory authority, constitutes a <u>prima facie</u> claim for fraudulent conveyance, which will be pursued by SMC regardless of the outcome here.

Indeed, corporate law has dealt with such attempts to skirt legal obligations before, and provides the remedy that the corporate form will not be abused to perpetrate a wrong such as that foisted upon SMC. SMC therefore respectfully requests that this Court find in its favor, and direct that the parties continue the currently stayed arbitration proceedings for a determination on damages.

## **STATEMENT OF FACTS**

A. <u>The Underlying Agreement Between SMC and NBAC</u>

On or about April 19, 2005, SMC and NBAC entered into the Agreement pursuant to which SMC agreed to lease the Equipment to NBAC for use at a bar and restaurant at the Resorts Casino and Hotel in Atlantic City, New Jersey. The Agreement provided for delivery of the Equipment on a staggered basis in late April through early May 2005.

In exchange, NBAC agreed to make certain initial payments at the time of executing the Agreement, including payment of a security/cleaning deposit, in addition to agreeing to make regular monthly payments and to maintain the Equipment in good condition, for which NBAC bore the risk of loss, destruction and damage. The Agreement also provided for a monthly rent of $45,345.00 (plus applicable taxes), for five months, with an estimated total rent of $226,725 during the life of the Agreement.

Any failure to comply with the terms of the Agreement, including delinquencies in payment, constituted a default. Upon a default, SMC was permitted to accelerate rental payments, terminate the Agreement, and enter NBAC's property and retake the Equipment. The Agreement also provided for disputes to be resolved in binding arbitration in the AAA, with the prevailing party to be reimbursed attorneys' fees and costs. In addition, the Agreement specifies that New York law must be used to resolve any disputes arising from the Agreement.

B.    NBAC Breached the Agreement

On or about April 18, 2005, PMG consummated a wire transfer in the benefit of SMC in the amount of $50,000, which represented a portion of SMC's first invoice under the Agreement. On or about April 22, 2005, PMG consummated another wire transfer in the amount of $47,197.64, which represented the final payment of SMC's first invoice and a total of $97,197.64 paid to SMC by PMG. SMC delivered the Equipment pursuant to the Agreement, which was signed for by "Timothy Hughes, on behalf of [PMG]." NBAC and PMG, however, failed to pay the monthly rental costs pursuant to the Agreement and remained in possession of some of the Equipment despite SMC's repeated demand for its return, which caused SMC to unnecessarily expend resources to prepare, file and serve an Order to Show Cause seeking the return of the Equipment.

C.    PMG Exercised Dominion and Control over NBAC, and Used NBAC to Cause Harm

PMG, together with its various affiliates, owns and operates exclusive nightclubs throughout the world under the "Nikki Beach" trade name. The limited discovery produced by PMG during the arbitration proceeding, and any reasonable inference drawn from other evidence in the possession of SMC, demonstrates the following:

- For months before NBAC was even formed, PMG's representatives repeatedly solicited SMC by e-mail and telephone regarding the "Nikki Beach" bar;

- By PMG's own admission in this and in the Mr. John, Inc. case, officers and directors of PMG repeatedly contacted SMC and actively negotiated the Agreement;

- By PMG's own admission in this and in the Mr. John, Inc. case, officers and directors of PMG were actively involved in organizing and establishing NBAC;

- By PMG's own admission in this and in the Mr. John, Inc. case, PMG is primarily a holding company for NBAC and other subsidiaries under the "Nikki Beach" trade name that provide restaurant management services;

- By PMG's own admission in this and in the Mr. John, Inc. case, Jack Penrod is the sole shareholder of PMG and the "Nikki Beach" companies;

- By PMG's own admission in this and in the Mr. John, Inc. case, Michael Penrod, one of the two persons who actively negotiated the Agreement with SMC and was involved with organizing and establishing NBAC, is President of PMG;

- By PMG's own admission in this and in the Mr. John, Inc. case, Michael Penrod is Vice President of NBAC;

- By PMG's own admission in this and in the Mr. John, Inc. case, Mr. Register, the other person who actively negotiated and signed the Agreement with SMC and was involved with organizing, establishing and closing NBAC, is Executive Vice President of PMG;

- By PMG's own admission in this and in the Mr. John, Inc. case, Mr. Register is also General Counsel of PMG;

