McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
88 Pine Street
24th Floor
New York, New York
Telephone: (212) 483-9490
Facsimile: (212) 483-9129
Attorneys for Defendant-Respondent,
Stewart's Mobile Concepts, Ltd.

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PENROD MANAGEMENT GROUP, INC., | : Civil Action No. 07-10649 (JGK/DFE) |
| Plaintiff-Petitioner, | : **CERTIFICATION OF COUNSEL IN OPPOSITION TO THE MOTION IN LIMINE BY PLAINTIFF-PETITIONER, PENROD MANAGEMENT GROUP, INC., TO QUASH THE TRIAL SUBPOENA ISSUED TO JACK PENROD, AND IN SUPPORT OF THE REQUEST BY DEFENDANT-RESPONDENT, STEWART'S MOBILE CONCEPTS, LTD., FOR AN ADVERSE INFERENCE** |
| v. | : |
| STEWART'S MOBILE CONCEPTS, LTD., | : |
| Defendant-Respondent. | : |

I, RYAN P. MULVANEY, hereby declare, under penalty of perjury as follows:

1.     I am an attorney-at-law of the State of New Jersey, am admitted <u>pro hac vice</u> in this Court for purposes of this matter, and am associated with the Newark and Morristown offices of the law firm of McElroy, Deutsch, Mulvaney & Carpenter, LLP. I am one of the attorneys responsible for handling this matter of behalf of Defendant-Respondent, Stewart's Mobile Concepts, Ltd. ("SMC"), and, as such I have personal knowledge of the facts set forth herein.

2.     I make this certification in opposition to the motion <u>in limine</u> by Plaintiff-Petitioner, Penrod Management Group, Inc. ("PMG"), to quash to the trial subpoena

issued to Jack Penrod, and in support of SMC's request for the imposition of an adverse inference for PMG's failure to produce Jack Penrod.

3.      Attached hereto as Exhibit "A" is a true and accurate copy of a June 24, 2004, email string from Michael Register to Jack Penrod and Michael Penrod, which was produced by PMG in the matter captioned Mr. John, Inc. v. Nikki Beach Atlantic City LLC and Penrod Management Group, which was pending in the Superior Court of the State of New Jersey, Law Division, Middlesex County, under Docket No. MID-L-7951-05.

4.      Attached hereto is Exhibit "B" is a true and accurate copy of an email dated September 8, 2004, from Mike Penrod to Michael Register and Jack Penrod, which was produced by PMG in the matter captioned Mr. John, Inc. v. Nikki Beach Atlantic City LLC and Penrod Management Group, which was pending in the Superior Court of the State of New Jersey, Law Division, Middlesex County, under Docket No. MID-L-7951-05.

5.      Attached hereto is Exhibit "C" is a true and accurate copy of an email from Mark Lefever of Resorts International to Jack Penrod, Michael Penrod, Michael Register, Sophia Sas and Bruce Hanrahan, all from PMG.

6.      Attached hereto is Exhibit "D" are true and accurate copies of news articles in which Jack Penrod was quoted regarding the formation and opening of NBAC.

7.      Attached hereto is Exhibit "E" is the May 5, 2008, Direct Examination Affidavit of Keith Futherman.

8.      Attached hereto as Exhibit "F" is a true and accurate copy of an email from Keith Futherman to Michael Register dated June 28, 2005, regarding Mr. Register's

conversation with Jack Penrod and Michael Penrod regarding the outstanding balances owed to SMC.

9.    Attached hereto is Exhibit "G" are true and accurate copies of listings of the Florida Department of State's website, and assorted filings therewith, by PMG.

10.    Attached hereto as Exhibit "H" is a true and accurate copy of incorporation documents from NBAC reflecting that PMG is the managing member of NBAC.

11.    Attached hereto as Exhibit "I" are true and accurate copies of listings of the Florida Department of State's website, and assorted filings therewith by, Penrod Management Company.

12.    Attached hereto as Exhibit "J" are true and accurate copies of listings of the Florida Department of State's website, and assorted filings therewith by, Penrod Management International, LLC.

13.    Attached hereto as Exhibit "K" are true and accurate copies of listings of the Florida Department of State's website, and assorted filings therewith, by Penrod Property Management, Inc.

14.    Attached hereto as Exhibit "L" are true and accurate copies of listings of the Florida Department of State's website, and assorted filings therewith by, Nikki Marina, LLC.

15.    Attached hereto as Exhibit "M" are true and accurate copies of listings of the Florida Department of State's website, and assorted filings therewith by, Nikki Beach Club.

16.    Attached hereto as Exhibit "N" are true and accurate copies of listings of the Florida Department of State's website, and assorted filings therewith by Nikki Beach At Sea, LLC.

17.    Attached hereto as Exhibit "O" are true and accurate copies of listings of the Florida Department of State's website, and assorted filings therewith by Nikki Beach Music, LLC.

18.    Attached hereto as Exhibit "P" are true and accurate copies of listings of the Florida Department of State's website, and assorted filings therewith by Nikki Beach Publishing, LLC.

19.    Attached hereto as Exhibit "Q" are true and accurate copies of listings of the Florida Department of State's website, and assorted filings therewith by Nikki Beach Holdings, LLC.

20.    Attached hereto as Exhibit "R" is a true and accurate copy of the Declaration of Nathan A. Goldberg, Esq., which was filed with this Court in a matter captioned 2005 Florida Festival, LLC v. Nikki VIP, LLC and Penrod Management Group, Inc., which was pending under Civil Action No. 05-6856.

21.    Attached hereto as Exhibit "S" is a true and accurate copy of a deposition transcript of Michael Penrod, which was taken in a matter captioned Mr. John Inc. v. Nikki Beach Atlantic City LLC and Penrod Management Group.

22.    Attached hereto as Exhibit "T" is a true and accurate copy of an article regarding the opening of a Nikki Beach entity in the Middle East.

23.     Attached hereto as Exhibit "U" is a true and accurate copy of <u>Mugno v. Societe Internationale De Telecommunications Aeronautiques, Ltd.</u>, No. 05-cv-2037, 2007 WL 316573 (E.D.N.Y. Jan. 30, 2007).

24.     Attached hereto as Exhibit "V" is a true and accurate copy of <u>Yearwood v. LoPiccolo</u>, No. 95-cv-2544, 1998 WL 474073 (S.D.N.Y. Aug. 10, 1998).

25.     Attached hereto as Exhibit "W" is a true and accurate copy of <u>Sterling Fifth Associates v. Carpentile Corp., Inc.</u>, No. 03-cv-6569, 2003 WL 22227960 (S.D.N.Y. Sept. 26, 2003).

26.     Attached hereto as Exhibit "X" is a true and accurate copy of <u>Treppel v. Biovail Corp.</u>, Civ. A. No. 03-3002, 2006 WL 468314 (S.D.N.Y. 2006).

27.     Attached hereto as Exhibit "Y" is a true and accurate copy of <u>Consolidated Rail Corp. v. Primary Industries Corp.</u>, Civ. A. No. 92-4927, 1993 WL 364471 (S.D.N.Y. 1993).

28.     Attached hereto as Exhibit "Z" is a true and accurate copy of <u>St. Paul Fire & Marine Ins. Co. v. Royal Ins. Co. of America</u>, No. 91-6151, 1993 WL 267347 (S.D.N.Y. 1993).

I hereby certify and declare under penalty and perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.  I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

_____
Ryan P. Mulvaney

Dated: June 13, 2008

5

# Exhibit A

**From:**          Mike Penrod [Mike@Penrods.com]
**Sent:**          Thursday, June 24, 2004 11:51 AM
**To:**            'Michael Register'
**Subject:**       RE: new status

I would say;
1. Yes
2. No
2. No

But that is me.


Mike Penrod
1 Ocean Drive
Miami Beach, FL 33139
Mike@penrods.com
1-954-854-3308 US Cellular
1-305-675-7656 eFax

-----Original Message-----
From: Michael Register [mailto:michael@penrods.com]
Sent: Thursday, June 24, 2004 11:28 AM
To: jack@penrods.com; 'Mike Penrod'
Subject: new status

Scott called me right after I sent out the previous e-mail to both of you.
He said they would remove the interest (8%) but wanted to keep the seven percent rent
clause. Note that the minimum rent is approximately $30,000 per month.

Thus, the three issues now outstanding are:

1. Can we agree to seven percent (7%) rent?
2. Can we agree to the management fee structure (if net profits below eight percent (8%)
of gross then two percent; if between eight percent (8%) and zero percent (0%) then two
percent management fee; and if losses no management fee -- all measured over a year)?
3. Are we willing to make a $250,000 contribution?

Let me know your thoughts on these so I can get back to Scott.

Michael Register
Nikki Beach
One Ocean Drive
Miami Beach, Florida  33139
305-608-3522

1

Penrod 000018

# Exhibit B

**From:**  Mike Penrod [mike@penrods.com]
**Sent:**  Wednesday, September 08, 2004 12:14 PM
**To:**  'Michael Register'; frankm@penrods.com
**Cc:**  'Jack Penrod'; mike@penrods.com
**Subject:** Opening Expense

Here are most of the opening expenses that I could think about. Please add any additional items so we can create a master list we use going forward.

Design & Conceptual

1. Sketches & Design fees
2. Drawings
3. 3rd party billable time
4. Purchasing of samples or products
5. Travel
6. Housing
7. Meals

Soft Costs

1. Hiring
2. Training
3. Travel
4. Housing
5. Meals
6. Uniforms
7. Field Marketing (visiting surrounding cities and clubs)
8. Pre-opening Marketing (supplies, materials, 3rd party placement, graphical design, web development)
9. Party decorations & supplies
10. Pre-opening parties (VIPs, city officials, concierge, press)
11. Music (CDs and Vinyl)
12. Entertainment costumes & props
13. Grand Opening Event (entertainers, celebrities, travel, housing)
14. Licenses & permits
15. Office space or rental
16. Opening collateral (menus, matches, chop sticks covers, signage, press and marketing kits)

Hard Cost

1. Computers (office, music, management)
2. Registers (POS)
3. Music Equipment & Sound
4. lighting
5. Club Lighting & equipment
6. furniture
7. bar equipment (coolers, ice-wells, mixers, soda machines)
8. kitchen equipment (coolers, ovens, fryers)

Penrod 000016

9. small equipment (plates, knives, forks, pots, pans, mixers))
10. glassware
11. Door & VIP equipment (velvet ropes, stamps, bracelets, lights, walkie-talkie)

Opening Inventory

1. Liquor
2. Beer & Wine
3. Food
4. Paper & Plastic
5. Office Supplies
6. Kitchen Supplies (spices, misc)
7. Restaurant Supplies (condiments, misc)
8. Bar Supplies (mixers, flavoring, flags)
9. Cleaning Supplies
10. Dry goods

**Mike Penrod**
1 Ocean Drive
Miami Beach Florida, 33139
+1-954-854-3308 Direct
Mike@Penrods.com
www.nikkibeach.com

Penrod 000017

3/23/2006

# Exhibit C

| From: | Mark.Lefever [Mark.Lefever@ResortsINT.com] |
| Sent: | Wednesday, June 29, 2005 9:35 AM |
| To: | mike@penrods.com; sophia@penrods.com; michael@penrods.com; Laura.Palazzo; jack@penrods.com; bruceh@penrods.com |
| Cc: | Andrew.Barth; Linda.Chatman; Audrey.Oswell |
| Subject: | RE: Nikki drops |

Mike

We do have some concerns with this method, especially with the regulatory requirements we need to follow.  This change places a risk on accountability on both sides with only one person verifying the cash.

I recommend Andrew Barth, Linda Chatman and Sophia meet to  discuss these procedures as soon as possible to work out some options, which we hope to minimize risks and time.

Your thoughts

Mark

-----Original Message-----
From: Mike Penrod [mailto:mike@penrods.com]
Sent: Sunday, June 26, 2005 3:49 AM
To: sophia@penrods.com; michael@penrods.com; Laura.Palazzo;
Mark.Lefever; jack@penrods.com; bruceh@penrods.com
Subject: Nikki drops

I want the end of night closing procedures from tonight on to be like I instructed.

I want blind drops from our registers with bank and register names. The tapes will be in managers drops for next day audit. I will not let my managment be tied up until 7 am next day, when they open at 11 am on the

day before.

We need a check and balance.  The best way is you not knowing what each bank should be and us not knowing what is in each bank rang.

The way you do it now is my managers give yiu everthing and wait all night
until your done.

This will start tonight! If you don't agree call me any time
19548543308.

Please excuse any mistakes, this was sent from my cell phone.

Mike Penrod
1 Ocean Drive
Miami Beach, FL 33139
mike@penrods.com

Penrod 000015

# Exhibit D



# CityAtlantic.com

*The Atlantic City You Always Wanted*

Home   Atlantic City Casinos   Hotels   Shows   Dining   Nightlife   Golf   Transportation   Attractions

Search [        ] **GO**

**Ultra-Luxe Living in Atlantic City**
888.653.4135

Arrival Date: Jun ▾ 9 ▾ 08 ▾   Nights: 2 ▾   Adults: 2 ▾   Beds: 2 ▾

**Click here for Hotel Rates**




- Home
- Casinos
- Hotels
- Entertainment
- Dining
- Nightlife
- Golf
- Transportation
- Attractions
- Features
- Recreation
- Shopping
- Movies
- Conventions

**Bachelor Parties**



Atlantic City is a tremendously popular place to have a bachelor party. There aren't too

## Nikki Beach Redefines Resorts

This summer, what London's *Observer* deems the "Sexiest Party on Earth" will make its way to Resorts Atlantic City.

### Sexiest Party on Earth

Resorts Atlantic City and Nikki Beach announced today that they have reached an agreement to open Nikki Beach Atlantic City as well as a Penrod's Elbo Room, a multi-tiered beach bar, restaurant, lounge and entertainment complex with an architectural design and attitude that will redefine the boardwalk.



### New Beach Bar Concept For Atlantic City

"With Nikki Beach, we're redefining the concept of a beach bar in Atlantic City," said Audrey Oswell, President and Chief Executive Officer of Resorts Atlantic City. "Nikki Beach is known world-wide as the hot spot for those with a taste for sophistication and style. Those who want more than the typical Atlantic City beach bar experience will love Nikki Beach."

With venues in South Beach, Miami; St. Tropez; St. Barths;

**Featured Article:**

**Live Music In AC**



Live music in Atlantic City hasn't been this good since the days when Sinatra and the Rat Pack wooed audiences at the famous 500 Club that stood on .... ▸ more

**Todays Weather**



Mon–06/09
High: **41°F**
Low: **34°F**
Intermittant Clouds

**Excellent Room Rates**
~$59
Stay & Play at
Showboat Atlantic City.
Limited time rate of $59!
www.ShowboatAtlanticCity.

Ads by Google

**Join Newsletter:**

many other places where you'll find gambling, the beach, golf, great dining and a wild nightlife all in the same area... **› more**

Marbella; Puerto Vallarta; Hollywood, FL; Buzio, Brazil and Sardinia, Nikki Beach brings its European style vibe to each of its locations, creating a haven for celebrities and industry high rollers looking for paradise on earth. Besides the atmosphere and signature Mojitos and Champagne, guests will enjoy haute cuisine for lunch, dinner, Sunday brunch or during fashion shows, model searches and special VIP events.

## Summer Concerts in the Sand

Penrod's Elbo Room, known as the oldest bar in Ft. Lauderdale built in 1938, will bring its rock and roll edge to the mix as well. Immortalized in beach party classics such as "Where the Boys Are," this second location will hold a 50,000-square-foot entertainment complex for summer concerts in the sand.

## Nikki Beach Lifestyle Fits in Atlantic City

"We traveled for many years visiting famous beaches around the world to find that special recipe that now makes Nikki Beach the ultimate beach club in the world" recounts Jack Penrod, owner of the Nikki Beach organization. "Even though we are in six different countries, we maintain our unique style, a kind of global culture. We are very excited to bring the Nikki Beach lifestyle to this beach and contribute to the development of Atlantic City."

Nikki Beach's wingspan includes Nikki Clothing, launching a brand new line this Spring 2005, *Nikki Style*, a national bimonthly fashion and lifestyle magazine, Nikki Music, releasing its third volume this February 2005, and also Nikki Marina, rising up as the hottest place to park your yacht in Ft. Lauderdale.

More information on Nikki Beach is available on line at www.nikkibeach.com.

Copyright CityAtlantic.com 2006-2008, all right reserved
Advertise with us   Contact Us

Atlantic City Hotels I Atlantic City Casinos I Atlantic City Dining
Atlantic City Golf I Atlantic City Nightlife

- Access to VIP Parties
- Discounted Rooms
- The Scoop on AC

Email: [                    ]

[ Join Newsletter ]

## Features:

### Atlantic City Idols



It's in you, and sooner or later it's going to come out. Doing it in the shower isn't enough. Doing it in the car is great, but eventually you're going.... **› more**

### Hail To The Chief

If ever a sandwich-maker could become the leader of the free world, he would most certainly be doing his thing from the White House. The White House Sub Shop.. **› more**

Resorts Casino Nikki Beach                                                    Page 1 of 2



**Home   Atlantic City Casinos   Chat   Forum   Gambling   Entertainment   A C Reservations   Site Map**

Add Atlanticcityone to your
Favorite

**Atlantic City Hotel
and Motel
Reservations**

  
FLIGHTS        CARS

Surf The Site
Atlantic City New
Jersey
Casinos and
Gambling
Atlantic City Casino
Directory

Atlantic City Dining Review

Atlantic City Casino
Entertainment

Atlantic City Casino
Promos/Tournament

Atlantic City Casino
Reservations

Atlantic City One Forum

**Gambling**
Gambler's Book Shelf
Casino Comps
Casino Tipping

Atlantic City New
Jersey
AC Attractions
Casino employment
FAQ
Health Care
Links
Non Casino Reservations

# Resorts Atlantic City to transform its beachfront into the "Sexiest Party on Earth" with Nikki Beach, Summer 2005

Atlantic City, NJ - This summer, what London's Observer deems the "Sexiest Party on Earth" will make its way to Resorts Atlantic City. Resorts Atlantic City and Nikki Beach announced today that they have reached an agreement to open NIKKI BEACH ATLANTIC CITY as well as a PENROD'S ELBO ROOM, a multi-tiered beach bar, restaurant, lounge and entertainment complex with an architectural design and attitude that will redefine the boardwalk.

"With Nikki Beach, we're redefining the concept of a beach bar in Atlantic City," said Audrey Oswell, President and Chief Executive Officer of Resorts Atlantic City. "Nikki Beach is known world-wide as the hot spot for those with a taste for sophistication and style. Those who want more than the typical Atlantic City beach bar experience will love Nikki Beach."

With venues in South Beach, Miami; St. Tropez; St. Barths; Marbella; Puerto Vallarta; Hollywood, FL; Buzio, Brazil and Sardinia, Nikki Beach brings its European style vibe to each of its locations, creating a haven for celebrities and industry high rollers looking for paradise on earth. Besides the atmosphere and signature Mojitos and Champagne, guests will enjoy haute cuisine for lunch, dinner, Sunday brunch or during fashion shows, model searches and special VIP events.

Penrod's Elbo Room, known as the oldest bar in Ft. Lauderdale built in 1938, will bring its rock and roll edge to the mix as well. Immortalized in beach party classics such as "Where the Boys Are," this second location will hold a 50,000-square-foot entertainment complex for summer concerts in the sand.

"We traveled for many years visiting famous beaches around the world to find that special recipe that now makes Nikki Beach the ultimate beach club in the world" recounts Jack Penrod, owner of the Nikki Beach organization. "Even though we are in six different countries, we maintain our unique style, a kind of global culture. We are very excited to bring the Nikki Beach lifestyle to this beach and contribute to the development of Atlantic City."

Resorts Casino Nikki Beach

**Quick Reservations**
**RV Parks**

**Reservations Near City's**
**With With Casinos**
**· Nation Wide Hotel**
**Reservations By City And**
**State**
**Vegas Reservations**

**Road Trips**
**Get in the car and hit the**
**road this weekend! With a**
**Road Trips search, you can**
**find great destinations and**
**fantastic deals just a short**
**drive from where you are.**

**Order American Casino**
**Guide 2005**
**Today for great money-**
**saving casino coupons. 30%**
**off retail**

**New Sports Packages**
**College and Super bowl**
**Packages**
**Golf Packages**
**Basketball Packages**
**More Nascar Packages**

**Going To Vegas?**
**Book Everything**
**Vegas!**
**• Las Vegas Golf Tee**
**Time**
**• Las Vegas Show**
**• Las Vegas Dining**
**• Las Vegas Wedding**
**• Las Vegas Hotel**

Nikki Beach's wingspan includes Nikki Clothing, launching a brand new line this Spring 2005, Nikki Style, a national bimonthly fashion and lifestyle magazine, Nikki Music, releasing its third volume this February 2005, and also Nikki Marina, rising up as the hottest place to park your yacht in Ft. Lauderdale.

More information on Nikki Beach is available on line at www.nikkibeach.com .

**Advertise With Us    Privacy Policy   About Us**
[Home]  [Casinos]  [Chat]   [Forum]   [Gambling]    [Entertainment]   [A C Reservations]      [Site Map]
**Copyright Cuthbertson Media Group 2001-2005**

# Exhibit E

McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
88 Pine Street
24th Floor
New York, New York
Telephone: (212) 483-9490
Facsimile: (212) 483-9129
Attorneys for Defendant-Respondent,
Stewart's Mobile Concepts, Ltd.

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PENROD MANAGEMENT GROUP, INC., | Civil Action No. 07-10649 (JGK/DFE) |
| Plaintiff-Petitioner, | |
| v. | DIRECT EXAMINATION AFFIDAVIT OF KEITH FUTERMAN IN SUPPORT OF DEFENDANT-RESPONDENT, STEWART'S MOBILE CONCEPTS, LTD. |
| STEWART'S MOBILE CONCEPTS, LTD., | |
| Defendant-Respondent. | |

STATE OF NEW YORK       )
                        ) ss
COUNTY OF SUFFOLK       )

I, Keith Futerman, being duly sworn, deposes and says:

1.    I am the Director of Sales for Defendant-Respondent Stewart's Mobile Concepts, Ltd. ("SMC") and, as such, I have personal knowledge of the facts set forth herein.    I provide this affidavit in lieu of direct testimony in support of Defendant-Respondent Stewart's Mobile Concepts, Ltd.

A.    <u>SMC</u>

2.    SMC is a family-owned business located in Huntington Station, New York that specializes in providing mobile kitchen rentals and support services for, among other things, special events, concessions, kitchen renovations, tours, strikes, and emergency situations.  SMC's temporary kitchens are capable of producing a high volume of food and providing an unlimited variety of food items.

3.    The Futerman family has worked in the food service, restaurant and catering industry for at least three generations. In the 1930s, my grandfather started my family's first business, a delicatessen, which was located in Brooklyn, New York.  My father later expanded the business to Queens and Long Island. Like me, my father grew up in the family business and had a vision to start a catering company approximately twenty years ago.  From the catering business grew SMC.

4.    In addition to mobile kitchen rentals, SMC provides full service mobile catering, concession services, and a professional serving and kitchen staff.

5.    Some of SMC's clients have included the Republican National Convention, FOX News, Madison Square Garden, Giants Stadium, Radio City Music Hall, Land Rover, numerous colleges and universities, major sporting events including the U.S. Open Golf Tournament and Ryder Cup, entertainment events including

the Rolling Stones Bridges to Babylon Tour, hospitals, correctional institutions, branches of the United States military, and major food service providers.

B.    Professional Background

6.    I was graduated from Syracuse University in 1993 with a degree in Hospitality and Food Service Management.

7.    Thereafter, I joined the family business and since graduating from college, I am now the Director of Sales and Marketing for SMC.

8.    As Director of Sales and Marketing, my responsibilities include, among other things, reviewing sales leads; making and responding to sales calls and email inquiries; conducting sales presentations; scheduling and attending site visits; preparing and sending proposals and product information and specifications to potential new customers; and dealing with accounting issues such as receivables with respect to my customers.

C.    The Contract with SMC

9.    On January 13, 2005, Michael Penrod logged on to SMC's website and completed a questionnaire on which he indicated the products and services that he was interested in procuring on behalf of Penrod Management.  More particularly, Mr. Penrod indicated that he was setting up three beach bars in the summer of 2005 and inquired about the possibility of renting portable

3

bar and kitchen facilities from SMC. In completing the questionnaire, Mr. Penrod provided his contact information at Penrod Management Group, Inc. ("Penrod Management"); an email address of "mike@penrods.com;" Penrod Management's business address of 1 Ocean Drive, Miami Beach, Florida 33139; and Penrod Management's telephone number of (305) 538-1111. Defendant-Respondent's Exhibit No. 2 is the questionnaire that Mr. Penrod completed and emailed to SMC.

10. On January 14, 2005, I emailed Mr. Penrod at "mike@penrods.com" to thank him for his interest in SMC's products and services. I also provided Mr. Penrod with the specifications for various products offered by SMC. Defendant-Respondent's Exhibit No. 3 is the January 14, 2005, email that I sent to Mr. Penrod at "mike@penrods.com."

11. On January 14, 2005, Mr. Penrod emailed me from his email address of "mike@penrods.com" and requested information on SMC's mobile bathrooms. Defendant-Respondent's Exhibit No. 3 is the January 14, 2005, email that I received from Mr. Penrod at "mike@penrods.com."

12. On January 14, 2005, I emailed Mr. Penrod at "mike@penrods.com" and indicated that I would have someone contact him regarding SMC's mobile bathrooms. Defendant-Respondent's Exhibit No. 3 is the January 14, 2005, email that I sent to Mr. Penrod at "mike@penrods.com."

13.  On  January  28,  2005,  I  emailed  Mr.  Penrod  at
"mike@penrods.com"  and  provided  him  with  additional  information
regarding  SMC's  products.    Defendant-Respondent's  Exhibit  No.  5
is  the  January  28,  2005,  email  that  I  sent  to  Mr.  Penrod  at
"mike@penrods.com."

14.  On  March  7,  2005,  Mr.  Penrod  emailed  me  from  his  email
address  of  mike@penrods.com  and  indicated  that  his  "operations
team"  -  namely  Bruce  Hanrahan  (who  had  an  email  address  of
"bruceh@penrods.com")  among  others  -  had  been  assembled  and  was
prepared  to  move  forward.    Mr.  Penrod  inquired  about  the
availability  of  SMC's  kitchen  and  prep  trailers  from  April  15,
2005,  through  the  end  of  September  2005.    Defendant-Respondent's
Exhibit  No.  5  is  the  March  7,  2005,  email  that  I  received  from
Mr.  Penrod  at  "mike@penrods.com."

15.  On  April  1,  2005,  Mr.  Hanrahan  sent  me  an  email  from
"bruceh@penrods.com"  inquiring  about  the  availability  of  SMC's
equipment  beginning  on  April  15,  2005.    Mr.  Hanrahan  also
requested  information  regarding  the  deposit  that  SMC  required.
Defendant-Respondent's  Exhibit  No.  5  is  the  April  1,  2005,  email
that  I  received  from  Mr.  Hanrahan  at  "bruceh@penrods.com."

16.  On  April  1,  2005,  I  emailed,  among  others,  Mr.  Penrod
at  "mike@penrods.com"  and  Mr.  Hanrahan  at  "bruceh@penrods.com"
and  provided  them  with  information  regarding  SMC's  available
products  and  services.    Defendant-Respondent's  Exhibit  No.  8  is

the April 1, 2005, email that I sent to Mr. Penrod at "mike@penrods.com."

17.  Shortly thereafter, Penrod Management placed an order with SMC for two 48' x 8' mobile kitchens, a 40' x 8' dishwashing trailer, an 8' x 20' combination walk-in cooler freezer, an 8' x 20' walk-in cooler, a 20' x 24' compact kitchen, and a 36' x 10' greenroom office trailer.  SMC required that Penrod Management pay an upfront deposit in the amount of $97,197.64 before SMC would agree to deliver the equipment.

18.  It is my recollection that Michael Register, who I understood from my conversations with either Mr. Penrod or Timothy Hughes to be a lawyer who worked for Penrod Management, instructed me to email him SMC's invoices, but to list Danielle Houser as the contact person, and the address of 1 Ocean Drive, Miami Beach, Florida, 33139 on the invoices.   It was my understanding from my conversations with Messrs. Register and Timothy Hughes that Ms. Houser was an accountant with Penrod Management.

19.  Pursuant to the instructions provided to me by Mr. Register, I emailed him Invoice # 701-05 in the amount of $97,197.64, and listed Ms. Houser as the contact person at Penrod Management at 1 Ocean Drive, Miami Beach, Florida 33139. The April 6, 2005, invoice reflected Penrod Management's order for two 48' x 8' mobile kitchens, a 40' x 8' dishwashing

6

trailer, an 8' x 20' combination walk-in cooler freezer, an 8' x 20' walk-in cooler, a 20' x 24' compact kitchen, and a 36' x 10' greenroom office trailer. Defendant-Respondent's Exhibit No. 9 is the April 6, 2005, invoice that I sent to Penrod Management.

20. Although I had already been negotiating with, among others, Mr. Penrod on behalf of Penrod Management, Messrs. Penrod, Register and Hughes instructed me to name "Nikki Beach Atlantic City, LLC" on SMC's invoices and the agreement as the entity with which SMC would contract. Mr. Penrod informed me that NBAC was recently created by Penrod Management. Pursuant to the instructions provided to me by Messrs. Penrod, Register and Hughes, I therefore included NBAC on SMC's invoices and the agreement.

21. On April 14, 2005, I emailed, among others, Mr. Penrod at "mike@penrods.com" and Mr. Register at "michael@penrods.com." In my email to Messrs. Penrod and Register, I stressed that the lease agreement had to be signed and that Penrod Management had to wire transfer an initial deposit in amount of $97,197.64 to SMC before SMC would deliver any equipment to the Resorts Casino in Atlantic City, New Jersey. Defendant-Respondent's Exhibit No. 11 is the April 14, 2005, email that I sent to Messrs. Penrod and Register at "mike@penrods.com" and "michael@penrods.com," respectively.

22.  On April 14, 2005, Mr. Register sent me an email from his address of "michael@penrods.com" advising me that he was faxing me changes to the proposed lease agreement.  Defendant-Respondent's Exhibit No. 11 is the April 14, 2005, email that I received from Mr. Register at "michael@penrods.com."

23.  Pursuant to the instructions provided to me by Mr. Register, on April 18, 2005, SMC executed an Equipment Rental Agreement (the "Agreement") naming NBAC with an address of 1 Ocean Drive, Miami Beach, Florida 33139, and telephone number of (305) 538-1111.  A signed copy of the Agreement was faxed to SMC from Penrod Management's facsimile number of (305) 534-7253.  Defendant-Respondent's Exhibit No. 12 is the Agreement that was faxed to SMC from Penrod Management's facsimile number of (305) 534-7253.

D.  Penrod Management Wire Transfers to SMC

24.  Also on April 18, 2005, Penrod Management wire transferred $50,000 from its Bank of America account into SMC's account.  Defendant-Respondent's Exhibit No. 13 is the wire transfer confirmation reflecting the $50,000 wire transfer from Penrod Management to SMC.

25.  On April 22, 2005, Penrod Management wire transferred an additional $47,197.64 from its Bank of America account into SMC's account.  Defendant-Respondent's Exhibit No. 15 is the

wire transfer confirmation reflecting the $47,197.64 wire transfer from Penrod Management's account to SMC.

26. As of April 22, 2005, Penrod Management had wire transferred the required deposit amount of $97,197.64 to SMC's account as SMC requested pursuant to Invoice # 701-05.

E.    SMC Invoices to and Communications with Representatives of Penrod Management Regarding the Outstanding Balance

27. On May 12, 2005, pursuant to the instructions provided to me by Mr. Register, I emailed him Invoice # 702-05 in the amount of $48,171.70, and listed Ms. Houser as the contact person at Penrod Management at 1 Ocean Drive, Miami Beach, Florida 33139. Defendant-Respondent's Exhibit No. 21 is the May 12, 2005, invoice that I sent to Penrod Management.

28. On May 23, 2005, SMC delivered the 40' x 8' dishwashing trailer to the Resorts Casino in Atlantic City, New Jersey. The mobile kitchen trailer was delivered to, received and accepted by, and signed for by Timothy Hughes on behalf of Penrod Management. Defendant-Respondent's Exhibit No. 22 is the receipt confirming that the mobile kitchen trailer was delivered and that Mr. Hughes accepted delivery on behalf of Penrod Management.

29. Also on May 23, 2005, SMC delivered the 48' x 8' kitchen trailer to the Resorts Casino in Atlantic City, New Jersey. The kitchen trailer was delivered to, received and

accepted by, and signed for by Mr. Hughes on behalf of Penrod Management. Defendant-Respondent's Exhibit No. 23 is the receipt confirming that the mobile kitchen trailer was delivered and that Mr. Hughes accepted delivery on behalf of Penrod Management.

30. As of June 9, 2005, Penrod Management had paid only $97,197.64 to SMC's account as SMC requested pursuant to Invoice # 701-05. Penrod Management, however, failed to pay Invoice # 702-05, and had accumulated an outstanding balance of $48,171.70.

31. On June 10, 2005, Mr. Register emailed me from his email address of "michael@penrods.com" and acknowledged that SMC had not been paid, and indicated that he would contact me to further discuss the outstanding balance owed to SMC. Defendant-Respondent's Exhibit No. 24 is the June 10, 2005, email that I received from Mr. Register at "michael@penrods.com."

32. On June 10, 2005, I emailed Mr. Register at "michael@penrods.com" in response to his email to me earlier that day. I informed Mr. Register that he had ignored several of my telephone messages, faxes, letters, and other emails, and that I would have appreciated the professional courtesy of a response. Defendant-Respondent's Exhibit No. 24 is the June 10, 2005, email that I sent to Mr. Register at "michael@penrods.com."

33.  On June 10, 2005, Mr. Register emailed me from his email address of "michael@penrods.com" and acknowledged that he had not responded to my telephone messages, faxes, letters, and other emails, but that he would contact me on the following Monday to further discuss the outstanding balance owed to SMC. Defendant-Respondent's Exhibit No. 24 is the June 10, 2005, email that I received from Mr. Register at "michael@penrods.com."

34.  On June 12, 2005, pursuant to the instructions provided to me by Mr. Register, I emailed him Invoice # 703-05 in the amount of $48,171.70, and listed Ms. Houser as the contact person at Penrod Management at 1 Ocean Drive, Miami Beach, Florida, 33139. Defendant-Respondent's Exhibit No. 25 is the June 12, 2005, invoice that I sent to Penrod Management.

35.  By June 12, 2005, Penrod Management had not paid Invoices Nos. 702-05 and 703-05.

36.  On June 17, 2005, I emailed Mr. Register at his email address of "michael@penrods.com" and requested that SMC be allowed to pick up one of the trailers because SMC had not been paid for its products or services, and it could have been used elsewhere. Defendant-Respondent's Exhibit No. 26 is the June 17, 2005, email that I sent to Mr. Register at "michael@penrods.com."

11

37.  On June 17, 2005, Mr. Register emailed me from his address of "michael@penrods.com" and acknowledged, among other issues, that an outstanding balance owed to SMC existed, and that he would contact me on the following Monday to further discuss the outstanding balance owed to SMC.   Defendant-Respondent's Exhibit No. 26 is the June 17, 2005, email that I received from Mr. Register at "michael@penrods.com."

38.  Thereafter, during the week of June 20, 2005, Mr. Register and I had a conversation about the outstanding balance owed to SMC.   I recall that Mr. Register informed me that SMC was on a long list of vendors that had not been paid, but that the obligations owed to SMC would be honored.   I also recall that Mr. Register told me that he was going to Jack Penrod's house to speak with him about outstanding balances owed to vendors, including SMC.

39.  On Tuesday, June 28, 2005, I emailed Mr. Register at his email address of "michael@penrods.com" and requested the status of Mr. Register's meeting with Mr. Penrod and Jack Penrod regarding the outstanding balance owed to SMC.   In the email, I reiterated my frustration that SMC was not being paid for its equipment despite the equipment being used by Penrod Management. Defendant-Respondent's Exhibit No. 27 is the June 28, 2005, email that I sent to Mr. Register at "michael@penrods.com."

40. In or about early to mid-July 2005, I had another conversation with Messrs. Penrod and Register regarding the outstanding balance owed to SMC. During the conversation, Messrs. Penrod and Register asked that I work with them on the outstanding balance in that they would fully pay for the equipment that they were using and was still at the site, but proposed reducing by half the amount owed on the two pieces of equipment that SMC retrieved from the site earlier that month.

41. On July 12, 2005, pursuant to the instructions provided to me by Mr. Register, I emailed him Invoice # 704-05 in the amount of $48,171.70, and listed Ms. Houser as the contact person at Penrod Management at 1 Ocean Drive, Miami Beach, Florida, 33139. Defendant-Respondent's Exhibit No. 29 is the July 12, 2005, invoice that I sent to Penrod Management.

42. As of July 2005, Penrod Management failed to pay Invoice Nos. 702-05, 703-05, and 704-05.

43. In or about early or mid-July 2005, I called Penrod Management and spoke with Ms. Sas. Ms. Sas and I discussed the outstanding balance owed to SMC. I asked Ms. Sas if she had heard back from Mr. Register regarding his meeting with Jack Penrod concerning payments to SMC. Ms. Sas told me that she had not yet communicated with Mr. Register, but that she would when he returned to the office, and also told me that Jack Penrod would be out of the country for a couple of weeks. Ms. Sas told

me that we were essentially in limbo until she spoke with Mr. Register.

44. On or about July 29, 2005, pursuant to the instructions provided to me by Mr. Register, I emailed him Invoice # 705-05 in the amount of $44,991.70, and listed Ms. Houser as the contact person at Penrod Management at 1 Ocean Drive, Miami Beach, Florida, 33139. Defendant-Respondent's Exhibit No. 30 is the July 29, 2005, invoice that I sent to Penrod Management.

45. On or about July 29, 2005, pursuant to the instructions provided to me by Mr. Register, I emailed him Invoice # 706-05 in the amount of $8,904, and listed Ms. Houser as the contact person at Penrod Management at 1 Ocean Drive, Miami Beach, Florida, 33139. Defendant-Respondent's Exhibit No. 31 is the July 29, 2005, invoice that I sent to Penrod Management.

46. As of August 2005, Penrod Management failed to pay Invoice Nos. 702-05, 703-05, 704-05, 705-05 and 706-05.

47. On or about December 18, 2005, pursuant to the instructions provided to me by Mr. Register, I emailed him Invoice # 707-05 in the amount of $23,248.61, and listed Ms. Houser as the contact person at Penrod Management at 1 Ocean Drive, Miami Beach, Florida, 33139. Defendant-Respondent's

Exhibit No. 32 is the December 18, 2005, invoice that I sent to Penrod Management.

48.    Currently, Penrod Management has failed to pay Invoice Nos. 702-05, 703-05, 704-05, 705-05, 706-05 and 707-05.

49.    As previously indicated, throughout the summer of 2005, I emailed and communicated with Messrs. Penrod, Register, and Hanrahan, and Ms. Sas regarding the outstanding balance owed to SMC.   When I emailed Messrs. Penrod, Register and Hanrahan, I emailed them at their "penrods.com" email addresses.   When I called Mr. Penrod, I typically called him on his cellular telephone, but would often call Mr. Register at Penrod Management's telephone number of (305) 538-1111, and would then follow the prompts to reach him.   I recall that Mr. Register's extension was x.121.   I also recall that on at least one occasion when I called and left a voicemail message for Mr. Hanrahan, his voicemail greeting indicated that I had reached his voicemail at "Penrod Management."   I do not recall if the voicemail greetings for Messrs. Penrod and Register, and Ms. Sas contained a similar greeting, or simply stated their respective names and that they were unavailable.

50.    To the best of my knowledge and recollection, all of SMC's correspondence was mailed to 1 Ocean Drive, Miami Beach, Florida, 33139.

51.  At no time did Messrs. Penrod, Register or Hanrahan, Ms. Sas, Ms. Houser, or anyone else from Penrod Management inform me that Penrod Management was not the proper entity to communicate with or to receive correspondence, invoices and telephone calls regarding the outstanding balance owed to SMC.

52.  At no time did Messrs. Penrod, Register or Hanrahan, Ms. Sas, Ms. Houser, or anyone else from Penrod Management inform me that Penrod Management was not responsible for the outstanding balance owed to SMC.  In fact, just the opposite; they assured me that SMC would be paid for its products and services.

53.  At no time did I believe that I was communicating with anyone holding themselves out as employees, agents or representatives of NBAC.  Messrs. Penrod, Register, Hanrahan, and Hughes, and Ms. Sas and Ms. Houser, held themselves out as employees, agents and representatives of Penrod Management.  All of my communications regarding the Agreement, invoices, and outstanding balance were with employees, agents or representatives of Penrod Management.

I declare under penalty of perjury that the foregoing statements are true, correct and accurate to the best of my knowledge, information and belief.

Executed on: May 5, 2008     By: _____

Keith Futerman

Notary Public

### CERTIFICATE OF ACKNOWLEDGEMENT OF NOTARY PUBLIC

STATE OF NEW YORK          )
                           ) ss
COUNTY OF SUFFOLK          )

On _____5/5/08_____ ,
b e f o r e                                    m e ,
_____Keith Futerman_____
_____ a notary public, personally appeared Keith Futerman, a representative of Stewart's Mobile Concepts, Ltd., and that Mr. Futerman is duly authorized to make this affidavit on behalf of the corporate Respondent-Defendant herein.

WITNESS my hand and official seal.

Signature _____

JENNIFER ZAJAC
Notary Public ... of New York
No. 01ZAC...0497
O.. a..ed in Suffolk County
My Commission ...pires July 18, 2009

17

# Exhibit F

**Subject: Followup**
**Date:** Tuesday, June 28, 2005 12:19 PM
**From:** keith@stewartsmobile.com <keith@stewartsmobile.com>
**To:** Michael Register <michael@penrods.com>

Michael,

What is the update? Have you spoken to Michael and Jack Penrod as per our conversation last week? When are you putting money into my account. I was in AC yesterday. You are using the equipment. The refrigerators and freezers are stocked, you are washing glassware. My patience is shot at this point. I need answers that you are going to act on.

Keith ·


Keith Futerman
Stewart's Mobile Concepts, Ltd.
845 East Jericho Turnpike
Huntington Station, NY 11746
Toll Free 800-919-9261
P 631-351-6030
F 631-351-1587
Cell 516-551-8865
Email: keith@stewartsmobile.com
"MOBILE KITCHEN RENTALS AND SUPPORT SERVICES FROM COAST TO COAST"
Website: http://www.stewartsmobile.com

DEFENDANT'S
EXHIBIT
27

# Exhibit G

Division of Corporations
http://www.sunbiz.org/scripts/cordet.exe?a1=DETFIL&n1=P010001...



### Florida Profit

## PENROD MANAGEMENT GROUP, INC.

**PRINCIPAL ADDRESS**
1 OCEAN DRIVE
4TH FLOOR
MIAMI BEACH FL 33139 US
Changed 05/11/2005

**MAILING ADDRESS**
1 OCEAN DRIVE
4TH FLOOR
MIAMI BEACH FL 33139 US
Changed 05/11/2005

| Document Number | FEI Number | Date Filed |
|---|---|---|
| P01000104533 | 651151495 | 10/29/2001 |

| State | Status | Effective Date |
|---|---|---|
| FL | ACTIVE | NONE |

### Registered Agent

| Name & Address |
|---|
| BONITATIBUS, PETER |
| 1300 NORTH FEDERAL HWY |
| 202 |
| BOCA RATON FL 33432 |
| Address Changed: 03/25/2002 |

### Officer/Director Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK<br>317 COCONUT LANE<br><br>MIAMI BEACH FL 33139 | P |

### Annual Reports

| Report Year | Filed Date |
|---|---|
| 2003 | 05/07/2003 |
| 2004 | 05/04/2004 |
| 2005 | 05/11/2005 |

Penrod 000074

3/30/2006 10:34 AM

| Previous Filing | | Return to List | | Next Filing |

No Events
No Name History Information

## Document Images
Listed below are the images available for this filing.

05/11/2005 -- ANNUAL REPORT
05/04/2004 -- ANN REP/UNIFORM BUS REP
05/07/2003 -- ANN REP/UNIFORM BUS REP
03/25/2002 -- COR - ANN REP/UNIFORM BUS REP
10/29/2001 -- Domestic Profit

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**

 

Penrod 000075

3/30/2006 10:34 AM

# 2005 FOR PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P01000104533

**FILED**
**May 11, 2005**
**Secretary of State**

Entity Name:  PENROD MANAGEMENT GROUP, INC.

**Current Principal Place of Business:**

1300 NORTH FEDERAL HWY
202
BOCA RATON, FL  33432

**Current Mailing Address:**

1300 NORTH FEDERAL HWY
202
BOCA RATON, FL  33432

**New Principal Place of Business:**

1 OCEAN DRIVE
4TH FLOOR
MIAMI BEACH, FL  33139    US

**New Mailing Address:**

1 OCEAN DRIVE
4TH FLOOR
MIAMI BEACH, FL  33139    US

FEI Number: 65-1151495        FEI Number Applied For ( )        FEI Number Not Applicable ( )        Certificate of Status Desired ( )

**Name and Address of Current Registered Agent:**

BONITATIBUS, PETER
1300 NORTH FEDERAL HWY
202
BOCA RATON, FL  33432  US

**Name and Address of New Registered Agent:**

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

Electronic Signature of Registered Agent                                        Date

In accordance with s. 607.193(2)(b), F.S., the corporation did not receive the prior notice.
Election Campaign Financing Trust Fund Contribution ( ).

**OFFICERS AND DIRECTORS:**

Title:        P              ( ) Delete
Name:        PENROD, JACK
Address:    317 COCONUT LANE
City-St-Zip:  MIAMI BEACH, FL  33139

**ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:**

Title:                    ( ) Change  ( ) Addition
Name:
Address:
City-St-Zip:

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Section 119.07(3)(i), Florida Statutes.  I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:    JACK PENROD                                    P                    05/11/2005

Electronic Signature of Signing Officer or Director                                        Date



DEFENDANT'S
EXHIBIT
20

## 2007 FOR PROFIT CORPORATION
## ANNUAL REPORT

**FILED**
**Aug 02, 2007 8:00 am**
**Secretary of State**
08-02-2007 90014 006 ***550.00

DOCUMENT # P01000104533

1. Entity Name
PENROD MANAGEMENT GROUP, INC.

40128005

| Principal Place of Business | Mailing Address |
|---|---|
| 1 OCEAN DRIVE<br>4TH FLOOR<br>MIAMI BEACH, FL  33139    US | 1 OCEAN DRIVE<br>4TH FLOOR<br>MIAMI BEACH, FL  33139    US |

DO NOT WRITE IN THIS SPACE

| 07262007 | No Chg-P | CR2E034 (11/05) |
|---|---|---|

4. FEI Number
65-1151495

☐ Applied For
☐ Not Applicable

5. Certificate of Status Desired    ☐    $8.75 Additional Fee Required

6. Name and Address of Current Registered Agent

BONITATIBUS, PETER
1300 NORTH FEDERAL HWY
202
BOCA RATON, FL  33432

DO NOT WRITE
IN THIS SPACE

8. The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida. I am familiar with, and accept the obligations of registered agent.

SIGNATURE
_Signature, typed or printed name of registered agent and title if applicable_    (NOTE: Registered Agent signature required when reinstating)    DATE

**FILE NOW!!! FEE IS $550.00**
**Due by September 14, 2007**

9. Election Campaign Financing Trust Fund Contribution.    ☐    $5.00 May Be Added to Fees

10.    OFFICERS AND DIRECTORS

| TITLE | P |
|---|---|
| NAME | PENROD, JACK |
| STREET ADDRESS | 317 COCONUT LANE |
| CITY-ST-ZIP | MIAMI BEACH, FL  33139 |

| TITLE | |
| NAME | |
| STREET ADDRESS | |
| CITY-ST-ZIP | |

| TITLE | |
| NAME | |
| STREET ADDRESS | |
| CITY-ST-ZIP | |

| TITLE | |
| NAME | |
| STREET ADDRESS | |
| CITY-ST-ZIP | |

| TITLE | |
| NAME | |
| STREET ADDRESS | |
| CITY-ST-ZIP | |

| TITLE | |
| NAME | |
| STREET ADDRESS | |
| CITY-ST-ZIP | |

DO NOT WRITE
IN THIS SPACE

12. I hereby certify that the information supplied with this filing does not qualify for the exemptions contained in Chapter 119, Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears in Block 10 or Block 11 if changed, or on an attachment with an address, with all other like empowered.

SIGNATURE _____    OMAR R BLANCO    7/26/2007    305-538-1111
SIGNATURE AND TYPED OR PRINTED NAME OF SIGNING OFFICER OR DIRECTOR    Date    Daytime Phone #


DEFENDANT'S
EXHIBIT
**34**

# Exhibit H

Status Report For: NIKKI BEACH ATLANTIC CITY, LLC

Business Name: NIKKI BEACH ATLANTIC CITY, LLC

Report Date: 02/14/2007

Business ID Number: 0600229364

Transaction Number: Sequence: 1053226: 1

Business Type: DOMESTIC LIMITED LIABILITY COMPANY

Status: CANCELLED

Filing Date: 03/04/2005

Home Jurisdiction: NJ

Status Change Date: 07/11/2006

Stock Amount: 0

DOR Suspension Start Date:

DOR Suspension End Date:

Tax Suspension Start Date:

Tax Suspension End Date:

Annual Report Month: 3

Last Annual Report Filed:

For Last Annual Report Paid Year:

Incorporator:

Agent: MARK SANDSON, ESQ.

Agent Address: 17 GORDON'S ALLEY

ATLANTIC CITY, NJ 08401

Office Address Status: Deliverable

Main Business Address:

Principal Business Address:

Associated Names

Name:

Type Description:

Officers/Directors/Members: Not Available

DEFENDANT'S
EXHIBIT
4

Mar  7 2005  11:38      P. 07
Mar  4 2005      16



*New Jersey Department of Treasury*
*Division of Commercial Recording*
*Certificate of Formation, Limited Liability Company*

L-100 NJSA 42 (2/94)

This form may be used to record the formation of a Limited Liability Company under and by virtue of New Jersey State law. Applicants must insure strict compliance with NJSA 42, the New Jersey Limited Liability Company Act, and insure that all applicable filing requirements are met. Applicants are advised to seek out private legal assistance before submitting filings to the Secretary's office.

1. Name of Limited Liability Company:  **Nikki Beach Atlantic City, LLC**

2. The purpose for which this Limited Liability Company is organized is:  **All uses permitted by law.**

3. Date of formation:      **Upon Filing**

4. Registered Agent Name & Address (must be in NJ):

    Mark Sandson
    17 Gordon's Alley
    Atlantic City, NJ 08401

*LLC*

```
FILED
MAR  4 2005
STATE TREASURER
```

5. Dissolution date:  **Perpetual**

6. Other provisions (list below or attach to certificate):

    **Managed by members:**

        **Penrod Management Group, Inc.**
        **Ocean One Drive**
        **Miami Beach, FL 33139**

The undersigned represent(s) that this Limited Liability Company has one or more members, and that this filing complies with requirements detailed in NJSA 42. The undersigned hereby attest(s) that they are authorized to sign this certificate on behalf of the Limited Liability Company.

*Bruce E. Hubbard*      **March 4, 2005**

Name                                        Date
Bruce Hubbard - Authorized Person          S1523792      0600229364
President - Hubbard, Inc.                   J2883492
D/B/A Hubco Incorporation Services

# Exhibit I



Florida Profit

**PENROD MANAGEMENT COMPANY**

PRINCIPAL ADDRESS
ONE OCEAN DR
MIAMI BEACH FL 33139

MAILING ADDRESS
ONE OCEAN DR
MIAMI BEACH FL 33139

| | | |
|---|---|---|
| Document Number | FEI Number | Date Filed |
| L89017 | 650207444 | 07/09/1990 |
| State | Status | Effective Date |
| FL | INACTIVE | NONE |
| Last Event | Event Date Filed | Event Effective Date |
| ADMIN DISSOLUTION FOR ANNUAL REPORT | 10/09/1992 | NONE |

## Registered Agent

| Name & Address |
|---|
| PENROD, JACK
ONE OCEAN DR
MIAMI BEACH FL 33139 |

## Officer/Director Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK V.
ONE OCEAN DR
MIAMI BEACH FL | P |

## Annual Reports

DEFENDANT'S
EXHIBIT
38

http://www.sunbiz.org/scripts/cordet.exe?a1=DETFIL&n1=L89017&n2=NAMFWD&n3=0...    6/7/2006



| Report Year | Filed Date |
|---|---|
| 1991 | 07/10/1991 |

  

View Events
View Name History

## Document Images
Listed below are the images available for this filing.

No images are available for this filing.

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**

 

# Exhibit J



## Florida Limited Liability

## PENROD MANAGEMENT INTERNATIONAL, LLC

### PRINCIPAL ADDRESS
ONE OCEAN DR.
MIAMI BEACH FL 33139

### MAILING ADDRESS
ONE OCEAN DR.
MIAMI BEACH FL 33139

| Document Number | FEI Number | Date Filed |
|---|---|---|
| L03000016669 | APPLIED | 05/08/2003 |

| State | Status | Effective Date |
|---|---|---|
| FL | ACTIVE | NONE |

**Total Contribution**
0.00

### Registered Agent

| Name & Address |
|---|
| FIELDSTONE, RONALD
201 ALHAMBRA CIR., STE. 601
CORAL GABLES FL 33134 |
| Name Changed: 05/25/2004 |

### Manager/Member Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK
ONE OCEAN DRIVE
MIAMI BEACH FL 33139 | P |

### Annual Reports

DEFENDANT'S
EXHIBIT
39



Division of Corporations

| Report Year | Filed Date |
|---|---|
| 2004 | 05/25/2004 |
| 2005 | 08/09/2005 |

Previous Filing      Return to List      Next Filing

No Events
No Name History Information

## Document Images

Listed below are the images available for this filing.

08/09/2005 -- ANNUAL REPORT
05/25/2004 -- ANN REP/UNIFORM BUS REP
05/08/2003 -- Florida Limited Liabilites

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**

Corporations Inquiry          Corporations Help

# Exhibit K



Division of Corporations

## Florida Profit

## PENROD PROPERTY MANAGEMENT, INC.

### PRINCIPAL ADDRESS
707 ROYAL PLAZA DRIVE
FT. LAUDERDALE FL 33301

### MAILING ADDRESS
707 ROYAL PLAZA DRIVE
FT. LAUDERDALE FL 33301

| Document Number | FEI Number | Date Filed |
|---|---|---|
| H65359 | 000000000 | 07/08/1985 |

| State | Status | Effective Date |
|---|---|---|
| FL | INACTIVE | NONE |

| Last Event | Event Date Filed | Event Effective Date |
|---|---|---|
| INVOLUNTARILY DISSOLVED | 10/13/1989 | NONE |

## Registered Agent

| Name & Address |
|---|
| PENROD, JACK V. |
| 707 ROYAL PLAZA DR |
| FT. LAUDERDALE FL 33301 |
| Name Changed: 07/28/1988 |
| Address Changed: 07/28/1988 |

## Officer/Director Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK V. 707 ROYAL PLAZA DRIVE FT. LAUDERDALE FL | PD |

DEFENDANT'S EXHIBIT
40

http://www.sunbiz.org/scripts/cordet.exe?a1=DETFIL&n1=H65359&n2=NAMFWD&n3=0...    6/7/2006

Division of Corporations

## Annual Reports

| Report Year | Filed Date |
|---|---|
| 1986 | 08/20/1986 |
| 1987 | 12/28/1987 |
| 1988 | 07/28/1988 |

  

Previous Filing        Return to List        Next Filing

### View Events

No Name History Information

## Document Images

Listed below are the images available for this filing.

No images are available for this filing.

## THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT

 

Corporations Inquiry        Corporations Help

# Exhibit L



## Florida Limited Liability

**NIKKI MARINA, LLC**

### PRINCIPAL ADDRESS
ONE OCEAN DR
MIAMI BEACH FL 33139

### MAILING ADDRESS
ONE OCEAN DR
MIAMI BEACH FL 33139

| Document Number | FEI Number | Date Filed |
|---|---|---|
| L04000005300 | APPLIED | 01/21/2004 |

| State | Status | Effective Date |
|---|---|---|
| FL | INACTIVE | NONE |

| Last Event | Event Date Filed | Event Effective Date |
|---|---|---|
| ADMIN DISSOLUTION FOR ANNUAL REPORT | 09/15/2006 | NONE |

Total Contribution
0.00

### Registered Agent

| Name & Address |
|---|
| FIELDSTONE, RONALD R<br>201 ALHAMBRA CIR, STE 601<br>CORAL GABLES FL 33134 |

### Manager/Member Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK<br>ONE OCEAN DRIVE<br><br>MIAMI BEACH FL 33139 | P |

DEFENDANT'S EXHIBIT 42



Division of Corporations

## Annual Reports

| Report Year | Filed Date |
|---|---|
| 2005 | 08/09/2005 |



Previous Filing        Return to List        Next Filing

View Events
No Name History Information

## Document Images

Listed below are the images available for this filing.

08/09/2005 -- ANNUAL REPORT
01/21/2004 -- Florida Limited Liabilites

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**

Corporations Inquiry                    Corporations Help

# Exhibit M



# Trademark

## NIKKI BEACH CLUB

| | | |
|---|---|---|
| **Document Number**<br>T00000000502 | **Date Filed**<br>05/02/2000 | **Expiration Date**<br>05/02/2010 |
| **Last Event**<br>TRADEMARK<br>ASSIGNMENT | **Event Date Filed**<br>10/28/2003 | **Event Effective Date**<br>NONE |
| **First Used in Florida**<br>12/19/1999 | **First Used Anywhere**<br>12/19/1999 | **Status**<br>ACTIVE |

**Mark Used In Connection With**
RESTAURANT, BEACH CLUB

**Disclaimer For**
BEACH CLUB

## Owners

| Name & Address |
|---|
| PENROD BROTHERS, INC., A FLA. CORP.<br>ONE OCEAN DRIVE<br>MIAMI BEACH FL 33139 |

Previous Filing     Return to List     Next Filing

### View Events
No Name History Information

## Type/Class

| SM-0042 | 0000000000 | 0000000000 | 0000000000 | 0000000000 |
|---|---|---|---|---|
| 0000000000 | 0000000000 | 0000000000 | 0000000000 | 0000000000 |
| 0000000000 | 0000000000 | 0000000000 | 0000000000 | 0000000000 |
| 0000000000 | 0000000000 | 0000000000 | 0000000000 | 0000000000 |

No Cross Reference

## Document Images

DEFENDANT'S
EXHIBIT
44

http://www.sunbiz.org/scripts/cordet.exe?a1=DETFIL&n1=T00000000502&n2=NAMFWD...  6/7/2006

Division of Corporations

Listed below are the images available for this filing.

| |
| --- |
| 10/28/2003 -- Trademark Assignment |
| 05/02/2000 -- Trademark |

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**

 

# Exhibit N



# Florida Limited Liability

## NIKKI BEACH AT SEA, LLC

### PRINCIPAL ADDRESS
ONE OCEAN DRIVE
MIAMI BEACH FL 33139

### MAILING ADDRESS
701 BRICKELL AVENUE, SUITE 3000
MIAMI FL 33131

| Document Number | FEI Number | Date Filed |
|---|---|---|
| L05000086068 | APPLIED | 08/30/2005 |

| State | Status | Effective Date |
|---|---|---|
| FL | ACTIVE | NONE |

| Total Contribution | | |
|---|---|---|
| 0.00 | | |

## Registered Agent

| Name & Address |
|---|
| INTRASTATE REGISTERED AGENT CORPORATION
701 BRICKELL AVE, SUITE 3000
MIAMI FL 33131 |

## Manager/Member Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK
100 ONE OCEAN DRIVE
MIAMI BEACH FL 33139 | MGR |

## Annual Reports

| Report Year | Filed Date |
|---|---|





No Events
No Name History Information

## Document Images

Listed below are the images available for this filing.

| |
|---|
| 09/08/2006 -- ANNUAL REPORT |
| 08/30/2005 -- Florida Limited Liabilites |

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**

# Exhibit O



## Florida Limited Liability

### NIKKI BEACH MUSIC, LLC

PRINCIPAL ADDRESS
1 OCEAN DRIVE
4TH FLOOR
MIAMI BEACH FL 33139
Changed 05/11/2005

MAILING ADDRESS
1 OCEAN DRIVE
4TH FLOOR
MIAMI BEACH FL 33139
Changed 05/11/2005

| Document Number | FEI Number | Date Filed |
|---|---|---|
| L03000021430 | 760738504 | 06/12/2003 |

| State | Status | Effective Date |
|---|---|---|
| FL | ACTIVE | NONE |

**Total Contribution**
0.00

## Registered Agent

| Name & Address |
|---|
| REGISTER, MICHAEL |
| 1 OCEAN DRIVE |
| 4TH FLOOR |
| MIAMI BEACH FL 33139 |
| Name Changed: 05/11/2005 |
| Address Changed: 05/11/2005 |

## Manager/Member Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK ONE OCEAN DRIVE | P |

DEFENDANT'S
EXHIBIT
46



MIAMI BEACH FL 33139

## Annual Reports

| Report Year | Filed Date |
|---|---|
| 2004 | 06/10/2004 |
| 2005 | 05/11/2005 |

  

No Events
No Name History Information

## Document Images

Listed below are the images available for this filing.

| |
|---|
| 05/11/2005 -- ANNUAL REPORT |
| 06/10/2004 -- ANN REP/UNIFORM BUS REP |
| 06/12/2003 -- Florida Limited Liabilites |

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**

# Exhibit P



## Florida Limited Liability

### NIKKI BEACH PUBLISHING, LLC

---

PRINCIPAL ADDRESS
ONE OCEAN DR.
MIAMI BEACH FL 33139

---

MAILING ADDRESS
ONE OCEAN DR.
MIAMI BEACH FL 33139

| Document Number | FEI Number | Date Filed |
|---|---|---|
| L03000021452 | 300193173 | 06/12/2003 |

| State | Status | Effective Date |
|---|---|---|
| FL | ACTIVE | NONE |

| Total Contribution | | |
|---|---|---|
| 0.00 | | |

---

## Registered Agent

| Name & Address |
|---|
| REGISTER, MICHAEL<br>1 OCEAN DRIVE<br>MIAMI BEACH FL 33139 |
| Name Changed: 05/11/2005 |
| Address Changed: 05/11/2005 |

## Manager/Member Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK<br>ONE OCEAN DRIVE<br>MIAMI BEACH FL 33139 | P |

## Annual Reports

DEFENDANT'S
EXHIBIT
47

Blumberg No. 5114

| Report Year | Filed Date |
|-------------|------------|
| 2004 | 05/25/2004 |
| 2005 | 05/11/2005 |

[ Previous Filing ]        [ Return to List ]        [ Next Filing ]

No Events
No Name History Information

## Document Images

Listed below are the images available for this filing.

05/11/2005 -- ANNUAL REPORT
05/25/2004 -- ANN REP/UNIFORM BUS REP
06/12/2003 -- Florida Limited Liabilites

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**

[ Corporations Inquiry ]        [ Corporations Help ]

# Exhibit Q

www.sunbiz.org - Department of State



# FLORIDA DEPARTMENT OF STATE
# DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | H |

Previous on List    Next on List    Return To List

No Events    No Name History

Entity Name

# Detail by Entity Name

## Florida Limited Liability Company

NIKKI BEACH HOLDINGS LLC

## Filing Information

| | |
|---|---|
| Document Number | L06000105431 |
| FEI Number | APPLIED |
| Date Filed | 10/30/2006 |
| State | FL |
| Status | ACTIVE |
| Effective Date | 10/31/2006 |

## Principal Address

ONE OCEAN DRIVE
MIAMI BEACH FL 33139

## Mailing Address

ONE OCEAN DRIVE
MIAMI BEACH FL 33139

## Registered Agent Name & Address

REGISTER, MICHAEL
ONE OCEAN DRIVE
MIAMI BEACH FL 33139 US

## Manager/Member Detail

Name & Address

Title MGRM

PENROD, JACK V
ONE OCEAN DRIVE
MIAMI BEACH FL 33139

## Annual Reports

| Report Year | Filed Date |
|---|---|
| 2007 | 09/05/2007 |

## Document Images



DEFENDANT'S
EXHIBIT
48

09/05/2007 -- ANNUAL REPORT

10/30/2006 -- Florida Limited Liability

Note: This is not official record. See documents if question or conflict.

Previous on List    Next on List        Return To List

No Events            No Name History

                                                            Entity Name :

Home  Contact us  Document Searches  E-Filing Services  Forms  Help
Copyright  and  Privacy Policies
Copyright © 2007 State of Florida, Department of State.

# 2007 LIMITED LIABILITY COMPANY
## ANNUAL REPORT

**DOCUMENT # L06000105431**

1. Entity Name
NIKKI BEACH HOLDINGS LLC

*FILED*

2007 SEP -5 AM 10: 03

SECRETARY OF STATE
TALLAHASSEE, FLORIDA

| Principal Place of Business | Mailing Address |
|---|---|
| ONE OCEAN DRIVE<br>MIAMI BEACH, FL 33139 | ONE OCEAN DRIVE<br>MIAMI BEACH, FL 33139 |

07262007    Chg-LLC    CR2E083 (12/06)

| 2. Principal Place of Business - No P.O. Box # | 3. Mailing Address | | 4. FEI Number | ✓ Applied For<br>Not Applicable |
|---|---|---|---|---|
| Suite, Apt. #, etc. | Suite, Apt. #, etc. | | 5. Certificate of Status Desired ☐ | $5.00 Additional Fee Required |
| City & State | City & State | | | |
| Zip | Country | Zip | Country | |

| 6. Name and Address of Current Registered Agent | 7. Name and Address of New Registered Agent |
|---|---|
| REGISTER, MICHAEL<br>ONE OCEAN DRIVE<br>MIAMI BEACH, FL 33139 | Name |
| | Street Address (P.O. Box Number is Not Acceptable) |
| | City _____ FL ___ Zip Code |

8. The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida. I am familiar with, and accept the obligations of registered agent.

SIGNATURE: _____
Signature, typed or printed name of registered agent and title if applicable     (NOTE: Registered Agent signature required when reinstating)     DATE

**Filing Fee is $50.00**
**Due by September 14, 2007**

Make check payable to
Florida Department of State

| 9. | MANAGING MEMBERS / MANAGERS | | 10. | ADDITIONS / CHANGES |
|---|---|---|---|---|
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY·ST·ZIP | MGRM<br>PENROD, JACK V<br>ONE OCEAN DRIVE<br>MIAMI BEACH, FL 33139 | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY·ST·ZIP | S00109184936<br>03/07/07--01017--008  **700.00  ☐ Change  ☐ Addition |
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY·ST·ZIP | | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY·ST·ZIP | ☐ Change  ☐ Addition |
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY·ST·ZIP | | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY·ST·ZIP | ☐ Change  ☐ Addition |
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY·ST·ZIP | | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY·ST·ZIP | ☐ Change  ☐ Addition |
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY·ST·ZIP | | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY·ST·ZIP | ☐ Change  ☐ Addition |
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY·ST·ZIP | | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY·ST·ZIP | ☐ Change  ☐ Addition |

11. I hereby certify that the information supplied with this filing does not qualify for the exemptions contained in Chapter 119, Florida Statutes. I further certify that the information indicated on this report is true and accurate and that my signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 608, Florida Statutes.

SIGNATURE: _____    OMAR BLANCO    2/26/2007    305-539-1111
SIGNATURE AND TYPED OR PRINTED NAME OF SIGNING MANAGING MEMBER, MANAGER, OR AUTHORIZED REPRESENTATIVE     Date     Daytime Phone #



DEFENDANT'S
EXHIBIT
49

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L06000105431
FILED 8:00 AM
October 30, 2006
Sec. Of State
jbryan

## Article I

The name of the Limited Liability Company is:

NIKKI BEACH HOLDINGS LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

ONE OCEAN DRIVE
MIAMI BEACH, FL. 33139

The mailing address of the Limited Liability Company is:

ONE OCEAN DRIVE
MIAMI BEACH, FL. 33139

## Article III

The name and Florida street address of the registered agent is:

MICHAEL REGISTER
ONE OCEAN DRIVE
MIAMI BEACH, FL. 33139

Having been named as registered agent and to accept service of process
for the above stated limited liability company at the place designated
in this certificate, I hereby accept the appointment as registered agent
and agree to act in this capacity. I further agree to comply with the
provisions of all statutes relating to the proper and complete performance
of my duties, and I am familiar with and accept the obligations of my
position as registered agent.

Registered Agent Signature: MICHAEL REGISTER

DEFENDANT'S
EXHIBIT
50

## Article IV

The name and address of managing members/managers are:

Title: MGRM
JACK V PENROD
ONE OCEAN DRIVE
MIAMI BEACH, FL. 33139

L06000105431
FILED 8:00 AM
October 30, 2006
Sec. Of State
jbryan

## Article V

The effective date for this Limited Liability Company shall be:

10/31/2006

Signature of member or an authorized representative of a member
Signature: MICHAEL REGISTER

# Exhibit R

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

2005 FLORIDA FESTIVAL, LLC,

                           Plaintiff,                      05 Civ. 6856 (SHS)

            -against-
                                                           GOLDBERG
NIKKI VIP LLC and PENROD MANAGEMENT                        DECLARATION
GROUP, INC.,

                           Defendants.

NATHAN A. GOLDBERG, under penalty of perjury, declares and says:

1.      I am an attorney with the law firm of Sullivan & Worcester LLP, counsel for plaintiff

in the above-captioned action.  I respectfully submit this declaration in support of plaintiff's

opposition to defendants' motion to dismiss or transfer the action dated August 8, 2005.

2.      Attached hereto as Exhibit A is a true and correct copy of the Complaint filed in the

above-captioned action.

3.      Attached hereto as Exhibit B is a true and correct copy of the Nikki Beach homepage

on its website: http://www.nikkibeach.com.

4.      Attached hereto as Exhibit C are true and correct copies of:  (a) defendants' listings

on the Florida Department of State's website; (b) Nikki VIP LLC's 2005 Annual Report filed with

the Florida Department of State; and (c) the Penrod Management Group, Inc.'s 2005 Annual Report

filed with the Florida Department of State.

5.      Attached hereto as Exhibit D are true and correct copies of certain listings on the

Florida Department of State's website, and assorted filings therewith, by entities that, upon

information and belief, are corporate affiliates or subsidiaries of defendants, including:  (a) Nikki

Beach Club; (b) Penrod Brothers, Inc.; (c) Nikki Beach Music, LLC; (d) Nikki Beach Publishing,

LLC; (e) Penrod Management International, LLC; and (f) Penrod Management International, LLC.

6.      Attached hereto as Exhibit E are true and correct copies of internet articles including:

(a) an article from the Nikki Beach website entitled "Jack Penrod," and (b) an article entitled

"Resorts Atlantic City to transform its beachfront into the "Sexiest Party on Earth" with Nikki

Beach, Summer 2005" from: http://www.atlanticcityone.com/resorts_casino_nikki_beach.htm.

7.      Attached hereto as Exhibit F are true and correct copies of: (a) Nikki Midtown

LLC's listing on the New York Department of State's website; and (b) a press release dated July 19,

2005 regarding Nikki Midtown LLC from Nikki Beach's website.

I declare under penalty of perjury and subject to the provisions of 17 U.S.C. § 1746 that the

foregoing is true and correct.

Dated: New York, New York
       September 15, 2005

NATHAN A. GOLDBERG [NG 5742]

-2-

**EXHIBIT A**

SULLIVAN & WORCESTER LLP
1290 Avenue of the Americas – 29th Floor
New York, New York 10104
212-660-3000

*Attorneys for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| 2004 FLORIDA FESTIVAL, LLC,<br><br>Plaintiff,<br><br>v.<br><br>NIKKI VIP LLC and PENROD MANAGEMENT GROUP INC.<br><br>Defendants. | INDEX NO.: *602224/05*<br>Date Purchased: 06/21/05<br><br>Plaintiff designates New York<br>County as place of trial<br><br>**SUMMONS**<br><br>The basis of venue is CPLR §503 |

TO:    ABOVE NAMED DEFENDANTS

YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve a copy of your answer on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the date of service (or within 30 days after the service is complete if the summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded.

Dated:  New York, New York
        June 21, 2005

SULLIVAN & WORCESTER LLP

By: _____
      Nathan A. Goldberg, Esq.
      1290 Avenue of the Americas, 29th Floor
      New York, New York 10104
      (212) 660-3000

      Attorneys for Plaintiff

NEW YORK
COUNTY CLERK'S OFFICE
JUN 2 1 2005
NOT COMPARED
WITH COPY FILED

To:

Nikki-VIP LLC
One Ocean Drive
Miami Beach, FL 33139-7321

*Defendant*

Penrod Management Group, Inc.,
One Ocean Drive
Miami Beach, FL 33139-7321

*Defendant*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

——————————————————————
2005 FLORIDA FESTIVAL, LLC,           )
)
Plaintiff,           )
)          **COMPLAINT**
v.           )
)
NIKKI VIP LLC and PENROD MANAGEMENT )
GROUP, INC.           )
)
Defendants.           )
——————————————————————)

## INTRODUCTION

By and through the present Complaint, plaintiff 2005 Florida Festival, LLC seeks redress

against defendants Nikki VIP LLC and Penrod Management Group, Inc. for their contractual

breaches and related defalcations with respect to the contemplated production of a summer

concert series in Atlantic City, New Jersey, in collaboration with Resorts Casino. As will be

further explicated below, plaintiff entered into a written agreement with defendant Nikki VIP

LLC - - whose performance thereunder was guaranteed by defendant Penrod Management Group

- - for the production and promotion of the planned concert series. Nikki VIP LLC breached

virtually every material obligation it had under the parties' agreement, including, without

limitation, its obligation to fund an account for the payment of expenses incurred in connection

with the concert series; its obligation to promote, market and advertise the concert series, and to

pay all expenses attendant thereto; its obligation to construct and provide (or to cause Resorts

Casino to provide) a concert venue suitable for the planned performances; and its obligation to

pay a host of third-party expenses incurred in furtherance of the concert series. In addition to the

foregoing, Nikki VIP LLC - - both prior to and after the execution of the parties' agreement - -

made numerous fraudulent and negligent misrepresentations to plaintiff, initially to induce

plaintiff to enter into the agreement and, thereafter, to persuade plaintiff not to exercise its

contractual right to terminate the parties' agreement following Nikki VIP LLC's breaches

thereof. By reason of the foregoing, plaintiff seeks in this Complaint damages for Nikki VIP

LLC's breach of contract, Penrod Management Group's breach of its guarantee of Nikki VIP

LLC's contractual obligations, and Nikki VIP LLC's fraudulent and negligent

misrepresentations.

In further support of its Complaint and claims herein, plaintiff 2005 Florida Festival,

LLC alleges and avers as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff 2005 Florida Festival, LLC ("FFL") is a limited liability corporation

organized under the laws of the State of Florida, having a principal place of business at 485

Madison Avenue, New York, New York.

2.      Defendant Nikki VIP LLC ("NVL") is, upon information and belief, a limited

liability corporation organized under the laws of the State of Florida, having a principal place of

business at One Ocean Drive, Miami Beach, Florida.

3.      Defendant Penrod Management Group, Inc. ("Penrod Management") is, upon

information and belief, a corporation organized under the laws of the State of Florida, having a

principal place of business at One Ocean Drive, Miami Beach, Florida. Upon information and

belief, Penrod Management is the parent company of, or is otherwise affiliated with and

exercises control over, NVL.

4.      This Court has personal jurisdiction over NVL and Penrod Management pursuant

to, *inter alia,* CPLR§§ 301 and 302, in that each of those parties transacted business in the State

2

of New York in connection with the matters at issue in this litigation; and as the parties'
agreement provides that the laws of the State of New York shall govern all disputes arising
thereunder.

### FACTUAL BACKGROUND

5.      FFL is an entity engaged, in conjunction with its affiliate, Track Entertainment,
Inc. ("Track"), in the promotion and presentation of concert performance events.  (As hereinafter
used herein, the term "FFL" shall refer, individually and collectively, to 2005 Florida Festival
LLC and Track.)

6.      Upon information and belief, NVL and its affiliated entities, including Penrod
Management, own and operate a number of exclusive nightclubs in diverse locations throughout
the world, including South Beach, Miami, Marbella, St. Tropez, Sardinia, Buzios, St. Barts,
Cabo, Puerto Vallarta and Hollywood.  These nightclubs are operated under the name "Nikki
Beach."

7.      In or about March of 2005, a representative of NVL approached FFL to determine
whether FFL might be interested in collaborating with NVL in the production and presentation of
a summer concert series in Atlantic City, New Jersey (the "Concert Series.")

8.      During the course of the parties' initial discussions, NVL advised FFL that NVL
had entered into a partnership or similar collaborative arrangement with Resorts International,
Inc. ("Resorts"), which operates and manages a casino property located in Atlantic City.  NVL
informed FFL that Resorts and NVL were constructing a first-class entertainment complex on
beachfront property in Atlantic City, adjacent to the Resorts Casino.  NVL further advised FFL
that the entertainment complex would contain a 4,000 seat outdoor concert theater (the "Arena");
a bar named the "Elbow Room," which is the name of a well-known bar located in Fort

Lauderdale, Florida that is owned and operated by an affiliate of NVL; and a "Nikki Beach" nightclub, the name under which the exclusive nightclubs owned by NVP and its affiliates are operated.

9.    During the course of the parties' discussions and negotiations, NVL further represented to FFL that it had the financial resources, expertise and experience necessary to work constructively with FFL in furtherance of the contemplated Concert Series; and that it had obtained commitments, of both a financial and promotional nature, from Resorts, which would greatly enhance the likely success of the Concert Series and facilitate the parties' efforts in respect thereof.

10.    In direct reliance on NVL's aforesaid (and other) representations (and Penrod Management's guarantee as described below), in or about April of 2005, FFL entered into an agreement with NVL concerning the production of the Concert Series (the "Agreement").

11.    Pursuant to the Agreement, NVL engaged FFL to work with NVL in the promotion of a minimum of 13 concerts (the "Concerts"), which would be held during the period June 1 – September 15, 2005 "at the Arena, a temporary open-air concert venue on the beach next to the Resorts Casino in Atlantic City, New Jersey."

12.    In the Agreement, NVL assumed full and sole responsibility "for providing (or causing Resorts Casino (or its affiliate)) the use of the Arena for the Concerts, including, without limitation, the stage already in place and the components thereof . . . ."

13.    Pursuant to the Agreement, NVL agreed "to cause Resorts Casino to provide substantial promotional support for the Concerts in all of Resorts' marketing and promotional materials that mention entertainment at Resorts (*i.e.*, the Casino and the Arena), at no cost to

[FFL]"; and to "provide [FFL] with opportunities to coordinate all marketing, promotion and advertising efforts for the Concerts with Resorts' general entertainment advertising efforts."

14.    NVL also agreed in the Agreement to implement "the media plan for each Concert at [NVL's] sole expense . . . and to be "solely responsible for all expenses associated with implementing said media plan."

15.    NVL also assumed the obligation in the Agreement to "transfer to a special account established by [FFL] (the "Special Account") the amount of $175,000, which amount shall be paid within 15 days following execution of this Agreement," and which "Special Account shall be used to fund the expenses for the Concerts . . . ."

16.    Penrod Management, "as an inducement for 2005 Florida Festival, LLC to execute this Agreement," specifically "guarantee[d] the full performance of the obligations of Nikki VIP LLC including, without limitation, Nikki VIP's obligation to fund the Special Account . . . ." But for Penrod Management's unconditional guarantee of NVL's obligations under the Agreement, FFL would not have executed the Agreement.

17.    Under the Agreement, FFL assumed responsibility, *inter alia,* for developing plans for the Concerts; coordinating the production elements for the Concerts; and "booking" the artists who were to appear at the Concerts.

18.    Pursuant to the Agreement, FFL was entitled to 70% of the profits generated from the Concerts; all proceeds from the sale of merchandise at the Concerts; and an allocable share of sponsorship revenues earned in connection with the Concert Series.

19.    Shortly following the parties' execution of the Agreement, and contrary to NVL's prior representations to FFL - - both as set forth in the Agreement and as made to FFL during the course of the parties' negotiations - - NVL acknowledged that it had not made sufficient

arrangements for the construction and completion of the Arena in time for the first anticipated

Concert under the Agreement. In this regard, NVL advised FFL that it had encountered

substantial problems with the construction of the stage at the Arena and that it had not made

adequate arrangements for the installation of the sound, lighting and other essential systems

necessary for the production and presentation of the Concerts at the Arena.

20.    After advising FFL of the foregoing, NVL acknowledged that, contrary to its prior

representations, it had neither the experience nor the ability to properly complete those tasks, and

it requested that FFL attend to the same. Although under no contractual obligation to do so, but

recognizing that it would not be possible to proceed with the Concerts unless the construction of

the stage was finalized and all systems ancillary thereto (including lighting and sound) were

satisfactorily installed, FFL acceded to NVL's request. NVL - - as it was obligated to do under

the parties' Agreement - - represented and confirmed that it would be solely responsible for all

expenses incurred in the construction of the stage and in the installation of the sound, lighting

and related systems ancillary thereto.

21.    In reliance on these further representations of NVL, FFL arranged for a number of

third-parties with whom it had longstanding relationships in the concert promotion business to

assist in the construction of the stage, the installation of the lighting and sound systems, and the

completion of the Arena. It was NVL's obligation to pay all expenses and other amounts

incurred by FFL and these third-parties in connection with the foregoing.

22.    At or about this time, NVL advised FFL that NVL intended to present the rap/hip-

hop artist "Ja Rule" at a concert at the Arena on May 28, 2005 and a fashion show at the Arena

on May 29, 2005. Although the Ja Rule performance and the fashion show were not covered by

the parties' Agreement, NVL requested that FFL produce the Ja Rule concert and assist with the

6

production of the fashion show. After discussions and negotiations between the parties, NVL agreed to pay FFL a $7,500 production fee for presenting the Ja Rule concert and to pay (or reimburse FFL) for all expenses incurred in connection with that event and the fashion show.

23.    At or about this same time, NVL requested that FFL present an "80's Show" at the Arena, *i.e.*, a Concert featuring performances of a number of groups who had been well-known and highly visible during the 1980's. NVL proposed that the "80's Show," which would be one of the Concerts under the Agreement, be held on May 27, 2005. NVL committed to FFL that NVL would "pre-sell" tickets to that Concert to representatives of other Atlantic City hotels and casinos, thereby eliminating any financial risk in respect of that Concert.

24.    In response to NVL's request in respect of the Ja Rule concert and the "80's Show," which were to be held at the Arena on May 27 and May 28, 2005, FFL - - with the knowledge and approval of NVL - - intensified its efforts to complete the construction of the Arena (including the stage) and the installation of the sound, lighting and other systems ancillary thereto. In this regard, the team assembled by FFL - - which included the most highly regarded third-party service providers in the concert industry - - worked nearly around the clock to complete the construction and installation, tasks that, under the Agreement, were the obligation of NVL.

25.    During this period of time, and at the request and with the approval of NVL - - FFL "booked" five groups to appear at the Arena on May 27, 2005 for the contemplated "80's Show." As is common and typical in the concert promotion industry, FFL was obligated to pay a substantial "deposit" to representatives of these groups to ensure their appearance at the scheduled Concert; and to pay the remaining balance of the artists' guaranteed fee on the day of the Concert performance.

7

26.    During May of 2005, the team assembled by FFL continued to work diligently to complete the construction of the Arena and the installation of the required systems.  NVL, in breach of its contractual obligations, failed to pay FFL and a number of third-parties the substantial amounts that had been, and were continuing to be incurred - - with NVL's knowledge and approval - - in the construction and completion of the Arena.

27.    While these events were unfolding, FFL, as it was obligated to do under the parties' Agreement, "booked" other acts to perform at the additional Concerts that were to be held as a part of the Concert Series, including a "Disco Package" for June 18, 2005; the appearance of the "Yin-Yang Twins" and "112" on June 25, 2005; the appearance of "Sugar Ray" on July 2, 2005; the appearance of certain well-known "DJs" for a DJ Party on July 16, 2005; the appearance of Patti LaBelle on July 23, 2005; the appearance of additional "DJs" for a dance party on August 13, 2005; and the appearance of Shawn Colvin and John Hiatt on September 3, 2005.

28.    As is common and typical in the concert promotion industry, FFL was obligated to pay substantial deposits to these artists to secure their appearance on the dates agreed.

29.    As alleged earlier herein, it is NVL's sole and exclusive obligation to promote, market and advertise the Concerts and to pay all amounts incurred in connection therewith.

30.    By May 19, 2005, *i.e.,* approximately one week prior to the scheduled "80's Show," NVL had utterly failed to promote, in any meaningful fashion, that Concert.  In that regard (but not by way of limitation), NVL had failed to "buy" radio spots for the Concert; to place print-ads for the Concert; to arrange for Concert advertisements on local billboards and signage; to coordinate with Resorts in the promotion of the Concert; or take any other meaningful steps in furtherance thereof.

8

31.    As a result of NVL's failure in this regard, and recognizing the severe consequences that would (and ultimately did) flow therefrom, FFL warned NVL that its failure to promote the "80's Show" had placed the same in substantial financial jeopardy. In a candid acknowledgment of its deficient performance, in late May of 2005, NVL requested that FFL attempt to promote and advertise the "80's Show."

32.    It is typical and, indeed, necessary in the concert promotion industry for concerts such as the "80's Show" (and the other Concerts) to be advertised and promoted at least 6-8 weeks in advance of the scheduled performance date. NVL's request that FFL assist in the promotion and marketing of the "80's Show" was made less than one week before the scheduled event. By that time, it was, as a practical matter, impossible to effectively market and promote that Concert. Nonetheless, and although under no contractual or other obligation to do so, FFL diligently engaged in marketing efforts in an effort to promote that Concert.

33.    On May 27, 2005, the "80's Show" was presented at the Arena. Despite the appearance of five well-known groups, as a direct result of NVL's failure to market, promote or advertise that Concert, only approximately 20 paying ticket-holders attended the Concert.

34.    On May 28, 2005, Ja Rule appeared at the Arena and FFL, consistent with the parties' agreement, assisted in the production of that Concert. On May 29, 2005, the fashion show was held at the Arena and FFL, consistent with the parties' agreement, assisted in the production of that event.

35.    NVL's failure to promote the "80's Show" was repeated in respect of the "Disco Package," which was scheduled to be held at the Arena on June 18, 2005. In this regard, as of June 8, 2005 - - ten days before the Concert - - NVL had taken no significant steps to promote, advertise or market that Concert.

9

36.     At the same time that it was failing to discharge its promotional, marketing and
advertising obligations, NVL continued in its failure to reimburse FFL (and certain third-parties)
for the substantial expenses that had been incurred in connection with the construction of the
stage and the installation of the sound and lighting systems at the Arena, and the promotion of
the Ja Rule concert.  As a result of NVL's failure to pay third-party obligations, certain third-
party service providers have threatened to dismantle the stage and remove the critical lighting
and sound systems at the Arena.

37.     NVL also defaulted in its obligation to pay labor costs that were incurred in
connection with the Concert Series, including payments required to be made under applicable
union rules and regulations.

38.     In short, NVL has failed to fulfill virtually any of its material obligations under
the parties' Agreement and, by reason thereof, FFL has sustained, and will continue to sustain
substantial damages.

## COUNT I
### (Breach of Agreement – Nikki VIP LLC)

39.     FFL hereby incorporates herein by reference in their entirety the allegations set
forth in the immediately preceding paragraphs of this Complaint.

40.     NVL has breached the parties' Agreement in a number of respects, including,
without limitation, by the following acts and omissions:

a.      NVL has failed to fully fund the Special Account (which is to be used to
pay for expenses incurred in connection with the Concerts), in derogation of paragraph 6(e)(i) of
the Agreement.

b.      NVL has failed to reimburse FFL and certain third-parties (including
United Site Services of Maryland, Inc., Mobile Mini, Inc., Clair Soundworx, Tri-State Staging,

Inc. and Mountain Productions, Inc.) for the substantial expenses that were incurred - - at NVL's

specific direction - - in connection with constructing the Arena and the stage and in installing the

lighting and sound systems at the Arena, and in otherwise furthering the Concert Series, in an

amount in excess of $325,000, in derogation, *inter alia,* of paragraphs 3(a) and 6(b) of the

Agreement.

   c.  NVL has failed to cause Resorts to provide substantial promotional

support for the Concerts in all of Resorts' marketing and promotional materials that mention

entertainment at Resorts, in derogation of paragraph 3(c) of the Agreement.

   d.  NVL has failed to provide FFL with the opportunity to coordinate all

marketing, promotion and advertising efforts for the Concerts with Resorts' general

entertainment advertising efforts, in derogation of paragraph 3(c) of the Agreement.

   e.  NVL has failed to properly promote and market the Concerts and to

implement the media plan for each Concert, in derogation of paragraph 7(g) of the Agreement.

   f.  NVL has failed to make payment for all expenses associated with

implementing the media plan for the Concerts, in derogation of paragraph 4(e) of the Agreement.

  41.  NVL has breached the parties' Agreement in a number of additional and further

respects.

  42.  FFL has fully performed all of its obligations under the Agreement.

  43.  FFL has been damaged by reason of NVL's contractual breaches in an amount to

be determined at trial.

**COUNT II**
**(Breach of Ja Rule/Fashion Show Agreement - - Nikki VIP LLC)**

  44.  FFL hereby incorporates herein by reference in their entirety the allegations set

forth in the immediately preceding paragraphs of this Complaint.

11

45.     NVL agreed to pay FFL a producer fee of $7,500 in connection with the May 28, 2005 Ja Rule concert at the Arena; and to reimburse FFL for all expenses FFL incurred in connection with that Concert and with the fashion show that was held on May 29, 2005.

46.     NVL has breached the aforesaid agreement by failing to pay the producer fee to FFL and by failing to reimburse FFL for the substantial expenses that it incurred in connection with the Ja Rule concert and the fashion show.

47.     FFL has fully performed all of its obligations under the aforesaid agreement.

48.     FFL has been damaged by reason of NVL's contractual breaches in an amount to be determined at trial.

**COUNT III**
**(Breach of Guaranty - - Penrod Managment)**

49.     FFL hereby incorporates herein by reference in their entirety the allegations set forth in the immediately preceding paragraphs of this Complaint.

50.     In the Agreement, Penrod Management guaranteed "the full performance of the obligations of Nikki VIP LLC" under the Agreement.

51.     As alleged and avered earlier herein, NVL is in breach of its material obligations to FFL under the Agreement.

52.     By reason of the foregoing, Penrod Management is obligated to FFL for all amounts due to FFL under the Agreement and for all damages caused by NVL's breaches thereof.

53.     FFL has made demand on Penrod Management to satisfy its obligations under its guarantee.

54.     Penrod Management has failed and refused to pay FFL the amounts to which it is entitled by reason of Penrod Management's guarantee.

12

55.     Penrod Management's conduct as aforesaid constitutes a breach of its guarantee.

56.     FFL has been damaged as a result of Penrod Management's contractual breaches in an amount to be determined at trial.

## COUNT IV
### (Fraudulent Inducement and Misrepresentation - - Nikki VIP LLC)

57.     FFL hereby incorporates herein by reference in their entirety the allegations set forth in the immediately preceding paragraphs of this Complaint.

58.     As alleged earlier herein, in connection with the parties' negotiation of the Agreement, NVL made numerous representations to FFL to induce FFL to enter into the Agreement.

59.     In this regard, during the period March – April of 2005, NVL advised FFL that it had the experience and expertise necessary to successfully promote the Concerts contemplated by the Agreement; that, by reason of its collaborative partnership with Resorts, Resorts would have an active and highly visible role in the promotion and marketing of the Concerts; and that Resorts had agreed to provide promotional and financial backing for the Concert Series; and that NVL had the experience and financial resources necessary to successfully construct the Arena and install the sound and lighting systems so that the same would be available for use at the Concerts.

60.     Following the execution of the parties' Agreement, and after NVL's breach thereof, NVL made a number of further representations to FFL in order to induce FFL to continue performing under the Agreement and to not terminate the same, as FFL had the contractual right to do; and to provide additional funding and advance payment of additional expenses in connection with the construction of the Arena and the promotion of the Concerts.

13

61.    In this regard, during the period May – June of 2005, NVL repeatedly assured FFL that NVL would reimburse FFL for the expenses that it was incurring in connection with the construction of the stage and the installation of the sound and lighting systems at the Arena; and that NVL would pay the substantial third-party expenses that were incurred in connection with the foregoing tasks; that FFL would cause Resorts to take a more active and affirmative role in connection with the promotion, marketing, advertising of the Concert.

62.    Each of the aforesaid representations was made by NVL for the specific purpose of inducing FFL to rely thereon.

63.    FFL relied on the representations summarized in paragraph 59, above by entering into the Agreement.  FFL would not have entered into the Agreement but for NVL's making of those representations.

64.    FFL relied on the representations summarized in paragraph 61 above by incurring additional expenses and otherwise working in furtherance of the Concert Series; by not terminating the parties' Agreement, as FFL had the right to do thereunder; by continuing to use its long-standing and favorable relationships with third-parties to complete the construction of the stage and the installation of the lighting and sound systems at the Arena; and in otherwise furthering NVL's interests in respect of the Concert Series.

65.    FFL's reliance as aforesaid was reasonable under the circumstances, and was undertaken to FFL's detriment and damage.

66.    The foregoing constitutes fraudulent inducement and fraudulent misrepresentation on the part of NVL.

67.    FFL has been damaged by reason of the aforesaid fraudulent conduct of NVL in an amount to be determined at trial.

14

## COUNT V
### (Negligent Misrepresentation - - Nikki VIP LLC)

68.    FFL hereby incorporates herein by reference in their entirety the allegations set forth in the immediately preceding paragraphs of this Complaint.

69.    Pleading in the alternative, and without waiver of or prejudice to its allegations and claims of fraud on the part of NVL, FFL alleges and avers that the representations of NVL summarized in paragraphs 59 and 61 above were made by NVL negligently, *i.e.*, without due regard for their truth or falsity.

70.    FFL relied upon the aforesaid representations of NVL to its damage and detriment, and such reliance was reasonable under the circumstances.

71.    The foregoing conduct of NVL constitutes negligent misrepresentation.

72.    FFL has been damaged by reason of the foregoing in an amount to be determined at trial.

### PRAYERS FOR RELIEF

By reason of and based upon the foregoing allegations and averments, plaintiff 2005 Florida Festival, LLC hereby prays for the entry of the following relief:

A.    That this Court enter judgment in favor of FFL and against NVL on Count I of the Complaint, in an amount to be determined at trial, together with interest thereon and an award of the attorneys' fees and costs incurred by FFL in connection with this action.

B.    That this Court enter judgment in favor of FFL and against NVL on Count II of the Complaint, in an amount to be determined at trial, together with interest thereon and an award of the attorneys' fees and costs incurred by FFL in connection with this action.

C.    That this Court enter judgment in favor of FFL and against Penrod Management on Count III of the Complaint, in an amount to be determined at trial, together with interest

thereon and an award of the attorneys' fees and costs incurred by FFL in connection with this action.

D.      That this Court enter judgment in favor of FFL and against NVL on Count IV of the Complaint, in an amount to be determined at trial, together with interest thereon and an award of the attorneys' fees and costs incurred by FFL in connection with this action.

E.      That this Court enter judgment in favor of FFL and against NVL on Count V of the Complaint, in an amount to be determined at trial, together with interest thereon and an award of the attorneys' fees and costs incurred by FFL in connection with this action.

F.      That this Court award punitive damages to FFL in an amount to be determined at trial.

G.      That this Court enter such other and further relief as it may deem just and appropriate in the circumstances.

SULLIVAN & WORCESTER, LLP

Nathan A. Goldberg, Esq.
1290 Avenue of the Americas
29th Floor
New York, New York 10104
Telephone: (212) 660-3000

Of Counsel:  John J. Rosenberg, Esq.*                *Attorneys for Plaintiff*
                                                     *2005 Florida Festival, LLC*

---

* Admitted in Massachusetts only.

16

**EXHIBIT B**

Welcome to NIKKI BEACH





SELECT A LOCATION YOU WOULD LIKE TO VISIT:

buzios · cabo san lucas · hollywood · marbella · miami
new york · puerto vallarta · sardinia · st barths · st tropez





9/15/2005

Welcome to NIKKI BEACH

sister companies:

    

**EXHIBIT C**

Division of Corporations                                                    Page 1 of 2



## Florida Limited Liability

### NIKKI VIP, LLC

#### PRINCIPAL ADDRESS
ONE OCEAN DRIVE
4TH FLOOR
MIAMI BEACH FL 33139
Changed 05/11/2005

#### MAILING ADDRESS
ONE OCEAN DRIVE
4TH FLOOR
MIAMI BEACH FL 33139
Changed 05/11/2005

| Document Number | FEI Number | Date Filed |
|---|---|---|
| L04000022385 | 200942594 | 03/23/2004 |

| State | Status | Effective Date |
|---|---|---|
| FL | ACTIVE | NONE |

**Total Contribution**
0.00

## Registered Agent

| Name & Address |
|---|
| REGISTER, MICHAEL<br>ONE OCEAN DRIVE<br>MIAMI BEACH FL 33139 |

## Manager/Member Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK<br>317 N. COCONUT LANE<br><br>MIAMI BEACH FL 33139 US | P |

Division of Corporations

# Annual Reports

| Report Year | Filed Date |
|---|---|
| 2005 | 05/11/2005 |

[ Previous Filing ]          [ Return to List ]          [ Next Filing ]

No Events
No Name History Information

# Document Images

Listed below are the images available for this filing.

| 05/11/2005 -- ANNUAL REPORT |
| 03/23/2004 -- Florida Limited Liabilites |

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**



Corporations Inquiry          Corporations Help

# 2005 LIMITED LIABILITY COMPANY ANNUAL REPORT

**FILED**
**May 11, 2005**
**Secretary of State**

DOCUMENT# L04000022385

**Entity Name:** NIKKI VIP, LLC

| **Current Principal Place of Business:** | **New Principal Place of Business:** |
|---|---|
| ONE OCEAN DRIVE<br>MIAMI BEACH, FL 33139 | ONE OCEAN DRIVE<br>4TH FLOOR<br>MIAMI BEACH, FL 33139 |
| **Current Mailing Address:** | **New Mailing Address:** |
| ONE OCEAN DRIVE<br>MIAMI BEACH, FL 33139 | ONE OCEAN DRIVE<br>4TH FLOOR<br>MIAMI BEACH, FL 33139 |

FEI Number: 20-0942594     FEI Number Applied For ( )     FEI Number Not Applicable ( )     Certificate of Status Desired ( )
In accordance with s. 607.193(2)(b), F.S., the limited liability company did not receive the prior notice.

| **Name and Address of Current Registered Agent:** | **Name and Address of New Registered Agent:** |
|---|---|
| REGISTER, MICHAEL<br>ONE OCEAN DRIVE<br>MIAMI BEACH, FL 33139     US | |

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

Electronic Signature of Registered Agent                                    Date

| **MANAGING MEMBERS/MEMBERS:** | **ADDITIONS/CHANGES:** |
|---|---|
| Title:                ( ) Delete<br>Name:<br>Address:<br>City-St-Zip: | Title:        P        ( ) Change  (X) Addition<br>Name:      PENROD, JACK<br>Address:   317 N. COCONUT LANE<br>City-St-Zip:  MIAMI BEACH, FL 33139 US |

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 608, Florida Statutes.

SIGNATURE:   JACK PENROD                                        P                        05/11/2005

Electronic Signature of Signing Managing Member, Manager, or Authorized Representative / Date

Division of Corporations                                          Page 1 of 2



## Florida Profit

## PENROD MANAGEMENT GROUP, INC.

### PRINCIPAL ADDRESS
1 OCEAN DRIVE
4TH FLOOR
MIAMI BEACH FL 33139 US
Changed 05/11/2005

### MAILING ADDRESS
1 OCEAN DRIVE
4TH FLOOR
MIAMI BEACH FL 33139 US
Changed 05/11/2005

| Document Number | FEI Number | Date Filed |
|---|---|---|
| P01000104533 | 651151495 | 10/29/2001 |

| State | Status | Effective Date |
|---|---|---|
| FL | ACTIVE | NONE |

## Registered Agent

| Name & Address |
|---|
| BONITATIBUS, PETER<br>1300 NORTH FEDERAL HWY<br>202<br>BOCA RATON FL 33432 |
| Address Changed: 03/25/2002 |

## Officer/Director Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK<br>317 COCONUT LANE<br>MIAMI BEACH FL 33139 | P |

## Annual Reports

| Report Year | Filed Date |
|---|---|
| 2003 | 05/07/2003 |
| 2004 | 05/04/2004 |
| 2005 | 05/11/2005 |

| Previous Filing | | Return to List | | Next Filing |
|---|---|---|---|---|

No Events
No Name History Information

## Document Images
Listed below are the images available for this filing.

05/11/2005 -- ANNUAL REPORT
05/04/2004 -- ANN REP/UNIFORM BUS REP
05/07/2003 -- ANN REP/UNIFORM BUS REP
03/25/2002 -- COR - ANN REP/UNIFORM BUS REP
10/29/2001 -- Domestic Profit

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**

Corporations Inquiry           Corporations Help

## 2005 FOR PROFIT CORPORATION ANNUAL REPORT

FILED
May 11, 2005
Secretary of State

DOCUMENT# P01000104533

Entity Name: PENROD MANAGEMENT GROUP, INC.

| | |
|---|---|
| **Current Principal Place of Business:** | **New Principal Place of Business:** |
| 1300 NORTH FEDERAL HWY<br>202<br>BOCA RATON, FL 33432 | 1 OCEAN DRIVE<br>4TH FLOOR<br>MIAMI BEACH, FL 33139     US |
| **Current Mailing Address:** | **New Mailing Address:** |
| 1300 NORTH FEDERAL HWY<br>202<br>BOCA RATON, FL 33432 | 1 OCEAN DRIVE<br>4TH FLOOR<br>MIAMI BEACH, FL 33139     US |

FEI Number: 65-1151495        FEI Number Applied For ( )        FEI Number Not Applicable ( )        Certificate of Status Desired ( )

| | |
|---|---|
| **Name and Address of Current Registered Agent:** | **Name and Address of New Registered Agent:** |
| BONITATIBUS, PETER<br>1300 NORTH FEDERAL HWY<br>202<br>BOCA RATON, FL 33432 US | |

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

        Electronic Signature of Registered Agent                         Date

In accordance with s. 607.193(2)(b), F.S., the corporation did not receive the prior notice.
Election Campaign Financing Trust Fund Contribution ( ).

| **OFFICERS AND DIRECTORS:** | **ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:** |
|---|---|
| Title:    P      ( ) Delete<br>Name.    PENROD, JACK<br>Address:  317 COCONUT LANE<br>City-St-Zip  MIAMI BEACH, FL 33139 | Title:         ( ) Change ( ) Addition<br>Name:<br>Address:<br>City-St-Zip: |

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE: JACK PENROD _____ P _____ 05/11/2005

        Electronic Signature of Signing Officer or Director                  Date

**EXHIBIT D**



## Trademark

### NIKKI BEACH CLUB

| | | |
|---|---|---|
| **Document Number** | **Date Filed** | **Expiration Date** |
| T00000000502 | 05/02/2000 | 05/02/2010 |
| **Last Event** | **Event Date Filed** | **Event Effective Date** |
| TRADEMARK ASSIGNMENT | 10/28/2003 | NONE |
| **First Used in Florida** | **First Used Anywhere** | **Status** |
| 12/19/1999 | 12/19/1999 | ACTIVE |

**Mark Used In Connection With**
RESTAURANT, BEACH CLUB

**Disclaimer For**
BEACH CLUB

## Owners

| Name & Address |
|---|
| PENROD BROTHERS, INC., A FLA. CORP.<br>ONE OCEAN DRIVE |
| MIAMI BEACH FL 33139 |

| Previous Filing | Return to List | Next Filing |
|---|---|---|

View Events
No Name History Information

## Type/Class

| | | | | |
|---|---|---|---|---|
| SM-004200 | 0000000000 | 0000000000 | 0000000000 | 0000000000 |
| 0000000000 | 0000000000 | 0000000000 | 0000000000 | 0000000000 |
| 0000000000 | 0000000000 | 0000000000 | 0000000000 | 0000000000 |
| 0000000000 | 0000000000 | 0000000000 | 0000000000 | 0000000000 |

No Cross Reference

## Document Images

Division of Corporations                                                    Page 2 of 2

Listed below are the images available for this filing.

| |
|---|
| 10/28/2003 -- Trademark Assignment |
| 05/02/2000 -- Trademark |

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**

**Corporations Inquiry**                         **Corporations Help**

Division of Corporations



## Florida Profit

### PENROD BROTHERS, INC.

**PRINCIPAL ADDRESS**
ONE OCEAN DR.
MIAMI BCH. FL 33139
Changed 08/25/1989

**MAILING ADDRESS**
ONE OCEAN DR.
MIAMI BCH. FL 33139
Changed 08/25/1989

| Document Number | FEI Number | Date Filed |
|---|---|---|
| H74863 | 592593084 | 09/09/1985 |
| **State** | **Status** | **Effective Date** |
| FL | ACTIVE | NONE |

## Registered Agent

| Name & Address |
|---|
| PENROD, JACK<br>ONE OCEAN DRIVE<br>MIAMI BCH. FL 33139 |
| Name Changed: 07/28/1988 |
| Address Changed: 03/28/1994 |

## Officer/Director Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK<br>ONE OCEAN DRIVE<br><br>MIAMI BEACH FL 33139 | P |
| PENROD, LUCIA<br>ONE OCEAN DRIVE<br><br>MIAMI BEACH FL 33139 | S |

## Annual Reports

| Report Year | Filed Date |
|---|---|
| 2003 | 05/06/2003 |
| 2004 | 04/29/2004 |
| 2005 | 04/04/2005 |

[ Previous Filing ]        [ Return to List ]        [ Next Filing ]

No Events
No Name History Information

## Document Images

Listed below are the images available for this filing.

04/04/2005 -- ANN REP/UNIFORM BUS REP
04/29/2004 -- ANNUAL REPORT
05/06/2003 -- ANN REP/UNIFORM BUS REP
03/22/2002 -- COR - ANN REP/UNIFORM BUS REP
04/16/2001 -- ANN REP/UNIFORM BUS REP
03/04/2000 -- ANN REP/UNIFORM BUS REP
03/14/1999 -- ANNUAL REPORT
03/31/1998 -- ANNUAL REPORT
03/10/1997 -- ANNUAL REPORT
06/20/1996 -- 1996 ANNUAL REPORT

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**



## 2005 FOR PROFIT CORPORATION ANNUAL REPORT

**FILED**
**Apr 04, 2005  08:00 AM**
**Secretary of State**

DOCUMENT # H74863

1. Entity Name
PENROD BROTHERS, INC.

| Principal Place of Business | Mailing Address |
|---|---|
| ONE OCEAN DR. MIAMI BCH., FL 33139 | ONE OCEAN DR. MIAMI BCH., FL 33139 |

### DO NOT WRITE IN THIS SPACE

04012005    No Chg-P    CR2E094 (10/03)

| 4. FEI Number | Applied For |
|---|---|
| 59-2593064 | Not Applicable |

5. Certificate of Status Desired ☐    $8.75 Additional Fee Required

6. Name and Address of Current Registered Agent

PENROD, JACK
ONE OCEAN DRIVE
MIAMI BCH., FL 33139

### DO NOT WRITE IN THIS SPACE

8. The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida. I am familiar with, and accept the obligations of registered agent.

SIGNATURE _____

Signature, typed or printed name of registered agent and title if applicable    (NOTE: Registered Agent signature required when reinstating)    DATE

| **FILE NOW!!! FEE IS $150.00** After May 1, 2005 Fee will be $550.00 | 9. Election Campaign Financing Trust Fund Contribution. ☐ | **$5.00** May Be Added to Fees |
|---|---|---|

10.                                    OFFICERS AND DIRECTORS

| TITLE | P |
|---|---|
| NAME | PENROD, JACK |
| STREET ADDRESS | ONE OCEAN DRIVE |
| CITY-ST-ZIP | MIAMI BEACH, FL 33139 |

| TITLE | S |
|---|---|
| NAME | PENROD, LUCIA |
| STREET ADDRESS | ONE OCEAN DRIVE |
| CITY-ST-ZIP | MIAMI BEACH, FL 33139 |

U00000286058
04/04/05-80013-012 150.00

### DO NOT WRITE IN THIS SPACE

| TITLE | |
|---|---|
| NAME | |
| STREET ADDRESS | |
| CITY-ST-ZIP | |

| TITLE | |
|---|---|
| NAME | |
| STREET ADDRESS | |
| CITY-ST-ZIP | |

| TITLE | |
|---|---|
| NAME | |
| STREET ADDRESS | |
| CITY-ST-ZIP | |

| TITLE | |
|---|---|
| NAME | |
| STREET ADDRESS | |
| CITY-ST-ZIP | |

12. I hereby certify that the information supplied with this filing does not qualify for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears in Block 10 or Block 11 if changed, or on an attachment with an address, with all other like empowered.

SIGNATURE: _Jack Penrod_    Jack Penrod    4-1-05    305 538-1111

SIGNATURE AND TYPED OR PRINTED NAME OF SIGNING OFFICER OR DIRECTOR    Date    Daytime Phone #



## Florida Limited Liability

### NIKKI BEACH MUSIC, LLC

**PRINCIPAL ADDRESS**
1 OCEAN DRIVE
4TH FLOOR
MIAMI BEACH FL 33139
Changed 05/11/2005

**MAILING ADDRESS**
1 OCEAN DRIVE
4TH FLOOR
MIAMI BEACH FL 33139
Changed 05/11/2005

| Document Number | FEI Number | Date Filed |
|---|---|---|
| L03000021430 | 760738504 | 06/12/2003 |

| State | Status | Effective Date |
|---|---|---|
| FL | ACTIVE | NONE |

**Total Contribution**
0.00

## Registered Agent

| Name & Address |
|---|
| REGISTER, MICHAEL
1 OCEAN DRIVE
4TH FLOOR
MIAMI BEACH FL 33139 |
| Name Changed: 05/11/2005 |
| Address Changed: 05/11/2005 |

## Manager/Member Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK
ONE OCEAN DRIVE | P |



MIAMI BEACH FL 33139

## Annual Reports

| Report Year | Filed Date |
|---|---|
| 2004 | 06/10/2004 |
| 2005 | 05/11/2005 |

[ Previous Filing ]     [ Return to List ]     [ Next Filing ]

No Events
No Name History Information

## Document Images

Listed below are the images available for this filing.



05/11/2005 -- ANNUAL REPORT
06/10/2004 -- ANN REP/UNIFORM BUS REP
06/12/2003 -- Florida Limited Liabilites

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**

Corporations Inquiry                  Corporations Help

# 2005 LIMITED LIABILITY COMPANY ANNUAL REPORT

**FILED**
**May 11, 2005**
**Secretary of State**

DOCUMENT# L03000021430

**Entity Name:** NIKKI BEACH MUSIC, LLC

| **Current Principal Place of Business:** | **New Principal Place of Business:** |
|---|---|
| 201 ALHAMBRA CIRCLE, SUITE 601 CORAL GABLES, FL 33134 | 1 OCEAN DRIVE 4TH FLOOR MIAMI BEACH, FL 33139 |
| **Current Mailing Address:** | **New Mailing Address:** |
| 201 ALHAMBRA CIRCLE, SUITE 601 CORAL GABLES, FL 33134 | 1 OCEAN DRIVE 4TH FLOOR MIAMI BEACH, FL 33139 |

FEI Number: 76-0738504     FEI Number Applied For ( )     FEI Number Not Applicable ( )     Certificate of Status Desired ( )
In accordance with s. 607.193(2)(b), F.S., the limited liability company did not receive the prior notice.

| **Name and Address of Current Registered Agent:** | **Name and Address of New Registered Agent:** |
|---|---|
| FIELDSTONE, RONALD 201 ALHAMBRA CIRCLE, SUITE 601 CORAL GABLES, FL 33134    US | REGISTER, MICHAEL 1 OCEAN DRIVE 4TH FLOOR MIAMI BEACH, FL 33139 US |

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE:  MICHAEL REGISTER                                      05/11/2005
_____              _____
Electronic Signature of Registered Agent                              Date

**MANAGING MEMBERS/MEMBERS:**                    **ADDITIONS/CHANGES:**

| Title: | P | ( ) Delete | Title: | ( ) Change ( ) Addition |
|---|---|---|---|---|
| Name: | PENROD, JACK | | Name: | |
| Address: | ONE OCEAN DRIVE | | Address: | |
| City-St-Zip: | MIAMI BEACH, FL 33139 | | City-St-Zip: | |

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 608, Florida Statutes.

SIGNATURE:  JACK PENROD                                P                    05/11/2005
_____
Electronic Signature of Signing Managing Member, Manager, or Authorized Representative / Date

Division of Corporations



## Florida Limited Liability

### NIKKI BEACH PUBLISHING, LLC

#### PRINCIPAL ADDRESS
ONE OCEAN DR.
MIAMI BEACH FL 33139

#### MAILING ADDRESS
ONE OCEAN DR.
MIAMI BEACH FL 33139

| Document Number | FEI Number | Date Filed |
|---|---|---|
| L03000021452 | 300193173 | 06/12/2003 |

| State | Status | Effective Date |
|---|---|---|
| FL | ACTIVE | NONE |

**Total Contribution**
0.00

## Registered Agent

| Name & Address |
|---|
| REGISTER, MICHAEL<br>1 OCEAN DRIVE<br>MIAMI BEACH FL 33139 |
| Name Changed: 05/11/2005 |
| Address Changed: 05/11/2005 |

## Manager/Member Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK<br>ONE OCEAN DRIVE<br>MIAMI BEACH FL 33139 | P |

## Annual Reports

Division of Corporations

| Report Year | Filed Date |
|---|---|
| 2004 | 05/25/2004 |
| 2005 | 05/11/2005 |

[ Previous Filing ]     [ Return to List ]     [ Next Filing ]

No Events
No Name History Information

## Document Images

Listed below are the images available for this filing.

| |
|---|
| 05/11/2005 -- ANNUAL REPORT |
| 05/25/2004 -- ANN REP/UNIFORM BUS REP |
| 06/12/2003 -- Florida Limited Liabilites |

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**



## 2005 LIMITED LIABILITY COMPANY ANNUAL REPORT

**FILED**
**May 11, 2005**
**Secretary of State**

DOCUMENT# L03000021452

**Entity Name:** NIKKI BEACH PUBLISHING, LLC

**Current Principal Place of Business:**

ONE OCEAN DR.
MIAMI BEACH, FL 33139

**New Principal Place of Business:**

**Current Mailing Address:**

ONE OCEAN DR.
MIAMI BEACH, FL 33139

**New Mailing Address:**

FEI Number: 30-0193173    FEI Number Applied For ( )    FEI Number Not Applicable ( )    Certificate of Status Desired ( )
In accordance with s. 607.193(2)(b), F.S., the limited liability company did not receive the prior notice.

**Name and Address of Current Registered Agent:**

FIELDSTONE, RONALD
201 ALHAMBRA CIR, STE 601
CORAL GABLES, FL 33134    US

**Name and Address of New Registered Agent:**

REGISTER, MICHAEL
1 OCEAN DRIVE
MIAMI BEACH, FL 33139    US

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE:  MICHAEL REGISTER                                    05/11/2005
_____          _____
        Electronic Signature of Registered Agent                    Date

**MANAGING MEMBERS/MEMBERS:**

| | |
|---|---|
| Title: | P      ( ) Delete |
| Name | PENROD, JACK |
| Address: | ONE OCEAN DRIVE |
| City-St-Zip: | MIAMI BEACH, FL 33139 |

**ADDITIONS/CHANGES:**

| | |
|---|---|
| Title: | ( ) Change ( ) Addition |
| Name: | |
| Address: | |
| City-St-Zip: | |

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 608, Florida Statutes.

SIGNATURE:  JACK PENROD                          P                    05/11/2005
_____
        Electronic Signature of Signing Managing Member, Manager, or Authorized Representative / Date

Division of Corporations



## Florida Limited Liability

### PENROD MANAGEMENT INTERNATIONAL, LLC

#### PRINCIPAL ADDRESS
ONE OCEAN DR.
MIAMI BEACH FL 33139

#### MAILING ADDRESS
ONE OCEAN DR.
MIAMI BEACH FL 33139

| Document Number | FEI Number | Date Filed |
|---|---|---|
| L03000016669 | APPLIED | 05/08/2003 |

| State | Status | Effective Date |
|---|---|---|
| FL | ACTIVE | NONE |

**Total Contribution**
0.00

### Registered Agent

| Name & Address |
|---|
| FIELDSTONE, RONALD |
| 201 ALHAMBRA CIR., STE. 601 |
| CORAL GABLES FL 33134 |
| Name Changed: 05/25/2004 |

### Manager/Member Detail

| Name & Address | Title |
|---|---|
| PENROD, JACK<br>ONE OCEAN DRIVE<br><br>MIAMI BEACH FL 33139 | P |

### Annual Reports



| Report Year | Filed Date |
|---|---|
| 2004 | 05/25/2004 |
| 2005 | 08/09/2005 |

[ Previous Filing ]     [ Return to List ]     [ Next Filing ]

No Events
No Name History Information

## Document Images
Listed below are the images available for this filing.

08/09/2005 -- ANNUAL REPORT
05/25/2004 -- ANN REP/UNIFORM BUS REP
05/08/2003 -- Florida Limited Liabilites

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**



## 2005 LIMITED LIABILITY COMPANY ANNUAL REPORT

**FILED**
**Aug 09, 2005**
**Secretary of State**

DOCUMENT# L03000016669

**Entity Name:** PENROD MANAGEMENT INTERNATIONAL, LLC

**Current Principal Place of Business:**                    **New Principal Place of Business:**

ONE OCEAN DR.
MIAMI BEACH. FL 33139

**Current Mailing Address:**                              **New Mailing Address:**

ONE OCEAN DR.
MIAMI BEACH, FL 33139

**FEI Number:**          **FEI Number Applied For (X)**     **FEI Number Not Applicable ( )**    **Certificate of Status Desired ( )**
In accordance with s. 607.193(2)(b), F.S , the limited liability company did not receive the prior notice.

**Name and Address of Current Registered Agent:**         **Name and Address of New Registered Agent:**

FIELDSTONE, RONALD
201 ALHAMBRA CIR., STE. 601
CORAL GABLES, FL 33134    US

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

                Electronic Signature of Registered Agent                          Date

**MANAGING MEMBERS/MANAGERS:**                           **ADDITIONS/CHANGES:**

| | | | |
|---|---|---|---|
| Title: | P          ( ) Delete | Title: | ( ) Change  ( ) Addition |
| Name: | PENROD, JACK | Name: | |
| Address: | ONE OCEAN DRIVE | Address: | |
| City-St-Zip: | MIAMI BEACH, FL 33139 | City-St-Zip: | |

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 608, Florida Statutes.

SIGNATURE.  JACK PENROD                                    P                        08/09/2005

                Electronic Signature of Signing Managing Member, Manager, or Authorized Representative / Date

**EXHIBIT E**



www.nikkibeach.com

Nikki Beach
Online V3.0

Choose A Location

NIKKI STORE

### JACK · PENROD

For over 40 years, Jack Penrod has been in the tourism and hospitality industry in South Florida. His career extends from early work on the beaches of the Keys and at the Greenbrier Hotel to current ventures with Nikki Beach, Pearl Restaurant and Champagne Lounge and Penrod's.

Working while attending college in Tallahassee, Florida, Jack Penrod entered the hospitality business as an employee of an area McDonald's making 85 cents an hour. He was 22 years old. Within 3 weeks, he became Manager of the store. That was the end of college.

His store would eventually become the top McDonald's in the country. He changed the way they were marketing in the fast-food business by creating new strategies to attract customers, such as hosting Miss Florida pageants in the parking lot and offering bus drivers free food if they stopped with their students. He wound up owning 16 McDonald's from Fort Lauderdale to Homestead.

After selling his McDonald's stores and investing time in other endeavors, Jack opened his first Penrod's Beach Club in Fort Lauderdale in 1983 to cater to the spring break market. To attract the greatest number of spring breakers to Fort Lauderdale and lure them to his clubs, Jack and his staff took to the road on a tour bus and visited universities all around the country in the month of January. They brought the beach to the snow by shipping loads of sand and palm trees to college campuses, holding bikini contests and giving free mugs and t-shirts to students signing up for travel packages. These promotional trips were a total success.

He owned Penrod's Beach Club, the Elbo Room, Bahama Mama and the Jolly Roger hotel in Fort Lauderdale. A couple of years later, Jack expanded his business to Daytona Beach, at the Clarendon Plaza Hotel. Anticipating the spring break market change in South Florida, Jack moved to South Beach, Miami Beach in the late 80's.

In December 1988, he opened Penrod's Beach Club, a $4 million, two-story, 35,000 square-foot complex, right on the sands of South Beach, at One Ocean Drive.

Miami Beach in the 80's was a run-down, retirement community, with an average age of 70 years old. Jack Penrod's vision was of an international beach community thriving with tourism. To get there, he started marketing where his brand recognition was strong – the college students.

Ten years later, Nikki Beach opened at the same location at One Ocean Drive, attracting the hip and trendy South Beach partygoers and an ever-growing population of international, mainly Europeans, wealthy visitors. While Nikki Beach caters to partygoers day and night, Pearl Restaurant and Champagne Lounge, which opened in December 2000, brings a new, high level of sophisticated entertainment dining to South Beach

Jack Penrod, together with the community and the City's administration over the years, has helped to create the famous South Beach and the successes that many Miami Beach businesses enjoy today. A constant innovator, Jack has transformed

visit
Nikki

WORK
opport



his operations to meet the needs of a changing and growing population of residents and visitors.

ack has transformed his operations into a global business venture. Nikki Beach is now in 7 different countries. USA, France, West Indies, Italy, Spain, Mexico and Brazil, catering to the rich and famous from all parts of the world.

Puerto-Vallarta  • Home • About Us • Events • Store • Menu • Copyright 2003 Penrods Entertainment  • Music ON • Music OFF

Nikki Beach • Nikki Marina • Nikki Style • Pearl • Saline • Penrod



Atlantic City One Information Guide  for Hotel Reservations, Entertainment, Dining,  News, and Gambling

**Home    Atlantic City Casinos    Chat    Forum    Gambling    Entertainment    A C Reservations    Site Map**

Add Atlanticcityone to your Favorite

**Atlantic City Hotel and Motel Reservations**


FLIGHTS


CARS

Surf The Site
Atlantic City New Jersey
Casinos and Gambling
Atlantic City Casino Directory

Atlantic City Dining Review

Atlantic City Casino Entertainment

Atlantic City Casino Promos/Tournament

Atlantic City Casino Reservations

Atlantic City One Forum

**Gambling**
Gambler's Book Shelf
Casino Comps
Casino Tipping

Atlantic City New Jersey
AC Attractions
Casino employment
FAQ
Health Care
Links
Non Casino Reservations

# Resorts Atlantic City to transform its beachfront into the "Sexiest Party on Earth" with Nikki Beach, Summer 2005

Atlantic City, NJ - This summer, what London's Observer deems the "Sexiest Party on Earth" will make its way to Resorts Atlantic City. Resorts Atlantic City and Nikki Beach announced today that they have reached an agreement to open NIKKI BEACH ATLANTIC CITY as well as a PENROD'S ELBO ROOM, a multi-tiered beach bar, restaurant, lounge and entertainment complex with an architectural design and attitude that will redefine the boardwalk.

"With Nikki Beach, we're redefining the concept of a beach bar in Atlantic City," said Audrey Oswell, President and Chief Executive Officer of Resorts Atlantic City. "Nikki Beach is known world-wide as the hot spot for those with a taste for sophistication and style. Those who want more than the typical Atlantic City beach bar experience will love Nikki Beach."

With venues in South Beach, Miami; St. Tropez; St. Barths; Marbella; Puerto Vallarta; Hollywood, FL; Buzio, Brazil and Sardinia, Nikki Beach brings its European style vibe to each of its locations, creating a haven for celebrities and industry high rollers looking for paradise on earth. Besides the atmosphere and signature Mojitos and Champagne, guests will enjoy haute cuisine for lunch, dinner, Sunday brunch or during fashion shows, model searches and special VIP events.

Penrod's Elbo Room, known as the oldest bar in Ft. Lauderdale built in 1938, will bring its rock and roll edge to the mix as well. Immortalized in beach party classics such as "Where the Boys Are," this second location will hold a 50,000-square-foot entertainment complex for summer concerts in the sand.

"We traveled for many years visiting famous beaches around the world to find that special recipe that now makes Nikki Beach the ultimate beach club in the world" recounts Jack Penrod, owner of the Nikki Beach organization. "Even though we are in six different countries, we maintain our unique style, a kind of global culture. We are very excited to bring the Nikki Beach lifestyle to this beach and contribute to the development of Atlantic City."

**Quick Reservations
RV Parks**

**Reservations Near City's
With With Casinos
· Nation Wide Hotel
Reservations By City And
State
Vegas Reservations**

**Road Trips
Get in the car and hit the
road this weekend! With a
Road Trips search, you can
find great destinations and
fantastic deals just a short
drive from where you are.**

Order **American Casino
Guide 2005**
Today for great money
saving casino coupons. 30%
off retail

New Sports Packages
**College and Super bowl
Packages
Golf Packages
Basketball Packages
More Nascar Packages**

**Going To Vegas?
Book Everything
Vegas!
• Las Vegas Golf Tee
Time
• Las Vegas Show
• Las Vegas Dining
• Las Vegas Wedding
• Las Vegas Hotel**

Nikki Beach's wingspan includes Nikki Clothing, launching a brand new line this Spring 2005, Nikki Style, a national bimonthly fashion and lifestyle magazine, Nikki Music, releasing its third volume this February 2005, and also Nikki Marina, rising up as the hottest place to park your yacht in Ft. Lauderdale.

More information on Nikki Beach is available on line at www.nikkibeach.com .

**EXHIBIT F**



www.nikkibeach.com

Nikki Beach

Miami



Choose A Location

NIKKI STORE

News Release FOR IMMEDIATE RELEASE 07/2005
Zucker Public Relations, Inc.
Media Contact: Jennifer Beard
Ph: 305.932.4999 x300

## NIKKI BEACH ANNOUNCES OPENING OF NIKKI MIDTOWN IN NEW YORK CITY, NY

### As part of the Nikki Beach 2005 Expansion Plan

NEW YORK, NY (July 19, 2005) – Nikki Beach, the premier address in the world to enjoy "The Sexiest Party on Earth", has announced the grand opening of Nikki Midtown in New York City, NY as part of its 2005 expansion plan. The new bi-level venue, located at 151 East 50th Street, is scheduled to have the VIP Grand Opening Thursday, September 29, 2005.

Nikki Midtown is designed in simplistic elegance inviting our guests to completely let lose by feeling the energy Nikki Beach is famous for in South Beach, Europe, Latin America and the Caribbean. The signature white linens, throw pillows and plush beds will adorn the 6,000 sq. ft. venue that will transform the venue from simple New York cool to South Beach chic and trendy.

Nikki Midtown will open daily at 3:00pm for the Nikki International Happy Hour or "Aperitif Party" featuring food, drinks, entertainment, music and fashion. The party will then flow into dinner with a menu focused on having a great time with friends. Nikki Beach has taken an amazing spin on family style service and created an upscale platter service menu for everyone to share tastes from around the world. Some of these menu items include the "Kings Feast", "Seafood Platter", Sushi Platter, and "Mediterranean Platter".

After dinner guests will enjoy dancing with international DJ's, models and cutting edge entertainment until 4 am. The second level features the private "Nikki VIP" lounge where VIP members, celebrities and the ultra chic can meet friends in private with a view down on to the main lounge.

With venues already in South Beach in Florida; St. Tropez, France; Marbella, Spain; Puerto Vallarta, Mexico; Buzios, Brazil; Hollywood, Florida; Sardinia, Italy; the island of St. Barths; Cabo San Lucas, Mexico; and most recently Atlantic City, New Jersey, Nikki Beach proudly brings its European vibe in 2005 to New York City, New York. With its world-class DJ's and succulent meals, Nikki Beach frequently attracts exclusive guests and celebrities such as Eva Longoria, Jamie Foxx, Justin Timberlake, JC Chasez, Beyoncee, Missy Elliot, P-Diddy, Paris Hilton, Nicole Ritchie, Naomi Campbell, Tyson Beckford, Shaquille O'Neal, Michael Jordan, Dennis Rodman, Carmen Electra, Jennifer Lopez, Matt Damon, Eva Mendez, Tara Reid, Bonno of U2, Roberto Cavalli and Dolce & Gabbana. It is a utopian universe, where time escapes you & you never wish to leave. For more information, please visit www.nikkibeach.com.





### The Miami Herald 03/03/2004

Behind the velvet rope
or athletes, celebrities, professional party-goers. They know a lot of people and can bring in a lot of people.' Perry Sasson, who promotes Pearl at Nikki Beach Club on Saturday nights, uses a personal touch: "Our main focus is direct marketing, calling our friends.' Friends, of course, ...... HTML TEXT



### The Observer 01/11/2004

Fancy bumping into Beyonce? Showering in champagne? Topping up that tan in the 'sexiest place on earth?' Well, it has to be Nikki Beach, darling! Polly Vernon joined the travelling circus of idle rich who criss-cross the world on a whim from one Nikki Beach paradise to the next









visit Nikki Clothi



EMPLOYE

# NYS Department of State

## Division of Corporations

## Entity Information

Selected Entity Name: NIKKI MIDTOWN, LLC

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | NIKKI MIDTOWN, LLC |
| **Initial DOS Filing Date:** | JULY 21, 2005 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC LIMITED LIABILITY COMPANY |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
NIKKI MIDTOWN, LLC
151 EAST 50TH STREET, 1ST FL
NEW YORK, NEW YORK, 10022

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results                     New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page



# Exhibit S

1

1       SUPERIOR COURT OF NEW JERSEY
        LAW DIVISION:  MIDDLESEX COUNTY
2       DOCKET NO.  MID-L-6951-05

3

4    MR. JOHN, INC.,

5              Plaintiff,      DEPOSITION OF,

6       -vs-                   MICHAEL VERNON
                               PENROD
7    NIKKI BEACH ATLANTIC CITY,
     LLC., and PENROD MANAGEMENT
8    GROUP, INC.,

9              Defendants.

10

11           TRANSCRIPT of the testimony of

12   MICHAEL VERNON PENROD as taken by and before

13   SANDRA A. BYBEL, a Certified Shorthand Reporter

14   and Notary Public of the State of New Jersey, at

15   the office of McElroy, Deutsch, Mulvaney &

16   Carpetner, LLP, Three Gateway Center, 100 Mulberry

17   Street, Newark, New Jersey, on Tuesday, March 20,

18   2007, commencing at 1:00 o'clock in the afternoon.

19

20

21

22

23       REPORTING SERVICES ARRANGED THROUGH:
         VERITEXT/NEW JERSEY REPORTING COMPANY
             25B Vreeland Road, Suite 301
24           Florham Park, New Jersey 07932
         Tel: (973) 410-4040   Fax: (973) 410-1313
25

**2**

```
 1 A P P E A R A N C E S :
 2
 3    MC ELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
 4    THREE GATEWAY CENTER
 5    100 MULBERRY STREET
 6    NEWARK, NEW JERSEY  07102
 7    BY:  RYAN MULVANEY, ESQ.
 8    ATTORNEYS FOR THE PLAINTIFF
 9
10    STEVEN B. SAVOLA, ESQ.
11    8770 SUNSET DRIVE #443
12    MIAMI, FLORIDA  33173
13    ATTORNEY FOR THE DEFENDANTS
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1 PENROD-6      Mr. John invoice,      32
 2      7/22/05
 3 PENROD-7      Mr. John invoice,      32
 4      8/19/05
 5 PENROD-8      Mr. John invoice,      32
 6      9/16/05
 7 PENROD-9A     Department of Treasury,   38
 8      Division of Revenue,
 9      Business Support Services,
10      Commercial Recording,
11      7/20/06
12 PENROD-9B     New Jersey Division of   38
13      Revenue, Certificate of
14      Cancellation, 6/30/06
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1          I N D E X
 2
 3 WITNESS        DIRECT CROSS REDIRECT RECROSS
 4 MICHAEL VERNON PENROD
 5 BY: MR. MULVANEY      5
 6 BY: MR. SAVOLA        51
 7
 8
 9
10
11        E X H I B I T S
12
13 NUMBER        DESCRIPTION        PAGE
14 PENROD-1    Credit Application      25
15      with Mr. John
16 PENROD-2    Agreement for Temporary   28
17      Restroom Services,
18      4/25/05
19 PENROD-3    Agreement for Temporary   28
20      Restroom Services,
21      5/3/05
22 PENROD-4    Mr. John invoice,     31
23      5/27/05
24 PENROD-5    Mr. John invoice,     32
25      6/24/05
```

**5**

```
 1 MICHAEL  VERNON  PENROD,
 2 100 South Point Drive, Apartment 2602,
 3 Miami Beach, Florida, 33139, having
 4 been duly sworn according to law, by
 5 the Officer, testifies as follows:
 6
 7 DIRECT EXAMINATION BY MR. MULVANEY:
 8    Q.    Michael, my name is Ryan Mulvaney.
 9 I'm an attorney for the plaintiff, Mr. John, in a
10 lawsuit pending against Nikki Beach Atlantic City
11 and Penrod Management in Middlesex County.
12    A.    Uh-huh.
13    Q.    Have you ever been deposed before?
14    A.    Yes.
15    Q.    In the State of New Jersey?
16    A.    No.
17    Q.    The state of Florida?
18    A.    Uh-huh.
19    Q.    I will just go over some ground rules
20 with you --
21    A.    Okay.
22    Q.    -- in case they're different from
23 the State of Florida.
24    A.    Okay.
25    Q.    If you need a break at any time just
```

2 (Pages 2 to 5)

6

1 let me know.  I only ask that you respond to my
2 question, if there is a question pending, before
3 taking the break.
4    A.    Yeah.
5    Q.    If you don't understand a question,
6 please let me know and I'll try and rephrase it or
7 repeat it.  If you don't tell me that you don't
8 understand, then I'll assume that you do.  And
9 wait, if you could, for my question to end before
10 you begin your answer it's a little bit easier for
11 the court reporter and us so we can get out of
12 here a lot quicker.
13    A.    Right.
14    Q.    Also, I'm sure you're familiar with
15 no head nods and shaking.  Everything has to be
16 oral so we can accurately get your testimony.
17        The depositions in Florida, did they
18 have to do in any way with the Nikki Beach Bar in
19 Atlantic City?
20    A.    No.
21    Q.    Where did you attend college?
22    A.    I went to Tallahassee Community
23 College for about a couple of months.  That was
24 it.
25    Q.    Did you receive a degree from there?

7

1    A.    No.
2    Q.    Do you have any professional
3 licenses?
4    A.    No.
5    Q.    Okay.  What did you do in preparation
6 for this deposition, if anything?
7    A.    Nothing.  Except with whatever Steve
8 had in the airport.
9    Q.    So you spoke with your attorney?
10    A.    Yes, I talked to the attorney.
11    Q.    Please don't disclose the
12 conversations you had, but you spoke with your
13 attorney?
14    A.    Yes.
15    Q.    And that's Mr. Savola?
16    A.    Correct.
17    Q.    Did you speak with Mr. Kennedy?
18    A.    I don't know who that is.
19    Q.    Paul Kennedy.
20        MR. SAVOLA:  He's co-counsel.
21    A.    I have never met him.
22    Q.    Did you review any documents?
23    A.    With Steve, yes.
24    Q.    Did you bring those documents with
25 you today?

8

1        MR. SAVOLA:  I've got a document, the
2 three documents that we produced in response to
3 request for production which are the two invoices
4 and the wire transfer.
5        MR. MULAVENY:  The two contracts.
6        MR. SAVOLA:  Yes.
7        MR. MULVANEY:  And that's it?
8    A.    Yes.
9        MR. MULVANEY:  Speaking of which, do
10 you have a complete copy of the wire transfer.  I
11 think the copy that you had provided was an
12 incomplete copy.  It was cut off at the bottom.
13 If we can have a complete copy of it it'd be
14 great.
15        We can take care of it later.  That's
16 fine?
17        MR. SAVOLA:  Okay.
18    Q.    Michael, for whom do you currently
19 work?
20    A.    I work with Penrod Brothers, Inc.
21 with -- I also have a place called The Elbow Room
22 in Fort Lauderdale and I got a salary from Penrod
23 Management Group also.
24    Q.    Is Penrod Management a subsidiary of
25 Penrod Brothers?

9

1        MR. SAVOLA:  Object.  Form.
2    A.    No.
3        MR. SAVOLA:  Just for the record
4 purposes, if I object to the form it doesn't mean
5 that you don't answer the question.  Go ahead and
6 answer the question.  It just puts a notation on
7 the record so if it comes up at trial it means I
8 can address it with the judge.
9    A.    Okay.  What were you asking?
10    Q.    Is Penrod Management a subsidiary of
11 Penrod Brothers?
12        MR. SAVOLA:  Object.
13    A.    I don't think so.  I don't know.
14    Q.    Do you receive a salary from Penrod
15 Management?
16    A.    Yes.
17    Q.    Do you have any title at Penrod
18 Management?
19    A.    No.
20    Q.    What is your title at Penrod
21 Brothers?
22    A.    I don't think I have one.  I guess I
23 do marketing and stuff there.  That's our property
24 in Miami Beach.
25    Q.    Okay.  Does Penrod Brothers have any

3 (Pages 6 to 9)

10

...areholders?
2    A.    Penrod Brothers, I believe it's -- I
3 don't know.  I would think it's just my father.
4    Q.    Your father is?
5    A.    Jack Penrod.
6    Q.    Is your father also a shareholder of
7 Penrod Management?
8    A.    I believe so.
9    Q.    What are your duties and
10 responsibilities with respect to your position, I
11 guess your marketing position with Penrod
12 Brothers?
13    A.    With Penrod Brothers I work with
14 the -- with the whole marketing division, with the
15 local teams setting up events and different
16 programs and our VIP services, our Nikki TV.
17    Q.    I'm sorry.
18    A.    We have a thing called Nikki TV.
19 It's mostly Internet related or marketing.
20    Q.    Nikki TV?
21    A.    Those are my core functions here down
22 in Miami.
23    Q.    What exactly does Penrod Management
24 do?
25    A.    I'm not sure.  What's the structure

11

1 of it.  I don't know.  I'm not sure exactly what
2 it does.
3    Q.    Is it a holding company for any
4 subsidiaries?
5    A.    I don't know.
6    Q.    Do you know if it has any
7 subsidiaries?
8    A.    I wouldn't know.  I'm not on the
9 board so I'm not sure.
10    Q.    You receive a salary from Penrod
11 Management?
12    A.    Uh-huh.  Yes.
13    Q.    And you don't know what it does.
14    A.    I'm not sure exactly.  You're asking
15 me does it have subsidiaries.  I don't know any of
16 the corporate structure.
17    Q.    Do you know the function of Penrod
18 Management, what it does, who it deals with?
19    A.    I believe it's Penrod Management
20 Group.  I believe it's the group that has some of
21 the administrative functions for some of the
22 properties.
23    Q.    What administrative functions?
24    A.    Some accounting and legal.
25    Q.    Does it bill for those services?

12

1    A.    Uh-huh.  Yes, from what I
2 understand.
3    Q.    Can you describe the properties?
4    A.    I'm not sure which ones are under
5 that.  I don't handle that under Penrod Management
6 Group.
7    Q.    But there are properties under Penrod
8 Management Group?
9    A.    I believe so.
10    Q.    And by property we're talking about?
11    A.    Bars, restaurants, night clubs.
12    Q.    Was Nikki Beach Atlantic City under
13 that?
14    A.    Nikki Beach Atlantic City, when we
15 set it up, we used the administrative and legal
16 functions of them to set it up.
17    Q.    Let's talk a little bit about this
18 Nikki Beach entity.
19    A.    Okay.
20    Q.    What is it?
21    A.    What do you mean?
22        MR. SAVOLA:  Object.  Form.
23    A.    What do you mean Nikki Beach, as in
24 properties?
25    Q.    Well, you tell me.

13

1    A.    You ask the questions.  I'm not
2 clear.
3    Q.    What is Nikki Beach?
4    A.    Nikki Beach is a brand that has
5 different restaurants and night clubs and beach
6 clubs around the world.  We also throw parties and
7 events, branded Nikki Beach with different
8 partners around the world in different locations.
9    Q.    How many Nikki Beach entities are
10 there?
11        MR. SAVOLA:  Object.  Form.
12    A.    I think there's -- well, Nikki Beach
13 entities, I think there's like 12 currently.
14    Q.    Can you tell me what they are?
15    A.    Nikki Beach -- there's a Nikki Beach
16 in Miami.  There's a Nikki Midtown in New York;
17 Nikki Marina in Hollywood, Florida; Nikki Beach in
18 Cabo San Lucas, Mexico; Nikki Beach in Puerto
19 Varta; Nikki Beach Saint Barts; Nikki Beach in
20 Sardinia, Italy; Nikki Beach in San Trope; Nikki
21 Beach in Marbella; and Nikki Beach Marrakech.  So
22 I guess it's 10.
23    Q.    Are all those Nikki Beach entities
24 still operating today?
25    A.    Yes.

4 (Pages 10 to 13)

14

1    Q.    Do they have their own employees?
2    A.    I believe so, yes.
3    Q.    Do they prepare their own financial
4 statements?
5    A.    I'm not sure about all of them.
6 They're more of an accounting question, which I
7 don't handle.
8    Q.    Who handles the accounting issues?
9    A.    Accounting is headed up by a lady
10 named Korollan and a guy named Omar.
11    Q.    Are they Penrod Management?
12    A.    Well, they are in Penrod Management.
13 Each location has somebody.
14    Q.    Each Nikki Beach --
15    A.    Each location has a --
16    Q.    Penrod Management.
17    A.    Each location has a local
18 administrator for accounting purposes.
19    Q.    And that person is a Nikki Beach
20 employee?
21    A.    I'm pretty sure.
22    Q.    Paid --
23    A.    By that location.
24    Q.    Receiving payroll from Nikki Beach?
25    A.    From each location wherever they

15

1 work.
2    Q.    Tell me about the Nikki Marina?
3 Let's just use that one.
4    A.    Okay.
5    Q.    It's still operating?
6    A.    Correct.
7    Q.    Does it does have its own employees?
8    A.    Correct.
9    Q.    Who are the employees?
10    A.    Their names?  I don't know all their
11 names.  I know a guy Jerry who is the general
12 manager and a guy -- well, no, he doesn't work
13 there anymore.  That's the only one I'm sure of
14 his name.
15    Q.    You said before that Penrod
16 Management provides legal and accounting services.
17 Can you describe what those services are?
18    A.    Well, for like Nikki Marina, since
19 we're talking about that.
20    Q.    Sure.
21    A.    What they do is they -- I think what
22 they do is they interact with local accountants
23 and accounts receivable to make sure that they're
24 being handled correctly.  And there, I think, if
25 there's any legal problems or legal matters, they

16

1 deal with -- Penrod Management Group helps handle
2 them.  They get involved, but it's very limited.
3    Q.    Did Penrod Management bill for those
4 services?
5    A.    They would, yes.
6    Q.    We'll keep it on this side for the
7 legal services.  Who provided the legal services
8 of Penrod Management.
9    A.    It depends on what...
10    Q.    To any of the Nikki Beach entities?
11    A.    Like here I heard today there's a
12 local legal counsel.  I don't know who he is.  I
13 never met him.
14    Q.    Do you have an understanding of
15 whether he provided legal services to your local
16 Nikki Beach company here?
17    A.    The guy you mentioned earlier?  I
18 imagine he did.  You guys asked me if I knew him.
19 I've never met him.
20    Q.    Who at Penrod Management provided
21 legal services?
22    A.    The gentleman, Michael Register, he
23 would coordinate which lawyers you hire.
24    Q.    Who at Penrod provided the accounting
25 services?

17

1    A.    The lady named Korollan and Omar,
2 they would either handle minor things or they'd
3 hire a local, depending on what country, they'd
4 hire local accounting services.  And also Michael
5 Register and Korollan handled that.
6    Q.    Did you hire local accounting
7 services in the State of New Jersey?
8    A.    Here we worked with -- we hired a --
9 brought a girl accountant, her name was Cath, I
10 don't know her last name off the top of my head.
11 She actually was our daily bookkeeper and
12 administrator, the main one.  She had two girls
13 that worked with her, I think.
14    Q.    Was she an employee of Penrod
15 Management?
16    A.    No.  She was an employee of Atlantic
17 City.
18    Q.    What do you mean?
19    A.    Nikki Beach Atlantic City.  When I
20 came up here and set up Nikki Beach Atlantic City
21 my general manager was this guy named Bruce, and
22 like the accounting administrative lead was named
23 Cath.  I don't know her last name.  I think her
24 name was Catherine, but everybody calls her Cath.
25    Q.    Did Penrod Management make any

18

1 payments?
2   A.   To them?
3   Q.   No. To Mr. John with respect to
4 Nikki Beach Atlantic City Bar?
5   A.   When we first were setting up
6 Atlantic City back in the beginning before we ever
7 had our offices set up, our accounts set up, they
8 wired us the money directly a wire to Mr. John for
9 us because I didn't have any accounts or anything
10 set up yet, and Mr. John had a deadline that
11 needed to be in then or we wouldn't have bathrooms
12 for the summer.
13   Q.   I'm sorry, you said "they."
14   A.   Mr. John said -- the lady that I was
15 dealing with Mr. John, I think her name is Lauren.
16   Q.   Okay.
17   A.   She -- I think that was who I was
18 dealing with too and I talked to her daily because
19 I was the one that coordinated it with Mr. John in
20 Atlantic City when I was up setting it up and they
21 needed the money right away to lock in the dates.
22 So I called down there and I had them send the
23 money from Miami to borrow the money, and I
24 believe we paid them back.
25   Q.   I'm sorry, "them" and the pronouns,

19

1 I'm getting lost.
2   A.   Sorry. Penrod Management Group.
3   Q.   So Penrod Management Group wired
4 transferred money?
5   A.   Yes. I believe it was a deposit so
6 we could lock in the dates with Mr. John.
7   Q.   To Mr. John?
8   A.   Correct.
9   Q.   So Penrod Management did a little bit
10 more than provide legal and accounting services?
11       MR. SAVOLA: Object to form.
12   A.   Well, they lent us the money to set
13 that up. They set up the accounts and the bank
14 accounts and I think that's about it.
15   Q.   Let me ask you, do you know who
16 Danielle Houser is?
17   A.   I don't recall. Where does she work?
18   Q.   Do you recognize her name as anybody
19 that worked for Penrod Management?
20   A.   Her name sounds familiar, but I don't
21 recall who she is.
22   Q.   When Nikki Beach entities, and I'll
23 use that term loosely, are formed do they apply
24 for loans on their own.
25       MR. SAVOLA: Object to form.

20

1   A.   Nikki Beach entities when we opened
2 up to different locations?
3   Q.   Take, for example, Nikki Beach
4 Marina, we'll kind of stick with that one because
5 we spoke about that one before. When Nikki Beach
6 Marina opened did it require working capital to
7 operate?
8       MR. SAVOLA: Object. Form.
9   A.   Each deal is different in each city
10 that I've set up different properties because I go
11 on the set up teams. And the marina, our partner
12 is the hotel, the Weston Diplomat, and in that
13 location the partner put up the upfront running
14 capital.
15   Q.   Was there any application that had to
16 be made with the --
17   A.   I don't know. Not to my knowledge.
18 I mean I don't know what the -- that was so long
19 ago. Nikki Marina's been there six years. I
20 don't recall what was set up.
21   Q.   When you opened up the Atlantic City
22 bar, was the working capital required?
23   A.   There was -- let me think. I believe
24 the hotel it was a complicated set up there
25 because we had to set -- our partner was the

21

1 Resorts Hotel and Nikki Beach Atlantic City, but
2 with the Casino Control Commissions I remember it
3 was very complicated. We had all these different
4 things we had to do there, so I'm not sure how the
5 money was put up for that one, for the working
6 capital, but it's usually the local partner.
7   Q.   What types of things did you have to
8 do with the Casino Control Commission? You had
9 mentioned there were things you had to do.
10   A.   I had to sit in front of board
11 meetings and show what we were doing. Layout
12 exactly what we planned on putting on the beach
13 because we wanted to have glassware, we wanted to
14 have concert stadium, music, food. So we had to
15 present all that to the Casino Control Commission,
16 the federal government, and the city. There's
17 like three or four different government bodies and
18 controlling bodies that I had to meet with for
19 months before the setup.
20   Q.   Did you have to file any applications
21 with either the city, the State of New Jersey, or
22 the Casino Control Commission?
23   A.   I believe so. I believe we had a
24 couple of different applications. I'm not sure
25 for what, but I remember we had quite a bit. We

6 (Pages 18 to 21)

22

1 hired a local law firm. They handled that.
2   Q.    What was the name of the law firm?
3   A.    I don't recall off the top of my
4 head. I will have to get that.
5   Q.    Do you recall the applicant on the
6 applications that were filed --
7   A.    No.
8   Q.    -- with the various subdivisions or
9 the State of New Jersey?
10  A.    No, I don't recall.
11  Q.    Would the applicant have been Penrod
12 Management?
13  A.    No. It would have been the local
14 company, which is our local partnership.
15  Q.    So it would have been Nikki Beach
16 Atlantic City?
17  A.    It should have been.
18  Q.    That would have filed any
19 applications?
20  A.    Uh-huh. Yeah.
21  Q.    With the State of New Jersey.  When
22 you deal with creditors or vendors or suppliers,
23 the same process, were applications filled out?
24  A.    Were there? I think we had a couple
25 setup applications for food vendors, but I'm not

23

1 sure what that entailed. The chef did that.
2   Q.    Who was the chef?
3   A.    Timothy Hughes.
4   Q.    And who did he work for?
5   A.    He worked at Nikki Beach Atlantic
6 City. But that application for food services, I
7 think it's a guarantee to pay. Like here's your
8 terms, you pay in 30 days, that kind of thing.
9 I'm not sure how detailed it is.
10  Q.    And who was that with?
11  A.    Whatever food vendors. I don't
12 remember the names. They're different up here
13 than they are from anywhere else.
14  Q.    Do you recall the applicant who would
15 have --
16  A.    No. Do I recall it? No.
17  Q.    -- who would have filed the
18 application?
19  A.    No. Actually I didn't see it. He
20 had documents because we sent them down to Miami
21 to read them.
22  Q.    Would it have been Nikki Beach
23 Atlantic City or would it have been Penrod
24 Management?
25  A.    Whenever we set up a new location we

24

1 have local partners so we always run everything
2 out of the local entity.
3   Q.    So it's always the local entity that
4 files whatever applications that need to be filed?
5   A.    Should be.
6   Q.    Should it have to apply for a loan
7 it's usually the local --
8   A.    I don't recall ever applying for a
9 loan.
10  Q.    If it ever applies for credit would
11 it be the local entity that applies for credit?
12  A.    I believe it would be. That would be
13 something that we'd have to check with the
14 accountants.
15  Q.    And the local permits or other
16 applications that needed to be filed with the
17 local zoning office or the Casino Control
18 Commission in whatever state, would it usually be
19 the local entity that files that paperwork?
20  A.    In Atlantic City, since that's the
21 only place we've had to file with Casino Control,
22 there we had the hotel, since they're our partner,
23 they had legal counsel that directed us where to
24 go and we had then hired our own local legal
25 counsel and they handled all those documents and

25

1 permits and zoning. I'm not sure exactly what
2 they set up. I imagine it was for the local thing
3 since the hotel was involved with it.
4       MR. MULVANEY: I would like to mark
5 this as Penrod-1.
6
7       (Penrod-1 Credit Application
8       with Mr. John is marked for
9       identification.)
10
11  Q.    I'll show this to you. What's being
12 shown to you, P-1, appears to be a credit
13 application filed with Mr. John.
14  A.    That's Danielle Houser.
15  Q.    Have you seen that before, that
16 document?
17  A.    No.
18  Q.    Do you now recall who Danielle Houser
19 is?
20  A.    I know the name. I'm not sure where
21 she works or where she worked. I don't know if
22 she still works for any of us.
23  Q.    And it appears as though that she's
24 completed a credit application under the name of
25 Penrod Management Group with Mr. John; is that

7 (Pages 22 to 25)

26

1 correct?
2    A.    That's what it appears, yeah.
3    Q.    Danielle Houser, did she have the
4 authority to bind Penrod Management?
5         MR. SAVOLA:  Object to the form.
6    A.    That would be for the lawyers.  I'm
7 not even sure who she is.  I just know the name
8 from somewhere.
9    Q.    Do you know who completed this
10 application?
11    A.    It says here Danielle Houser.
12    Q.    Do you know if anybody else at Penrod
13 Management participated in compiling the
14 information that appears on that?
15    A.    I wouldn't have an idea.  I wouldn't
16 know.
17    Q.    Do you know if those are Penrod
18 Management credit references?
19    A.    Well, I know the names of these
20 vendors.  These are south Florida vendors.
21 Southern Wine & Spirits, Sysco.  I don't know who
22 they are though.
23    Q.    You do recognize those entities?
24    A.    Uh-huh.  Yes.  They're Miami based
25 vendors.

28

1 was the applicant applying for credit with Mr.
2 John, correct?
3         MR. SAVOLA:  Object to form.
4    A.    That's what it appears to be.  That's
5 what she wrote.
6         MR. MULVANEY:  I'd like to mark this
7 as Penrod-2.
8
9         (Penrod-2 Agreement for
10 Temporary Restroom Services, 4/25/05
11 is marked for identification.)
12         MR. MULVANEY:  Mark this as well.
13
14         (Penrod-3 Agreement for Temporary
15 Restroom Services, 5/3/05 is marked for
16 identification.)
17
18    Q.    Do you recognize those documents?
19    A.    I was shown these this morning and I
20 think I recall seeing these a couple years ago.
21    Q.    Okay.
22    A.    But if you notice, this is before we
23 had our -- everything totally set up there because
24 I even used my cell phone as the main number.
25    Q.    Is that your cell phone or is that

27

1    Q.    If you could just refer back to that
2 for one second.  Does that appear to be Penrod
3 Management's banking information on that credit
4 application?
5    A.    I think they used Bank of America.
6 That's where I get -- that's where -- I don't know
7 if that's a bank account number though.  I'm not
8 sure.  I don't know what it is.  I know that's
9 Bank of America.
10    Q.    And that's Penrod Management's phone
11 number and address?
12    A.    Where's the phone number.
13    Q.    305 534-7253?
14    A.    That's the fax number.
15    Q.    But that's Penrod Management's fax
16 number?
17    A.    I don't know.  I'm not sure.  But the
18 538-1111, that's actually Penrod's -- is that a
19 Penrod Management number?  I'm not sure if that's
20 what they use.  That's the location, 1 Ocean
21 Drive.  That's the night club.
22    Q.    That's the correct address for Penrod
23 Management?
24    A.    One Ocean Drive, yes.
25    Q.    And it shows that Penrod Management

29

1 your number at Penrod Management?
2    A.    It's my cell phone.  You can call it
3 and it'll ring right now.  Because we didn't have
4 the offices set up so they used my cell phone as
5 Nikki Beach Atlantic City's phone number.
6    Q.    I'm looking at --
7    A.    And since it was -- we had to set up
8 so early with Mr. John just to lock it in for the
9 summer that everything was done were they used my
10 cell phone and they called me directly.
11    Q.    When you say "we," who do you mean
12 "we."
13    A.    Well, when me dealing with I think
14 her name was Lauren when she kept talking to me
15 and she would call my cell phone directly because
16 I didn't have an office up here.  It wasn't set up
17 yet or the accounts.
18    Q.    Do you recognize that to be Mike
19 Register's signature?
20    A.    I don't know his signature, but I
21 don't know who else would sign it under Michael
22 Register.
23    Q.    That's Penrod-2.  And Penrod-3, do
24 you recognize that?
25    A.    I don't know his signature.

8 (Pages 26 to 29)

30

1    Q.    Do you have any reason to suspect
2 it's not his signature.
3    A.    I mean I wouldn't think someone else
4 would sign his name.
5    Q.    Do you recall participating in a
6 negotiation of any of these specifications on the
7 contract?
8    A.    Yes.  I mean I was dealing with
9 Lauren the whole time trying to figure out the
10 right price and right units to use when I was at
11 Atlantic City.
12    Q.    And you're looking at Penrod-2.  I
13 show you Penrod-3.
14    A.    I don't remember the exact --
15    Q.    The same question.
16    A.    I mean I was the one that was dealing
17 with her directly, but I don't remember the
18 numbers or if these are exactly that, but I'm sure
19 they are if that's what's in the paper.
20    Q.    And it's your contention that, and
21 correct me if I'm wrong, that the contract is
22 between Nikki Beach Atlantic City and Mr. John?
23    A.    Correct.
24    Q.    Can you point anywhere on either
25 Exhibits 2 or 3 and tell me where would it

31

1 identify Nikki Beach Atlantic City as being a
2 party to the contract?
3    A.    The events are Nikki Beach Atlantic
4 City.
5    Q.    The event is Nikki Beach Atlantic
6 City.  Is there any indication of a party to that
7 contract being Nikki Beach Atlantic City, Inc.
8         MR. SAVOLA:  Object to form.
9    A.    It just probably says Nikki Beach Bar
10 Atlantic City Boardwalk.
11    Q.    That's a location.  Does it say -- is
12 there a party on it?
13    A.    I don't think so.
14    Q.    That identifies Nikki Beach Atlantic
15 City as the party to the contract or does it just
16 generally refer to Nikki Beach?
17         MR. SAVOLA:  Object to form.
18    A.    Now that I see it it says, the top
19 part says Nikki Beach Bar Atlantic City.
20    Q.    Again that's the location.  Is there
21 any indication that the party --
22    A.    It doesn't.
23         MR. MULVANEY: Let's mark these.
24
25         (Penrod-4 Mr. John invoice,

32

1    5/27/05 is marked for identification.)
2         (Penrod-5 Mr. John invoice,
3    6/24/05 is marked for identification.)
4         (Penrod-6 Mr. John invoice,
5    7/22/05 is marked for identification.)
6         (Penrod-7 Mr. John invoice,
7    8/19/05 is marked for identification.)
8         (Penrod-8 Mr. John invoice,
9    9/16/05 is marked for identification.)
10
11    Q.    I'll show you what's been marked as
12 Exhibit-4 and ask you to take a look at it.
13    A.    What was this?
14    Q.    Did you ever receive that document?
15    A.    I didn't.
16    Q.    But the document reflects that it was
17 sent to Penrod Management, correct?
18    A.    Uh-huh.  Yes.
19    Q.    And it appears to be an invoice from
20 Mr. John, Incorporated.
21    A.    Yes.  It's the first time I've ever
22 seen it though.
23    Q.    Do you know to whom that invoice
24 would have been sent at Penrod Management?
25    A.    It does not say here who they sent it

33

1 to.
2    Q.    Right.  But in opening the mail at
3 Penrod if somebody sees an invoice where do they
4 usually ship it or to whom do they usually send it
5 to at Penrod Management?
6         MR. SAVOLA:  Object to form.
7    A.    I don't know.  It usually would be
8 somebody's name on it, you know, send blank
9 invoices.
10    Q.    Has anyone ever a sent a blank
11 invoice?
12    A.    I don't know.
13    Q.    Who is the accounts receivable
14 accounts payable person at Penrod Management?
15    A.    It would be -- you'd have to ask
16 Korollan, the accountant.  She would know who.  I
17 don't know how it's structured.  I'm not in
18 accounting.
19    Q.    Do you have any information or
20 knowledge concerning these invoices?
21    A.    No.  I don't handle the accounting at
22 Penrod Management, so I wouldn't know.
23    Q.    But it's your position as a
24 representative of Penrod Management that Penrod
25 Management doesn't owe anything to Mr. John.

9 (Pages 30 to 33)

34

1        MR. SAVOLA: Object to form.
2   Q.    Correct.
3        MR. SAVOLA: Nobody has said that he
4 is a representative of the management group.
5   A.    I work there.
6        MR. MULVANEY: Well, we asked for a
7 person from Penrod Management who has knowledge
8 and information concerning the contracts at issue
9 and the invoices at issue and Mr. Penrod was
10 produced.
11        MR. SAVOLA: Well, he's being listed
12 in the Answers to Interrogatories by Penrod
13 Management Group as someone that has information,
14 just as Mr. Register has information. As it so
15 happens, Mr. Penrod here has the most information
16 with regard to this deal.
17   Q.    So you're telling me today that
18 you're not an employee of Penrod Management?
19   A.    No, I am. But you said a
20 representative. I was the one in Atlantic City
21 talking to Mr. John and setting up the company,
22 setting up the local company. These invoices
23 going to Penrod Management, I don't handle
24 accounting. I don't know where these went or if
25 they came in. I've never seen them.

35

1   Q.    I'd ask you to take a look at
2 Exhibits 5, 6, 7 and 8. I'm sorry, the
3 individual you mentioned before, was it Koren?
4   A.    Korollan, K-O-R-O-L-L-A-N.
5   Q.    Does she have a last name?
6   A.    I don't know it off the top of my
7 head. These are all sent in a row. What are
8 these, faxes? They're all sent together.
9 They're all in order.
10   Q.    Did you have any conversations with
11 anybody at Penrod Management and/or Penrod
12 Brothers concerning those invoices?
13   A.    These invoices? Not to my knowledge.
14 I've never seen this before. I know we talked
15 about payments before, but I don't know if these
16 were the invoices or what we talked about.
17   Q.    You had conversations regarding
18 payments to Mr. John?
19   A.    From Atlantic City, yeah.
20   Q.    What do you mean from Atlantic City?
21   A.    Well, we paid Mr. Johns, I believe we
22 paid them once or twice from Atlantic City and
23 then I think we then default. But these were all
24 sent in order by fax. I'm not sure what these are
25 for. And they're each a different month.

36

1   Q.    After receiving the invoices did you
2 have a conversation with Mr. Register about them,
3 do you recall?
4        MR. SAVOLA: Objection to form.
5 Which invoices are you talking about?
6        MR. MULVANEY: Any one of them.
7   A.    These exhibits with Mr. Register,
8 these invoices? I don't recall talking to him
9 about that.
10   Q.    Do you recall having a conversation
11 with accounts payable at Penrod Management
12 concerning any of the invoices?
13   A.    No, not that I recall. This would
14 have been with Cath, the local girl. They handle
15 all the invoices.
16   Q.    Did you ever instruct anyone at Mr.
17 John to send invoices to Cat?
18   A.    In Atlantic City?
19   Q.    Presumably she's in Atlantic City?
20   A.    All the invoices I believe went
21 there.
22   Q.    But the invoices that I'm showing you
23 now, exhibits --
24   A.    Yeah, these say Penrod Management
25 Group and they're all sent in chronological order.

37

1   Q.    Sent to Penrod Management, correct?
2   A.    Right.
3   Q.    Did you ever tell anyone after or do
4 you know if anyone had a conversation with anyone
5 at Mr. John concerning those invoices?
6   A.    Do I know if anybody did? I don't
7 know what conversations they had from Miami.
8   Q.    Do you know if anybody at Penrod
9 Management ever told anyone at Mr. John to not
10 send invoices to Penrod Management?
11   A.    I don't know. Not to my knowledge.
12   Q.    After receiving those invoices do you
13 know if Penrod Management ever informed Mr. John
14 that it did not intend to pay those invoices?
15        MR. SAVOLA: Object to form. I
16 don't think he's ever said that these were
17 received.
18   A.    I've never seen them. And they appear
19 to be 5 months in a row fax or sent down there.
20 I don't know anything about them. I never seen
21 them. I don't know if there's discussion about
22 them or what.
23   Q.    Does the fax transmission at the
24 bottom of those pages accurately reflect a
25 facsimile number to Penrod Management.

10 (Pages 34 to 37)

**38**

1  A.    No.  They actually show they're all
2 sent September and in order, but it doesn't say a
3 number.  It doesn't say a phone number.
4       MR. MULVANEY: All right.  Mark those.
5
6       (Penrod-9A Department of Treasury,
7  Division of Revenue, Business Support
8  Services, Commercial Recording, 7/20/06
9  is marked for identification.)
10       (Penrod-9B New Jersey Division
11  of Revenue, Certificate of Cancellation,
12  6/30/06 is marked for identification.)
13
14  Q.    I'm going to show you what's been
15 marked 9A and 9B.  Take a look at that.  Do you
16 recognize those documents?
17  A.    I've never seen them before.
18  Q.    Did you assist in the preparation of
19 those documents?
20  A.    No.
21  Q.    Do you recognize that as the
22 signature -- is there a signature?
23  A.    It looks like the same one before,
24 Michael Register's.
25  Q.    Do you have any reason to suspect

**39**

1 that's not Michael Register's signature?
2  A.    No.
3  Q.    Am I correct when I say that Mr.
4 Register requested that all the information be
5 shipped to Penrod Management in response to those
6 documents?
7  A.    Are you asking me does it say ship it
8 to Penrod Management?  Yeah, it says that.
9  Q.    And it appears that those documents
10 reflect Penrod Management's closure of the Nikki
11 Beach Atlantic City Bar; is that correct?
12  A.    I don't know.  I don't know what this
13 is for.
14  Q.    Well, if you'll take a minute and
15 take a look at it.
16       I'll ask again, do those documents
17 reflect Penrod Management's closure of Nikki Beach
18 Atlantic City?
19  A.    Yes, it looks like Nikki Beach
20 Atlantic City was closed.
21  Q.    Does it reflect on those documents
22 the date that the closure was to be effective?
23  A.    That would be this?
24  Q.    That's the file date.  The file date
25 specifies July 11, 2006.

**40**

1  A.    Is when they filed.  So that would be
2 the date, right?
3  Q.    Do you see any other dates on there
4 when it was prepared, when it was sent to the
5 State of New Jersey by anybody from Penrod
6 Management?
7       MR. SAVOLA: Object.  Form.
8  A.    It'd just be the signature here.
9  Q.    And what does that date say?
10  A.    6/30/06.
11  Q.    Do you have any idea when this case
12 was commenced?
13  A.    No.
14  Q.    What's the date of formation up here?
15  A.    March 23, 2005.  That's the
16 corporation?
17  Q.    Well, do you have any knowledge of
18 when Nikki Beach Atlantic City was formed by
19 Penrod Management?
20  A.    No.
21  Q.    But those do appear to be documents
22 that Penrod Management would have filed to cc
23 operations of Nikki Beach Atlantic City Bar?
24  A.    Well, it appears that Michael
25 Register filed to cancel it.

**41**

1  Q.    Let's go back to the Nikki Beach
2 entities for a minute.  We can go through each
3 one.  You said there's one in Miami, correct?
4  A.    Yeah.
5  Q.    What is the name of that one?
6  A.    The legal name?  I'm not exactly
7 sure, but I think that's Penrod Brothers I believe
8 is the corporate name there.  Penrod Brothers, I
9 believe that's the name of the company there, but
10 I'm not sure.
11  Q.    So it's not a Nikki Beach?
12  A.    It's d/b/a Nikki Beach.
13  Q.    Is it a bar or --
14  A.    It's a bar restaurant.
15  Q.    Bar restaurant?
16  A.    Lounge, beach club.
17  Q.    Do you recall the name of it?
18  A.    Nikki Beach.
19  Q.    The location in Miami, do you recall
20 the actual name of the bar?
21  A.    It's Nikki Beach.
22  Q.    Is it Nikki Beach Miami or --
23  A.    Nikki Beach is the name of the beach
24 club.  There's a place called Pearl, it's the
25 second floor.  Nikki Beach is actually just the

11 (Pages 38 to 41)

42

1 actual beach part. The building itself is
2 Penrod's because it was Penrods a long time before
3 and then we did a beach club on the back called
4 Nikki Beach. That's why I believe it retained the
5 name Penrod Brothers. That was before my time.
6     Q.     And that entity, the Nikki Beach
7 location in Miami has its own employees?
8     A.     Uh-huh. Yes.
9     Q.     Do you know how many employees it
10 has?
11     A.     I think I've heard it's around 350,
12 400 this time of year.
13     Q.     Is it a seasonal operation?
14     A.     It's open year round, but the peak
15 seasons are now when it's cold here, it's warm
16 there. But I think all the employees are under
17 Penrod Brothers because in that property the Nikki
18 Beach part is actually just the beach. Upstairs
19 it's a restaurant called Pearl and downstairs it's
20 called -- what it's called, something else.
21     Q.     So there's a beach bar. Is this at a
22 hotel?
23     A.     No, it's a stand-alone big building.
24     Q.     And outside at the beach --
25     A.     It's called Nikki Beach.

43

1     Q.     And upstairs Penrod has a restaurant
2 called Pearl?
3     A.     Pearl Restaurant and Lounge and
4 there's a cafe restaurant on the side that's open
5 during the week called Cafe Nikki. There's a bar
6 downstairs indoor, kind of a night club called --
7 I think it's called Blue or something like that.
8     Q.     And Cafe Nikki, is that another one
9 of the Nikki Beach entities?
10     A.     No. It was the first one. It was the
11 first thing that was done there. It was a
12 memorial for my little sister named Nicole, so we
13 did a little cafe for her called Cafe Nikki.
14     Q.     Is Nikki Beach a tradename?
15     A.     Nikki Beach is a beach club that we
16 then expanded around the world and called Nikki
17 Beach as the brand.
18     Q.     So it's a brand name Nikki Beach?
19     A.     Uh-huh. Yes.
20     Q.     And it's really the distinguishing
21 feature is whether it's Atlantic City or whether
22 it's the marina --
23     A.     Where it is.
24     Q.     Or Nikki Cafe --
25          MR. SAVOLA: Let him get the question

44

1 out.
2     Q.     Is the general description and my
3 description accurate?
4     A.     Can you repeat the again.
5     Q.     Sure. Nikki Beach you indicate is a
6 brand name, correct?
7     A.     Nikki Beach is the brand name that
8 people know our parties and things around the
9 world with.
10     Q.     Does Nikki Beach have a clothing
11 line?
12     A.     Nikki Clothing. It's not Nikki
13 Beach. It's different. The Nikki brand I guess
14 is the brand. If you go to go to New York it's
15 called Nikki Midtown.
16     Q.     Let's go through this. The Nikki
17 brand and then we have Nikki --
18     A.     Nikki Beach are the beach clubs.
19     Q.     So there's a Nikki brand in
20 Manhattan.
21     A.     And Nikki Midtown is the name.
22     Q.     And there was a Nikki brand in
23 Atlantic City.
24     A.     There was a Nikki Beach.
25     Q.     And a Nikki brand in Miami.

45

1     A.     There's the Cafe Nikki. It's the
2 first thing we ever did. It was a memorial for my
3 little sister on the beach. It was called Nikki
4 Beach.
5     Q.     And there are other Nikki Beach
6 brands worldwide?
7     A.     There are Nikki Beach clubs in
8 different parts where there's beaches, yes.
9     Q.     Could you describe for me the Nikki
10 brand in midtown?
11     A.     The Nikki brand in Midtown is a happy
12 hour restaurant night club.
13     Q.     What is it called?
14     A.     Nikki Midtown, that's the name.
15 Midtown is the actual name of the bar.
16     Q.     Where is it located?
17     A.     151 East 50th Street. 10022 is the
18 zip code, New York, New York. I set that one up
19 so I know the name and address.
20     Q.     And Nikki Midtown has its own
21 employees?
22     A.     Uh-huh. Yes.
23     Q.     How many employees?
24     A.     I don't recall. I haven't been
25 there since I opened it, but I think it's --

46

1  Q.    Don't guess, but is it over 10?
2  A.    Yes, it's over 10.
3  Q.    Over 20?
4  A.    I'd say it's probably 30, 50, between
5 that range.
6  Q.    And what does Nikki Midtown do?
7  A.    It's a happy hour bar restaurant and
8 night club.
9  Q.    I think we already discussed Nikki
10 Marina. You said there's one in Cabo?
11  A.    Uh-huh. Yes.
12  Q.    What is the name of the one in one
13 Cabo?
14  A.    In Cabo San Lucas we have a Nikki
15 Beach bar at the Somelia Hotel.
16  Q.    And what is the name of it?
17  A.    The hotel?
18  Q.    The Nikki Beach Bar.
19  A.    Nikki Beach, that's what it's called.
20  Q.    Not Nikki Beach Cabo?
21  A.    It does say Cabo San Lucas underneath
22 if that's what you mean.  Just like you see Hard
23 Rock Cafe, Hard Rock Vegas, Hard Rock whatever.
24  Q.    And it's located where?
25  A.    At the Somelia Hotel. It's called

47

1 Me.  The hotel is M-E.
2  Q.    Does Nikki Beach have any
3 shareholders?
4  A.    I don't know.  What do you mean, the
5 brand itself?
6  Q.    Yes.
7  A.    If there are any it'd probably be my
8 father. I don't know if there are any.
9  Q.    Just he would be the only one?
10  A.    I mean I'm not sure.  What happens is
11 in each location we have partners and we have a
12 local corporation that has the local partnership.
13 I'm not sure Nikki Beach itself is separate. I
14 don't know how that works.
15  Q.    And do you do that by agreement with
16 the hotel or wherever it is you're establishing a
17 Nikki Beach brand?
18  A.    I think almost every single one is
19 different, but I wouldn't know that.  That would
20 be something to ask Michael Register.
21  Q.    He didn't want to appear so I have to
22 ask you.
23  A.    Yeah, I don't know.
24  Q.    Do you have a contract with Resorts?
25  A.    I believe we did.

48

1  Q.    Do you remember the parties to that
2 contract?  Was it Penrod Management and Resorts?
3  A.    There would always be the local
4 corporation.
5  Q.    Do you have a copy of that contract
6 available?
7  A.    I don't have one with me, no.
8      MR. MULVANEY: Let's take a few
9 minutes. I think that really might be all I have
10 at this point. I want to take a break.
11
12      (There is a short recess.)
13
14      MR. MULAVENY: Back on the record.
15  Q.    You testified earlier that the name
16 Nikki Beach is a brand name, correct?
17  A.    Yes.
18  Q.    Do you know who owns the brand name
19 Nikki Beach or I should who or what entity owns
20 the brand name Nikki Beach?
21  A.    I'm not sure.
22  Q.    Would it make sense to you that
23 Penrod Management owns the brand name Nikki Beach?
24      MR. SAVOLA: Object to the form.
25  A.    Yeah, I don't know. I don't know if

49

1 it's my dad or what it is. I'm not sure.
2  Q.    And with respect to the contracts
3 that we looked at earlier, and if you need to look
4 at them again, let me know, I think I have them
5 here, do you have any reason to believe that the
6 products referenced on those contracts were not
7 delivered by Mr. John?
8  A.    Do I have any reason to believe that
9 those products and those contracts -- let me see
10 which one you're talking about to make sure.
11  Q.    This is the April 25th contract that
12 we marked Penrod-2.
13  A.    From what I recall we received all
14 the restrooms. I don't remember how many there
15 were. I forget because it was two years ago and I
16 didn't really pay attention to the restrooms that
17 much.
18  Q.    So you believe that Mr. John
19 delivered the restrooms?
20  A.    I believe so.
21  Q.    At least referenced on Penrod-2?
22  A.    I believe so. I'm not sure exactly
23 if 2 Gold Plus was delivered, but there were
24 bathrooms delivered. I know they delivered
25 bathrooms.

13 (Pages 46 to 49)

50

1    Q.    And the same questions for Penrod-3
2  do you have any reason to believe that the toilets
3  and/or other products on Penrod-3 were not
4  delivered by Mr. John?
5    A.    These I'm not sure what these are.
6  Four city main temporary bathrooms, are those
7  Jiffy Johns, are they -- what are they?  I don't
8  know.
9    Q.    I can't help you.  Unfortunately, I'm
10 the one asking the questions today.
11   A.    I don't know what these are to be
12 honest with you.  These -- I know we had two big
13 bathrooms and two ADA are the disability
14 accessible ones.  I know we had those in the
15 summer.  These, I don't know what they are.
16   Q.    As you sit here today, can you tell
17 me that Mr. John did not deliver those?
18   A.    I don't know.
19   Q.    Anything on either 2 or 3.
20   A.    Number 3, I don't know what those
21 bathrooms are.
22   Q.    Okay.
23   A.    I don't know if they delivered them
24 or not.  I don't know what they are.  These on
25 number 2, I believe they're all delivered.

51

1    Q.    So as far as you know Mr. John
2  delivered everything under the contract on
3  Penrod-2?
4         MR. SAVOLA:  Object to form.
5    A.    On number 2 I believe those were
6  all -- those were delivered.
7         MR. MULAVENY:  Okay.  I think that's
8  about it.
9
10 CROSS EXAMINATION BY MR. SAVOLA:
11   Q.    Let me ask you to have a look at
12 Exhibit-2 which was shown to you by opposing
13 counsel.  This is en titled The Agreement for
14 Temporary Restroom Services and it's dated April
15 25, 2005.  Is there anywhere on this purported
16 agreement for which the plaintiffs are making a
17 claim herein that says that this is Penrod
18 Management Group that entered into this agreement.
19        MR. MULAVENY:  Objection to form.
20   A.    The only thing I see on here is Nikki
21 Beach Bar Atlantic City Boardwalk, Atlantic City,
22 New Jersey and my name, Michael Register's name
23 and my cell phone number and the word Nikki Beach.
24   Q.    Do you see the word Penrod Management
25 Group referred to as a party to this agreement

52

1  anywhere on Exhibit-2?
2         MR. MULAVENY:  Objection.
3    A.    Nowhere.
4    Q.    Let me have you take a look at
5  Exhibit-3, which is another document entitled
6  Agreement for Temporary Restroom Services dated
7  May 3, 2005 for which the plaintiff is making a
8  claim herein.  Do you see anywhere on this
9  agreement where Penrod Management Group is a
10 party?
11        MR. MULAVENY:  Objection.
12   A.    I don't see Penrod Management Group
13 listed on there either.
14        MR. MULAVENY:  Thank you.  That's all
15 I have.
16        MR. MULVANEY:  That's it.
17        MR. SAVOLA:  We'll read please.
18        (The deposition is concluded
19     at 2:35 p.m.)
20
21
22
23
24
25

53

1    SIGNATURE   PAGE
2
3
4         I have read the foregoing
5         transcript and it is true
6         and correct to the best of
7         my knowledge and belief.
8
9
10
11
12
13    MICHAEL VERNON PENROD
14
15
16
17 Sworn and subscribed to
18 before me on this
19            day
20 of           .
21
22
23
24 Notary Public
25

14 (Pages 50 to 53)

54

1        CERTIFICATE OF OFFICER
2        I, SANDRA A. BYBEL, a Notary Public
3 and Certified Shorthand Reporter of the State of
4 New Jersey, do hereby certify that prior to the
5 commencement of the examination of MICHAEL VERNON
6 PENROD, the witness was duly sworn by me.
7        I DO FURTHER CERTIFY that the
8 foregoing is a true and accurate transcript of the
9 testimony as taken stenographically by and before
10 me at the time, place and on the date hereinbefore
11 set forth.
12       I DO FURTHER CERTIFY that I am
13 neither a relative nor employee, nor attorney or
14 counsel to any of the parties involved, that I am
15 neither related to nor employed by such attorney
16 or counsel and that I am not financially
17 interested in the outcome of the action.
18
19
20
21
22
23 A NOTARY PUBLIC OF THE STATE OF NEW JERSEY
24 My Commission Expires June 26, 2007
25 C.S.R. License No. 30X100058300

15 (Page 54)

**A**

accessible 50:14
account 27:7
accountant 17:9
  33:16
accountants 15:22
  24:14
accounting 11:24
  14:6,8,9,18 15:16
  16:24 17:4,6,22
  19:10 33:18,21
  34:24
accounts 15:23 18:7
  18:9 19:13,14 29:17
  33:13,14 36:11
accurate 44:3 54:8
accurately 6:16
  37:24
action 54:17
actual 41:20 42:1
  45:15
ADA 50:13
address 9:8 27:11,22
  45:19
administrative 11:21
  11:23 12:15 17:22
administrator 14:18
  17:12
afternoon 1:18
ago 20:19 28:20
  49:15
agreement 3:16,19
  28:9,14 47:15 51:13
  51:16,18,25 52:6,9
ahead 9:5
airport 7:8
America 27:5,9
and/or 35:11 50:3
answer 6:10 9:5,6
Answers 34:12
anybody 19:18 26:12
  35:11 37:6,8 40:5
anymore 15:13
Apartment 5:2
appear 27:2 37:18
  40:21 47:21
appears 25:12,23
  26:2,14 28:4 32:19

39:9 40:24
applicant 22:5,11
  23:14 28:1
application 3:14
  20:15 23:6,18 25:7
  25:13,24 26:10 27:4
applications 21:20,24
  22:6,19,23,25 24:4
  24:16
applies 24:10,11
apply 19:23 24:6
applying 24:8 28:1
April 49:11 51:14
ARRANGED 1:22
asked 16:18 34:6
asking 9:9 11:14 39:7
  50:10
assist 38:18
assume 6:8
Atlantic 1:7 5:10
  6:19 12:12,14 17:16
  17:19,20 18:4,6,20
  20:21 21:1 22:16
  23:5,23 24:20 29:5
  30:11,22 31:1,3,5,7
  31:10,14,19 34:20
  35:19,20,22 36:18
  36:19 39:11,18,20
  40:18,23 43:21
  44:23 51:21,21
attend 6:21
attention 49:16
attorney 2:13 5:9 7:9
  7:10,13 54:13,15
ATTORNEYS 2:8
authority 26:4
available 48:6

**B**

B 2:10 3:11
back 18:6,24 27:1
  41:1 42:3 48:14
bank 19:13 27:5,7,9
banking 27:3
bar 6:18 18:4 20:22
  31:9,19 39:11 40:23
  41:13,14,15,20
  42:21 43:5 45:15
  46:7,15,18 51:21

Bars 12:11
Barts 13:19
based 26:24
bathrooms 18:11
  49:24,25 50:6,13,21
beach 1:7 5:3,10 6:18
  9:24 12:12,14,18,23
  13:3,4,5,7,9,12,15
  13:15,17,18,19,19
  13:20,21,21,23
  14:14,19,24 16:10
  16:16 17:19,20 18:4
  19:22 20:1,3,5 21:1
  21:12 22:15 23:5,22
  29:5 30:22 31:1,3,5
  31:7,9,14,16,19
  39:11,17,19 40:18
  40:23 41:1,11,12,16
  41:18,21,22,23,23
  41:25 42:1,3,4,6,18
  42:18,21,24,25 43:9
  43:14,15,15,17,18
  44:5,7,10,13,18,18
  44:24 45:3,4,5,7
  46:15,18,19,20 47:2
  47:13,17 48:16,19
  48:20,23 51:21,23
beaches 45:8
beginning 18:6
belief 53:7
believe 10:2,8 11:19
  11:20 12:9 14:2
  18:24 19:5 20:23
  21:23,23 24:12
  35:21 36:20 41:7,9
  42:4 47:25 49:5,8
  49:18,20,22 50:2,25
  51:5
best 53:6
big 42:23 50:12
bill 11:25 16:3
bind 26:4
bit 6:10 12:17 19:9
  21:25
blank 33:8,10
Blue 43:7
board 11:9 21:10
Boardwalk 31:10
  51:21

bodies 21:17,18
bookkeeper 17:11
borrow 18:23
bottom 8:12 37:24
brand 13:4 43:17,18
  44:6,7,13,14,17,19
  44:22,25 45:10,11
  47:5,17 48:16,18,20
  48:23
branded 13:7
brands 45:6
break 5:25 6:3 48:10
bring 7:24
Brothers 8:20,25
  9:11,21,25 10:2,12
  10:13 35:12 41:7,8
  42:5,17
brought 17:9
Bruce 17:21
building 42:1,23
Business 4:9 38:7
BYBEL 1:13 54:2

**C**

C 2:1 5:1
Cabo 13:18 46:10,13
  46:14,20,21
cafe 43:4,5,8,13,13
  43:24 45:1 46:23
call 29:2,15
called 8:21 10:18
  18:22 29:10 41:24
  42:3,19,20,20,25
  43:2,5,6,7,13,16
  44:15 45:3,13 46:19
  46:25
calls 17:24
cancel 40:25
Cancellation 4:14
  38:11
capital 20:6,14,22
  21:6
care 8:15
CARPENTER 2:3
Carpenter 1:16
case 5:22 40:11
Casino 21:2,8,15,22
  24:17,21
Cat 36:17

56

**Cath** 17:9,23,24
  36:14
**Catherine** 17:24
**cc** 40:22
**cell** 28:24,25 29:2,4
  29:10,15 51:23
**Center** 1:16 2:4
**Certificate** 4:13
  38:11 54:1
**Certified** 1:13 54:3
**certify** 54:4,7,12
**check** 24:13
**chef** 23:1,2
**chronological** 36:25
**city** 1:7 5:10 6:19
  12:12,14 17:17,19
  17:20 18:4,6,20
  20:9,21 21:1,16,21
  22:16 23:6,23 24:20
  30:11,22 31:1,4,6,7
  31:10,15,19 34:20
  35:19,20,22 36:18
  36:19 39:11,18,20
  40:18,23 43:21
  44:23 50:6 51:21,21
**City's** 29:5
**claim** 51:17 52:8
**clear** 13:2
**closed** 39:20
**closure** 39:10,17,22
**clothing** 44:10,12
**club** 27:21 41:16,24
  42:3 43:6,15 45:12
  46:8
**clubs** 12:11 13:5,6
  44:18 45:7
**code** 45:18
**cold** 42:15
**college** 6:21,23
**comes** 9:7
**commenced** 40:12
**commencement** 54:5
**commencing** 1:18
**Commercial** 4:10
  38:8
**Commission** 21:8,15
  21:22 24:18 54:24
**Commissions** 21:2
**Community** 6:22

**company** 1:23 11:3
  16:16 22:14 34:21
  34:22 41:9
**compiling** 26:13
**complete** 8:10,13
**completed** 25:24 26:9
**complicated** 20:24
  21:3
**concerning** 33:20
  34:8 35:12 36:12
  37:5
**concert** 21:14
**concluded** 52:18
**contention** 30:20
**contract** 30:7,21 31:2
  31:7,15 47:24 48:2
  48:5 49:11 51:2
**contracts** 8:5 34:8
  49:2,6,9
**Control** 21:2,8,15,22
  24:17,21
**controlling** 21:18
**conversation** 36:2,10
  37:4
**conversations** 7:12
  35:10,17 37:7
**coordinate** 16:23
**coordinated** 18:19
**copy** 8:10,11,12,13
  48:5
**core** 10:21
**corporate** 11:16 41:8
**corporation** 40:16
  47:12 48:4
**correct** 7:16 15:6,8
  19:8 26:1 27:22
  28:2 30:21,23 32:17
  34:2 37:1 39:3,11
  41:3 44:6 48:16
  53:6
**correctly** 15:24
**counsel** 16:12 24:23
  24:25 51:13 54:14
  54:16
**country** 17:3
**County** 1:1 5:11
**couple** 6:23 21:24
  22:24 28:20
**court** 1:1 6:11

**co-counsel** 7:20
**credit** 3:14 24:10,11
  25:7,12,24 26:18
  27:3 28:1
**creditors** 22:22
**CROSS** 3:3 51:10
**currently** 8:18 13:13
**cut** 8:12
**C.S.R** 54:25

**D**

**D** 3:1 5:1
**dad** 49:1
**daily** 17:11 18:18
**Danielle** 19:16 25:14
  25:18 26:3,11
**date** 39:22,24,24 40:2
  40:9,14 54:10
**dated** 51:14 52:6
**dates** 18:21 19:6 40:3
**day** 53:19
**days** 23:8
**deadline** 18:10
**deal** 16:1 20:9 22:22
  34:16
**dealing** 18:15,18
  29:13 30:8,16
**deals** 11:18
**default** 35:23
**Defendants** 1:9 2:13
**degree** 6:25
**deliver** 50:17
**delivered** 49:7,19,23
  49:24,24 50:4,23,25
  51:2,6
**Department** 4:7 38:6
**depending** 17:3
**depends** 16:9
**deposed** 5:13
**deposit** 19:5
**deposition** 1:5 7:6
  52:18
**depositions** 6:17
**describe** 12:3 15:17
  45:9
**description** 3:13 44:2
  44:3
**detailed** 23:9
**Deutsch** 1:15 2:3

**different** 5:22 10:15
  13:5,7,8 20:2,9,10
  21:3,17,24 23:12
  35:25 44:13 45:8
  47:19
**Diplomat** 20:12
**DIRECT** 3:3 5:7
**directed** 24:23
**directly** 18:8 29:10
  29:15 30:17
**disability** 50:13
**disclose** 7:11
**discussed** 46:9
**discussion** 37:21
**distinguishing** 43:20
**division** 1:1 4:8,12
  10:14 38:7,10
**DOCKET** 1:2
**document** 8:1 25:16
  32:14,16 52:5
**documents** 7:22,24
  8:2 23:20 24:25
  28:18 38:16,19 39:6
  39:9,16,21 40:21
**doing** 21:11
**downstairs** 42:19
  43:6
**Drive** 2:11 5:2 27:21
  27:24
**duly** 5:4 54:6
**duties** 10:9
**d/b/a** 41:12

**E**

**E** 2:1,1 3:1,11 5:1,1,1
  53:1,1
**earlier** 16:17 48:15
  49:3
**early** 29:8
**easier** 6:10
**East** 45:17
**effective** 39:22
**either** 17:2 21:21
  30:24 50:19 52:13
**Elbow** 8:21
**ELROY** 2:3
**employed** 54:15
**employee** 14:20
  17:14,16 34:18

54:13
employees 14:1 15:7
    15:9 42:7,9,16
    45:21,23
en 51:13
entailed 23:1
entered 51:18
entities 13:9,13,23
    16:10 19:22 20:1
    26:23 41:2 43:9
entitled 52:5
entity 12:18 24:2,3
    24:11,19 42:6 48:19
ESQ 2:7,10
establishing 47:16
event 31:5
events 10:15 13:7
    31:3
everybody 17:24
exact 30:14
exactly 10:23 11:1,14
    21:12 25:1 30:18
    41:6 49:22
examination 5:7
    51:10 54:5
example 20:3
exhibits 30:25 35:2
    36:7,23
Exhibit-2 51:12 52:1
Exhibit-3 52:5
Exhibit-4 32:12
expanded 43:16
Expires 54:24

**F**
facsimile 37:25
familiar 6:14 19:20
far 51:1
father 10:3,4,6 47:8
fax 1:24 27:14,15
    35:24 37:19,23
faxes 35:8
feature 43:21
federal 21:16
figure 30:9
file 21:20 24:21 39:24
    39:24
filed 22:6,18 23:17
    24:4,16 25:13 40:1

40:22,25
files 24:4,19
filled 22:23
financial 14:3
financially 54:16
fine 8:16
firm 22:1,2
first 18:5 32:21 43:10
    43:11 45:2
floor 41:25
Florham 1:24
Florida 2:12 5:3,17
    5:23 6:17 13:17
    26:20
follows 5:5
food 21:14 22:25
    23:6,11
foregoing 53:4 54:8
forget 49:15
form 9:1,4 12:22
    13:11 19:11,25 20:8
    26:5 28:3 31:8,17
    33:6 34:1 36:4
    37:15 40:7 48:24
    51:4,19
formation 40:14
formed 19:23 40:18
Fort 8:22
forth 54:11
four 21:17 50:6
front 21:10
function 11:17
functions 10:21
    11:21,23 12:16
FURTHER 54:7,12

**G**
G 53:1,1
Gateway 1:16 2:4
general 15:11 17:21
    44:2
generally 31:16
gentleman 16:22
getting 19:1
girl 17:9 36:14
girls 17:12
glassware 21:13
go 5:19 9:5 20:10
    24:24 41:1,2 44:14

44:14,16
going 34:23 38:14
Gold 49:23
government 21:16,17
great 8:14
ground 5:19
group 1:8 8:23 11:20
    11:20 12:6,8 16:1
    19:2,3 25:25 34:4
    34:13 36:25 51:18
    51:25 52:9,12
guarantee 23:7
guess 9:22 10:11
    13:22 44:13 46:1
guy 14:10 15:11,12
    16:17 17:21
guys 16:18

**H**
H 3:11 5:1
handle 12:5 14:7
    16:1 17:2 33:21
    34:23 36:14
handled 15:24 17:5
    22:1 24:25
handles 14:8
happens 34:15 47:10
happy 45:11 46:7
Hard 46:22,23,23
head 6:15 17:10 22:4
    35:7
headed 14:9
heard 16:11 42:11
help 50:9
helps 16:1
hereinbefore 54:10
hire 16:23 17:3,4,6
hired 17:8 22:1 24:24
holding 11:3
Hollywood 13:17
honest 50:12
hotel 20:12,24 21:1
    24:22 25:3 42:22
    46:15,17,25 47:1,16
hour 45:12 46:7
Houser 19:16 25:14
    25:18 26:3,11
Hughes 23:3

**I**
idea 26:15 40:11
identification 25:9
    28:11,16 32:1,3,5,7
    32:9 38:9,12
identifies 31:14
identify 31:1
imagine 16:18 25:2
incomplete 8:12
Incorporated 32:20
indicate 44:5
indication 31:6,21
individual 35:3
indoor 43:6
information 26:14
    27:3 33:19 34:8,13
    34:14,15 39:4
informed 37:13
instruct 36:16
intend 37:14
interact 15:22
interested 54:17
Internet 10:19
Interrogatories
    34:12
invoice 3:22,24 4:1,3
    4:5 31:25 32:2,4,6,8
    32:19,23 33:3,11
invoices 8:3 33:9,20
    34:9,22 35:12,13,16
    36:1,5,8,12,15,17
    36:20,22 37:5,10,12
    37:14
involved 16:2 25:3
    54:14
issue 34:8,9
issues 14:8
Italy 13:20
it'd 8:13 40:8 47:7
it'll 29:3

**J**
Jack 10:5
Jerry 15:11
Jersey 1:1,14,17,23
    1:24 2:6 4:12 5:15
    17:7 21:21 22:9,21
    38:10 40:5 51:22
    54:4,23

58

Jiffy 50:7
John 1:4 3:15,22,24
  4:1,3,5 5:9 18:3,8
  18:10,14,15,19 19:6
  19:7 25:8,13,25
  28:2 29:8 30:22
  31:25 32:2,4,6,8,20
  33:25 34:21 35:18
  36:17 37:5,9,13
  49:7,18 50:4,17
  51:1
Johns 35:21 50:7
judge 9:8
July 39:25
June 54:24

**K**

keep 16:6
Kennedy 7:17,19
kept 29:14
kind 20:4 23:8 43:6
knew 16:18
know 6:1,6 7:18 9:13
  10:3 11:1,5,6,8,13
  11:15,17 15:10,11
  16:12 17:10,23
  19:15 20:17,18
  25:20,21 26:7,9,12
  26:16,17,19,21 27:6
  27:8,8,17 29:20,21
  29:25 32:23 33:7,8
  33:12,16,17,22
  34:24 35:6,14,15
  37:4,6,7,8,11,13,20
  37:21 39:12,12 42:9
  44:8 45:19 47:4,8
  47:14,19,23 48:18
  48:25,25 49:4,24
  50:8,11,12,14,15,18
  50:20,23,24 51:1
knowledge 20:17
  33:20 34:7 35:13
  37:11 40:17 53:7
Koren 35:3
Korollan 14:10 17:1
  17:5 33:16 35:4
K-O-R-O-L-L-A-N
  35:4

**L**

L 5:1
lady 14:9 17:1 18:14
Lauderdale 8:22
Lauren 18:15 29:14
  30:9
law 1:1 5:4 22:1,2
lawsuit 5:10
lawyers 16:23 26:6
Layout 21:11
lead 17:22
legal 11:24 12:15
  15:16,25,25 16:7,7
  16:12,15,21 19:10
  24:23,24 41:6
lent 19:12
Let's 12:17 15:3
  31:23 41:1 44:16
  48:8
License 54:25
licenses 7:3
limited 16:2
line 44:11
listed 34:11 52:13
little 6:10 12:17 19:9
  43:12,13 45:3
LLC 1:7
LLP 1:16 2:3
loan 24:6,9
loans 19:24
local 10:15 14:17
  15:22 16:12,15 17:3
  17:4,6 21:6 22:1,13
  22:14 24:1,2,3,7,11
  24:15,17,19,24 25:2
  34:22 36:14 47:12
  47:12 48:3
located 45:16 46:24
location 14:13,15,17
  14:23,25 20:13
  23:25 27:20 31:11
  31:20 41:19 42:7
  47:11
locations 13:8 20:2
lock 18:21 19:6 29:8
long 20:18 42:2
look 32:12 35:1 38:15
  39:15 49:3 51:11

52:4
looked 49:3
looking 29:6 30:12
looks 38:23 39:19
loosely 19:23
lost 19:1
lot 6:12
Lounge 41:16 43:3
Lucas 13:18 46:14,21

**M**

M 5:1
mail 33:2
main 17:12 28:24
  50:6
making 51:16 52:7
management 1:7
  5:11 8:23,24 9:10
  9:15,18 10:7,23
  11:11,18,19 12:5,8
  14:11,12,16 15:16
  16:1,3,8,20 17:15
  17:25 19:2,3,9,19
  22:12 23:24 25:25
  26:4,13,18 27:19,23
  27:25 29:1 32:17,24
  33:5,14,22,24,25
  34:4,7,13,18,23
  35:11 36:11,24 37:1
  37:9,10,13,25 39:5
  39:8 40:6,19,22
  48:2,23 51:18,24
  52:9,12
Management's 27:3
  27:10,15 39:10,17
manager 15:12 17:21
Manhattan 44:20
Marbella 13:21
March 1:17 40:15
marina 13:17 15:2,18
  20:4,6,11 43:22
  46:10
Marina's 20:19
mark 25:4 28:6,12
  31:23 38:4
marked 25:8 28:11
  28:15 32:1,3,5,7,9
  32:11 38:9,12,15
  49:12

marketing 9:23
  10:11,14,19
Marrakech 13:21
matters 15:25
MC 2:3
McElroy 1:15
mean 9:4 12:21,23
  17:18 20:18 29:11
  30:3,8,16 35:20
  46:22 47:4,10
means 9:7
meet 21:18
meetings 21:11
memorial 43:12 45:2
mentioned 16:17
  21:9 35:3
met 7:21 16:13,19
Mexico 13:18
Miami 2:12 5:3 9:24
  10:22 13:16 18:23
  23:20 26:24 37:7
  41:3,19,22 42:7
  44:25
Michael 1:6,12 3:4
  5:8 8:18 16:22 17:4
  29:21 38:24 39:1
  40:24 47:20 51:22
  53:13 54:5
Middlesex 1:1 5:11
midtown 13:16 44:15
  44:21 45:10,11,14
  45:15,20 46:6
MID-L-6951-05 1:2
Mike 29:18
minor 17:2
minute 39:14 41:2
minutes 48:9
money 18:8,21,23,23
  19:4,12 21:5
month 35:25
months 6:23 21:19
  37:19
morning 28:19
MULAVENY 8:5
  48:14 51:7,19 52:2
  52:11,14
Mulberry 1:16 2:5
Mulvaney 1:15 2:3,7
  3:5 5:7,8 8:7,9 25:4

28:6,12 31:23 34:6
36:6 38:4 48:8
52:16
music 21:14
M-E 47:1

_____
**N**

N 2:1 3:1 5:1,1,1 53:1
name 5:8 15:14 17:9
17:10,23,24 18:15
19:18,20 22:2 25:20
25:24 26:7 29:14
30:4 33:8 35:5 41:5
41:6,8,9,17,20,23
42:5 43:18 44:6,7
44:21 45:14,15,19
46:12,16 48:15,16
48:18,20,23 51:22
51:22
named 14:10,10 17:1
17:21,22 43:12
names 15:10,11
23:12 26:19
need 5:25 24:4 49:3
needed 18:11,21
24:16
negotiation 30:6
neither 54:13,15
never 7:21 16:13,19
34:25 35:14 37:18
37:20 38:17
new 1:1,14,17,24 2:6
4:12 5:15 13:16
17:7 21:21 22:9,21
23:25 38:10 40:5
44:14 45:18,18
51:22 54:4,23
Newark 1:17 2:6
Nicole 43:12
night 12:11 13:5
27:21 43:6 45:12
46:8
Nikki 1:7 5:10 6:18
10:16,18,20 12:12
12:14,18,23 13:3,4
13:7,9,12,15,15,16
13:17,17,18,19,19
13:20,20,21,23
14:14,19,24 15:2,18

16:10,16 17:19,20
18:4 19:22 20:1,3,5
20:19 21:1 22:15
23:5,22 29:5 30:22
31:1,3,5,7,9,14,16
31:19 39:10,17,19
40:18,23 41:1,11,12
41:18,21,22,23,25
42:4,6,17,25 43:5,8
43:9,13,14,15,16,18
43:24 44:5,7,10,12
44:12,13,15,16,17
44:18,19,21,22,24
44:25 45:1,3,5,7,9
45:11,14,20 46:6,9
46:14,18,19,20 47:2
47:13,17 48:16,19
48:20,23 51:20,23
nods 6:15
Notary 1:14 53:24
54:2,23
notation 9:6
notice 28:22
number 3:13 27:7,11
27:12,14,16,19
28:24 29:1,5 37:25
38:3,3 50:20,25
51:5,23
numbers 30:18

_____
**O**

O 5:1,1
object 9:1,4,12 12:22
13:11 19:11,25 20:8
26:5 28:3 31:8,17
33:6 34:1 37:15
40:7 48:24 51:4
Objection 36:4 51:19
52:2,11
Ocean 27:20,24
office 1:15 24:17
29:16
Officer 5:5 54:1
offices 18:7 29:4
Okay 5:21,24 7:5
8:17 9:9,25 12:19
15:4 18:16 28:21
50:22 51:7
Omar 14:10 17:1

once 35:22
ones 12:4 50:14
open 42:14 43:4
opened 20:1,6,21
45:25
opening 33:2
operate 20:7
operating 13:24 15:5
operation 42:13
operations 40:23
opposing 51:12
oral 6:16
order 35:9,24 36:25
38:2
outcome 54:17
outside 42:24
owe 33:25
owns 48:18,19,23
o'clock 1:18

_____
**P**

P 2:1,1 5:1 53:1
PAGE 3:13
pages 37:24
paid 14:22 18:24
35:21,22
paper 30:19
paperwork 24:19
Park 1:24
part 31:19 42:1,18
participated 26:13
participating 30:5
parties 13:6 44:8
48:1 54:14
partner 20:11,13,25
21:6 24:22
partners 13:8 24:1
47:11
partnership 22:14
47:12
parts 45:8
party 31:2,6,12,15,21
51:25 52:10
Paul 7:19
pay 23:7,8 37:14
49:16
payable 33:14 36:11
payments 18:1 35:15
35:18

payroll 14:24
peak 42:14
Pearl 41:24 42:19
43:2,3
pending 5:10 6:2
Penrod 1:6,7,12 3:4
5:11 8:20,22,24,25
9:10,11,14,17,20,25
10:2,5,7,11,13,23
11:10,17,19 12:5,7
14:11,12,16 15:15
16:1,3,8,20,24
17:14,25 19:2,3,9
19:19 22:11 23:23
25:25 26:4,12,17
27:2,10,15,19,22,25
29:1 32:17,24 33:3
33:5,14,22,24,24
34:7,9,12,15,18,23
35:11,11 36:11,24
37:1,8,10,13,25
39:5,8,10,17 40:5
40:19,22 41:7,8
42:5,17 43:1 48:2
48:23 51:17,24 52:9
52:12 53:13 54:6
Penrods 42:2
Penrod's 27:18 42:2
Penrod-1 3:14 25:5,7
Penrod-2 3:16 28:7,9
29:23 30:12 49:12
49:21 51:3
Penrod-3 3:19 28:14
29:23 30:13 50:1,3
Penrod-4 3:22 31:25
Penrod-5 3:24 32:2
Penrod-6 4:1 32:4
Penrod-7 4:3 32:6
Penrod-8 4:5 32:8
Penrod-9A 4:7 38:6
Penrod-9B 4:12
38:10
people 44:8
permits 24:15 25:1
person 14:19 33:14
34:7
phone 27:10,12 28:24
28:25 29:2,4,5,10
29:15 38:3 51:23

60

place 8:21 24:21
  41:24 54:10
plaintiff 1:5 2:8 5:9
  52:7
plaintiffs 51:16
planned 21:12
please 6:6 7:11 52:17
Plus 49:23
point 5:2 30:24 48:10
position 10:10,11
  33:23
preparation 7:5
  38:18
prepare 14:3
prepared 40:4
present 21:15
Presumably 36:19
pretty 14:21
price 30:10
prior 54:4
probably 31:9 46:4
  47:7
problems 15:25
process 22:23
produced 8:2 34:10
production 8:3
products 49:6,9 50:3
professional 7:2
programs 10:16
pronouns 18:25
properties 11:22 12:3
  12:7,24 20:10
property 9:23 12:10
  42:17
provide 19:10
provided 8:11 16:7
  16:15,20,24
provides 15:16
Public 1:14 53:24
  54:2,23
Puerto 13:18
purported 51:15
purposes 9:4 14:18
put 20:13 21:5
puts 9:6
putting 21:12
P-1 25:12
p.m 52:19

**Q**

question 6:2,2,5,9 9:5
  9:6 14:6 30:15
  43:25
questions 13:1 50:1
  50:10
quicker 6:12
quite 21:25

**R**

R 2:1 5:1,1 53:1
range 46:5
read 23:21 52:17
  53:4
really 43:20 48:9
  49:16
reason 30:1 38:25
  49:5,8 50:2
recall 19:17,21 20:20
  22:3,5,10 23:14,16
  24:8 25:18 28:20
  30:5 36:3,8,10,13
  41:17,19 45:24
  49:13
receivable 15:23
  33:13
receive 6:25 9:14
  11:10 32:14
received 37:17 49:13
receiving 14:24 36:1
  37:12
recess 48:12
recognize 19:18
  26:23 28:18 29:18
  29:24 38:16,21
record 9:3,7 48:14
Recording 4:10 38:8
RECROSS 3:3
REDIRECT 3:3
refer 27:1 31:16
referenced 49:6,21
references 26:18
referred 51:25
reflect 37:24 39:10
  39:17,21
reflects 32:16
regard 34:16
regarding 35:17
Register 16:22 17:5

29:22 34:14 36:2,7
  39:4 40:25 47:20
Register's 29:19
  38:24 39:1 51:22
related 10:19 54:15
relative 54:13
remember 21:2,25
  23:12 30:14,17 48:1
  49:14
repeat 6:7 44:4
rephrase 6:6
reporter 1:13 6:11
  54:3
REPORTING 1:22
  1:23
representative 33:24
  34:4,20
request 8:3
requested 39:4
require 20:6
required 20:22
Resorts 21:1 47:24
  48:2
respect 10:10 18:3
  49:2
respond 6:1
response 8:2 39:5
responsibilities 10:10
restaurant 41:14,15
  42:19 43:1,3,4
  45:12 46:7
restaurants 12:11
  13:5
Restroom 3:17,20
  28:10,15 51:14 52:6
restrooms 49:14,16
  49:19
retained 42:4
Revenue 4:8,13 38:7
  38:11
review 7:22
right 6:13 18:21 29:3
  30:10,10 33:2 37:2
  38:4 40:2
ring 29:3
Road 1:23
Rock 46:23,23,23
Room 8:21
round 42:14

row 35:7 37:19
rules 5:19
run 24:1
running 20:13
Ryan 2:7 5:8

**S**

S 2:1 3:11 53:1
Saint 13:19
salary 8:22 9:14
  11:10
San 13:18,20 46:14
  46:21
SANDRA 1:13 54:2
Sardinia 13:20
Savola 2:10 3:6 7:15
  7:20 8:1,6,17 9:1,3
  9:12 12:22 13:11
  19:11,25 20:8 26:5
  28:3 31:8,17 33:6
  34:1,3,11 36:4
  37:15 40:7 43:25
  48:24 51:4,10 52:17
says 26:11 31:9,18,19
  39:8 51:17
seasonal 42:13
seasons 42:15
second 27:2 41:25
see 23:19 31:18 40:3
  46:22 49:9 51:20,24
  52:8,12
seeing 28:20
seen 25:15 32:22
  34:25 35:14 37:18
  37:20 38:17
sees 33:3
send 18:22 33:4,8
  36:17 37:10
sense 48:22
sent 23:20 32:17,24
  32:25 33:10 35:7,8
  35:24 36:25 37:1,19
  38:2 40:4
separate 47:13
September 38:2
services 1:22 3:17,20
  4:9 10:16 11:25
  15:16,17 16:4,7,7
  16:15,21,25 17:4,7

19:10 23:6 28:10,15
38:8 51:14 52:6
set 12:15,16 17:20
18:7,7,10 19:12,13
20:10,11,20,24,25
23:25 25:2 28:23
29:4,7,16 45:18
54:11
setting 10:15 18:5,20
34:21,22
setup 21:19 22:25
shaking 6:15
shareholder 10:6
shareholders 10:1
47:3
ship 33:4 39:7
shipped 39:5
short 48:12
Shorthand 1:13 54:3
show 21:11 25:11
30:13 32:11 38:1,14
showing 36:22
shown 25:12 28:19
51:12
shows 27:25
side 16:6 43:4
sign 29:21 30:4
signature 29:19,20
29:25 30:2 38:22,22
39:1 40:8
single 47:18
sister 43:12 45:3
sit 21:10 50:16
six 20:19
somebody 14:13 33:3
somebody's 33:8
Somelia 46:15,25
sorry 10:17 18:13,25
19:2 35:2
sounds 19:20
south 5:2 26:20
Southern 26:21
speak 7:17
Speaking 8:9
specifications 30:6
specifies 39:25
Spirits 26:21
spoke 7:9,12 20:5
stadium 21:14

stand-alone 42:23
state 1:14 5:15,17,23
17:7 21:21 22:9,21
24:18 40:5 54:3,23
statements 14:4
stenographically
54:9
Steve 7:7,23
STEVEN 2:10
stick 20:4
Street 1:17 2:5 45:17
structure 10:25
11:16
structured 33:17
stuff 9:23
subdivisions 22:8
subscribed 53:17
subsidiaries 11:4,7
11:15
subsidiary 8:24 9:10
Suite 1:23
summer 18:12 29:9
50:15
SUNSET 2:11
SUPERIOR 1:1
suppliers 22:22
Support 4:9 38:7
sure 6:14 10:25 11:1
11:9,14 12:4 14:5
14:21 15:13,20,23
21:4,24 23:1,9 25:1
25:20 26:7 27:8,17
27:19 30:18 35:24
41:7,10 44:5 47:10
47:13 48:21 49:1,10
49:22 50:5
suspect 30:1 38:25
sworn 5:4 53:17 54:6
Sysco 26:21

_____
T
_____

T 3:11 53:1
take 8:15 20:3 32:12
35:1 38:15 39:14,15
48:8,10 52:4
taken 1:12 54:9
talk 12:17
talked 7:10 18:18
35:14,16

talking 12:10 15:19
29:14 34:21 36:5,8
49:10
Tallahassee 6:22
teams 10:15 20:11
Tel 1:24
tell 6:7 12:25 13:14
15:2 30:25 37:3
50:16
telling 34:17
temporary 3:16,19
28:10,14 50:6 51:14
52:6
term 19:23
terms 23:8
testified 48:15
testifies 5:5
testimony 1:11 6:16
54:9
Thank 52:14
they'd 17:2,3
thing 10:18 23:8 25:2
43:11 45:2 51:20
things 17:2 21:4,7,9
44:8
think 8:11 9:13,22
10:3 13:12,13 15:21
15:24 17:13,23
18:15,17 19:14
20:23 22:24 23:7
27:5 28:20 29:13
30:3 31:13 35:23
37:16 41:7 42:11,16
43:7 45:25 46:9
47:18 48:9 49:4
51:7
three 1:16 2:4 8:2
21:17
throw 13:6
time 5:25 30:9 32:21
42:2,5,12 54:10
Timothy 23:3
title 9:17,20
titled 51:13
today 7:25 13:24
16:11 34:17 50:10
50:16
toilets 50:2
told 37:9

top 17:10 22:3 31:18
35:6
totally 28:23
tradename 43:14
transcript 1:11 53:5
54:8
transfer 8:4,10
transferred 19:4
transmission 37:23
Treasury 4:7 38:6
trial 9:7
Trope 13:20
true 53:5 54:8
try 6:6
trying 30:9
Tuesday 1:17
TV 10:16,18,20
twice 35:22
two 8:3,5 17:12 49:15
50:12,13
types 21:7

_____
U
_____

U 53:1
Uh-huh 5:12,18
11:12 12:1 22:20
26:24 32:18 42:8
43:19 45:22 46:11
underneath 46:21
understand 6:5,8
12:2
understanding 16:14
Unfortunately 50:9
units 30:10
upfront 20:13
upstairs 42:18 43:1
use 15:3 19:23 27:20
30:10
usually 21:6 24:7,18
33:4,4,7

_____
V
_____

V 5:1
various 22:8
Varta 13:19
Vegas 46:23
vendors 22:22,25
23:11 26:20,20,25
VERITEXT/NEW

62

| | | |
|---|---|---|
| 1:23 | year 42:12,14 | 31 3:22 |
| **VERNON** 1:6,12 3:4 | **years** 20:19 28:20 | **32** 3:24 4:1,3,5 |
| 53:13 54:5 | 49:15 | **33139** 5:3 |
| **VIP** 10:16 | **York** 13:16 44:14 | **33173** 2:12 |
| **Vreeland** 1:23 | 45:18,18 | **350** 42:11 |
| **vs** 1:6 | | **38** 4:7,12 |

| **W** | **Z** | **4** |
|---|---|---|
| **wait** 6:9 | **zip** 45:18 | **4/25/05** 3:18 28:10 |
| **want** 47:21 48:10 | **zoning** 24:17 25:1 | **400** 42:12 |
| **wanted** 21:13,13 | | **410-1313** 1:24 |
| **warm** 42:15 | **#** | **410-4040** 1:24 |
| **wasn't** 29:16 | **#443** 2:11 | |
| **way** 6:18 | | **5** |
| **week** 43:5 | **0** | **5** 3:5 35:2 37:19 |
| **went** 6:22 34:24 | **07102** 2:6 | **5/27/05** 3:23 32:1 |
| 36:20 | **07932** 1:24 | **5/3/05** 3:21 28:15 |
| **Weston** 20:12 | | **50** 46:4 |
| **we'll** 16:6 20:4 52:17 | **1** | **50th** 45:17 |
| **we're** 12:10 15:19 | **1** 27:20 | **51** 3:6 |
| **we've** 24:21 | **1:00** 1:18 | **534-7253** 27:13 |
| **Wine** 26:21 | **10** 13:22 46:1,2 | **538-1111** 27:18 |
| **wire** 8:4,10 18:8 | **100** 1:16 2:5 5:2 | |
| **wired** 18:8 19:3 | **10022** 45:17 | **6** |
| **witness** 3:3 54:6 | **11** 39:25 | **6** 35:2 |
| **word** 51:23,24 | **12** 13:13 | **6/24/05** 3:25 32:3 |
| **work** 8:19,20 10:13 | **151** 45:17 | **6/30/06** 4:14 38:12 |
| 15:1,12 19:17 23:4 | | 40:10 |
| 34:5 | **2** | |
| **worked** 17:8,13 | **2** 30:25 49:23 50:19 | **7** |
| 19:19 23:5 25:21 | 50:25 51:5 | **7** 35:2 |
| **working** 20:6,22 21:5 | **2:35** 52:19 | **7/20/06** 4:11 38:8 |
| **works** 25:21,22 47:14 | **20** 1:17 46:3 | **7/22/05** 4:2 32:5 |
| **world** 13:6,8 43:16 | **2005** 40:15 51:15 | |
| 44:9 | 52:7 | **8** |
| **worldwide** 45:6 | **2006** 39:25 | **8** 35:2 |
| **wouldn't** 11:8 18:11 | **2007** 1:18 54:24 | **8/19/05** 4:4 32:7 |
| 26:15,15 30:3 33:22 | **23** 40:15 | **8770** 2:11 |
| 47:19 | **25** 3:14 51:15 | |
| **wrong** 30:21 | **25B** 1:23 | **9** |
| **wrote** 28:5 | **25th** 49:11 | **9A** 38:15 |
| | **26** 54:24 | **9B** 38:15 |
| **X** | **2602** 5:2 | **9/16/05** 4:6 32:9 |
| **X** 3:1,11 | **28** 3:16,19 | **973** 1:24,24 |
| | | |
| **Y** | **3** | |
| **yeah** 6:4 22:20 26:2 | **3** 30:25 50:19,20 52:7 | |
| 35:19 36:24 39:8 | **30** 23:8 46:4 | |
| 41:4 47:23 48:25 | **30X100058300** 54:25 | |
| | **301** 1:23 | |
| | **305** 27:13 | |

# Exhibit T

*AME Info – the ultimate Middle East business resource*

# Saraya Aqaba partners with Nikki Beach Hotels & Resorts to operate its newly introduced hotel

Saraya Aqaba Real Estate Development psc. and Nikki Beach EMEA Hotels and Resorts Limited, one of the world's most recognizable lifestyle and entertainment brands, signed an agreement to operate a luxurious hotel and a number of serviced lifestyle residential units in the Saraya Aqaba development in Jordan.

**Jordan: Monday, May 05 - 2008 at 15:37**

**South Jordan UT New Homes**
view just listed homes, townhomes, condos, and real estate for sale.

**Holiday Inn in Amman**
Book your hotel in Jordan here. Official site. Low rates guaranteed

Ads by Google

The Nikki Beach Hotel & Residences at Saraya Aqaba will be the first in the Middle East, among other fifteen new hotels and resorts located in 12 countries around the world.

The agreement was signed by Mr. 'Shadi Ramzi' Al-Majali, General Manager of Saraya Aqaba and Mr. Jihad El-Khoury, Chairman and CEO of Nikki Beach EMEA Hotels and Resorts, in the presence of Mr. Ali Kolaghassi, Vice Chairman and CEO of Saraya Holdings, and Vice Chairman of the Board of Directors of Saraya Aqaba, and Mr. Jack Penrod, Owner and Founder of Nikki Beach and Mr. Sary Arab, Chief Operating Officer of Nikki Beach EMEA Hotels & Resorts.

'Saraya is proud to be the first in the Middle East to bring the Nikki Beach brand on board. And as we always seek to distinguish each Saraya destination with its meticulously selected characteristics, Saraya Aqaba's partnership with Nikki Beach today adds the fresh and vibrant element to the Saraya Aqaba destination, hosting this highly acclaimed lifestyle and entertainment brand, while also opening new horizons for Aqaba as well. It is with great pride that we offer Saraya Aqaba residents, guests and visitors this different and unmatched style and class of luxury,'

said Mr. Ali Kolaghassi, Vice Chairman, CEO of Saraya Holdings, and Vice Chairman of the Board of Directors of Saraya Aqaba.

'Saraya Aqaba's partnership with Nikki Beach Hotels & Resorts expresses an integrated

- First Row, from Right to left: Mr. Shadi Ramzi' Al-Majali, General Manager of Saraya Aqaba and Mr. Jihad El-Khoury, Chairman and CEO of Nikki Beach EMEA Hotels and Resorts signing the agreement. Second Row from right to left: Mr. Jack Penrod, Owner and Founder of Nikki Beach, and Mr. Ali Kolaghassi, Vice Chairman and CEO of Saraya Holdings, and Vice Chairman of the Board of Directors of Saraya Aqaba attending the signing ceremony.

pioneering vision towards the tourism sector, as a vibrant sector, and one of diversity and openness. Our partnership with the best experts in the field of premier luxury, leisure and entertainment comes to translate our keen interest in placing Aqaba on the international tourism map, bringing the luxury beach Lifestyle to the shores of Aqaba.' said Mr. 'Shadi Ramzi' Al-Majali, General Manager of Saraya Aqaba.

"The Saraya Aqaba superb location with its unique blend of luxury villas, high end retail and a world class hotels, fits perfectly with our strategy to develop the best and most exclusive destinations in the world. Nikki Beach offers a unique experience combining five-star service, luxury accommodations, design and ambiance with signature entertainment in an international, jet-set resort environment.' said Mr. Jihad El-Khoury, Chairman and CEO of Nikki Beach EMEA Hotels and Resorts.

Located on the shores of Aqaba on the Red Sea, the Nikki Beach Hotel at Saraya Aqaba will include approximately 140 hotel rooms, 28 of which are hotel suites.

Residents and visitors of the Nikki Beach Hotel will have access to its different dining facilities and restaurants, beach club and outdoor pool, Spa and fitness facilities, business center with meeting rooms, as well as retail shops.

Furthermore, Nikki Beach will entail a residential component consisting of 132 units of one, two or three bedrooms, as envisioned by Nikki Beach developers of the boutique hotel concept of a life full of sheer luxury.

Catering to the VIP, Nikki Beach lifestyle residences will offer 6-star services with unique and bespoke privileges, such as fully furnished residential units up to the highest standards bearing the Nikki Beach signature design package and furniture, access to Nikki Beach Resort, Priority access and VIP treatment in all the hotel's facilities and outlets, exclusive discounts, 24 hour 'Nikki Sensations' concierge service, care free maintenance 24-7, as well as many other privileges.

The Nikki Beach series of Hotel and Resorts in different parts of the world offer an exclusive range of 5 star amenities and services in enchanting settings, with Ultra VIP Service for all guests, offering the theatrical entertainment Nikki Beach Style, interactive events that are heavily influenced by Art, Music, Fashion, & Film that has been the hallmark of the brand since the 90s.

The Saraya Aqaba destination, built over an area of 617,000 square meters, around a man made lagoon adding 1.5km to the beach front of the Gulf of Aqaba, includes various types of residential units.

The destination also comprises five 5-star hotels and two boutique hotels, Souk Saraya which includes retail shops, restaurants and recreational activities, in addition to 'Wild Wadi' Water Park, amphitheatre, kids club, Sports Park, beach club, offices and conference center as well as other facilities.

The Infrastructure and construction works in Saraya Aqaba have reached an advanced stage of development on ground, as it is

✉ Saraya RSS feed

1.  Saraya showcases its destinations and services at PropertyLink'08
2.  Saraya launches its first sales showroom in the GCC
3.  Saraya Aqaba showcases the life of exclusive luxury At the Kuwait International Property Show
4.  Saraya and Deutsche Bank AG sign strategic and financial advisory agreement
5.  Saraya Aqaba launches interior design selection
6.  Saraya Aqaba holds its ordinary and extra ordinary general assembly meetings
7.  Saraya welcomes visitors at PropertyLink 08
8.  Rotary Amman Jordan River hosts Saraya Aqaba General Manager
9.  Saraya opens up its gateway to the World

» more Saraya news

Saraya Aqaba partners with Nikki Beach Hotels & Resorts to operate its newly introduced hotel | Saraya

expected to open by the end of 2009 with an approximate cost of $1bn.

**Holiday Inn in Amman**
Book your hotel in Jordan here. Official site. Low rates guaranteed
www.Holidayinn.com

**Luxury Jordan Tours**
Discover Petra with the experts Luxury tours and hotels since 1758
www.coxandkingsusa.com

Ads by Google

Current rating:
0%
Recommendation
Not recommended at all
Not recommended
Somewhat recommended
Moderately recommended
Recommended
Recommended
Highly recommended
Highly recommended
Very highly recommended
Must read

ADD ARTICLE TO
■ Facebook
■ del.icio.us
■ Digg

Posted by staff reporter
Monday, May 05 - 2008 at 15:37 UAE local time (GMT+4)

Replication or redistribution in whole or in part is expressly prohibited without the prior written consent of AME Info FZ LLC / Emap Limited.

**Readers' recommendation**
This press release is not rated by enough users

Saraya Aqaba partners with Nikki Beach Hotels & Resorts to operate its newly introduced hotel | Saraya

**Disclaimer:**
Articles in this section are primarily provided directly by the companies appearing or PR agencies which are solely responsible for the content. The companies concerned may use the above content on their respective web sites provided they link back to http://www.ameinfo.com

Any opinions, advice, statements, offers or other information expressed in this section of the AME Info Web site are those of the authors and do not necessarily reflect the views of AME Info FZ LLC / Emap Limited. AME Info FZ LLC / Emap Limited is not responsible or liable for the content, accuracy or reliability of any material, advice, opinion or statement in this section of the AME Info Web site.

For details about submitting your stories, please read the guide - all content published is subject to our terms and conditions

© 1996 - 2008 AME Info FZ LLC / Emap Limited. All rights reserved.

6/9/2008

# Exhibit U

Westlaw.

Slip Copy
Slip Copy, 2007 WL 316573 (E.D.N.Y.)
(Cite as: 2007 WL 316573 (E.D.N.Y.))

Page 2

**H**Mugno v. Societe Internationale De
Telecommunications Aeronautiques, Ltd.
E.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Anthony MUGNO, Plaintiff,
v.
SOCIETE INTERNATIONALE DE
TELECOMMUNICATIONS AERONAUTIQUES,
LTD., Societe Internationale de Telecommunications
SC, Society Internationale de Telecommunications
Inc., SITA, SC; SITA Inc.; SITA, SITA Information
Networking Company USA, Inc.; SITA Inc NV; a/k/a
The SITA Group; Engineering Airport and Desktop
Services; and The Hartford Insurance Group,
Defendants.
No. 05-cv-2037 (DRH)(ARL).

Jan. 30, 2007.

Law Office of Ruth M. Pollack, by Ruth. M. Pollack,
Esq., Riverhead, NY, for the Plaintiff.
Hunton & Williams LLP, by Annette A. Idalski, Esq.,
Lindsey Camp Edelmann, Esq., Atlanta, GA, Hunton
& Williams LLP, by Shawn Patrick Regan, Esq., New
York, NY, for Defendant Societe Internationale de
Telecommunications Aeronautiques, LTD.

### MEMORANDUM & ORDER

On Motion to Dismiss (doc. # 40) and Motion to Strike
(doc. # 44)

HURLEY, Senior District Judge.
**\*1** Plaintiff alleges that as the result of stress fractures
to his right foot and soft tissue damage to his right
ankle, together with osteoporosis, Plaintiff's doctor
advised him to take a disability leave. The instant case
arises from the alleged denial of Plaintiff's request for
short-term disability benefits from his then-employer,
who he claims to be Defendant Societe Internationale
de Telecommunications Aeronautiques, Ltd.
("Societe" or "the Company"), and from the
employer's benefits provider, Defendant The Hartford
Insurance Group ("Hartford").[FN1]

FN1. For convenience, the Court shall refer

to the defendant insurance company as
"Hartford."

Plaintiff is Anthony Mugno ("Plaintiff" or "Mugno"),
a senior integration engineer, who brings the present
suit against Societe on an Amended Complaint (see
Amended Compl. (hereinafter, "Complaint") (doc. #
14)) asserting violations of (1) the Family and Medical
Leave Act ("FMLA"); (2) the Employee Retirement
Income Security Act ("ERISA"); (3) the Americans
with Disabilities Act ("ADA"); and (4) New York
State Human Rights Law.[FN2]Except for Hartford,
Mugno asserts that Societe and the other named
Defendants are one and the same. Mugno states:

> FN2. Mugno's Fifth Cause of Action is
> directed against Hartford. Under this last
> Cause of Action, Mugno claims Hartford was
> negligent in its handling and denial of his
> disability claim, as well as violated Societe's
> health benefit plan ("the Plan"), ERISA,
> ADA, and New York State law. (See
> Complaint at 12.) In response, Hartford has
> filed a Motion to Dismiss. (See doc. # 32.)
> The Court addresses that Motion in a
> separate Memorandum and Order.

Upon information and belief, at all relevant times,
Societe Internationale de Telecommunications
Aeronautiques, LTD ("Societe") was and is also
known as SOCIETE INTERNATIONALE DE
TELECOMMUNICATIONS SC; and/or SOCIETY
INTERNATIONALE DE
TELECOMMUNICATIONS INC.; and/or SITA, SC;
and/or SITA, INC.; and/or SITA; SITA Information
Networking Company USA, INC.; and/or SITA INC
NV; and/or THE SITA GROUP; and/or
ENGINEERING AIRPORT AND DESKTOP
SERVICES (unless otherwise indicated, hereinafter
"Societe" or "Societe a/k/a SITA"), depending upon
the international legal and/or practical requirements
for such names.
(Complaint at 9.)

In response, Defendant Societe moves to dismiss
Plaintiff's Complaint pursuant to Federal Rules of
Civil Procedure 12(b)(2), (5), and (6). In support of its
Motion to Dismiss, Societe makes six arguments: (1)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

it was never served Mugno's Complaint (*see* Societe's Mem. of Law in Support of Mot. Dismiss ("Societe's Dismissal Mem.") at 7-9 (doc. # 41)); (2) Mugno's attempted service of his Complaint was untimely (*see id.* at 9-12); (3) Societe is not Mugno's employer; therefore, claims under the FMLA, ADA and New York State laws cannot be brought against it (*see id.* at 13, 15-16, 17); (4) Mugno's ADA claim is time-barred (*see id.* at 13-14); (5) the allegations in Mugno's Complaint establish that he was not disabled; therefore, he states no cause of action under either the ADA or New York State law (*see id.* at 14-15; 16-17); and (6) Mugno has failed to properly plead his ERISA claim against Societe (*see id.* at 18-20).

Defendant Societe simultaneously moves to **strike** and/or exclude the **declarations** of both Mugno and his counsel, Attorney Pollack ("Pollack"), arguing that these **declarations** "are not based on personal knowledge, contain unsupported conclusory and speculatory statements, and set forth improper legal conclusions...." (Societe's Mem. In Support of Mot. **Strike** ("Societe's **Strike** Mem.") at 1 (doc. # 45).) In addition to seeking the exclusion of Mugno's and Pollack's **Declarations**, Societe requests that the eight documents attached to Mugno's **Declaration** also be **stricken** and/or disregarded by the Court, arguing that "none of the documents are admissible as they are not authenticated as required by the Rules of Evidence." (*Id.* at 14 (citing Fed.R.Evid. 901(a) (further citations omitted).) Finally, Societe asks that Plaintiff be sanctioned for filing the Declarations, arguing those Declarations were filed in bad faith and to mislead the Court. (*See* Societe's Strike Mem. at 17-18.)

*2 In his Joint Memorandum of Law in Opposition ("Pl.'s Opp'n Mem.") to both Societe's and Hartford's motions for dismissal, Plaintiff skirts Societe's arguments. Instead of responding to Societe's enumerated points, Mugno asserts his right to amend his Complaint and argues that he was unaware of the proper name of his employer. Mugno further tries to confuse the issue by casting blame on Societe for its alleged failure to provide Mugno with the name of proper agent for service. Plaintiff later argues that Societe has purposely avoided service in this case. Plaintiff also tries to shift the Court's focus to a right-to-sue letter which is not germane to this motion. To provide credence to his arguments, Plaintiff's counsel attaches various documents to his Opposition

Memo. (Notably missing, though, is the disability benefit Plan with which Societe allegedly did not comport.) Counsel does this after protesting Societe's submission of various Declarations in support of its dismissal motion. Finally, Plaintiff makes a confused argument that, since discovery has not been concluded, Societe's Motion to Dismiss is premature. Plaintiff has not filed any opposition papers to Societe's Motion to Strike.

For the reasons set forth, *infra,* the Court (1) GRANTS in part and DENIES in part Societe's Motion to Strike, and (2) GRANTS Societe's Motion to Dismiss.

## I. FACTUAL BACKGROUND[FN3]

> FN3. This summary of facts is based on the Plaintiff's First Amended Verified Complaint (previously defined as the "Complaint" (doc. # 14)).

Prior to August 2003, Mugno had worked for Societe for five years in its Engineering and Desktop Services department. At some time, Mugno suffered stress fractures in his right foot and soft tissue damage to his right ankle, coupled with osteoporosis.[FN4] As a result of this condition, Mugno's doctors advised Mugno to take leave from work.

> FN4. It is unclear from the Complaint exactly when or how Mugno suffered his foot and ankle injuries. However, this information is not relevant to the motion before the Court.

Mugno alleges that the Company's Human Resources representative, Susan Farrell, was not available to him to report his leave, nor did Farrell advise Mugno of his "rights and obligations under the Plan, under the leave policy or that the FMLA and short term disability ran concurrently, among other omissions...." (Complaint at ¶ 38.) Mugno also states that his boss, Frank Sullivan, was not available so that he (Mugno) could report his leave. Therefore, on or about August 23, 2003, after notifying Mike De Iulio, Sullivan's supervisor, Mugno began his leave of absence. According to Mugno's Complaint, De Iulio approved the leave, as well as Mugno's offer to continue working on his project from home. And, despite De Iulio stating he did not need one, Mugno provided De Iulio with a physician's note to justify his need for leave. Several days later, Sullivan contacted Mugno to

Slip Copy
Slip Copy, 2007 WL 316573 (E.D.N.Y.)
**(Cite as: 2007 WL 316573 (E.D.N.Y.))**

Page 4

offer Mugno a ride to work. Although not stated in the Complaint, the reasonable inference that can be drawn from the Complaint is that Mugno did not accept this offer. Mugno continued to work from home for the Company for three to four weeks.

On September 5, 2003, while Mugno was working from home, Farrell sent Mugno the Company's disability claim paperwork. Thereafter, Mugno contacted Hartford, the Company's disability benefits provider, and established a claim. He also timely completed the other required paperwork for the Company and returned it to Farrell. To ensure all paperwork was received, Mugno followed up with Farrell and was informed that all necessary paperwork and information had been received.

*3 Later, in the third week of September, Farrell called Mugno to inform him that if he was on short-term disability leave, he could not be doing work for the Company, nor could he use the Company's e-mail. This prompted Mugno's repeated attempts to contact various Company personnel to seek guidance on how to handle his leave since he was providing coaching and instruction-from his home, via telephone-to another engineer about his duties on an on-going project. Mugno's attempts were to no avail.

On November 20, 2003, Mugno left a voice mail for Farrell "informing her that he was ready, willing and able to return to work[.]" (Complaint at ¶ 58.) The next day, Mugno received a phone call from Societe's Human Resources Director, Dorothy Lago, who "informed plaintiff he had been away from the office for too long, had not kept them [the Company] abreast of his status and was therefore no longer employed by SITA."(*Id.* at ¶ 59.)Mugno's termination was not memorialized in writing.

Mugno contends that Societe wrongfully terminated him "on account of his disability, actual and/or perceived."(Complaint at ¶ 62.) Mugno further asserts that "Societe ... clearly 'diddled' Mr. Mugno in contravention of all applicable law to avoid paying his disability insurance and for other discriminatory reasons ."(*Id.* at ¶ 65.)Among other allegations of wrongdoing by Societe, Mugno claims that Societe failed to abide by the terms of the [Societe] policy with The Hartford after a claim had been established."(*Id.* at 76.)Concomitantly, Mugno alleges that "Hartford failed and refused to properly process

the forms and claim duly provided to it by Mr. Mugno through his physicians."(*Id.* at 92.)Mugno also alleges:

Upon information and belief, The Hartford wrongfully denied plaintiff's short term disability benefits based only on a non medical opinion rendered by a negligently trained "Claims Examiner" dated on or about November 12, 2003 based on the fact that the claims examiner found Mr. Mugno's physician's "restrictions overly excessive based on the type of injury."

(*Id.* at ¶ 95.)Nowhere in Mugno's Complaint is there an indication, nor can an inference be drawn, that Mugno appealed this denial of short term disability benefits.

Societe contracted with Defendant Hartford to provide its employees disability insurance, as well as other benefits (collectively, "the Plan"). While employed by Societe, Mugno qualified as a participant in the Plan, entitling him to: (a) long- and short-term disability benefits; (b) major medical benefits; (c) life insurance; and (d) other benefits. Specifically as to short-term disability, on the eighth day of disability and after exhausting all sick leave, the Plan was to pay 70% of Mugno's weekly salary for six months, up to a maximum weekly amount of $700. (*See* Complaint at ¶ 33.)

## II. PROCEDURAL BACKGROUND

Given the protracted history of this case, the Court believes a review of its procedural background is warranted. On April 26, 2005, Mugno filed his Complaint against Societe Internationale Telecommunications Aeronautiques and The Hartford Insurance Company. (*See* doc. # 1.) Simultaneously, a summons was issued as to both named defendants.

*4 On September 14, 2005, in lieu of filing an answer and pursuant to this Judge's Individual Practice Rule 2(B), Societe filed a letter requesting a pre-motion conference ("Societe's pre-motion conference letter") seeking permission to file a motion to dismiss. (*See* doc. # 3.) [FN5] Significantly, in this first filing by Societe, it stated: "Plaintiff formerly was employed by SITA Information Networking Computing USA, Inc. (hereinafter "SITA") as a network integration engineer. He was not an employee of Societe. Plaintiff

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 5
Slip Copy, 2007 WL 316573 (E.D.N.Y.)
(Cite as: 2007 WL 316573 (E.D.N.Y.))

has not named SITA as a defendant in this lawsuit."(Societe's pre-motion conference letter at 1 n. 1.) <sup>FN6.</sup>"Due to the press of business," Mugno requested an extension of time (*i.e .,* Mugno's first request for extension) within which to respond to Societe's pre-motion conference letter. (Letter from Ruth M. Pollack, Esq., Pollack & Kotler, to Hon. Denis R. Hurley, U.S. District Court, (Sept. 26, 2005) (doc. # 8).) However, Pollack never filed a response to Societe's pre-motion conference letter. Regardless, the Court held a pre-motion conference on October 19, 2005; thereafter, an order was entered (the "October 19th Order") granting Plaintiff permission to file an amended complaint on or before November 16, 2005, that added SITA Information Networking Computing USA, INC. as a defendant. The October 19th Order also stated: "Should Defendants believe that service of the amended complaint is not effectuated properly, they may submit a letter to the Court seeking permission to move to dismiss the Amended Complaint and the Court will issue a briefing schedule."

> FN5. The Court notes that according to this Judge's Individual Practice Rule 2(C), "Service of a pre-motion conference letter within the time provided by Federal Rule of Civil Procedure 12(a) constitutes timely service of a motion made pursuant to Federal Rule of Civil Procedure 12(b)." Individual Practice Rules of Judge Denis R. Hurley, *available at* http://www.nyed.uscourts.gov/pub/rules/DR H-MLR.pdf.

> FN6. Societe subsequently provided Mugno with the proper name of his employer, SITA Information Networking Computing USA, Inc., on at least three other occasions.

Mugno failed to file an amended complaint on or before November 16, 2005. Thereafter, on November 17, 2005, and pursuant to the October 19th Order, Societe filed a letter requesting permission to file a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and (5). (*See* Letter from Annette A. Idalski, Esq., Hunton & Williams LLP, to Hon. Denis R. Hurley, U.S. District Court (Nov. 17, 2005) (doc. # 12)). In response, Mugno's counsel made an untimely request (*i.e.,* Mugno's second request for an extension) for additional time within which to file an

amended complaint. (*See* Letter from Ruth M. Pollack, Esq., Pollack & Kotler, to Hon. Denis R. Hurley, U.S. District Court, (Nov. 18, 2005) (doc. # 13).) Pollack claimed "press of business" and "the extent of research required to accomplish" proper service as the reasons for not being able to file the amended complaint by November 16th.<sup>FN7</sup>Mugno's counsel then asked that she "be granted until November 2, 2005 to file the amended complaint and respond to the papers filed by defense counsel."(*Id.*) Assuming "November" was an error on Pollack's part, the Court granted Plaintiff an extension until December 2, 2005, to file the amended complaint. (*See* November 22, 2005 Order.) Despite this accommodation, Plaintiff's counsel was again untimely; Mugno's Amended Complaint was not filed until December 3, 2005. (*See* doc. # 14.)

> FN7. The Court notes that, with the information provided by Societe (*i.e.,* the proper name of Mugno's employer, SITA Information Networking Computing USA, Inc.), it takes less than five minutes' time to search New York State's Department of State's website to learn the proper defendant's registered agent upon whom to effect service.

**\*5** Thereafter, on December 5, 2005, Societe filed its "Third Request to File Motion to Dismiss based on Plaintiff's Failure to Effectuate Service Pursuant to the Court's Orders dated October 19, 2005 and November 22, 2005."(Doc. # 16.) Defendant Hartford also requested a pre-motion conference so that it could move to dismiss Mugno's Amended Complaint. Mugno's counsel never responded to either request. Thereafter, the Court waived its pre-motion conference requirement and set a briefing schedule on all defendants' motions to dismiss. (*See* Dec. 28, 2005 Briefing Order.) According to the Briefing Order, Defendants were to serve moving papers on or before February 3, 2006, and Plaintiff was to serve opposition papers on or before March 3, 2006.

A day before Plaintiff's March 3th deadline, Mugno's counsel filed a letter requesting an extension of time to file opposition papers (*i.e.,* Mugno's third request for an extension). (*See* Letter from Ruth M. Pollack, Esq., Law Office of Ruth M. Pollack, to Hon. Denis R. Hurley, U.S. District Court, (Mar. 2, 2006) (doc. # 19) .) The requested extension was on consent, would give Plaintiff until April 17, 2006 to serve his

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

opposition papers, and would allow each defendant until May 17, 2006 to reply. (*See id.*)On March 3, 2006, the Court "So Ordered" the requested extension. (*See* March 3, 2006 Order.)

On Plaintiff's April 17th due date, Attorney Pollack filed her forth request for an extension; she sought an additional 45 days within which to file Mugno's opposition to Defendants' dismissal papers. Pollack claimed the press of business, illnesses of herself and her mother, and her client's residence out-of-state as reasons for her last-minute request. (*See* Letter from Ruth M. Pollack, Esq., Law Office of Ruth M. Pollack, to Hon. Denis R. Hurley, U.S. District Court, (Apr. 17, 2006) (doc. # 20).) Societe vehemently opposed Pollack's request, making pointed arguments for its objections, to wit, Pollack's reasons did not rise to the level of extraordinary circumstances which the Court's Individual Practice Rule 9(G) require. Societe noted that Pollack's "continued references to her client's out-of-state residence, press of business, and illness are not new (indeed, she has relied upon these excuses in her prior requests)." (*See* Letter from Annette A. Idalski, Esq., Hunton & Williams LLP, to Hon. Denis R. Hurley, U.S. District Court (Apr. 19, 2006) (doc. # 21)). The Court did grant Mugno an extension, but only for 30 days; therefore, Plaintiff was to serve his opposition papers by May 15, 2006. (*See* April 4, 2006 Order.)

Mugno's counsel did not comply the April 4th Order. Rather, on May 19, 2006, Pollack filed "an emergency letter request for leave to file [Mugno's] answers to defendants' Rule 12 applications ..." (*See* Letter from Ruth M. Pollack, Esq., Law Office of Ruth M. Pollack, to Hon. Denis R. Hurley, U.S. District Court, (May 19, 2006) (doc. # 23).) As extraordinary circumstances, Pollack again assert a heavy work load and medical treatments. (*See id.*)Counsel asked for reconsideration of her April 17th request for extension, to June 14, 2006, claiming the reference to "May" in the April 17th application was a "typographical error." (*Id.*) Alternatively, Pollack sought an extension to May 22, 2006 by which to serve Mugno's opposition papers. (*See id.*)Given Pollack's pattern of missing deadlines and making untimely requests for extensions, both Societe and Hartford filed letters opposing this latest request for an extension and requesting that their dismissal motions be considered unopposed. (*See* Letter from Annette A. Idalski, Esq., Hunton & Williams LLP, to Hon. Denis R. Hurley, U.S. District

Court (May 19, 2006) (doc. # 25); Letter from Norman L. Tolle, Esq., Ravkin & Radler, to Hon. Denis R. Hurley, U.S. District Court (May 19, 2006) (doc. # 24).) The Court granted Pollack's alternative request "for a final extension to May 22, 2006 to serve opposition papers."(May 22, 2006 Order.)

*6 Incredibly, again, Pollack did not meet her extended deadline. Therefore, on May 25, 2006, having yet to receive Mugno's overdue opposition papers, Societe filed another letter "respectfully request[ing] that this Court grant Defendant Societe permission to file its uncontested dispositive motion with the Court for immediate ruling on the same."(Letter from Annette A. Idalski, Esq., Hunton & Williams LLP, to Hon. Denis R. Hurley, U.S. District Court (May 25, 2006) (doc. # 27).)[FN8] On May 26, 2006, Pollack filed a response, stating, *inter alia:*

> FN8. Hartford made a similar request in its May 25, 2006 letter filed with the Court. (*See* Letter from Norman L. Tolle, Esq., Ravkin & Radler, to Hon. Denis R. Hurley, U.S. District Court (May 19, 2006) (doc. # 26).)

I am still actually engaged in an ancillary proceeding, and have advised defendants that, while my papers were due to be "served" as of Monday, May22 [ (*sic* ) ], I have required a few days to forward the Memorandum of Law.... The Memo of Law will be complete by tomorrow morning *because I am completing it tonight.*
(Letter from Ruth M. Pollack, Esq., Law Office of Ruth M. Pollack, to Hon. Denis R. Hurley, U.S. District Court, (undated) (filed May 26, 2006) (emphasis added) (doc. # 28).) Again, Pollack claimed "being actually engaged," "working with a client from out of state, and her "need to pace [her]self" as the "the extraordinary reasons" for her request that she be allowed to untimely serve her opposition papers on May 27, 2006, and that Defendants be allowed until June 7, 2006, to serve any reply. (*Id.*) The Court granted Pollack's untimely request. (*See* June 1, 2006 Order.)

Having received Mugno's untimely Response to Defendant Societe's Motion to Dismiss, together with two Declarations in support of his Response, Societe sought permission to file a motion to strike the Declarations. (*See* Letter from Lindsey Camp

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 7
Slip Copy, 2007 WL 316573 (E.D.N.Y.)
**(Cite as: 2007 WL 316573 (E.D.N.Y.))**

Edelmann, Esq., Hunton & Williams LLP, to Hon. Denis R. Hurley, U.S. District Court (June 2, 2006) (doc. # 30).) Societe posited that the Declarations failed to comply with the requirement of personal knowledge, and contained improper legal conclusions, as well as irrelevant and inadmissible evidence. (*See id.*)The Court granted Societe's request. (*See* June 5, 2006 Order.)

According to the May 28, 2006, docket text accompanying the filing of document # 29:

SUMMONS Returned Executed by Anthony Mugno. Societe Internationale De Telecommunications Aeronautiques, Ltd. served on 8/23/2005, answer due 9/12/2005; The Hartford Insurance Company served on 8/23/2005, answer due 9/30/2005; Societe Internationale De Telecommunications SC served on 12/23/2005, answer due 1/12/2006; Societe Internationale De Telecommunications Inc., Sita, SC served on 12/3/2005, answer due 12/23/2005; Sita, Inc. Served on 12/3/2005, answer due 12/23/2005; Sita, Sita Information Networking Company USA, Inc. served on 8/23/2005, answer due 9/12/2005; Sita Inc NV served on 12/3/2005, answer due 12/23/2005. (Attachments: # 1 Affidavit societe [ (*sic* ) ] and hartford [ (*sic* ) ] affidavits of service) (Pollack, Ruth) (Entered: 05/28/2006)

**\*7** (*Mugno v. Societe Internationale Telecommunications Aeronautiques* et al., No. 05-cv-2037 (DRH)(ARL), docket entry (E.D .N.Y. May 28, 2006).) The first attachment to this docket entry is virtually illegible. (See doc. # 29-1.) The second attachment is captioned "Anthony Mugno against Societe Internationale Telecommunications Aeronautiques and The Hartford Insurance Company" and is labeled an "Affidavit of Service". (Doc. # 29-2.) The Affidavit indicates that on August 23, 2005, Robert D. Helfand, the Assistant Vice President and Senior Counsel of Hartford, was served "the Summons In A Civil Action;" there is no mention of service of a complaint or an amended complaint. (*Id.*) (There is no evidence in the record that the Defendants identified in Attorney Pollack's docket entry were served Mugno's original Complaint.)

On July 13, 2006, Plaintiff served a summons and "1st Amended Verified Complaint" on "Societe Internationale" and "SITA". Proof of service was evidenced by an affidavit filed on September 29, 2006.

(*See* doc. # 47-2.) This unlabeled affidavit was captioned "Anthony Mugno against Societe Internationale, etc, et al .," indicated a case number of "05 CV 2037(ML)(JH)," and stated that service of a summons and a first amended verified complaint to 1201 Peachtree Street in Atlanta, Georgia, was made "[b]y delivering to and leaving [the summons and complaint] with Monique Jober".(*Id.*) It further identified Ms. Jober "to be the authorized agent for Registered Agent of the corporation."(*Id.*) Societe requested that its pending Motion to Dismiss be considered its response to Plaintiff's July 13th service of the Amended Complaint (*see* Letter from Annette A. Idalski, Esq., Hunton & Williams LLP, to Hon. Denis R. Hurley, U.S. District Court (July 28, 2006) (doc. # 39), and the Court granted that request (*see* July 31, 2006 Order).

Having provided this detailed background, the Court proceeds to consider first Societe's Motion to Strike and then its Motion to Dismiss.

### III. DISCUSSION

*A. Societe's Motion to Strike*

Federal Rule of Procedure 12(b) states, *inter alia:*

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(b). Yet, as the Second Circuit has instructed, when presented with other Rule 12(b) motions, courts may consider evidentiary matter "presented by affidavit or otherwise." *Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1010-11 (2d Cir.1986) (considering affidavit submitted in support of a Rule 12(b)(1) motion) (citing *Exchange Nat'l Bank of Chicago v. Touche Ross & Co .,* 544 F.2d 1126, 1130-31 (2d Cir.1976)). In that vein, Rule 56 is relevant "in that the body of decisions under Rule 56 offers guidelines in considering evidence submitted outside the pleadings."*Id.* at 1011.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*8 In turn, Rule 56(e) requires that affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."Fed.R.Civ.P. 56(e). Thus, where an affidavit is not based on personal knowledge, it may be stricken. See *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988); *Morris v. Northrop Grumman Corp.,* 37 F.Supp.2d 556, 568 (E.D.N.Y.1999). Also, where an affidavit contains hearsay that would not be admissible as a hearsay exception, such hearsay can be struck. See *Caldwell v. Am. Basketball Assoc.,* 825 F.Supp. 558, 572 (S . D.N.Y.1993), *aff'd,*66 F.3d 523 (2d Cir.1995), *cert denied,*518 U.S. 1033 (1996). Likewise, **affidavits** containing conclusory allegations and legal arguments are subject to being struck. See *Kamen,* 791 F.2d at 1011.

The Court must also consider 28 U.S.C. § 1746 in its decision whether to **strikedeclarations**. Where a matter is permitted to be supported, evidenced, or established by a sworn **declaration** by the person making the **declaration**, such

matter may, with like force and effect, be supported, evidenced, established, ... in writing of such person which is subscribed by him, as true *under penalty of perjury,* and dated, in substantially the following form:

* * *

(2) If executed within the United States, ...: "I **declare** (or **certify**, verify, or state) *under penalty of perjury* that the foregoing is true and correct. Executed on (date).

(Signature)".

28 U.S.C. § 1746 (emphasis added). Similarly, Local Civil Rule 1.10 provides helpful guidance in the Court's consideration of Societe's Motion to Strike. Rule 1.10 requires:

In situations in which any local rule provides for an affidavit or a verified statement, the following are acceptable substitutes: (a) a statement subscribed under penalty of perjury as prescribed in 28 U.S.C. § 1746; or (b) if accepted by the court as a substitute for

an affidavit or a verified statement, (1) a statement signed by an attorney or by a party not represented by an attorney pursuant to Federal Rule Civil Procedure 11, or (2) an oral representation on the record in open court.

Here, in support of his opposition papers to Societe's Motion to Dismiss, Mugno has submitted his Declaration with several attached documents and his counsel's Declaration.

1. Mugno's Declaration

Mugno's Declaration begins, "ANTHONY Mugno, being duly sworn, deposes and says:" (Pl.'s Decl. at 1, Ex. A attached to Societe's Reply in Supp. Mot. Strike (doc. # 46).) Mugno's lengthy Declaration concludes: "WHEREFORE, plaintiff respectfully seeks an order denying the motions of defendants in their entirety, together with such other and further relief as a [ (*sic* ) ] just and proper."(*Id.* at 10.)The Declaration is electronically signed by Mugno, but it is not notarized. (*Id.*)

*9 Despite its length, a paramount element missing from Mugno's Declaration is Mugno's attestation that he made the Declaration on personal knowledge. One's belief alone is not enough upon which to make a declaration, nor is knowledge alone sufficient; the Federal Rules require *personal* knowledge. *See*Fed.R.Civ.P. 56(e); *Sellers,* 842 F.2d at 643;*Morris,* 37 F.Supp.2d at 568. Moreover, Mugno has failed to show affirmatively that he is competent to testify to the matters stated therein. Further, even assuming, *arguendo,* that Mugno's Declaration was based on personal knowledge, the Court's review of the Declaration persuades it that much of Mugno's statements made therein would not be admissible in evidence.[FN9]*See*Fed.R.Evid. 402; *see also Caldwell,* 825 F.Supp. at 572.

FN9. The Court also notes that Mugno's Declaration is replete with conclusory allegations and legal arguments, many presented in the form of rhetorical questions. If the Court was not striking Mugno's Declaration in its entirety for other deficiencies, large portions of the Declaration would be stricken to eliminate these conclusory allegations and legal arguments. *See Kamen,* 791 F.2d at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 316573 (E.D.N.Y.)
**(Cite as: 2007 WL 316573 (E.D.N.Y.))**

1011:*Morris,* 37 F.Supp.2d at 568.

In any event, Mugno's Declaration is further deficient in that it is not made under penalty of perjury. To ensure the trustworthiness of a declaration, federal law requires a declarant subscribe his statement subject to the risk of criminal penalty. *See* 28 U.S.C. § 1746; *see also, e.g, Margo v. Weiss,* 213 F.3d 55, 62 (2d Cir.2000) ("Perjury is a crime under 18 U.S.C. § 1623."). Without the necessary "under-penalty-of-perjury" proclamation, the Court will not rely upon Mugno's Declaration nor the documents attached thereto. Therefore, the Court grants Societe's Motion to Strike Mugno's Declaration.

2. Pollack's Declaration

Attorney Pollack, Mugno's counsel, also submitted a Declaration. (*See* Ex. B attached to Societe's Reply in Supp. Mot. Strike (doc. # 46).) The preamble to Pollack's Declaration states: "RUTH M. POLLACK, ESQ.," attorney for plaintiff, *being mindful of* the penalties for perjury, affirms and declares as follows:"(*Id.* at 1 (emphasis added).) Pollack concludes with a request for "an order denying the motions of both defendants in their entirety, together with such other and further relief as is just and proper."(*Id.* at 2.) While dated May 22, 2006, and containing a signature line for "Ruth M. Pollack, Esq. (RP1407)," the Pollack **Declaration** is **unsigned.** (*Id.*)

First, the Court does not find "being mindful of" the penalties of perjury the same as making a **declaration** "under penalty of perjury." The first indicates one's awareness of the penalty for perjury, whereas the second indicates one's willingness to be subjected to that penalty. The statute requires willingness to be subjected to perjury's penalty. *See* 28 U.S.C. § 1746. Second, without a signature-either actual or electronic-the Court does not know whether Pollack subscribes to the statements made in her purported Declaration. *See id.* Indeed, it is the signature that provides assurance to the Court that the declarant swears or attests to what is stated in the declaration. Thus, given the document before it alleged to be a Declaration, the Court will not considered Pollack's Declaration since it does not comport with the requirements of 28 U.S.C. § 1746. Therefore, the Court grants this portion of Societe's Motion to Strike, as well.

3. Societe's Request for Sanctions

*10 In addition to requesting the Declarations of Mugno and Pollack be stricken, pursuant to Federal Rule of Civil Procedure 56(g), Societe also seeks sanctions against Plaintiff. Societe argues the Declarations were filed in bad faith:

Indeed, neither declaration is properly sworn to as required by 28 U.S.C. § 1746 and Local Rule 1.10 and both declarations set forth conclusory allegations, which are not based on personal knowledge, for the sole purpose of distracting Defendant Societe and this Court from the fact that Plaintiff never served Defendant Societe, despite numerous opportunities to do so.

(Societe's Strike Mem. at 17.) Societe also asserts that Plaintiff filed the Declarations as a means of delaying the proceedings. (*See id.* at 18.)

Where bad faith or purposeful delay is used, Rule 56(g) directs a court to sanction the offending party:

Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing then to pay to the other party the amount of reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees....

Fed.R.Civ.P. 56(g). Here, the Court is not satisfied that Plaintiff caused his and Pollack's Declarations to be filed in bad faith. Rather, given the record before it, the Court is persuaded that the deficient Declarations were filed in a desperate attempt to defeat Societe's Motion to Dismiss and that the deficiencies of the Declarations are the result of sloppy lawyering. (*See infra* Part IV.) Likewise, it does not appear to the satisfaction of this Court that Plaintiff filed the Declarations solely for the purpose of delay. Instead, given Attorney Pollack's questionable performance throughout this case, it appears to the Court that Pollack's purpose in filing the Declarations was a poorly executed attempt to preserve Mugno's Amended Complaint in light of Societe's diligent attempt to dismiss it. Thus, finding no bad faith and no

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 316573 (E.D.N.Y.)
(Cite as: 2007 WL 316573 (E.D.N.Y.))

Page 10

purposeful delay, the Court will not order Mugno to pay Societe's costs associated with its Motion to Strike; in that regard, Societe's Motion to Strike is denied.

*B. Societe's Motion to Dismiss*

*1. Standard of Review-Rule 12(b)(5 )*

Where a defendant moves for dismissal under Rules 12(b)(2), (5), and (6), "the Court must first address the preliminary questions of service and personal jurisdiction." *Mende v. Milestone Tech., Inc.,* 269 F.Supp.2d 246, 251 (S.D.N.Y.2003) (citing *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 221 (2d Cir.1963) ("logic compel[s] initial consideration of the issue of jurisdiction over the defendant-a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim")). Where a court is presented with a Rule 12(b)(5) dismissal motion arguing insufficiency of process, " 'a Court must look to matters outside the complaint to determine whether it has jurisdiction.' " *Id.* (quoting *Darden v. DaimlerChrysler N. Am. Holding Corp.,* 191 F.Supp.2d 382, 387 (S.D.N.Y.2002)). " 'Conclusory statements that a defendant was properly served are insufficient to overcome a defendant's sworn affidavit that he was never served with process.' " *Id.* (quoting *Howard v. Klynveld Peat Mrwick Goerdeler,* 977 F.Supp. 654, 658 (S.D.N.Y.1997), *aff'd,*173 F.3d 855 (2d Cir.1999). When a defendant makes a Rule 12(b)(5) motion, it is the plaintiff's burden of proof to establish its service of process was adequate. *See Preston v. New York,* 233 F.Supp.2d 452, 466 (S.D.N.Y.2002).

*2. Standard of Review-Rule 12(b)(2 )*

*11 "Objections pursuant to Rule 12(b)(2) concern lack of personal jurisdiction, which results when a summons and compliant have not been served on the defendant pursuant to Rule 12(b)(5)." *Anzulewicz v. Nat'l Fuel Gas Supply Corp.,* 208 F.R.D. 47, 49 n. 5 (W.D.N.Y.2002). When a defendant moves for dismissal under Rule 12(b)(2), it is the plaintiff's burden of proof to show that the court has jurisdiction over the defendant. *See Kernan v. Kurz-Hastings, Inc.,* 175 F.3d 236, 240 (2d Cir.1999)."If the court chooses not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." *Marine Midland Bank, N.A. v.*

*Miller,* 664 F.2d 899, 904 (2d Cir.1981). A court will "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations" but "will not draw 'argumentative inferences' in the plaintiff's favor." *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1996). And, " '[c]onclusory allegations are not enough to establish personal jurisdiction.' " *Mende,* 269 F.Supp.2d at 251 (quoting *Harris v. Wells,* 832 F.Supp. 31, 34 (D . Conn.1993)).

*3. The Instant Motion to Dismiss*

As the plaintiff herein and in order to defeat Societe's Motion to Dismiss, it is Mugno's burden of proof to establish that his service of process was adequate. Here, because Societe has moved for dismissal under Rules 12(b)(2) and (5), in addition to subsection (6), the Court looks to matters outside the Complaint to determine if that burden is met. Upon review of those matters, it is clear that Mugno has failed to meet that burden. Mugno offers no competent evidence that overcomes Societe's Declarations that support its position that it was never served with process, one of its grounds for dismissal. (As discussed in Part III(A), *supra,* and for the reasons stated therein, the Court does not consider Mugno's or Pollack's Declarations.) First, Mugno's supposed affidavit of service regarding the alleged August 23, 2005 service is wholly illegible. (*See* doc. # 29-2.) [FN10]Second, Plaintiff's statement that he effected service on Societe on that date (*see* Pl.'s Opp'n Mem. at 3) is unavailing in the face of Societe's **Declarations** that establish service was not effected upon Societe or SITA. *See Howard,* 977 F.Supp. at 658 ("Conclusory statements that a defendant was properly served are insufficient to overcome defendant's sworn **affidavit** that he was never served with process."). Yet, even if the Court were to assume, *arguendo,* that service was made on August 23, 2005, it is still not effective in light of Susan Sima's Declaration ("Sima Decl."). (*See* Sima Decl. at ¶ 2, Ex. B, attached to Societe's **Strike** Mem.) As discussed *infra,* Sima **declares** that she is a receptionist for SITA who is not authorized to accept service of process for SITA (*see id.* at ¶ 4), and she is not aware of the entity known as Societe (*see id.* at ¶ 7). Further, Sima informed the process server of this fact, but, nonetheless, the server proceeded to leave a summons and complaint with her. (*See id.* at ¶ 5). Under both New York's and the Federal Rules of Civil Procedure, this attempted service is inadequate. *See McKibben v. Credit Lyonnais,* No. 98-cv-3358 (LAP),

Slip Copy
Slip Copy, 2007 WL 316573 (E.D.N.Y.)
**(Cite as: 2007 WL 316573 (E.D.N.Y.))**

1999 U.S. Dist. LEXIS 12310, *6-7 (S.D.N.Y.1999) (citing N.Y.C.P.L.R. § 311 and Fed.R.Civ.P. 4(h)(1)).

> FN10. The Court notes that Mugno did file an affidavit of service dated July 14, 2006 wherein process server Dennis Novik testified he served a Monique Jober, alleged to be "the authorized agent for Register Agent" for "Societe Internationale and SITA," at 1201 Peachtree Street in Atlanta, Georgia, on July 13, 2006. (See doc. # 47-2.) However, as before, service of this Complaint-the "1st Amended Verified Complaint"-is untimely as it was served more than 120 days from filing, which occurred on December 3, 2005. Therefore, service continues to be insufficient.

**\*12** Conversely, in support of its Motion to Dismiss, Societe submitted several Declarations:

(1) *Declaration of Alain Brodeur* ("Brodeur Decl."), Corporate Secretary for Societe Internationale de Telecommunications Aeronautiques, S.C. ("Societe"), a foreign entity, which is registered to do business in the State of Georgia as Societe Internationale de Telecommunications Aeronautiques, LTD, (*see* Brodeur Decl. at ¶ 2, Ex. A, attached to Societe's Strike Mem.);

(2) *Declaration of Susan Sima,* a receptionist of SITA Information Networking Computing USA, Inc. ("SITA"), (*see* Sima Decl. at ¶ 2, Ex. B, attached to Societe's Strike Mem.); and

(3) *Declaration of Chip Parker* ("Parker Decl."), in-house senior legal counsel for SITA, (*see* Parker Decl. at ¶ 2, Ex. C, attached to Societe's Strike Mem.).

According to Brodeur, Societe is not registered to transact business in New York State and does not maintain a registered agent in this State. (*See* Brodeur Decl. at ¶ 3.) Brodeur further declares that Sima is not an employee of Societe and is not authorized to accept service on Societe's behalf. (*See id.* at ¶¶ 4, 6.) Brodeur further states that "Mugno was not employed by Societe during 2003, which is the time period relevant to this lawsuit."(*Id.* at ¶ 7.) Brodeur's Declaration comports with the requirements of 28 U.S.C. § 1746.

As briefly mentioned above, in her Declaration, Sima testifies that she is not authorized to accept service of a summons on SITA's behalf. (*See* Sima Decl. at ¶ 4.) Yet:

[o]n August 26, 2005, an individual, who identified herself as a process server, arrived at SITA's office located at 55 Orville Drive, Bohemia, New York and handed me a Summons and Complaint. The Summons and Complaint were styled, *"Anthony Mugno v. Societe Internationale Telecommunications Aeronautiques and The Hartford Company."*

(*Id.* at ¶ 3 (emphasis in original).) While Sima states she informed the process server that she was not authorized to accept service of a summons or complaint, and that she would locate someone who was, "The process server indicated that she would not wait for the proper representative and that her job was simply to deliver the paperwork."(*Id.* at ¶ 5.) After informing Sima of this, the process server "then immediately exited the building." (*Id.*) Sima further testified that she is not employed by Societe, nor is she aware of that entity. (*See id.* at ¶ 7.) Sima's Declaration satisfies the criteria of 28 U.S.C. § 1746.

Declarant Parker states that SITA maintains an office at 55 Orvill Drive in Bohemia, New York, as well as at various other locations. (*See* Parker Decl. at ¶ 3.) He also declares that while Sima is an SITA employee, she has never been authorized to accept service on behalf of SITA. (*See id.* at ¶ 5.) According to Parker Declaration, Mugno was also an SITA employee from January 1, 2001, through November 23, 2003. (*See id.* at ¶ 6.) All elements required of 28 U.S.C. § 1746 are found in Parker's Declaration.

**\*13** Yet, despite Societe's clear evidence supporting its position that it was not timely served, Mugno persists in making an argument that focuses on his filing of his initial Complaint after the issuance of a right-to-sue letter. (*See* Pl.'s Opp'n Mem. at 2-3 .) This argument misses the point. Societe makes no issue of when Plaintiff *filed* his Complaint; its time-related argument is based on Federal Rule of Civil Procedure 4(m),<sup>FN11</sup> *i.e.,* the *service* of the summons and complaint upon Societe. (*See* Societe's Dismissal Mem. at 9-10.) Societe states: "Here, in order to satisfy the requirements of Rule 4(m), Plaintiff was required to perfect service on Defendant Societe no later than August 24, 2005-within 120 days after his

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 316573 (E.D.N.Y.)
(Cite as: 2007 WL 316573 (E.D.N.Y.))

Complaint was filed. Plaintiff did not do so, however."(*Id.* at 10.)Yet, according to Societe's Declarations, Mugno caused the Summons and Complaint to be served on August 26, 2005, *i.e.,* after the 120-day period required of Rule 4(m).

> FN11. According to Rule 4(m), where service of a summons and complaint
>
> is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.
>
> Fed.R.Civ.P. 4(m).

Moreover, when the Court afforded Plaintiff additional time within which to serve an amended Complaint, Mugno again was untimely in service. (*See supra* Part II, "Procedural Background," at 9-10.) The record is abundantly clear that Mugno did not serve the initial Complaint or his Amended Complaint within the time frame mandated by the Federal Rules or by the extension deadlines granted by the Court. On this basis alone, the dismissal of the Amended Complaint is warranted.[FN12]*See Mused v. Dep't of Agric. Food & Nutrition Serv.,* 169 F.R.D. 28, 33 (W.D.N.Y.1996) (stating where a "plaintiff has failed to complete service within 120 days and has not shown good cause for such failure, the court should dismiss the action rather than grant an extension of time to complete service"). And, as one of our sister court in the Northern District of New York has stated, "Although Rule 4 is given liberal construction, 'there are limits to the rule's malleability. The goal of liberal construction cannot be utilized as a substitute for the plain legal requirement as to the manner in which service of process may be had.' " *Anzulewicz,* 208 F.R.D. at 49 (quoting 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1083 (2d ed.1987)).

> FN12. And, for this reason, Plaintiff's request for leave for an enlargement of time *nunc pro tunc* (*see* Pl.'s Opp'n Mem. at 8) is denied.

Likewise, the Court is unpersuaded by Mugno's argument that Societe sought to frustrate service by using various business names. (See Pl.'s Opp'n Mem. at 6-7.) This dubious argument is substantially mitigated by the fact that in its very first filing with the Court, Societe not only indicated it was the wrong defendant (as it did not employ Mugno), it provided Mugno and the Court with the proper legal name of Mugno's former employer, SITA-a non-defendant at that time. (*See* Societe's pre-motion conference letter at 1 n. 1.) [FN13] This, together with the repeated opportunities afforded Plaintiff to effect service, undermines Mugno's spurious argument that his efforts to serve the Amended Complaint were frustrated by Societe.

> FN13. As noted in Part II, "Procedural Background," *supra,* there were several other instances when Societe provided Plaintiff with the correct name of the entity that employed him during the relevant time period. (*See also* Societe's Reply at 3 n. 3 (providing all the instances when Societe *"informed plaintiff that service was defective and indicated the proper party to serve in this matter on at least seven separate occasions"* (emphasis in original)).) Moreover, the Court allowed Mugno to amend his initial complaint to add SITA and to properly effect service on it and Societe. (*See, e.g.,* October 19th Order.) Yet, Mugno failed to do so.

*14 Indeed, Societe continues to maintain in its Motion to Dismiss that Mugno's attempted service was made on the wrong party, *i.e.,* Societe. Societe has been unwavering in its position that SITA is the proper defendant since it was the entity that employed Mugno during the relevant time period. This fact is supported by the Declaration of Parker (*see* Parker Decl. at ¶ 6) and the copies of Mugno's 2003 and 2004 W-2 Wage and Tax Statements attached as Exhibit 1 to Parker's Declaration.

As Societe correctly asserts, despite Plaintiff's insistence that Societe and SITA are the same entity (*see* Pl.'s Opp'n Mem. at 1, 4), "[t]his allegation is not supported by any admissible evidence and should be disregarded."(Societe's Reply Mem. at 4 (citing *Howard,* 977 F.Supp. at 658).) Yet, Societe does admit that SITA is its "sister company." (*Id.* at 1.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 13
Slip Copy, 2007 WL 316573 (E.D.N.Y.)
(Cite as: 2007 WL 316573 (E.D.N.Y.))

However, service on one is not the same as service on the other. *See McKibben,* 1999 U.S. Dist. LEXIS 12310, at *9 ("New York Courts have consistently held that service of process on one corporation does not confer jurisdiction over another, 'even where one corporation may wholly own another, or where they may share the same principals.' " (quoting *In re Crespo,* 123 Misc.2d 862, 475 N.Y.S.2d 319, 323 (N.Y.Sup.Ct.1984)); *AICPA v. Affinity Card,* 8 F.Supp.2d 372, 377-78 (S.D.N.Y.1998) (finding that, despite one individual serving as an office and director of two corporations and despite those corporations sharing some employees and having a common address and phone number, service on one corporation does not render service on the other one); *Rinzler v. Jafco Assocs.,* 21 A.D.3d 360, 362 (N.Y.App.Div.2005) (finding that service on one entity does not validate service as to another entity, even though the two entities have the same address and share the same shareholders and officers). Thus, Mugno's attempts to serve SITA via Societe are ineffective.

Even if service had been timely, Plaintiff cannot meet his burden of establishing that the Court has jurisdiction over Societe or SITA. The record is absent of any evidence that establishes proper service on Societe or SITA.[FN14] Instead, there is evidence submitted by Societe (*i.e.,* the Declarations of Brodeur, Sima, and Parker) that service was not properly made upon Societe or SITA. *See, e.g., Amnay v. Del Labs,* 117 F.Supp.2d 283, 286 (E.D.N.Y.2000) (Spatt, J.) ("New York courts have held that a receptionist is generally not authorized by a corporation to receive service unless there is evidence that a person to be served has resisted service.") (further citation omitted). And, Plaintiff's conclusory statements to the contrary (asserted throughout his Opposition Memo) are unavailing. *See Mende,* 269 F.Supp.2d at 251 ("[c]onclusory allegations are not enough to establish personal jurisdiction"). Since the Plaintiff has failed to meet his burden of showing that the Court has jurisdiction over Societe and/or SITA, the Court has no jurisdiction over those named Defendants.

> FN14. As stated in Part II, "Procedural Background," *supra,* the document Plaintiff submitted as proof of service (presumably an **affidavit**) is wholly illegible. (*See* doc. # 29-1.) And, the Court has **stricken** Mugno's and Pollack's **Declarations.**

*15 In turn, without such jurisdiction, the Court "lacks power to dismiss [the C]omplaint for failure to state a claim."*Arrowsmith,* 320 F.2d at 221. Thus, the Court does not consider Societe's Rule 12(b)(6) arguments.

## IV. A FINAL WORD OF CAUTION

A review of this case causes the Court to raise a cautionary flag as to Plaintiff's Counsel's performance. She has requested six extensions, four of which have been untimely. She has also violated several Court-ordered deadlines (*e.g.,* October 19th Order, November 22, 2005 Order, March 3, 2006 Order, April 4, 2006 Order, May 22, 2006 Order). While the Court is sympathetic to Counsel's medical issues, understands dissolving a law partnership is time-consuming, and knows there are many pressures to being a solo practitioner, these situations-alone or in concert-do not vitiate her ethical obligation to diligently represent her client. *See* N.Y.S.B.A.Code of Prof'l Responsibility Canon 6 (amended 2002) ("A lawyer should represent a client competently."); *see also id.*EC 6-1 ("the lawyer should act with competence and proper care"); *id.*EC 6-4 ("In addition to being qualified to handle a particular matter, the lawyer's obligation to the client requires adequate preparation for and appropriate attention to the legal work, as well as promptly responding to inquiries from the client."(emphasis added)); *id.*DR6-1-1(A)(2) ("A lawyer shall not handle a legal matter without preparation adequate in the circumstances."); *cf. id.*DR 2-110(B)(3).

In an effort to have Plaintiff's case decided on the merits, the Court afforded Plaintiff's Counsel repeated opportunities to correct her deficiencies. However, Counsel persisted with a pattern of requesting untimely extensions and, when granted such extensions, with a pattern of missing those deadlines. Based on the tortured history of this case and finding that it is the result of Counsel's performance herein, her request for attorney's fees (*see* Pl.'s Opp'n Mem. at 7) is denied. The Court encourages Counsel take whatever steps are necessary to avoid a repetition of what transpired in this case. Counsel may wish to explore available avenues of assistance to aid her in effectively managing her practice and competently and diligently representing her clients.

*CONCLUSION*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 316573 (E.D.N.Y.)
**(Cite as: 2007 WL 316573 (E.D.N.Y.))**

For the foregoing reasons, Defendant Societe's Motion to Strike (doc. # 44) is GRANTED in part and DENIED in part; the Declarations of Mugno and Pollack are stricken, but no sanctions shall be awarded to Societe. Further, Defendant Societe's Motion to Dismiss (doc. # 40) is GRANTED in its entirety.

The Court notes that there is no evidence that the remaining named Defendants have been served with a summons and the Complaint. If sufficient evidence of proper service on the remaining Defendants is not filed within thirty (30) days of the issuance of this Memorandum and Order, in accordance with Federal Rule of Civil Procedure 4(m), the Court shall dismiss the action without prejudice as to those Defendants.

**\*16SO ORDERED.**

E.D.N.Y.,2007.
Mugno     v.     Societe     Internationale     De Telecommunications Aeronautiques, Ltd.
Slip Copy, 2007 WL 316573 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit V

Westlaw.

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　　Page 2
Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.))**

Yearwood v. LoPiccolo
S.D.N.Y.,1998.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Gilbert YEARWOOD, Plaintiff,
v.
Lt. Vincent LoPICCOLO, Sgt. Zaccagnino, C.O.
Haight, C.O. Hockler, and C.O. Kennedy, Defendants.
No. 95 CIV. 2544(DC).

Aug. 10, 1998.

Gilbert Yearwood, Mohawk Correctional Facility,
Rome, Pro Se Plaintiff.
Dennis C. Vacco, Esq., Attorney General of the State
of New York, By Evan A. Gordon, Esq., Assistant
Attorney General, New York, for Defendants.

MEMORANDUM DECISION

CHIN, D.J.
**\*1** Pro se plaintiff Gilbert Yearwood brings this action
pursuant to 42 U.S.C. § 1983 alleging that he was
beaten by prison guards at Fishkill Correctional
Facility ("Fishkill") on March 17, 1995 in retaliation
for filing grievances against two correctional officers.
Defendants move for summary judgment pursuant to
Fed.R.Civ.P. 56(c) on the grounds that: (1) plaintiff
has failed to offer sufficient evidence to support his
claims, (2) the Eleventh Amendment bars this action,
and (3) defendants are entitled to qualified immunity.
Plaintiff cross-moves for summary judgment in his
favor.

Because I hold that plaintiff has failed to submit
evidence raising a triable issue of fact,[FN1] defendants'
motion is granted in all respects, plaintiff's motion is
denied, and the complaint is dismissed.

> FN1. Accordingly, I need not address the
> merits of defendants' affirmative defenses.

BACKGROUND

Plaintiff commenced this Section 1983 action against
defendants by filing an unsworn complaint on March
29, 1995, seeking, inter alia, $1,000,000 in damages.

According to Yearwood's unverified complaint, on
March 17, 1995, Correctional Officer Nicholas
Hockler, Lieutenant Vincent LoPiccolo, and Sergeant
Michael Zaccagnino allegedly brought him to Special
Housing Unit ("SHU") P and assaulted him in
retaliation for instituting grievance procedures against
LoPiccolo and Zaccagnino. The complaint states that
sometime prior to the alleged beating (it is unclear
when), Hockler supposedly told LoPiccolo and
Zaccagnino that Yearwood had "a big mouth."
Yearwood alleges that the three officers led him from
an unspecified location to SHU P, where Hockler
supposedly grabbed his neck and "started choking
[him] and LoPiccolo hit [him] on the right side of [his]
head with a pair of keys and Zaccagnino punch[ed]
[him] in the mouth busting [his] bottom lip."

Yearwood maintains that this beating rendered him
unconscious, and that upon awakening, Hockler
kicked him in the groin. Hockler and LoPiccolo then
allegedly moved him to SHU 4-2, where, according to
the complaint, the assault continued. After plaintiff
was placed in keeplock, Correctional Officers Robert
Haight and Gerard Kennedy allegedly joined in the
assault.

The unsworn complaint does not explicitly invoke any
particular constitutional provisions. Because I am
required to liberally construe plaintiff's pro se papers
"to raise the strongest arguments that they suggest,"
however, I construe the complaint as raising two
constitutional claims: a First Amendment retaliation
claim and an Eighth Amendment "cruel and unusual
punishment" claim. See Soto v. Walker, 44 F.3d 169,
173 (2d Cir.1995) (quoting Burgos v. Hopkins, 14
F.3d 787, 790 (2d Cir.1994)).

At a conference on September 6, 1996, I established a
discovery deadline of November 8, 1996. That
deadline was eventually extended to December 21,
1997. All told, more than two years passed between
the filing of the complaint and the close of discovery;
both sides had ample opportunity to conduct the
requisite discovery in this case.

**\*2** The parties now cross-move for summary
judgment. In moving for summary judgment,
defendants have submitted a notice of motion, sworn

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 3
Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.))**

affidavits denying in substance plaintiff's allegations, a Rule 56.1 Statement of Undisputed Facts, as well as documentary material in the form of Yearwood's medical records. Defendants' notice of motion informs plaintiff they are moving for summary judgment pursuant to Fed.R.Civ.P. 56 and specifically warns him that:

[Y]ou may not simply rely on your complaint, but you must respond by **affidavits** or as otherwise provided ..., setting forth specific facts showing that there is a genuine issue of material fact for trial. Any factual assertions in our **affidavits** will be accepted by Judge Chin as being true unless you submit **affidavits** or other documentary evidence contradicting our assertions. If you do not so respond, summary judgment, if appropriate, may be entered against you. If summary judgment is granted against you, your case will be dismissed and there will be no trial.

In opposing summary judgment, plaintiff has submitted a document stylized as an "Opposition Motion to Defendants Summary Request Motion" and "**Affidavit**." In this document, which is not notarized or signed but states that its author "**declares** [its contents] under penalty perjury," Yearwood states that he has filed grievances against LoPiccolo and Zaccagnino. He does not set forth facts countering defendants' sworn version of the alleged beating. Instead, he simply calls defendants' account "false stories" and states in conclusory fashion that he has "physical evidence towards the defendants," but submits none. He has also failed to submit a Rule 56.1 Counterstatement of Disputed Material Facts. Yearwood does attach a few letters either sent to or received from prison officials regarding grievances that he filed against LoPiccolo and Zaccagnino.

Yearwood also has submitted a document titled, "pro se motion for summary judgment," but neither submits a Statement of Undisputed Facts nor any evidence in support of his cross-motion.

### DISCUSSION

A. *Standard for Summary Judgment*

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). In resolving such a motion, a court must assess whether there are any material factual issues to be tried, drawing all reasonable inferences against the moving party and viewing the evidence in the light most favorable to the non-moving party. *See Adams v. Department of Juvenile Justice of the City of New York,* 143 F.3d 61, 65 (2d Cir.1998).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."*Id.* Material factual disputes exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."*Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,*-U.S.-, 118 S.Ct. 169 (1997).

**\*3** Once the movant meets his or her burden of proving the absence of triable issues of fact, it is incumbent upon the non-moving party to provide additional support for the allegations in the complaint. To defeat summary judgment, a plaintiff "may not rest on the allegations in [his] pleadings, but must adduce 'significant probative supporting evidence' demonstrating that a factual dispute exists." *Dzaba v. Havthe & Curley,* No. 94 Civ. 1767(JFK), 1996 WL 31156, \*2 (S.D.N.Y. Jan.26, 1996) (quoting *Anderson,* 477 U.S. at 249),*aff'd,*112 F.3d 503 (2d Cir.1996).

Because Yearwood proceeds pro se, this Court must give him some latitude. However, a pro se party's "bald assertions" cannot overcome a motion for summary judgment. *Dresdner v. Brockenton,* No. 93 Civ. 8814(DLC), 1996 WL 452275, \*1 (S.D.N.Y. Aug.8, 1996). Instead, he must provide the Court with "some basis to believe that his 'version of relevant events is not fanciful." ' *Id.* (quoting *Christian Dior-New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 38 (2d Cir.1986)).

In addition, Local Civil Rule 56.1 requires a party opposing summary judgment to include a "separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried."Failure to do so ordinarily calls for "[a]ll material facts set forth in [the movant's] statement ... [to] be deemed to be admitted."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.))**

## B. *Plaintiff's Claims*

### 1. *First Amendment Retaliation Claim*

I begin by addressing Yearwood's First Amendment claim. It is well-settled that an inmate's right to seek redress of his grievances is guaranteed by the First and Fourteenth Amendments. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). Indeed, purposeful interference with a prisoner's right to petition for redress in prison disciplinary proceedings or a court of law "is precisely the sort of oppression that ...section 1983[is] intended to remedy."*Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987) (citation omitted).

To prevail on a First Amendment retaliation claim, a plaintiff must demonstrate that (1) the engaged conduct is constitutionally protected and (2) the defendants' harassment was motivated or substantially caused by plaintiff's engagement in this protected conduct. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Because retaliation claims are "prone to abuse" by prisoners who can allege retaliation for "every decision [they] dislike[ ]," heightened specificity in pleading and evidentiary support is required. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983); *see Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998) ("Because retaliation claims 'can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof ....' ') (quoting *Justice v. Coughlin,* 941 F.Supp. 1312, 1316 (N.D.N.Y.1996)); *Gill v. Pact Org.,* No. 95 Civ. 4510(LAP), 1997 WL 539948, *12 (S.D.N.Y. Aug.28, 1997) (same).

**\*4** Plaintiff's letters indicating that he in fact filed complaints against two of the defendants a few months before the alleged attack arguably suffices to raise an issue of fact as to the first required element.

The record does not, however, present a triable issue as to the second element. Specifically, the evidence would not support a finding that defendants beat Yearwood or that they did so in response to his filing of grievances against two correctional officers.

Defendants have submitted sworn affidavits in which they deny employing any force, let alone excessive force. Rather, defendants uniformly contend that plaintiff's injuries resulted from a seizure attack. Hockler states that he discovered Yearwood wandering about in an unauthorized area of Fishkill.

He states that Yearwood became belligerent and walked away from him, defying his direct orders to stop. At that point, Hockler attests that he called for assistance. LoPiccolo and Zaccagnino immediately responded to Hockler's call for help. According to defendants' affidavits, just as these three were leading Yearwood to SHU P for admission to keeplock, he began convulsing, hitting his head against the floor several times and once against a water cooler. Hockler and Zaccagnino attest that they heard Yearwood say, "I got seizures."

Defendants quickly summoned Nurse J. Banks of the Fishkill Medical Clinic, who arrived minutes later. After Yearwood recovered, defendants' evidence shows that he acted abusively toward defendants and the treating nurse. Nurse Banks examined Yearwood and indicated in her report that no treatment was necessary at that time. She also noted that the "inmate claims he had seizures." Yearwood was then charged with verbal harassment, refusal to comply with direct orders, and infliction of bodily harm upon himself, and placed in keeplock. The next day, Yearwood was again given a full-body exam by two other nurses in the Medical Clinic, who noted in their report that, notwithstanding his claims of pain and swelling, there were no signs of any marks or swelling. Yearwood received Advil and other muscle relaxants for his alleged pains.

Haight swears that he was not involved in any incident involving Yearwood. Similarly, Kennedy swears that he simply processed Yearwood into the strip cell after his treatment, all of which occurred without incident.

The medical records, which reveal that Yearwood suffered only minor injuries, generally confirm defendants' account. Although the records note that Yearwood accused Hockler, Zaccagnino, and LoPiccolo of attacking him, they also suggest that the alleged injury to Yearwood's groin area was self-inflicted. Nurse Banks, for example, indicates in her report that at 9:15 a.m. on March 17, 1995, she observed Yearwood "squeezing [his] penis in attempt to cause self-inflicted injury," and that he was "boisterous" and "angry." *See also* 3/17/95 Health Assessment Form ("Inmate was noted to have been manipulating himself-several spots of blood on underwear"). The treating nurses also noted in the records that Yearwood was abusive and "threatening" during their examination of him and that he eventually

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.))

had to be isolated and monitored for "possible injury to self and/or others."Likewise, both LoPiccolo and Hockler attest that they observed Yearwood "intentionally inflicting injury to his own penis by pulling and scratching it."

*5 By contrast, plaintiff has not come forward with admissible evidence to refute these sworn affidavits and documentary evidence. First, because plaintiff has failed to file a Counterstatement of Material Facts in Dispute, the facts contained in defendants' Rule 56.1 statement and buttressed by defendants' sworn accounts will be deemed to be true. *See* Local Rule 56.1; *see also Cox v. Colgane,* No. 94 Civ. 6361(DAB), 1998 WL 148424, *3 (S.D.N.Y. Mar.27, 1998)* (deeming facts in defendants' 56.1 statement to be true where pro se plaintiff failed to file 56.1 counterstatement after notice of likely consequences); *Higgins v. Coombe,* No. 94 Civ. 7492(MGC), 1998 WL 113955, *2 (S.D.N.Y. Mar.13, 1998)* (same). While defendants' notice of motion did not explicitly inform plaintiff that a Rule 56.1 Counterstatement was required, it did contain an express reference to Rule 56.1, and informed him of the consequences of failing to comply with *Fed.R.Civ.P. 56.* Where, as here, a pro se litigant received specific notice from the movant as to the consequences of failure to comply with the rules of procedure, and he acknowledged his understanding by filing some form of a response, no further notice is required before Rule 56.1 may be enforced against a pro se litigant. *See M.B. v. Reish,* 119 F.3d 230, 232 (2d Cir.1997) (stating that "easily comprehensible notice from the party moving for summary judgment would suffice") (quoting *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). In this case, deeming defendants' version of the facts to be true, no reasonable juror could find that Yearwood was beaten at all, much less in retaliation for filing grievances against defendants. His claim therefore fails.

Second, even if I were to overlook plaintiff's procedural default and examine the record, he would still be unable to defeat summary judgment. The totality of Yearwood's submissions to the Court consists of an unverified complaint to which no effect need be given at summary judgment,[FN2] an **unsigned** and unsworn **declaration**, and assorted correspondence between Yearwood and prison officials.

FN2. In contrast, a verified complaint may be

treated as an **affidavit** if it meets the requirements of *Fed.R.Civ.P. 56(e)* and is of sufficient factual specificity. *See Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

Unsworn **declarations** that comply with *28 U.S.C. § 1746* may be treated as equivalent to sworn **affidavits** for purposes of a summary judgment motion. Such documents must include a verification by the **declarant** that its contents are "true under penalty of perjury" and must be dated. Here, Yearwood's purported "**affidavit**" is written "under penalty perjury" and is dated, but the document is **unsigned.** Thus, it fails to comport with the requirements of *28 U.S.C. § 1746* and should be **disregarded.**

But even if I were to fully credit this **unsigned** and unsworn **declaration,** the document still fails to raise a triable issue of fact as to plaintiff's First Amendment claim. The document fails to offer any specifics at all as to the alleged beating, but instead contains a conclusory assessment that defendants' **affidavits** are "false stories." He cannot defeat the motion for summary judgment, however, "by relying on ... conclusory statements, or on mere assertions that **affidavits** supporting the motion are not credible."*Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996).

*6 There are numerous aspects in which Yearwood's **declaration** is deficient. It does not specify the portions of defendants' "stor[y]" with which he disagrees, does not set forth each defendants' purported role in the alleged retaliatory conduct, and does not explain the precise circumstances and time frame in which the alleged beating occurred. Nor does he specifically and clearly deny that he inflicted his own slight injuries. While the record does not indicate whether Yearwood has a history of seizures, he also does not explicitly deny telling defendants and Nurse Banks on March 17, 1995 that he "got seizures," and he does not deny having had seizure attacks in the past. Despite having received explicit warning that he "may not simply rely on [his] complaint," plaintiff fails to provide sufficient basis for a factfinder to believe that his "version of [the] relevant facts is not fanciful."*Christian-Dior,* 792 F.2d at 38.

Moreover, although Yearwood declares summarily that he has "physical evidence" to prove his assault, he has not tendered any documentation to that effect to this

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.))**

Court. He does suggest that there may have been at least one witness to the events of March 17th, but fails to provide a sworn affidavit from such an individual. Instead, he submits a letter in which a staff attorney with Prisoners' Legal Services states that she heard from an inmate that a "beat up" may have taken place on March 17, 1995 at SHU 4-2. The letter itself is inadmissible hearsay, and no affidavit from a witness has been submitted to the Court corroborating any aspect of Yearwood's allegations.

For all of these reasons, and in light of the heightened skepticism with which I must view allegations of retaliation, *see Colon,* 58 F.2d at 872, I hold that plaintiff has failed to present sufficient evidence to raise an issue of fact as to whether defendants in fact attacked him or whether, even assuming they did use force against him, they did so in retaliation for the grievances he filed against LoPiccolo and Zaccagnino. Hence, defendants are entitled to summary judgment on this claim, and plaintiff's cross-motion for summary judgment must be denied.

I now turn to Yearwood's second claim.

### 2. *Eighth Amendment Claim*

The Eighth Amendment, which prohibits the imposition of "cruel and unusual punishment," protects prisoners from the "unnecessary and wanton infliction of pain" by prison guards. *Romano v. Howarth,* 998 F.2d 101, 104 (2d Cir.1993) (citing *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). There are two components to this inquiry-an objective prong and a subjective prong. *See id.* at 105.

Objectively, the plaintiff must show that the alleged use of force is grave or harmful enough to be actionable. Only the use of physical force that is "repugnant to the conscience of mankind" amounts to a constitutional violation. *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Conversely, the Constitution's "prohibition of 'cruel and unusual' punishments necessarily excludes ...*de minimis* uses of physical force."*Hudson v. McMillian,* 503 U.S. 1, 9-10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Second Circuit, for example, has noted that not "every push or shove, even if it may later seem unnecessary in

the peace of the judge's chambers, violates a prisoner's constitutional rights."*Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom.John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

*7 Subjectively, the plaintiff must then show that the prison guards acted wantonly, with the sadistic or malicious intent to harm him. *See Hudson,* 503 U.S. at 7;*Romano,* 998 F.2d at 105.

In this case, because plaintiff failed to comply with this Court's Local Civil Rules by not filing a 56.1 Counterstatement, defendants' version of the undisputed facts are taken as true. Based on those facts, a jury could not find that a beating actually occurred, that defendants were the culpable parties, or that an unconstitutional degree of physical force was used.

But even if I were to excuse plaintiff's failure to satisfy Rule 56.1, accept the allegations in his unsworn complaint as true, and give full effect to the statements in his **unsigneddeclaration,** the undisputed facts would still show that plaintiff did not suffer injuries amounting to "cruel and unusual punishment."

Plaintiff's medical records following the March 17, 1995 incident, the accuracy of which is uncontroverted, reveal that he suffered only a minor bump to the side of his head and slight bleeding in his groin area. The treating nurse determined that the small bump was not a recent injury and that the "several spots of blood" in his groin region resulted from a self-inflicted injury. No other marks, bruises, excess swelling, or edema were discovered after several full-body examinations by three nurses on two separate days despite Yearwood's claims of bruises and swelling all over his body. He received only Advil and other muscle relaxants for his alleged pain.

The medical records thus completely undermine plaintiff's allegations by strongly suggesting not only that his alleged injuries were self-inflicted, but that, even assuming any force was used against him, such force was de minimis in nature. *See, e.g., Norman v. Taylor,* 25 F.3d 1259, 1262-64 (4th Cir.1994) (keys swung at inmate's face which struck his thumb did not amount to "cruel and unusual punishment"), *cert. denied,*513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *White v. Holmes,* 21 F.3d 277, 280-81 (8th Cir.1994) (keys swung at inmate which slashed his ear did not rise to Eighth Amendment violation); *Shabazz*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.))

Page 7

*v. Pico*, 994 F.Supp. 460, 471 (S.D.N.Y.1998) (kicking inmate's ankles and feet during pat frisk causing an abrasion and minor laceration on finger suggestive of de minimis force); *DeArmas v. Jaycox*, No. 92 Civ. 6139(LMM), 1993 WL 37501, *4 (S.D.N.Y. Feb.8, 1993) (punching inmate in arm and kicking him in leg constituted de minimis force), *aff'd,*14 F.3d 591 (2d Cir.1993); *Gabai v. Jacoby*, 800 F.Supp. 1149, 1154-55 (S.D.N.Y.1992) (shoving chair at inmate causing bruise not actionable); *Neal v. Miller*, 778 F.Supp. 378, 384 (W.D.Mich.1991) (backhand blow to groin not actionable).

Yearwood, on the other hand, does not challenge the accuracy of these medical records, nor has he submitted evidence that in any way rebuts their contents. Plaintiff has not, in short, adduced any admissible evidence that would enable a rational trier of fact to conclude that the defendants employed force of such magnitude as to be "repugnant to the conscience of mankind."For this reason, Yearwood cannot meet the objective prong of his Eighth Amendment claim.[FN3] Accordingly, summary judgment is granted in favor of defendants on this count and plaintiff's cross-motion on this count is denied.

> FN3. Because plaintiff fails to meet the objective component of the excessive force inquiry, I need not address the evidence in the record bearing on the issue of defendants' subjective intent.

## CONCLUSION

*8 Defendants' motion for summary judgment is granted, and the complaint is dismissed with prejudice. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

S.D.N.Y.,1998.
Yearwood v. LoPiccolo
Not Reported in F.Supp.2d, 1998 WL 474073 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit W

Westlaw.

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2003 WL 22227960 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22227960 (S.D.N.Y.))**

**H**Sterling Fifth Associates v. Carpentile Corp., Inc.
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
STERLING FIFTH ASSOCIATES Plaintiff,
v.
CARPENTILE CORPORATION, INC. and Lodina
Corporation N.V. Defendants.
**No. 03 Civ.6569(HB).**

Sept. 26, 2003.

Partner in a partnership whose sole asset was property
sued co-partner and co-partner's affiliate, a lender to
the partnership, seeking to prevent the proposed sale
of the property. Following defendants' removal of the
suit from state court, the partner moved to remand.
The District Court, Baer, J., held that co-partner failed
to prove that its principal place of business was
Kuwait, and thus, there was no diversity jurisdiction.

Motion granted.

West Headnotes

Removal of Cases 334 ☞107(7)

334 Removal of Cases
    334VII Remand or Dismissal of Case
        334k107 Proceedings for Remand and Review
Thereof
            334k107(7) k. Evidence. Most Cited Cases
Co-partner failed to prove that its principal place of
business was Kuwait, and thus, there was no diversity
jurisdiction supporting removal of the partner's action
seeking to prevent the co-partner's sale of property
that was the partnership's sole asset; the co-partner had
taken an opposite position at a prior hearing, and a
declaration relied upon by the co-partner failed to
comply with a statute permitting an unsworn
declaration made under penalty of perjury to substitute
for a sworn affidavit if the claimant stated that its
contents were true and correct. 28 U.S.C.A. § 1441; 28
U.S.C.A. § 1746.

*OPINION & ORDER*

BAER, J.
*1 Plaintiff Sterling Fifth Associates ("Sterling")
moves to remand this matter to the New York State
Supreme Court. For the following reasons, Sterling's
motion is granted.

I. BACKGROUND

Sterling and Carpentile Corporation ("Carpentille")
are partners in 575 Fifth Associates ("the
Partnership"), a New York partnership whose sole
asset is property located at 575 Fifth Avenue ("the
Property").[FN1] On July 14, 2003, Carpentille served
notice on its partners that it intended to force the sale
of the Property, pursuant to a provision of the Second
Amended and Restated Agreement of Partnership
("the Partnership Agreement"). Although a sale at the
proposed price ($250 million) would, according to
Sterling, yield at least $8 million less than what the
partnership owes to its lenders, Carpentille apparently
stands to benefit from this sale because its affiliate
Lodina Corporation N.V. ("Lodina"), a lendor to the
Partnership, would be paid over $100 million and
Carpentille would receive consideration from Lodina
for accelerating the sale.

FN1. The third partner, First Stone
Associates, is not a party to this lawsuit.

On August 5, Sterling filed a lawsuit in New York
Supreme Court and on that same day also sought
temporary and preliminary injunctive relief to prevent
Carpentille from exercising this option to sell. Sterling
asserts in its verified compliant that Carpentille owes
Sterling fiduciary and contractual duties which will be
breached by the proposed sale. The parties agreed to
extend the deadline to proceed with the sale of the
property to August 20, 2003. On August 19, 2003, a
hearing on plaintiff's preliminary injunction was heard
before Justice Karla Moskowitz, who enjoined
Carpentille from forcing the sale of the property.
Justice Moskowitz ordered expedited discovery and
set a trial date of November 17, 2003. On August 22,
2003, Sterling amended its complaint to name Lodina
as a defendant. On August 26, 2003 Carpentille
submitted its first set of document requests. On
August 28, 2003, Carpentille and Lodina filed a notice
of removal pursuant to 28 U.S.C. § 1441 on the basis

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 22227960 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22227960 (S.D.N.Y.))

of diversity jurisdiction, and Sterling on September 10, 2003 filed the instant motion to remand.[FN2] Sterling contends that defendants' removal was improper because Carpentille's principal place of business is New York-rather than Kuwait, as Carpentille asserts-and thus this Court lacks subject-matter jurisdiction because the parties are not diverse.[FN3] In the alternative, Sterling contends that Carpentille waived its right to removal.

> FN2. The parties met with the Court on September 5, 2003 to establish an expedited briefing schedule.

> FN3. Lodina is incorporated in the Netherlands Antilles and its principal place of business is Kuwait.

## II. DISCUSSION

Carpentille and Lodina, as the parties seeking the jurisdiction of this Court, bear the burden that removal from New York Supreme Court was proper. *See, e.g., United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994) (citing *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936))."In resolving a motion to remand, courts must be mindful of considerations of federalism and the limited jurisdiction conferred on subject matter jurisdiction courts and should 'strictly construe[ ]' the federal removal statute, resolving all doubts 'in favor of remand." ' *Vasura v. Acands,* 84 F.Supp.2d 531, 533 (S.D.N.Y.2000) (quoting *Miller v. First Security Investments, Inc.,* 30 F.Supp.2d 347, 350 (E.D.N.Y.1998)). The case must be remanded to state court if the party who seeks a federal forum fails to satisfy its burden. *See, e.g., United Food & Commercial Workers Union,* 30 F.3d at 301.

### A. Carpentille's principal place of business

\*2 Carpentille is incorporated in Delaware and licensed to do business in New York. It is co-owned by National Investments Company, a public shareholding company based in Kuwait which owns 49% of Carpentille's outstanding shares, and Gulf Investments Company, a public shareholding company based in Bahrain which owns the remaining 51% of the outstanding shares. *See* Al Majid Decl. ¶

4-6. Carpentille's sole asset is its interest in the Partnership, whose sole asset is the Property. Carpentille contends that its principal place of business is Kuwait. Sterling contends that Carpentille represents to the public that its principal place of business is New York, that it actively conducts business in New York, and that it has a limited presence in Kuwait.

According to Yousef S. Al Majid, the President and a director of Carpentille, Carpentille at all relevant times maintained and maintains its principal place of business in Kuwait, where it shares office space with its controlling shareholder, National Investments Company. *See* Al Majid Decl. ¶ 4. All three of Carpentille's officers and directors are Kuwaiti citizens who reside and work in Kuwait, and it has no employees or officers and directors who work or reside in New York.[FN4] *See* Al Majid Decl. ¶ 7, 13. The authority to sign for or on behalf of the company rests solely with its officers and directors in Kuwait, all policy decisions are made by its officers in Kuwait, and all key documents related to the Property and Partnership were executed by its officers in Kuwait. *See* Al Majid Decl. ¶ 8. Although Carpentille has no bank account of its own, its parent National Investments Company maintains a bank account in Kuwait and a correspondent bank in New York. Finally, Carpentille notes that the partnership agreement defines "business day" with respect to Carpentille as "a legal day for transaction of business in Kuwait and is not an Islamic holiday" while "business day" for the other partners is defined as any day "which is not a legal holiday in New York."Hans Decl. Ex C ¶ 2.6.

> FN4. Carpentille's other officers are Fuad A. Al Khamis, vice president and secretary, and Waleed A. Al Azzazz, a vice president.

With respect to Sterling's evidence of Carpentille's operations in New York and its lack of operations in Kuwait, Sterling notes that the information on file with the New York Department of State lists Carpentille's "principal executive office" as an attorney formerly at Lord Day & Lord, Barrett Smith in New York. Carpentille wrote in its 2001 franchise tax return, dated February 13, 2003, that its principal place of business outside of Delaware is New York .[FN5] Sterling makes clear that Carpentille actively participates in the decisionmaking as well as the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22227960 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22227960 (S.D.N.Y.))

Page 4

day-to-day operations of the Partnership, which business it conducts through its New York-based agents, accountants and lawyers, UBS Realty Investors LLC, PriceWaterhouseCoopers LLP, and King & Spalding LLP. Sterling contends that its "regular communications" and "substantive discussions concerning the Partnership's operations are with Carpentille's representative in New York, not anyone in Kuwait."Katz Aff. ¶¶ 13, 14. Sterling also contends that Carpentille's presence in Kuwait is minimal-for example, Carpentille has no day-to-day operations or payroll of its own in Kuwait. *See* Katz Aff. ¶¶ 21, 22. Moreover, Carpentille is not registered with the Ministry of Economy and Commerce to do business in Kuwait, as foreign companies must be under Kuwaiti law; Carpentille is not listed with the Kuwait Chamber of Commerce as a domestic company nor listed in any Kuwaiti business directories.

> FN5. The phone number listed for Carpentille has a 212 area code. It lists as its directors Fuad A. Al-Khamis and Seraj Al-Baker, c/o UBS Realty Investors LLC, in New York, New York.

*3 It is well-settled that there are two general tests that courts apply to determine a corporation's principal place of business and that which test the court should use "depends on the structure and nature of the corporation."*See Peters v. Timespan Comms. Inc.,* No. 97 Civ. 8750(DC), 1999 WL 135231, at *5 (S.D.N.Y. Mar.12, 1999); *see also R.G. Barry Corp. v. Mushroom Makers, Inc.,* 612 F.2d 651, 655 (2d Cir.1979). Under the so-called "nerve-center test," "[w]here corporate operations are spread across numerous states, courts have tended to emphasize those factors that identify the place where overall corporate policy originates."*R.G. Barry Corp.,* 612 F.2d at 655. "[T]he principal place of business of a far-flung corporate enterprise is 'the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective." ' *Id.* The second test is commonly called the "bulk-of-activities test" or the "place-of-operations test," and is generally used when the corporation's operations are centralized. *See R.G. Barry Corp.,* 612 F.2d at 655. Under this test, courts "deemphasize the concentration on the corporate 'nerve center' and [ ] focus instead upon the state in

which a corporation has its most extensive contacts with, or greatest impact on, the general public." *R.G. Barry Corp.,* 612 F.2d at 655. Sterling cites a number of cases for the proposition that "[w]here a corporation has a sole business purpose of owning, operating or developing a single business interest or asset, courts have deemed the location of that interest or asset to be a persuasive determinant of the corporation's principal place of business." Plaintiff's Mem. of Law in Support of its Motion to Remand 15 (citing e.g., *Pine Ridge Realty Corp. v. Block & Co.,* No. 97-2076, 1997 WL 292136 (D.Kan. May 16, 1997) and *Delalande, Inc. v. Fine,* 545 F.Supp. 268, 272 (S.D.N.Y.1982)).

At issue in *Delalande* was the principal place of business of a Delaware corporation that was organized by a French conglomerate as a holding company to acquire stock in a certain company. *See Delalande,* 545 F.Supp. at 269. Judge Brieant rejected the argument that the company's principal place of business was France, where its parent-the ultimate decisionmaker-was located, and held instead that its principal place of business was New York. Central to this result was that "the management and implementation of these decisions and policies are effectuated principally in New York."*Id.* at 272.Judge Brieant also noted that, as here, the company represented in several official documents, such as its Delaware corporate franchise tax filing, that its principal place of business was New York. *See id.* at 272-73.The second case that Sterling relies on is *Pine Ridge Realty.*There the District Court in Kansas held that the principal place of business of a corporation whose sole purpose and sole asset was a commercial real estate venture in Kansas was Kansas, rather than Connecticut where the corporation's headquarters and employees were allegedly located.[FN6]The court noted that the Tenth Circuit rejected the nerve-center test and the corporate-activities test and instead adopted an approach that looks to the corporation's total operations. *See id.* at *3 (citing *Amoco Rocmount Co. v. Anshultz Corp.,* 7 F.3d 909, 914-15 (10th Cir.1993)). The court explained that the principal place of business of a corporation engaged in a single line of business is the state where its operating functions are located rather than its executive and administrative offices-the so called "single-line-of-business rule." *See id.*The court considered and rejected the contention that the existence of a management contract meant that the operations were assumed by another, independent company:

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2003 WL 22227960 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22227960 (S.D.N.Y.))

FN6. The court was unpersuaded by the vice president's affidavit, which stated that its only office, all employees, all corporate records, all accounting, and all business and strategic decisions occurred in Connecticut, because there was evidence that the corporation did not have its own offices and that its officers were not even aware of when or how they were appointed to their positions. *See Pine Ridge Realty,* 1997 WL 292136, at *2-*3.

*4 The explicit purpose of PERG and its partners was to own, operate, and develop the Kansas site. They still own the real estate and have chosen to operate it by delegating responsibilities to other entities, presumably under the owners' ultimate control. In that way, the Block companies act for the owners as would employees at the place of operations. The sole business activity of PERG and Pine Ridge remains the oversight and control of the commercial development in Kansas; accordingly, the site of that development in Kansas predominates in the court's analysis. *See id.* at *5.

While *Delalande* is favorable to Sterling's contention that the location of the asset that the corporation controls is important, other courts in this District have taken a different view. *See Refco Properties Inc. v. Trump,* No. 94 Civ. 2124(CSH), 1995 WL 412423 (S.D.N.Y. July 12, 1995) (holding that the principal place of business of a holding company that participated in a partnership that owned a hotel in New York was Illinois, where the holding company's parent and employees were located)

The instant dispute involves a fact pattern that falls somewhere between *Delalande* and *Refco.*It resembles *Delalande* to the extent, for example, that Carpentille submitted filings that stated its principal place of business was New York. It resembles *Refco* to the extent that its officers and directors and employees and its office space were shared with a parent. Sterling argues with some force that Carpentille's asset-management agreement with UBS is also important because it gives Carpentille a New York-based presence, and that this agreement distinguishes this case from *Refco.*It appears that although Refco's Illinois-based employees shared space with the employees of its parent company, these

employees performed all duties in connection with the partnership, and thus, Refco did not retain any agents in New York. Here, while UBS provided advisory services to Carpentille under the asset-management agreement and although the agreement specifically identifies UBS as an independent contractor, the agreement also grants to UBS considerable responsibility for the day-to-day operations of Carpentille's interest in the Partnership. The agreement delineates several services that UBS is to provide, such as services with respect to partnership matters and as to operational matters.[FN7]As for partnership matters, the Agreement provides that UBS will, *inter alia,*"Ensure that managing partner performs duties and responsibilities as outlined in the partnership agreement," and "Represent [Carpentille] at partnership meetings and ensure that [Carpentille] is timely informed of acts which must be performed under the terms of the partnership agreement."As for operational matters, the Agreement provides that UBS will, *inter alia,*"Make visits to and inspect the property," and "Meet with the managing partner and building manager at least quarterly to review operations of the property."

FN7. The agreement also provides that UBS is to perform that following "disposition services:"

With respect to any sale during the term of this Agreement, UBS Brinson, Inc. will, in all cases subject to the prior written approval of Investor:

• interview, select and negotiate contract with investment sales broker,

• direct the preparation and distribution of basic sales materials,

• screen prospective purchasers,

• analyze and consult with investor regarding any offers to purchase received,

• negotiate with prospective purchaser the sales price and other terms and conditions,

• generally consult with and advise investor with respect to all aspects of the

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2003 WL 22227960 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22227960 (S.D.N.Y.))

sale.

**\*5** I do not need resolve the tension between *Delalande* and *Refco*-to the extent that there is any-because it is enough here to decide that I cannot help but have substantial doubts about Carpentille's proof with respect to its contention that its principal place of business is Kuwait. Put another way, Carpentille has failed to carry its burden. *See Vasura, 84 F.Supp.2d at 533.* It should be noted that in this motion to remand, both parties have taken positions opposite to ones they made to Justice Moskowitz at the hearing on August 19. Carpentille's counsel stated, in response to Judge Moskowitz's question about Sterling's ability to collect from Carpentille if successful, that Carpentille was "here in court today" and that "[Sterling] state[s] only that [Carpentille] sits in Kuwait, but the client is here."On the other hand, Sterling argued before Justice Moskowitz that "this is very important, your Honor, we are talking about a defendant Carpentille which, although it's a Delaware corporation, its center of gravity is in Kuwait."Aug. 19 Hearing Tr. 15. In my view, Carpentille's admission, given that it bears the burden to demonstrate its right to a federal forum, is more significant. Further and to simply make the cheese more binding, Al Majid's declaration, on which Carpentille relies for several of its contentions about its operations in Kuwait, fails to comply with 28 U.S.C. § 1746, under which this declaration was submitted. Section 1746 permits an unsworn declaration made under penalty of perjury to substitute for a sworn affidavit, but only if the claimant states that its contents are true and correct. [FN8] 28U.S.C. § 1746; *but seeLeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 66 (2d Cir.1999). There is no such language here. Moreover, when executed outside the United States, such an unsworn statement must indicate that the statement is made under penalty of perjury *under the laws of the United States of America.*Again this declaration contains no such language. Here, the declarant simply states: "YOUSEF S. AL MAJID, pursuant to 28 U.S.C. § 1746 and under penalty of perjury declares and says...." Consequently, it is hard if not impossible for me to rely on the language to support the proposition that Carpentille's principal place of business is Kuwait.

FN8. Section 1746 provides in pertinent part:

Wherever ... any matter is required or

permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same ..., such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

(1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)".

Because Carpentille has failed to shoulder its burden of proof it is unnecessary to reach Sterling's alternative argument, namely that Carpentille has waived the right to remove the case to federal court.

### III. CONCLUSION

For the foregoing reasons, Sterling's motion to remand is granted. The Clerk of the Court is instructed to transfer the file to the New York Supreme Court, New York County, and to remove the matter from my docket.

SO ORDERED

S.D.N.Y.,2003.
Sterling Fifth Associates v. Carpentile Corp., Inc.
Not Reported in F.Supp.2d, 2003 WL 22227960 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit X

Westlaw.

**H** Treppel v. Biovail Corp.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Jerry I. TREPPEL, Plaintiff,
v.
BIOVAIL CORPORATION, Eugene N. Melynk,
Kenneth C. Cancellara, Michael Sitrick, and Sitrick
and Company, Inc., Defendant.
No. 03 Civ. 3002 PKL JCF.

Feb. 28, 2006.

*MEMORANDUM AND ORDER*

FRANCIS, Magistrate J.
*1 Plaintiff Jerry Treppel alleges that the defendants
executed a smear campaign that sabotaged his career
as a securities research analyst. The factual and
procedural history of this case is discussed at length in
four prior opinions. See *Treppel v. Biovail Corp.,* No.
03 Civ. 3002, 2006 WL 278170 (S.D.N.Y. Feb. 6,
2006) (*"Treppel IV"* ); *Treppel v. Biovail Corp.,* No.
03 Civ. 3002, 2005 WL 2086339 (S.D.N.Y. Aug. 30,
2005) (*"Treppel III"* ); *Treppel v. Biovail Corp.,* No.
03 Civ. 3002, 2005 U.S. Dist. LEXIS 2737 (S.D.N.Y.
Feb. 22, 2005) (*"Treppel II"* ); *Treppel v. Biovail
Corp.,* No. 03 Civ. 3002, 2004 WL 2339759
(S.D .N.Y. Oct. 15, 2004) (*"Treppel I"* ). After two
rounds of motions to dismiss, the plaintiff's surviving
claims include defamation, tortious interference with
prospective economic advantage, and civil conspiracy.
The parties are currently engaged in discovery, and
defendant Biovail Corporation ("Biovail") has now
moved for a protective order precluding the only two
depositions noticed to date by the plaintiff. For the
reasons described below, the motion is granted.

*Background*

The plaintiff seeks to depose Dr. Douglas J.P. Squires,
Chief Executive Officer and a member of the Board of
Directors of Biovail (the "Board of Directors" or the
"Board"), and Wilfred Bristow, another member of
the Board. Each of these potential witnesses has
submitted a declaration attesting that he has no
personal knowledge of the facts underlying the claims

and counterclaims. (Declaration of Wilfred Bristow
dated Jan. 16, 2006, attached as Exh. C to Defendant
Biovail Corporation's Memorandum of Law in
Support of its Motion for a Protective Order
("Def.Memo."), ¶¶ 3-4; Declaration of Douglas J.P.
Squires dated Jan. 6, 2006, attached as Exh. D to Def.
Memo., ¶¶ 2-4). As of yet, the plaintiff has noticed no
other depositions.

*Discussion*

"[H]igh ranking corporate executives are not
automatically given special treatment which excuses
them from being deposed." *General Star Indemnity Co.
v. Platinum Indemnity Ltd.,* 210 F.R.D. 80, 83
(S.D.N.Y.2002) (quoting *Kuwait Airways Corp. v.
American Security Bank, N.A.,* Civ. A. No. 86-2542,
1987 WL 11994, at *4 (D.D.C. May 26, 1987));
see *CBS, Inc. v. Ahern,* 102 F.R.D. 820, 822
(S.D .N.Y.1984) ("[T]he fact that the witness has a
busy schedule is simply not a basis for foreclosing
otherwise proper discovery."). Even where, as here, a
high-ranking corporate officer denies knowledge of
the underlying facts, that claim is "subject to testing
by the examining party." *Consolidated Rail Corp. v.
Primary Industries Corp.,* Nos. 92 Civ. 4927 & 92 Civ.
6313, 1993 WL 364471, at *1 (S.D.N.Y. Sept. 10,
1993) (citation omitted).

However, permitting unlimited access to corporate
executives could disrupt their businesses and create a
tool for harassment. See *Armstrong Cork Co. v. Niagra
Mohawk Power Corp.,* 16 F.R.D. 389, 390
(S.D.N.Y.1954) ("The court should be alert to see that
the liberal deposition procedure provided in the
Federal Rules is used only for the purpose for which it
is intended and is not used as a litigation tactic to
harass the other side or cause it wasteful expense.")
Despite the broad inquiry permitted by Rule 26(b)(1)
of the Federal Rules of Civil Procedure, Rule 26(b)(2)
authorizes courts to restrict discovery that is
unreasonably burdensome:

*2 The frequency or extent of use of the discovery
methods otherwise permitted under these rules and by
any local rule shall be limited by the court if it
determines that: (I) the discovery sought is
unreasonably cumulative or duplicative, or is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                 Page 3
Not Reported in F.Supp.2d, 2006 WL 468314 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 468314 (S.D.N.Y.))

obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed R. Civ. P. 26(b)(2). *See also* Fed.R.Civ.P. 26(g)(2) (attorney making discovery request must certify it is "not unreasonable or unduly burdensome" and not "interposed for any improper purpose, such as to harass").

When considering whether to allow the deposition of a corporate executive, courts consider the likelihood that the individual possesses relevant knowledge and whether another source could provide identical information. *See* *General Star,* 210 F.R.D. at 83 (deposition permitted where no testimonial or other evidence that executives lacked personal information, and party seeking discovery had already pursued alternative sources); *Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.,* 203 F.R.D. 98, 102 (S.D.N.Y.2001) (plaintiff presented sufficient evidence to infer that chief executive officer had unique knowledge); *Speadmark, Inc. v. Federated Department Stores, Inc.,* 176 F.R.D. 116, 117-18 (S.D.N.Y.1997) (protective order denied where senior management official was present for numerous discussions concerning contract); *Wertheim Schroder & Co. v. Avon Products Inc.,* No. 91 Civ. 2287, 1995 WL 6259, at *2 (Jan. 9, 1995 S.D.N.Y.) (deposition allowed where testimony of other witness indicated that chief financial officer had personal knowledge not wholly duplicative of other discovery); *CBS,* 102 F.R.D. at 822 ("Since it is apparent that [the executive witness] had personal knowledge of facts relevant to this lawsuit, plaintiff must carry a heavy burden to demonstrate good cause for a protective order."). Unless the executive has some "unique knowledge[,]" "it may be appropriate to preclude a redundant deposition" of that individual. *Consolidated Rail Corp.,* 1993 WL 364471, at *1; *accord* *Tri-Star Pictures, Inc. v. Unger,* 171 F.R.D. 94, 102 (S.D.N.Y.1997); *see* *Naftchi v. New York University Medical Center,* 172 F.R.D. 130, 133 (S.D.N.Y.1997) (court precluded deposition twice but finally permitted

it after party conducted additional discovery).

In this case, several factors weigh in favor of disclosure. The matter concerns alleged misconduct and bias by an analyst reporting on publicly-traded companies. The parties have asserted multimillion dollar claims and counterclaims. Certainly, before proceeding to trial, the plaintiff requires and is entitled to extensive discovery concerning the defendants' alleged interactions with media representatives, as well as their related internal investigations and conversations.

**\*3** However, the importance of the two proposed depositions has not been demonstrated. The plaintiff has not explained why the noticed individuals are believed to have personal knowledge of the underlying events, nor why that knowledge is believed to be unique. The plaintiff has made no attempt to depose any lower level executives, and, at the time he noticed the depositions, document discovery had not been completed. The defendant's motion is therefore granted, but the plaintiff is free to seek the depositions of Dr. Squires and Mr. Bristow if and when he has developed a foundation for the belief that they possess personal, non-duplicative knowledge of relevant facts.

SO ORDERED.

S.D.N.Y.,2006.
Treppel v. Biovail Corp.
Not Reported in F.Supp.2d, 2006 WL 468314 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit Y

Westlaw.

Not Reported in F.Supp.                                                     Page 2
Not Reported in F.Supp., 1993 WL 364471 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1993 WL 364471 (S.D.N.Y.))

**H**Consolidated Rail Corp. v. Primary Industries Corp.
S.D.N.Y.,1993.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
CONSOLIDATED RAIL CORPORATION, Plaintiff,
v.
PRIMARY INDUSTRIES CORPORATION,
Defendant.
CONSOLIDATED RAIL CORPORATION, Plaintiff,
v.
PRIMARY COAL, INC., Defendant.
Nos. 92 Civ. 4927 (PNL), 92 Civ. 6313 (PNL).

Sept. 10, 1993.

MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.
*1 The plaintiff in these related actions, Consolidated Rail Corporation ("Conrail"), has moved for a protective order precluding certain depositions and directing that others be conducted in Philadelphia, Pennsylvania. The defendants, Primary Industries Corp. and Primary Coal, Inc. (collectively referred to as "Primary"), have cross-moved for an order compelling discovery responses and extending the deadline for completion of discovery. Each of these issues will be addressed in turn.

*Background*

Conrail, a common carrier, seeks to recover freight charges that it contends are owed by Primary, a coal producer. Primary has counterclaimed, asserting that it suffered damages when Conrail wrongfully closed its port facility at Philadelphia and diverted its coal traffic to Baltimore. Conrail has filed a motion for summary judgment on statute of limitations grounds which is currently pending.

*Discussion*

A. *Executive Officer Depositions*

Primary has served a notice for the deposition of ten Conrail employees. Conrail has agreed to produce seven of these witnesses, but has moved for a protective order precluding the depositions of three others: James Hagan, Chairman, President, and Chief Executive Officer of Conrail; Robert Swert, Vice President of Labor Relations; and David LeVan, Senior Vice President of Operations. Each of these individuals has submitted an affidavit attesting that he has no personal knowledge of the facts underlying the claims and counterclaims in these cases except for what he may have learned from other Conrail employees.

Highly-placed executives are not immune from discovery. "[T]he fact that the witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery." *CBS, Inc. v. Ahern,* 102 F.R.D. 820, 822 (S.D.N.Y.1984) (citation omitted). Moreover, a claim that the witness lacks knowledge is subject to testing by the examining party. *See Amherst Leasing Corp. v. Emhart Corp.,* 65 F.R.D. 121, 122 (D.Conn.1974).

At the same time, permitting unfettered discovery of corporate executives could threaten disruption of their business and could serve as a potent tool for harassment in litigation. Accordingly, where other witnesses have the same knowledge, it may be appropriate to preclude a redundant deposition of a highly-placed executive. *See CBS,* 102 F.R.D. at 822 n. 2; *Amherst,* 65 F.R.D. at 123.

Given these considerations, it is appropriate in these cases to defer any live depositions of the three named executives until it has been demonstrated that they have some unique knowledge pertinent to the issues in these cases. Primary may seek to establish such a foundation through Rule 31 depositions upon written questions of these executives as well as through the deposition testimony of other witnesses. Until such a showing has been made, however, these three individuals shall not be deposed in person.

B. *Site of Depositions*

Conrail next contends that the depositions of its seven remaining witnesses should be held in Philadelphia, where Conrail's headquarters are located, rather than in New York, as the deposition notice indicates.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 3
Not Reported in F.Supp., 1993 WL 364471 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 364471 (S.D.N.Y.))**

END OF DOCUMENT

**\*2** This request has merit. It is far more efficient to require Primary's counsel to travel to Philadelphia than it is to require Conrail's attorney and seven witnesses to come to New York. *See Huynh v. Werke, 90 F.R.D. 447, 449 (S.D.Ohio 1981)*. Moreover, it is possible that documents available in Conrail's offices but not previously disclosed in discovery will be necessary for the depositions.

Accordingly, the depositions of Conrail's employees shall be taken in Philadelphia. Since Conrail, as the plaintiff, would normally be expected to produce its witnesses for deposition in the forum district, it shall initially bear the costs of conducting the depositions in Philadelphia, including the travel and accommodation expenses of Primary's counsel, as well as his reasonable attorney's fees. *See id.;*local civil rule 15. These costs shall ultimately be taxed against the losing party at the conclusion of the litigation.

C. *Document Requests*

In its cross-motion, Primary seeks to compel production of a variety of documents primarily related to the reasons that Conrail closed its Philadelphia facility. Such documents are of doubtful relevance to any issue in the cases and are clearly not pertinent to Conrail's pending summary judgment motion. Since the request for this discovery will be moot if the summary judgment motion is granted, the motion to compel is denied without prejudice to renewing it after the dispositive motion is decided.

D. *Discovery Schedule*

Finally, Primary seeks an extension of the discovery deadline. Because of the pending summary judgment motion, the parties may decide to defer some discovery until the motion is decided. The discovery deadline shall therefore be held in abeyance until the motion for summary judgment has been determined.

SO ORDERED.

S.D.N.Y.,1993.
Consolidated Rail Corp. v. Primary Industries Corp.
Not Reported in F.Supp., 1993 WL 364471 (S.D.N.Y.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit Z

Not Reported in F.Supp.                                                                                      Page 2
Not Reported in F.Supp., 1993 WL 267347 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 267347 (S.D.N.Y.))**

**H**St. Paul Fire & Marine Ins. Co. v. Royal Ins. Co. of
America
S.D.N.Y.,1993.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
ST. PAUL FIRE & MARINE INSURANCE
COMPANY, Plaintiff,
v.
ROYAL INSURANCE COMPANY OF AMERICA,
Defendant.
No. 91 Civ. 6151 (PNL).

July 12, 1993.

MEMORANDUM AND ORDER

LEVAL, District Judge.
*1 Defendant Royal Insurance Company moves to
quash a subpoena issued by plaintiff St. Paul Fire &
Marine Insurance Co., directing one of Royal's
employees, Felix J. Riccardo, to appear at trial.
Plaintiff asks that if the subpoena is quashed,
defendant be barred from introducing at trial any
exhibits in Riccardo's handwriting. Both parties note
that if Riccardo does not testify at trial, his deposition
will be admissible under <u>Federal Rule of Civil
Procedure 32(a)(3)(B)</u>.

*Background*

These discovery disputes arise in the context of
litigation between two insurance companies over their
responsibilities under primary and excess insurance
contracts to pay claims arising from a tugboat accident.
The defendant is the primary insurer, and the plaintiff
is the excess insurer. By all accounts, claims from the
accident required payment from both companies under
their respective policies. The interpretation of the two
insurance contracts and the amount of their respective
payments are at issue in this lawsuit.

Plaintiff subpoenaed Felix Riccardo, an employee of
the defendant who works in its Atlanta office, to
testify at trial. Plaintiff earlier secured Riccardo's
attendance at a deposition after defendant was ordered
to produce him, Order, January 28, 1993, and
sanctioned for its failure to comply. Order, February 8,

1993. Riccardo was apparently the claims adjuster
who was initially involved in determining Royal's and
St. Paul's liability under this claim.

*Discussion*

*St. Paul's subpoena of Felix Riccardo*

Rule 45(c)(3)(A)(ii) appears to require the quashing of
a subpoena if it requires a person who is neither a party
nor an officer of a party to travel to a place more than
100 miles from his or her residence or place of
business to testify.

There is, however, no reason why a party which
causes the quashing of such a subpoena should be
protected from any adverse inference which may be
drawn from the failure of the subpoenaed person to
testify. Royal argues that no adverse inference should
be allowed since St. Paul deposed Riccardo before
trial and will be able to offer Riccardo's deposition
testimony at trial, citing *Padilla v. Olympic Airways,
765 F.Supp. 835, 838 n. 2 (S.D.N.Y.1991)* for support.
*Padilla,* however, offers no support because there the
plaintiff who unsuccessfully sought an adverse
inference had not asked that the witness appear at trial.

So far as the evidence in this case indicates, it appears
that Royal, who continues to employ Mr. Riccardo,
could easily produce him to testify at this trial and
would do so if it considered this advantageous. In such
circumstances, an adverse inference is appropriate.
*Playboy Enterprises, Inc. v. Chuckleberry Publishing,
Inc., 486 F.Supp. 414, 433 (S.D.N.Y.1980).* The fact
that Royal is entitled to have the subpoena for Mr.
Riccardo quashed does not entitle it to protection from
adverse inferences, any more than a civil litigant's
decision to invoke the Fifth Amendment entitles him
to protection from adverse inferences drawn from the
failure to testify.

*Admissibility of documents in Riccardo's handwriting*

*2 St. Paul has asked that if Riccardo does not appear
at trial, Royal should be barred from introducing into
evidence any documents in Mr. Riccardo's
handwriting. There is however no requirement in <u>Rule</u>

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                     Page 3
Not Reported in F.Supp., 1993 WL 267347 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 267347 (S.D.N.Y.))**

901(a) of the Federal Rules of Evidence that a
document be authenticated by the person who created
it. The questions of admissibility will be reserved for
trial.

*Conclusion*

The subpoena issued by St. Paul Insurance Company
for the trial testimony of Felix J. Riccardo is hereby
quashed. However, St. Paul Insurance may be
permitted to argue that adverse inferences should be
drawn against Royal Insurance Company for its
failure to produce Mr. Riccardo at trial. Rulings on the
admissibility of documents in Mr. Riccardo's
handwriting will await timely objections, if any, at
trial.

SO ORDERED:

S.D.N.Y.,1993.
St. Paul Fire & Marine Ins. Co. v. Royal Ins. Co. of
America
Not Reported in F.Supp., 1993 WL 267347
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.