- By PMG's own admission in this and in the Mr. John, Inc. case, Mr. Register was also Vice President of NBAC;

- By PMG's own admission in this and in the Mr. John, Inc. case, on April 21, 2005, PMG – not NBAC – completed an application for credit with Mr. John, Inc., another vendor, who provided services at the NBAC bar, which provided that "[t]he undersigned hereby

applies for credit with Mr. John, Inc. and agrees to abide by its standard terms and conditions as printed below as to any presently outstanding or future account balances;"

- The Florida fax number on the credit application completed and submitted by PMG to Mr. John, Inc. for the NBAC bar is the same Florida fax number used by NBAC;

- The credit application completed and submitted by PMG to Mr. John, Inc. for the NBAC bar was signed by Penrod Management's internal accountant, and specifically referenced PMG's creditors and the corporate Bank of America account;

- Email communication among SMC (and other vendors) and officers and directors of PMG and allegedly NBAC were from PMG email addresses;

- On April 18, 2005, PMG – not NBAC – wired $50,000 to SMC from PMG's Bank of America corporate account;

- On April 22, 2005, PMG – not NBAC – wired $47,197.64 to SMC from PMG's Bank of America corporate account;

- On April 26, 2005, PMG – not NBAC – wired $17,700 from PMG's Bank of America corporate account to Mr. John, Inc.'s corporate account at Commerce Bank;

- PMG wire transferred funds to, or otherwise paid, vendors for NBAC's costs and expenses;

- SMC (among other vendors) sent invoices to Danielle Houser of PMG;

- Other vendors, including Mr. John, Inc., sent invoices to Mr. Register of PMG in Florida;

- On May 22, 2005, a representative of PMG – not NBAC – signed for the delivery of the Equipment at the NBAC bar, specifically indicating that the Equipment was "delivered, received and accepted by Timothy Hughes on behalf of [PMG] in satisfactory condition;"

- The Agreement is signed by Mr. Register in his apparent capacity as General Counsel to NBAC (he is also General Counsel to and Executive Vice President of PMG), yet the Agreement was faxed back to SMC from PMG's facsimile number;

- During the pendency of a civil action pending in the Superior Court of the State of New Jersey, Law Division, Middlesex County, under Docket Number MID-L-7951-05, Mr. Register of PMG wrote to the State of New Jersey to officially effectuate the closure of NBAC and rendered it judgment proof;

- Accepting as true Mr. Register's testimony regarding NBAC reimbursing PMG, it did so by preferring PMG over bona fide creditors such as SMC.

D.    PMG Closes NBAC

On or about June 30, 2006, Mr. Register directed the State of New Jersey to file closure papers for NBAC, and directed the State to send all documents to PMG. PMG effectuated the closure of NBAC *during the pendency of* the Mr. John, Inc. case, which involved the very same parties, claims and issues. PMG rendered NBAC judgment proof.

## CAUSES OF ACTION AND DEFENSES

On September 20, 2006, SMC recommenced this action by filing Demands for Arbitration against NBAC and PMG seeking damages related to the Agreement. SMC claims, among other things, that NBAC breached the Agreement. SMC further contends that the corporate veil should be pierced to compel PMG to pay the debts of NBAC. SMC contends that, over the course of negotiating and performing under the Agreement until breach, PMG exercised dominion and control over NBAC sufficient to justify a finding of alter ego status such that PMG should be declared a proper party to the currently stayed arbitration proceeding.

PMG denies liability, claims that it was not a party to the Agreement, that NBAC was a separate and distinct entity, and that it and NBAC are not the alter-egos of each other. Thus, PMG argues has no obligation to pay the outstanding debts owed to SMC.

## LEGAL ARGUMENT

## POINT I

## THE CORPORATE VEIL SHOULD BE PIERCED TO HOLD PMG LIABLE FOR THE OUTSTANDING BALANCE OWED TO SMC

A.    Choice of Law Issues

This action was commenced by PMG pursuant to an Order to Show Cause on November 28, 2007, to enjoin arbitration hearings against it, arguing that it should not be required to

arbitrate because it is a non-signatory to the Agreement, which contains a New York choice-of-law clause. This Court has jurisdiction over this controversy pursuant to 28 U.S.C. § 1332.

"A federal court sitting in diversity must apply the choice-of-law rules of the forum state, in this instance New York." Tri-State Employment Services, Inc. v. The Mountbatten Surety Co., Inc., 295 F.3d 256, 260 (2d Cir. 2002); see also Krauss v. Manhattan Life Ins. Co., 643 F.2d 98, 100 (2d Cir. 1991) (noting in action based on diversity jurisdiction, choice-of-law rules of forum state apply). Here, although a choice-of-law clause exists in the Agreement between SMC and NBAC, a New Jersey entity, PMG claims that it is not a party to the Agreement and presumably will argue that it is not bound by the choice-of-law clause. Like the Tri-State case, this Court, which sits in diversity, must therefore apply the choice-of-law principles of the State of New York because there are no conflicts among New York law, Florida law (where PMG is located), and New Jersey law (where NBAC was located).

Normally under New York choice of law principles, "[t]he law of the state of incorporation determines whether the corporate form will be disregarded. Fletcher v. Atex, Inc., 68 F.3d 1451, 1457 (2d Cir. 1995) (quoting Kalb, Voothis & Co. v. American Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993)). Although an unpublished decision from this District, Network Enterprises, Inc. v. APBA Offshore Productions, Inc., 2002 WL 31050846 (S.D.N.Y. 2002) is particularly instructive when resolving choice-of-law questions in cases involving piercing the corporate veil. In Network Enterprises, Inc., this Court recognized the principle that "[i]n New York, the determination of whether to pierce the corporate veil is governed by the law of the company's state of incorporation." 2002 WL 31050846 *3. This Court also noted that, "because [the defendant was] a Florida corporation New York would apply Florida law to the alter ego analysis *in the event of a conflict*." Id. (emphasis supplied). This Court found that the laws of

8

New York and Florida with respect to the alter ego analysis did not conflict and were "substantially the same." Id. This Court held that "[because] the consideration would be the same under either New York or Florida law, there is no true conflict and New York law will accordingly apply." Id.; see also Employers Ins. Co. of Wausau v. The Duplan Group, 899 F. Supp. 1112, 1118-19 (S.D.N.Y. 1995) (applying law of forum and rejecting contention that court must apply law of state with most significant contacts and interest because that analysis is used only when conflict exists between states' laws).

Here, PMG acknowledges that it is a Florida corporation. Petition, at ¶ 5 ("Petitioner [PMG] is a corporation organized under the laws of the State of Florida and maintains its principal place of business at 1 Ocean Drive, Miami Beach, Florida 33139). PMG also claims that NBAC was a separate and distinct New Jersey limited liability company. Because New Jersey and Florida law would apply only when the laws of those states and New York conflict, and because no conflict exists with respect the particular states' standards for piercing the corporate veil here, this Court should apply New York law. See Network Enterprises, Inc., 2002 WL 31050846 *3; Employers Ins. Co. of Wausau, 899 F. Supp. at 1118 ("The choice between the law of New York and that of another state is a consideration only where a *conflict* exists between New York and foreign law") (underline in original) (citing Zurich Insurance v. Shearson Lehman Hutton, 84 N.Y.2d 309, 315, 618 N.Y.S.2d 609, 611, 642 N.E.2d 1065, 1067 (1994) (where no conflict exists between the law of New York and that of another state concerning particular issue, no choice of law problem arises); Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 137 (2d Cir. 1991) (applying New York law to issue of piercing corporate veil because parties agreed to use New York law and Florida and New York standards were "virtually identical"); State of New Jersey v. Ventron Corp., 94 N.J. 475, 500

(1983) (holding to pierce corporate veil, courts must find "that the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent," and that the subsidiary was used "to perpetuate a fraud or injustice, or otherwise circumvent the law.")

B.    New York Standard for Piercing the Corporate Veil

In order to pierce corporate veil under New York law, a party must show "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." American Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997); see also Ventron Corp., 94 N.J. 475, 500 (1983) (holding to pierce corporate veil, courts must find "that the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent," and that the subsidiary was used "to perpetuate a fraud or injustice, or otherwise circumvent the law.")   "[C]ontrol, whether of the subsidiaries by the parent …, is the key; the control must be used to commit a … wrong that causes plaintiff's loss. Wm. Passalacqua Builders, Inc., 933 F.2d at 138 (citing Electronic Switching Indus., Inc. v. Faradyne Elec. Corp., 833 F.2d 418, 424 (2d Cir. 1987) (absent a showing that "control and domination was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act" New York law will not allow a piercing of the corporate veil).   "Liability may therefore be predicated … upon a showing of complete control by the dominating corporation that leads to a wrong against third parties." Id.  New York courts disregard the corporate form "when the … corporation has been so dominated by an individual or another corporation …, and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego." Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir. 1979).

SMC asserts that NBAC was dominated and controlled by PMG, and that NBAC was really the agent of PMG. To determine whether those assertions are correct, the trier of fact is entitled to consider factors that would tend to show that NBAC was a dominated corporation, such as: "(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of officers and directors, keeping of corporate records and the like; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlap in ownership, officers, directors and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the amount of business discretion displayed by the allegedly dominated corporation; (7) whether the related corporations deal with the dominated corporation at arms length; (8) whether the corporations are treated as independent profit centers; (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." Wm. Passalacqua Builders, Inc., 933 F.2d at 139.

Because "no one factor is determinative," Freeman v. Complex Computing Co., Inc., 119 F.3d 1044, 1053 (2d Cir. 1997), courts conduct a broad inquiry into the "totality of the facts." United States v. Funds Held ex rel. Wetterer, 210 F.3d 96, 106 (2d Cir. 2000). The fact finder "must decide whether – considering the totality of the evidence – the policy behind the presumption of corporate independence and limited shareholder liability – encouragement of business development – is outweighed by the policy justifying disregarding the corporate form – the need to protect those who deal with the corporation." Id. A consideration of those factors here will lead any trier-of-fact to the conclusion that NBAC is the alter ego of PMG. The evidence and testimony, and any reasonable inferences drawn therefrom, demonstrate:

11

C.    PMG Management Dominated and Controlled NBAC

    1.    Absence of Corporate Formalities; Establish and Maintain Corporate Indicia

Although a New Jersey Business Registration Certificate was obtained for NBAC, the evidence and testimony will show that NBAC was formed and dominated by PMG.  First, any entity that conducts business in the State of New Jersey must be incorporated and registered with the State's Department of Treasury, Division of Revenue, pursuant to the New Jersey Business Corporations Act, N.J.S.A. § 14A:1-1, et seq., and the New Jersey Limited Liability Act, N.J.S.A. § 42:2B-1, et seq.  That NBAC has a Business Registration Certificate is therefore of no moment to how it was actually operated.  Significantly, during the discovery period in arbitration, SMC requested information from NBAC and PMG regarding their formation and corporate structures.  Mr. Register indicated that no one would be appearing on behalf of NBAC, and therefore failed to respond to SMC's discovery requests.  Although PMG provided limited responses, it failed to produce any evidence to show that NBAC did things that legitimately operating companies do, such as issue corporate shares and/or stock certificates; conduct regular corporate meetings; operate pursuant to its own established By-Laws and operating agreement; elect corporate officers and directors other than PMG officers and directors; file a 2005 annual report; and apply for and secure its own lines of credit.  To the contrary, the evidence and testimony will show that NBAC never conducted its own corporate activity.

    2.    Undercapitalization of NBAC

The evidence and testimony will show that NBAC was severely undercapitalized from the outset.  Indeed, that fact is conceded by Mr. Register.  Register Dec., at ¶ 21.  The evidence and testimony will show that PMG, to induce SMC and others to provide services to NBAC, consummated several wire transfers totaling well-over $100,000 in furtherance of the Agreement

and other contracts with vendors.  In addition to the untold thousands of dollars of deposits paid by PMG to, among others, SMC, PMG used its own corporate account to pay for most if not all of NBAC's expenses including, but not limited to, the lighting equipment; wrist bands; safes; radios; kitchen supplies, dishes, and other expenses; and payroll and operating expenses.  Only when NBAC was about to become liable for the money owed vendors and suppliers was it rendered defunct, closed and abandoned at the will of PMG.

Rather than applying for or otherwise securing its own credit and/or working capital, PMG literally funded NBAC by, among other things, infusing NBAC with capital and making other capital contributions such as directly paying NBAC's creditors, like SMC.  Mr. Register attempts to brush aside the payments made by PMG on behalf NBAC by, for the first time, referring to them as "loans."  Register Dec., at ¶¶ 21, 26, 43.  Other than the undocumented testimony of Mr. Register, whose credibility is questionable because of his refusal to appear for a deposition in the Mr. John, Inc. case, characterization of PMG's payments, however, belies the facts and law, and presents possible additional tax consequences for the companies.  First, the only NBAC "balance sheet" produced by PMG fails to list PMG as a creditor of NBAC.  (PMG Exh., L).  Second, there is no evidence of interest charged by PMG to NBAC in contemplation of the "loan."  Third and perhaps most compelling, there is no evidence of the critical document that would evidence the loan, such as a loan agreement between PMG and NBAC.

       3.      Overlap in Ownership, Officers, Directors and Overall Blurring of Lines of Corporate Control and Responsibility

The evidence and testimony will show that NBAC and PMG essentially shared the same business address, email addresses and facsimile number; and officers, directors, and members.  Although PMG contends that NBAC was a separate and distinct entity, it was unmistakably anything but.

First, evidence produced by PMG during the discovery period in the arbitration and in other cases in this and other judicial districts, in addition to documents independently obtained by SMC during its investigation of this case, will reveal that the corporate address for NBAC and PMG and facsimile numbers were identical, namely 1 Ocean Drive, Miami Beach, Florida and (305) 534-7253. Mr. Register testifies that NBAC had its principal place of business in New Jersey, yet strangely failed to provide NBAC's address. Perhaps that is so because the evidence recently produced by PMG will show that the addresses listed on NBAC's incorporation papers and other documents as its "principal place of business" – 17 Gordon's Ally, Atlantic City, New Jersey, and 1133 Boardwalk, Atlantic City, New Jersey – are actually the respective addresses of Sandson & DeLucry, LLC, a law firm that was presumably responsible for marshalling NBAC's corporate papers through the State of New Jersey's Department of Treasury, Division of Revenue, and the Resorts Atlantic City casino and hotel. Indeed, not one true and actual New Jersey address ever existed for NBAC. Additionally, although the Agreement was signed on behalf of NBAC by Mr. Register (who also serves as PMG's General Counsel and Executive Vice President), the Agreement was faxed back to SMC from PMG's Florida facsimile number.

Second, it is undisputed that NBAC and PMG had overlapping ownership. PMG admitted here and in the Mr. John, Inc. case that the negotiation leading up to the execution of the Agreement were conducted by representatives of PMG, namely Messrs. Register and Penrod. Significantly, although Mr. Register now claims that Mr. Penrod "had no position with PMG[,]" Register Dec., at ¶ 42, that claim is directly contradicted by Mr. Register's representations in discovery responses in the Mr. John, Inc. case, and by the sworn deposition testimony of Mr. Penrod, who was produced by PMG for deposition, in that case. One would think that PMG would have objected to producing someone who "had no position" with it. The evidence and

testimony will show that decisions ranging from ordering glassware to negotiating and ultimately paying vendors, including SMC, was contemplated and discussed by Messrs. Register and Penrod, and then presented to and further discussed with Jack Penrod – the founder and sole shareholder of PMG and various underlying "Penrod" and "Nikki Beach" entities – for his input and ultimate decision. Indeed, all of those people are tied to PMG and NBAC.

Furthermore, Mr. Register testifies that NBAC was evaluated and it was determined that it could not succeed. Register Dec., at ¶ 36. Although curiously absent from Mr. Register's testimony is who evaluated and determined NBAC's future, it is clear that it was the same people who started it. Indeed, NBAC's own incorporation papers acknowledge that it would be and was managed by PMG. (PMG Exh., A(a)). It was only after PMG realized that its business plan for a "Nikki Beach" bar in Atlantic City would not succeed that it stopped paying vendors and suppliers, abandoned the project and retreated to Florida, officially closed and de-registered NBAC, and began to hide behind corporate formalities in an attempt to avoid each and every vendor-and-supplier-turned-creditor (yet somehow manage to "reimburse" itself from NBAC's coffers). The corporate structure here hardly suggests that NBAC operated as a truly separate, independent and distinct entity that was free from PMG's influence and control.

4.     Financial Transactions Reveal Intermingling

As previously indicated, NBAC did not apply for or secure its own credit or business loans. Even Mr. Register acknowledges that NBAC was capitalized by PMG. Register Dec., at ¶ 36. Rather than securing its own funding and capital, beginning as early as January 2005 – two months before NBAC was even formed, incorporated and registered in the State of New Jersey – PMG, by and through Messrs. Register and Penrod, negotiated contracts with vendors and suppliers. The evidence and testimony will show that PMG used its own funds to induce those

vendors and suppliers to provide services by consummating hundreds-of-thousands-of-dollars directly to those vendors and suppliers, including SMC. Although Mr. Register now, for the first time, characterizes PMG's payments to NBAC as "loans," the absence of a loan agreement between those entities is telling. between PMG and NBAC, invoices from PMG to NBAC, or some records evidencing proof of the loan obligation, PMG fails to demonstrate a bona fide debt and correspondingly its status as a bona fide creditor who should have been paid before anyone else. Furthermore, the "balance sheet" produced by PMG shows that NBAC and Penrod's Elbo Room, a casual restaurant, shared sales.

     5.     The Amount of Business Discretion Displayed by the Allegedly Dominated Corporation and Whether PMG Dealt with NBAC at Arm's Length

The phrase "arm's-length" means "[o]f or relating to dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential relationship." BLACK'S LAW DICTIONARY 102 (7th ed. 1999). According to that definition, an arm's-length transaction contemplates parties who act independently and have no relationship to each other. Here, however, the evidence and testimony will show that the discretion that was exercised was ultimately that of PMG.

The decisions to open, operate, and close were made by PMG representatives who became NBAC "representatives" only after NBAC was formed by PMG. The decision to pay vendors and suppliers was made by officers, directors and members of NBAC who were also officers, directors and members of PMG. The orchestration of NBAC's alleged "reimbursement" of the wire transfers that PMG made to SMC, if true, were made by officers, directors and members of NBAC who were also officers, directors and members of PMG. Even NBAC's incorporation papers acknowledged that NBAC's managing member was none other than PMG. Indeed, without PMG, NBAC was paralyzed and could not function. Based on the

16

foregoing, it is therefore undisputed that NBAC did not and could not exercise business discretion separate and distinct from PMG.

6.    Whether the Corporations are Treated as Independent Profit Centers

As previously indicated, the evidence and testimony will show that Penrod Management funded NBAC, and that PMG consummated wire transfers on NBAC's behalf in furtherance of the Agreement and other contracts with vendors. Furthermore, the "balance sheet" produced by PMG shows that NBAC and Penrod's Elbo Room, a casual restaurant, shared sales. Importantly, however, PMG failed to produce any evidence during the course of arbitration discovery to demonstrate that NBAC was a separate and distinct profit center; PMG failed to produce, among other documents, tax returns and financial statements, and bank account information and ledgers despite the AAA granting SMC's cross-motion to compel production of documents listed in SMC's document demands. Naturally, had those and other documents been favorable to PMG, then they would certainly have been produced.

7.    The Payment or Guarantee of Debts of the Dominated Corporation by Other Corporations in the Group

As previously indicated, the evidence and testimony will show that PMG funded NBAC, and that PMG consummated wire transfers on NBAC's behalf. As Mr. Register admits, PMG's capital contributions went to settle and pay NBAC's debts and liabilities. Register Dec., ¶ 37. Furthermore, despite arguing otherwise in the Mr. John, Inc. case, Mr. Register now acknowledges that PMG guaranteed debts owed to Mr. John. Register Dec., ¶ 25.

D.    SMC Suffered A Harm As A Result of PMG's Dominion and Control Over NBAC

The veil piercing standard in New York also requires the showing that PMG's domination resulted in a fraud or wrong that injured the party seeking to pierce the corporate

veil.  Cary Oil Co., Inc. v. MG Refining & Marketing, Inc., 230 F. Supp. 2d 439, 458 (S.D.N.Y. 2002).  Numerous "wrongs" that are present here have been found to satisfy this factor.

      1.     Breach of Contract

      For purposes of the second piercing prong, courts have found sufficient evasion and nullification of contractual responsibilities.  See Cary Oil Co., Inc., 230 F. Supp. 2d at 460 (holding jury could conclude that plan was devised to nullify parent's obligation to perform under contracts); see also Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Int'l, Inc., 758 F. Supp. 908, 918 (S.D.N.Y. 1991) (noting parents causing subsidiaries to breach contracts is valid veil-piercing theory).

      Here, the evidence and testimony will show that despite having negotiated the Agreement for months before its execution and wire transferring payments to SMC in furtherance of its performance, PMG instructed SMC to list NBAC as the contracting party in April 2005.  The evidence and testimony will further show that, after SMC stopped receiving payments from PMG, it likewise did not receive payments from NBAC sufficient to cover its invoices.  Indeed, although PMG paid almost $100,000 in furtherance of the Agreement, it has done nothing but abandon its responsibilities, effectuate the closure of NBAC, and hide behind a maze of corporate structures yet point to NBAC as the responsible defaulting but defunct party.

      2.     Rendering Subsidiary Judgment Proof

      In addition, courts have found "a classic example" of the wrong prong a parent rendering a subsidiary judgment proof.  See Sahu v. Union Carbide Corp., 2006 WL 3377577 (S.D.N.Y. Nov. 20, 2006) ("[a] classic example of conduct in satisfaction of the fraud prong is the stripping of assets of the subsidiary corporation by the parent to render the subsidiary judgment proof."); see also Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Int'l, Inc., 758 F. Supp. 908, 918

(S.D.N.Y. 1991) (noting that asset-stripping is valid veil-piercing theory); <u>Oil Trading Ltd. v. Interpetrol Bermuda Ltd.</u>, 774 F. Supp. 840, 847 (S.D.N.Y. 1991) ("It is clear that proof of a stripping of the assets of the subsidiary by the parent, motivated by a desire to render the subsidiary judgment proof, would constitute a fraud or wrong justifying piercing the corporate veil.") (quotations omitted).

Here, it is undisputed that PMG effectuated the closure of NBAC. Significantly, that closure was effectuated during the pendency of a case pending in the Superior Court of the State of New Jersey, Law Division, Middlesex County, under Docket Number MID-L-7951-05, and within a mere ten days after the initial arbitration of this matter was administratively terminated because of NBAC's refusal to pay AAA fees. Indeed, the evidence and testimony will reveal that PMG requested the State of New Jersey to officially close NBAC on July 10, 2006. The <u>Mr. John, Inc.</u> case, however, was commenced on November 4, 2005, and remained pending until it settled in or about July 2007, yet during that case, PMG rendered NBAC judgment proof.

3.    <u>Preferential or Otherwise Fraudulent Transfer to Creditor</u>

Finally, under both New York and New Jersey law, equally sufficient are situations when directors of a failing company breach their quasi-duty to bona fide creditors and prefer to repay themselves over those bona fide creditors. <u>See</u> <u>I/M/O of EAC of New York v. Capri 4000, Inc.</u>, 853 N.Y.S.2d 419, 421 (N.Y.A.D. 3d Dep't 2008) (holding that piercing justified where "preferential transfers of corporate funds to directors, officers or shareholders of a corporation that is, or later becomes, insolvent, in derogation of the rights of general creditors."); <u>P.A. Building Co. v. Silverman</u>, 298 A.D.2d 327, 328 (holding that even if shareholder demonstrated that transfer equaled value of loan, transfer nevertheless invalid because preferential to detriment of other creditors); <u>Gilchinsky v. Naional Westminster Bank N.J.</u>, 159 N.J. 463 (interpreting

New Jersey's fraudulent transfer statute); Kiernan v. Davis, 132 N.J. Eq. 245, 247 (Ch. Div. 1942) (interpreting New Jersey's preference statute and noting officers and directors may not prefer certain creditors over others).

Here, Mr. Register surprisingly reveals that NBAC "reimbursed" PMG for the initial payments that PMG made to SMC.  Register Dec., ¶¶ 21, 26, 43.  Interestingly, throughout the course of discovery, PMG never produced a loan document or any other document evidencing a loan made by it to NBAC and the corresponding repayment thereof.  Naturally, in the absence of a loan agreement between PMG and NBAC, invoices from PMG to NBAC, or some records evidencing proof of the alleged loan obligation, PMG fails to demonstrate a bona fide debt and correspondingly its status as a bona fide creditor who should have been paid before anyone else. Yet here, PMG apparently secured for itself, by and though its officers and directors who also served as officers and directors of NBAC, reimbursement of the capital contributions that it provided to SMC on behalf of NBAC before any bona fide, disinterested and disconnected creditor, such as SMC, received payment.  The transaction by which NBAC allegedly reimbursed PMG was preferential and fraudulent because NBAC at the time of the payment was either insolvent or its insolvency was imminent.  Register Dec., ¶ 19.  Mr. Register's testimony reveals preferential self-dealing, and provides the basis for SMC's latest statutory cause of action against PMG that is simultaneously being prepared with this trial brief and accompanying in limine motions, and will be momentarily filed.

## CONCLUSION

The undisputed facts, and all inferences therefrom, lead any reasonable fact-finder to the inescapable conclusion that NBAC was controlled and dominated by PMG.  As previously demonstrated, NBAC's officers, directors, general counsel and sole shareholder were the same as

PMG's, which allowed PMG to control every aspect of NBAC's business. The entities shared the same address, email address, and facsimile number. NBAC did not control its own finances. PMG – not NBAC – wire transferred $97,197.64 to SMC, and additional funds to other vendors and suppliers in contemplation of those entities delivering their products and services. PMG used its own corporate account to pay for other hard and soft costs and operating expenses associated with and incurred by NBAC. Moreover, PMG orchestrated its apparent reimbursement from NBAC by granting to itself a priority position over other disinterested creditors. Only when NBAC was about to become liable for the money owed to SMC and other creditors was it rendered defunct and abandoned at the will of PMG. PMG's decision to render NBAC defunct obliterated SMC's right to the money owed to it for the rental of the Equipment.

In addition to the foregoing, the evidence and testimony will demonstrate that, despite PMG's defense in this case, at no time did it ever (1) inform SMC or other vendors that SMC and the other creditors were sending invoices, and default and demand letters to the wrong party; (2) inform SMC that PMG was not responsible for the outstanding debt; or (3) instruct SMC to send the invoices and letters to NBAC in New Jersey. The evidence and testimony will show that PM did just the opposite. Perhaps more importantly, when SMC requested information and documents from PMG that substantiated PMG's defense during the fourteen month arbitration proceeding, it produced nothing more than the Agreement at issue and registration and other certificates for NBAC despite being compelled by arbitrator order to produce documents requested by SMC regarding the alter-ego issue. It can obviously be presumed that if those documents were favorable and actually supported PMG's position, then PMG would have undertaken every effort to expeditiously produce them.

The contractual relationship between SMC and NBAC and, by extension, PMG, entitles SMC to expect that NBAC would not be put out of business by PMG at its whim simply by altering legal identities and rendering NBAC insolvent for the explicit purpose of preventing SMC from collecting payment on the Agreement and subsequent judgments. Put simply, there was a promise, delivery and provision of services, and a resulting breach. Accordingly, SMC has established that it will succeed on its alter ego theory against PMG because the level of control exercised by PMG over NBAC was substantial and demonstrates sufficient domination to justify piercing the corporate veil.

For the reasons set forth herein, a reasonable fact-finder should find in favor of SMC and against PMG. Specifically, this Court should declare that PMG is the alter ego of NBAC and direct the parties to this matter to proceed to the damages portion of the arbitration hearing, which has been held in abeyance until this Court resolves the alter ego issue. Judgment on the issue of alter ego should therefore be entered in favor of SMC and against PMG.

McELROY, DEUTSCH, MULVANEY & CARPENTER LLP
Attorneys for Respondent-Defendant,
Stewart's Mobile Concepts, Ltd.

Date: June 3, 2007          By: _____
Richard S. Mills
Ryan P. Mulvaney
88 Pine Street
24th Floor
New York, New York 10005
Telephone: (212) 483-9490
Facsimile: (212) 483-9129

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 3, 2008, I caused to be served the trial brief of Defendant-Respondent, Stewart's Mobile Concepts, Ltd., the certification of counsel, and this Certificate of Service on all counsel of record and the Clerk of Court via electronic filing.

McELROY, DEUTSCH, MULVANEY & CARPENTER LLP
Attorneys for Respondent-Defendant,
Stewart's Mobile Concepts, Ltd.

Date: June 3, 2007         By: _____

Richard S. Mills
Ryan P. Mulvaney
88 Pine Street
24th Floor
New York, New York 10005
Telephone: (212) 483-9490
Facsimile: (212) 483-9129