IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

PENROD MANAGEMENT GROUP,

                Plaintiff-Petitioner,

                v.

STEWART'S MOBILE CONCEPTS, LTD.,

                Defendant-Respondent.

Civil Action No.: 07-CV-10649

---

## PENROD MANAGEMENT GROUP'S PRE-TRIAL MEMORANDUM

---

Attorneys for Plaintiff-Petitioner
Penrod Management Group

Sean C. Sheely
Christine Tramontano
HOLLAND & KNIGHT LLP
195 Broadway
New York, New York 10007 3189
(212) 513-3200

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ............................................................................1

SUMMARY OF THE ARGUMENT .....................................................................1

PROCEDURAL HISTORY....................................................................................1

STATEMENT OF FACTS .....................................................................................2

LEGAL ARGUMENT............................................................................................3

POINT I ..................................................................................................................3

    THE LLC VEIL SHOULD NOT BE PIERCED ...............................................3

    A. CHOICE OF LAW: THE NEW JERSEY STANDARD FOR ALTER EGO APPLIES..................3

        1.  New Jersey Standard for Piercing the Corporate Veil ..........................4

        2.  Heightened Standard to Pierce the LLC Veil ......................................6

        3.  SMC Must Prove by Clear and Convincing Evidence that NBAC's LLC Veil Should be Pierced...................................................................7

        4.  SMC Must Prove that PMG's Alleged Misuse of NBAC's LLC Form Proximately Caused SMC's Harm .......................................................8

    B. SMC FAILS TO MEET ITS BURDEN ...............................................................8

        1.  SMC Fails to Present Evidence that NBAC was Organized and Operated as a Mere Instrumentality of PMG.......................................8

        2.  SMC Fails to Present Evidence that PMG Used NBAC to Perpetrate Fraud, To Accomplish Injustice, or to Circumvent the Law ................8

        3.  SMC Fails to Present Evidence Establishing the Factors Relevant to a Determination of Alter-Ego .................................................................9

            a.  PMG's Wire-Transfer of Funds to SMC is Not Indicative of Undercapitalization ................................................................... 9

            b.  "Overlapping" Officers and Common Address and Telephone Lines are Typical of LLCs and Their Related Entities ................................. 10

CONCLUSION......................................................................................................11

## TABLE OF AUTHORITIES

### CASES

*Advanced Telephone Systems, Inc. v. Com-Net Prof. Mobile Radio, LLC,*
  846 A.2d 1264................................................................................................................10

*Bd. of Trs. v. Foodtown, Inc.,*
  *296* F.3d *164 (3d Cir. 2002)* ......................................................................................5

*D.R. Horton Inc. - New Jersey v. Dynastar Development, L.L.C.,*
  No. MER-L-1808-00, 2005 WL. 1939778 (N.J. Super. Ct. Law Div. 2005)............4, 7, 8,9,10

*Fletcher v. Atex, Inc.,*
  68 F.3d 1451 (2d Cir. 1995)......................................................................................3

*Green v. William Mason & Co.,*
  996 F. Supp. 394 (D.N.J. 1998) ..............................................................................5

*Kalb, Voorhis & Co. v. American Fin. Corp.,*
  8 F.3d 130 (2d Cir. 1993)..........................................................................................3

*Kaplan v. First Options of Chicago, Inc.,*
  19 F.3d 1503 (3d Cir. 1994), *aff'd,* 514 U.S. 938, 115 S.Ct. 1920 (1995)..........................9, 10

*Lyon v. Barrett,*
  89 N.J. 294, 445 A.2d 1153 (1982)...........................................................................9

*Mikropul Corp. v. Desimone & Chaplin-Airtech, Inc.,*
  599 F. Supp. 940 (S.D.N.Y. 1984) ...........................................................................3

*Mitsui O.S.K. Lines v. Continental Shipping Line, Inc.,*
  2007 WL. 1959250 (D.N.J. 2007) ............................................................................10

*New York State Teamsters Conference Pension & Retirement Fund v. Hoh,*
  554 F. Supp. 519 (N.D.N.Y. 1982)............................................................................5

*Portfolio Fin. Serv. Co. v. Sharemax.com, Inc.,*
  334 F. Supp. 2d 620 (D.N.J. 2004) ..........................................................................4

*Soviet Pan Am Travel Effort v. Travel Committee, Inc.,*
  756 F. Supp. 126 (S.D.N.Y. 1991) ...........................................................................3

*Verni ex rel. Burstein v. Harry M. Stevens, Inc.,*
  903 A.2d 475, 387 N.J. Super. 160 (N.J. Super. A.D. 2006)................................................4,5

## PRELIMINARY STATEMENT

Plaintiff-Petitioner Penrod Management Group, Inc. respectfully submits this Pre-Trial Memorandum in support of its petition to enjoin arbitration.

## SUMMARY OF THE ARGUMENT

Defendant-Respondent Stewart's Mobile Concepts, Ltd. ("SMC") has failed to demonstrate by clear and convincing evidence that Penrod Management Group, Inc's ("PMG") is the alter ego of Nikki Beach Atlantic City LLC ("NBAC").  SMC argues that PMG and NBAC are alter egos because they allegedly share "the same officers, directors, shareholders, telephone numbers, addresses, and ultimate decision-makers"  SMC Trial Brief 2.  As set forth below, SMC's allegations are insufficient to justify a finding of alter ego pursuant to the heightened standard applicable to piercing the veil of a limited liability company.

## PROCEDURAL HISTORY

PMG commenced this action via Order to Show Cause on November 28, 2007, pursuant to Fed. R. Civ. Pro. 65 to enjoin arbitration proceedings that SMC initiated against NBAC and PMG before the American Arbitration Association pursuant to a "Demand for Arbitration" dated September 20, 2006.  PMG's basis for the application was that there is no enforceable arbitration agreement between PMG and SMC.

On February 15, 2008, the parties appeared before U.S. District Judge Koeltl for oral argument on the issue of whether the Court, rather than the arbitrators, should decide whether PMG is the alter ego of NBAC and, therefore, subject to arbitration pursuant to the agreement between SMC and NBAC.  By Opinion and Order dated February 16, 2008, this Court determined that PMG demonstrated a likelihood of success on the merits of its claim that arbitration should be stayed pending a decision by this Court on whether SMC sustains its burden of proving that PMG is the alter ego of NBAC.

On February 29, 2008, the parties submitted a letter and Notice, Consent and Order of Reference for the Exercise of Magistrate Jurisdiction to proceed on the issue of piercing the corporate veil.

## STATEMENT OF FACTS

PMG respectfully refers the Court to the Direct Examination Declaration of John Michael Register in Support of Penrod Management Group., Inc; the Direct Examination of Keith Futerman in Support of Defendant-Respondent, Stewart's Mobile Concepts, Ltd.[1]; and the Deposition and Interrogatory Read-Ins by Defendant-Respondent Stewart's Mobile Concepts, Ltd. for a full recitation of the evidence offered by the respective parties

In summary, SMC's primary offer of evidence through the Direct Examination of Keith Futerman in Support of Defendant-Respondent, Stewart's Mobile Concepts, Ltd. ("Futerman Aff."), is that officers of PMG also allegedly held positions with NBAC. SMC also contends that PMG and NBAC shared a common address, and telephone and facsimile numbers. Further, SMC claims that PMG wire-transferred funds to SMC representing the down payment that SMC required on the equipment lease agreement between SMC and NBAC. Finally, through the Deposition and Interrogatory Read-Ins, SMC asserts that officers of PMG also allegedly held positions with NBAC.

---

[1] Currently pending is PMG's motion *in limine* to preclude the admission into evidence of the affidavit testimony of Bob Hiss and motion to quash defendant-respondent's SMC's subpoena *ad testificandum* of Jack Penrod.

2

# LEGAL ARGUMENT

## POINT I

### THE LLC VEIL SHOULD NOT BE PIERCED

**A.    CHOICE OF LAW: THE NEW JERSEY STANDARD FOR ALTER EGO APPLIES**

Under New York choice of law principles, in the context of piercing the corporate veil, the court will apply the law of the state of incorporation of the entity whose corporate form is to be disregarded. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995); *Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993). New York's "interest analysis" test applicable to choice of law requires that "the law of the jurisdiction having the greatest interest in the litigation will be applied and that the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Kalb, Voorhis & Co.*, 8 F.3d at 132 (citing *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 582 (1969)).

The law of the state of incorporation applies to an alter ego determination based on the reasoning that because a "corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away." *Kalb, Voorhis & Co. v*, 8 F.3d at 132-33 (citing *Soviet Pan Am Travel Effort v. Travel Committee, Inc.*, 756 F. Supp. 126, 131 (S.D.N.Y. 1991) (applying New York choice of law principles); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 307 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation ... and to its creditors for corporate debts."); *see also Mikropul Corp. v. Desimone & Chaplin-Airtech, Inc.*, 599 F.Supp. 940, 942 (S.D.N.Y. 1984) (stating that the state of incorporation "has a paramount

3

interest in preserving the corporate form under [its] law by regulating the standards which control piercing the veil of [that state's] corporations")).

Accordingly, because the entity whose form SMC seeks to disregard is NBAC, a New Jersey limited liability company, New Jersey alter ego principles apply.

### 1.    New Jersey Standard for Piercing the Corporate Veil

Under New Jersey law, it is well established that "a corporation is a separate entity from its shareholders…and a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 903 A.2d 475, 497, 387 N.J. Super. 160, 198 (N.J. Super. A.D. 2006). This principal applies equally whether the shareholder is an individual or a corporation. *Id.* As such, "mere ownership of a subsidiary does not justify the imposition of liability on the parent." *Id.* (citing *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001)).

New Jersey courts view piercing the corporate veil as an "equitable remedy whereby the protections of corporate formation are lost and the parent corporation may be found liable for the actions of the subsidiary." *Id.* at 498, 387 N.J. Super. at 198-99 (citing *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 215 F.Supp.2d 482, 497 (D.N.J. 2002)). Its purpose is to remedy fundamental unfairness that will result from a failure to disregard the corporate form. *Id.*, 387 N.J. Super. at 199 (citing *Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk,* 332 F.3d 188, 193 (3d Cir. 2003)). "In the absence of fraud or injustice, courts generally will not pierce the corporate veil to impose liability on the corporate principals." *Id.* (citing *Lyon v. Barrett*, 89 N.J. 294, 300, 445 A.2d 1153 (1982); *Portfolio Fin. Serv. Co. v. Sharemax.com, Inc.*, 334 F.Supp.2d 620, 626 (D.N.J. 2004)).

The party seeking an exception to the fundamental principle that a corporation is a separate entity from its principal has the burden of proving that the court should disregard the

4

corporate entity. *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 903 A.2d 475, 498, 387 N.J.

Super. at 199  (citing *Tung v. Briant Park Homes, Inc.*, 287 N.J.Super. 232, 240, 670 A.2d 1092

(App.Div. 1996)).  Thus, there is a strong presumption that PMG and NBAC are separate and

distinct entities and it is SMC's burden to establish that NBAC's LLC form should be

disregarded. *See Green v. William Mason & Co.*, 996 F.Supp. 394, 398 (D.N.J. 1998) (citing

*New York State Teamsters Conference Pension & Retirement Fund v. Hoh*, 554 F.Supp. 519, 525

(N.D.N.Y. 1982)).

In order to state a claim for piercing the corporate veil, a party must prove that:

1. One corporation is organized and operated as to make it a mere instrumentality of another corporation; and

2. The dominant corporation is using the subservient corporation to perpetrate fraud, to accomplish injustice, or to circumvent the law.

*Bd. of Trs. v. Foodtown, Inc., 296 F.3d 164, 171 (3d Cir. 2002).  The court will consider the*

*following factors in determining whether to pierce the corporate veil:*

1. Gross undercapitalization;

2. Failure to observe corporate formalities;

3. Non-payment of dividends;

4. The insolvency of the debtor corporation at the time;

5. Siphoning of funds of the corporation by the dominant stockholder;

6. Non-functioning of other officers or directors;

7. Absence of corporate records; and

8. And the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Id. at 172.*

###### 2.   Heightened Standard to Pierce the LLC Veil

Recent case law holds that the traditional standard for piercing a corporation's veil must be modified to accommodate the special characteristics of a limited liability company. *D.R. Horton Inc. - New Jersey v. Dynastar Development*, L.L.C., No. MER-L-1808-00, 2005 WL 1939778 (N.J. Super. Ct. Law Div. 2005) (*see* Appendix).

In *D.R. Horton*, the court stated that "[c]ertainly, the various factors which would justify piercing an LLC veil would not be identical to the corporate situation for the obvious reason that many of the organizational formalities applicable to corporations do not apply to LLCs." *Id.* at *34. Specifically, the court recognized that "[r]eliance on dominance and control of the LLC form … conflicts with the underlying policy of flexibility within the LLC statute." *Id.* at *35. The court noted that "out-of-state authority and commentators agree that the veil-piercing formula for limited liability companies should be molded to account for that business form's special attributes." *Id.* at *36 (citations not provided).

"[G]iven the statutory authorization of flexible LLC management structures ... application of the alter ego factor to LLCs will often lead to illogical results." *Id.* at 35. Because LLCs are managed by their members, and members are normally authorized agents or managers for the purpose of conducting business, the *D.R. Horton* court recognized that the alter ego corporate formalities and domination and control factor is usually satisfied in the case of LLCs. *Id.* at *35. Consequently, domination of LLC management by members of the LLC is an inappropriate factor for the courts to use to pierce the veil of an LLC, absent other equitable issues.

The *D.R. Horton* court modified the two-part test used for corporate veil-piercing concluding that:

1.  Lesser weight should be afforded the element of domination and control and adherence to corporate formalities because the statute authorizing limited liability

6

companies expressly authorizes managers and members to operate the firm (*id.* at *31); and.

2. Undercapitalization should be weighed carefully in the LLC context, particularly involving a start-up LLC. *Id.* at *36.

In *D.R. Horton* the court found that the defendant's "failure to scrupulously identify the entity through which he was acting, his dominion and control of [the LLC], and the entity's undercapitalization should not loom as large as it might were the entity a corporation." *Id.* at *36.

### 3.    SMC Must Prove by Clear and Convincing Evidence that NBAC's LLC Veil Should be Pierced

In *D.R. Horton*, the court required a showing by clear and convincing evidence, rather than by a preponderance of the evidence, to pierce the veil of a LLC when the party seeking to pierce the veil is a contract claimant. *Id.* at * 19, 22.

First, the court reasoned that "a fact-finder should have a higher degree of confidence in a claim to pierce the veil on a private contract claim. The same considerations that call for a heightened level of proof in an equitable or legal fraud claim are at play in a corporate veil piercing claim" ... because indeed, "piercing the veil is an equitable remedy, in derogation of the statute limiting liability" *Id.* at *22.

Second, the court reasoned that a heightened standard should apply to contract claimants (as opposed to tort claimants) because contract claimants are voluntary creditors. *Id.* at *23. Contract claimants voluntarily enter into transactions with a corporate entity and they are expected to suffer the consequences of the limited liability ascribed to the corporate form. *Id.* at *23 (quoting FLETCHER CYC. OF PRIVATE CORP. § 41.85 (2004)).

7

### 4.  SMC Must Prove that PMG's Alleged Misuse of NBAC's LLC Form Proximately Caused SMC's Harm

The *D.R. Horton* court recognized that a party seeking to impose liability under an alter ego theory must prove that its harm was caused by misuse of the corporate form. Unquestionably, "causation is an important, if not essential element, in determining, in a contract case, that an owner's domination and control has been used as an instrument of fraud or injustice, or to circumvent the law." *Id.* at *31.

## B.  SMC FAILS TO MEET ITS BURDEN

### 1.  SMC Fails to Present Evidence that NBAC was Organized and Operated as a Mere Instrumentality of PMG

SMC cannot prove by clear and convincing evidence that NBAC was organized and operated as a mere instrumentality of PMG.  In its Trial Brief, SMC refers to the structure of PMG and the Nikki Beach Entities as a convoluted maze of corporate entities.  SMC presents no evidence that NBAC did not exist independently and with a proper purpose.  Rather, SMC offers evidence that PMG officers also held positions with NBAC, that PMG and NBAC allegedly shared a common address and telephone and facsimile numbers, and that PMG wire-transferred funds to SMC representing the down payment that SMC required on the equipment lease agreement between SMC and NBAC.  These facts are not sufficient to demonstrate that NBAC, a New Jersey LLC, was organized and operated as a mere instrumentality of PMG.

### 2.  SMC Fails to Present Evidence that PMG Used NBAC to Perpetrate Fraud, To Accomplish Injustice, or to Circumvent the Law

SMC does not offer clear and convincing evidence sustaining its burden to prove that PMG used NBAC to perpetrate a fraud, accomplish injustice, or to circumvent the law.  SMC points to the fact that NBAC allegedly breached its contract with SMC.  But SMC does not and

8

cannot demonstrate that PMG caused NBAC to breach such agreement.  Rather, NBAC failed to draw budgeted numbers and closed after three months.

### 3.    SMC Fails to Present Evidence Establishing the Factors Relevant to a Determination of Alter-Ego

"Not every disregard of corporate formalities or failure to maintain corporate records justifies piercing the corporate veil."  *Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1521 (3d Cir. 1994), *aff'd,* 514 U.S. 938, 115 S.Ct. 1920 (1995).  Indeed, in the case of a LLC, adherence to corporate formalities carries less weight because certain corporate formalities may be irrelevant to the LLCs actual operation.  *D.R. Horton Inc. – New Jersey v. Dynastar Development*, L.L.C.**,** No. MER-L-1808-00, 2005 WL 1939778, at *35 (N.J. Super. Ct. Law Div. 2005).  Moreover, the statutory-mandated formalities required of LLCs are far fewer than those required of a corporation, thereby encouraging a considerable amount of freedom and flexibility to the management of an LLC.  *Id.*

The evidence proffered by SMC does not meet its high burden to establish by clear and convincing evidence that PMG is the alter ego of SMC.

### a.    PMG's Wire-Transfer of Funds to SMC is Not Indicative of Undercapitalization

SMC alleges that PMG induced SMC to provide services to NBAC by wire-transferring funds to SMC to cover the down payment on the equipment rental agreement between NBAC and SMC.  SMC Trial Brief 15-16.  Yet, SMC was aware that NBAC was a newly formed entity without assets of its own, and it bore the risk that it would not be paid pursuant to the agreement between the two parties.  For instance, in a Pennsylvania case relied upon by the *D.R. Horton* court, a LLC's limited liability was upheld in the face of undercapitalization where the party seeking to pierce the corporate veil knew that it was dealing with a start-up LLC that initially had no assets.  *Advanced Telephone Systems, Inc. v. Com-Net Prof. Mobile Radio, LLC*, 846 A.2d

9

1264, 128-81 (Pa. Super. 2004). Similarly, here, the evidence offered by SMC shows that SMC knew that it was entering into a contract with NBAC, not PMG, and that NBAC was a start-up company with limited assets.

Similarly, the fact that SMC required PMG to complete a credit application for NBAC is irrelevant—SMC did not require PMG to serve as guarantor on the lease agreement with NBAC. In any event, courts are reluctant to pierce the corporate veil even where conduct consists of large monetary withdrawals and re-payments of loans. *Mitsui O.S.K. Lines v. Continental Shipping Line, Inc.*, 2007 WL 1959250, at *5 (D.N.J. 2007) (citing *Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1521, 1523 (3d Cir. 1994) (involving corporate withdrawals of $4.5 million for personal use and partial repayment of a personal loan)).

### b. "Overlapping" Officers and Common Address and Telephone Lines are Typical of LLCs and Their Related Entities

SMC alleges that NBAC and PMG shared the same business address, email domains, and facsimile numbers, and had overlapping officers, directors. However, such evidence is not indicia of an alter ego relationship and does not justify piercing the corporate veil of an LLC. Rather, where an individual is the principal of several entities, the operational efficiency in maintaining a central office, common employees, and common telephone lines, as well as unified administrative control and central accounting, for those entities is consistent with the business-promotion goals of the Limited Liability Act. *D.R. Horton Inc. – New Jersey v. Dynastar Development*, L.L.C**.,** No. MER-L-1808-00, 2005 WL 1939778, at *6, 37 (N.J. Super. Ct. Law Div. 2005).

## CONCLUSION

For the foregoing reasons, PMG respectfully submits that it is not the alter ego of NBAC

and, therefore, should not be required to participate in an arbitration brought pursuant to a

contract between SMC and NBAC.  Judgment should be entered in favor of PMG and against

SMC on the issue of alter ego.


Dated:   New York, New York
         June 13, 2008

                              Respectfully submitted,

                              HOLLAND & KNIGHT LLP

                              By:
                                 Sean C. Sheely
                                 Christine Tramontano
                                 195 Broadway
                                 New York, New York 10007
                                 (212) 513-3200

                                 Attorneys for Plaintiff-Petitioner
                                 Penrod Management Group


Of Counsel:
L.H. Steven Savola, Esq. (*pro hac vice*)
Savola LLC Law Firm
8770 Sunset Drive, #443
Miami, FL 33173
(305) 279-6406


# 5383318_v3

11

# APPENDIX

Westlaw.

Not Reported in A.2d                                                          Page 1
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))**

**C**D.R. Horton Inc.-New Jersey v. Dynastar
Development, L.L.C.
N.J.Super.L.,2005.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of New Jersey, Law Division.
D.R. HORTON INC.-NEW JERSEY d/b/a/ SGS
Communities, Plaintiff,
v.
DYNASTAR DEVELOPMENT, L.L.C., Evangeline
Health Care, Inc., The Esplanade at Bear Creek,
L.L.C., and Melville Borne, Jr., Defendants.
**No. MER-L-1808-00.**

Aug. 10, 2005.

Sterns and Weinroth, P.C. (Jason Feinstein,
appearing) for plaintiff.
Edward M. Bernstein, L.L.C. (James Manahan,
appearing) for defendants Dynastar Development,
L.L.C., Evangeline Health Care, Inc ., and Melville
Borne, Jr.

OPINION

OSTRER, J.
**\*1** This is the court's decision in the above matter.
Default judgment was previously entered in favor of
the plaintiff on its claims against The Esplanade at
Bear Creek, L.L.C. ("Esplanade L.L.C."). The court's
decision pertains to the claims against the remaining
defendants.

The court finds against the plaintiff on counts one,
three, and four of the Fifth Amended Complaint,
which alleged various forms of breach of contract by
defendants Dynastar Development L.L.C.
("Dynastar") and Evangeline Health Care, Inc.
("Evangeline"). As the contracting party, only
Esplanade L.L.C. was liable on these claims. The
court also finds against the plaintiff on counts two
and five, which alleged claims of unjust enrichment
against Dynastar and Evangeline. Only Esplanade
L.L.C. was enriched, and its relationship was already

governed by a contract. The court also finds against
the plaintiff on count seven of the complaint, wherein
plaintiff alleged that Melville Borne, Jr. ("Borne")
should be held liable, on a theory of piercing the
"corporate veil."

However, the court does find for the plaintiff on
count six of the complaint, alleging legal fraud, as it
applied to Dynastar and Borne, but not Evangeline.
The complaint's claim of legal fraud expressly sought
judgment only against the business entities and not
Borne, individually. However, the parties tried the
claim with the understanding that the fraud claim
applied to all defendants. *See* Defendants' Post Trial
Brief at 19. The court will therefore amend the
pleadings to conform to the evidence. *See* R. 4:9-2
(permitting amendment of pleading to conform to
evidence). Inasmuch as plaintiff seeks punitive
damages on the fraud claim, an additional hearing
needs to be held to take evidence on that claim.

*FACTS*

1. *General Description of Project.*

This lawsuit arises out of the construction of a
planned residential retirement community on over
400 acres in West Windsor Township. Known as the
Bear Creek Planned Development, the project was
intended to satisfy part of the township's Mt. Laurel
affordable housing obligation. As originally
conceived, it involved three kinds of housing: (1)
single family homes, most market-rate, but some
affordably priced; (2) affordably-priced townhomes;
and (3) a continuing care residential community
("CCRC"), which in turn was to consist originally of
senior citizen apartments and assisted living units.
The single-family development was ultimately named
the Village Grande at Bear Creek. The townhome
development was eventually called the Hamlet at
Bear Creek.

The parties involved in this litigation acquired their
interests from those who first conceived the project.
The Bear Creek development initially involved on
one side, Lehigh Housing Development Corp.
("Lehigh Corp."), which was to develop the CCRC

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

portion, and on the other side, what the court will call the "SGS Entities"-which was to develop the single family homes and townhouses. By "SGS" entities, the court refers to two entities: SGS Adult Communities at West Windsor, L.L.C. ("SGS Adult L.L.C."), and SGS Communities, Inc. ("SGS Inc."), a management company.

2. *PRRC Agreement.*

**\*2** Critical to the lawsuit is a contract dated April 26, 1996 (Exh. P-1 Evid.), entitled "PRRC Project Cooperation Agreement" ("PRRC Agreement"), and executed by Lehigh Corp., Pennington Properties Development Corporation ("Pennington Corp.") and SGS Adult L.L.C. The PRRC Agreement identified SGS Adult L.L.C. and Pennington Corp. as the "VBC Developer," that is, the developer of the single family homes and town homes. Lehigh Corp. was identified as the developer of the CCRC portion of the development. The PRRC Agreement described the parties' responsibilities in constructing the development.

In particular, the PRRC Agreement provided a formula for the parties to share the costs of improvements like roads, water line and sewer line extensions, which would be located outside each developer's respective property, but which would benefit that property. The VBC developer was to bear two-thirds of the cost of such off-site improvements and the CCRC developer was to bear one-third. Either party could proceed to install such improvements, on an as-needed basis, and then bill the other party for its appropriate share of the cost. The PRRC Agreement stated:

Where there are any off-tract improvements, such as but not limited to sewer line extensions, water line extensions, or roadway improvements, that provide benefit to both the CCRC Project and the VBC Project, then the parties shall allocate the costs and expenses of such off-tract improvements as follows: The CCRC Developer shall be responsible for one-third of such costs and expenses and the VBC Developer shall be responsible for two-thirds of such costs and expenses.... [T]he first party ready to proceed with its project shall have the right to complete the off-tract improvements that provide benefit to both the CCRC Project and the VBC Project....

[PRRC Agreement at 4-5.]

Reimbursement was due within ten days, after which eighteen percent interest would accrue. Also, the delinquent party would be liable for attorney's fees incurred in seeking collection.

[T]he other party shall reimburse the party that made the payment on its behalf within 10 business days after proof of such advanced payment has been presented to the responsible party (with there to be an 18% per annum interest charge to accrue on any required reimbursement payments that are not timely made within the 10 business day time period, and with the party who does not timely make such required reimbursement payment(s) to be responsible for any and all costs and expenses of collection, including attorney's fees, that are incurred by the other party in seeking such reimbursement payment(s)).

[*Id.* at 4, 285 N.E.2d 501.]

The PRRC Agreement also recognized that it was important for the CCRC developer to complete affordable housing units in a timely way. Procurement of building permits for the townhome development depended on it. Although the CCRC Agreement did not set clear deadlines, the CCRC Developer agreed not to delay the VBC Developer's procurement of permits.

**\*3** The CCRC Developer has agreed and continues to agree to construct 60 affordable housing units.... The CCRC Developer acknowledges and understands that 15 of these affordable housing units will be credited and applied to affordable housing unit requirements for the VBC Developer's Projects, and the CCRC Developer therefore agrees to construct the affordable housing units in the CCRC Project in a timely fashion so as to not delay the VBC Developer in its procurement of building permits and/or certificates of occupancy to complete the VBC Project.

[*Id.* at 2, 285 N.E.2d 501.]

The PRRC Agreement stated that it was binding on the parties as well as their successors and assigns. *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at 5, 285 N.E.2d 501. It was to be construed under New Jersey law. *Ibid.* The Agreement did not prohibit, or even require prior approval of its assignment. It did not even require notice of an assignment.

3. *New Participants.*

Less than a year after the PRRC Agreement was executed, different business entities were assigned the rights and obligations of the original signatories. On the home builder side, even before the project was conceived, members of the Zaitz family contracted to sell land held by a family trust to Pennington Corp. *See* Rothman Tr. at 17. However, Pennington Corp. assigned its interests in the project to SGS Adult L.L.C. Thereafter, a New York Stock Exchange company, D.R. Horton, Inc., acquired SGS Adult L.L.C. The evidence at trial did not clarify the precise structure of the acquisition of SGS Adult L.L.C. The transaction was described by Fred Rothman, who was president of SGS Communities, Inc. and an owner of SGS Adult L.L .C. Rothman testified, "We sold the New Jersey assets to ... D.R. Horton, Inc. [which] acquired those assets in a newly formed company called D.R. Horton .Inc.-New Jersey."*See* Rothman Tr. at 8, 11. The acquisition occurred in December 1996 and Rothman became president of D.R. Horton's New Jersey entity ("Horton NJ"), where he served until 2002.

A little over a year after Horton NJ entered the scene on the home-builder side, Lehigh Corp. on the CRRC side agreed to convey its interests in the project to Esplanade L.L.C., then a newly formed New Jersey limited liability company located in Covington, Louisiana, under an agreement made February 20, 1998 ("Lehigh-Esplanade Agreement"). Exh. P-2 Evid. However, Esplanade L.L.C.'s obligation to purchase Lehigh Corp.'s interest was conditioned upon Esplanade L.L.C. obtaining various acceptable agreements or opinions. Among these was assignment of the PRRC Agreement with the approval of SGS Adult L.L.C. Lehigh-Esplanade Agreement at ¶ 6 at 6. (Although such approval was never secured, the court does not attach the significance to this that plaintiff would. Inasmuch as the PRRC Agreement did not require such approval, there was no necessity for Borne or Esplanade L.L.C. to request it.)

Also conditions of Esplanade L.L.C.'s performance were: an agreement to purchase the land for the CCRC project; obtaining an opinion from bond counsel that the project would be eligible for tax exempt bond financing, and a firm commitment for the underwriting of a tax exempt bond issue. Lehigh Corp. agreed to help Esplanade L.L.C. obtain these agreements, as well as help Esplanade L.L.C. obtain amendments to Lehigh Corp.'s May 22, 1995 agreement to purchase the land for the project from the Zaitz trust. If Esplanade L.L.C. did not obtain these agreements and opinions by March 1, 1998, the Lehigh-Esplanade Agreement would be null and void.

*4 Among other "items and/or work in process" listed, Esplanade L.L.C. was assigned Lehigh Corp.'s rights and obligations under the PRRC Agreement. *See* Exhibit A, Lehigh-Esplanade Agreement. Esplanade L.L.C. also assumed Lehigh Corp.'s rights to purchase the land from the Zaitz trust, and acquired the engineering and architectural work already underway. Esplanade L.L.C. also agreed to pay various accounts payable of over $143,000, including over $16,000 to "SGS." Esplanade L.L.C. was also supposed to succeed to the certificate of need and all other governmental and regulatory approvals.

The Lehigh-Esplanade Agreement was executed by Anthony Mazzucca, Jr. on behalf of Lehigh Corp., and by Borne on behalf of Esplanade L .L.C. It was over a year later that Esplanade L.L.C. actually took title to the property. By deed dated May 30, 1999, Benjamin J. Zaitz conveyed all right, title and interest to Block 33, Lot 1.02, West Windsor Township, Mercer County, New Jersey to The Esplanade at Bear Creek, L.L.C.. Exh. D-3 Evid. and Exh. D-3A Evid. The deed was returned after being recorded to Richard Hamilton, Esq. at Stark & Stark, who at that time, was acting as attorney for both Horton NJ and Esplanade L.L.C. Exh. D-3A Evid.

4. *Borne Entities.*

The Lehigh-Esplanade Agreement authorized Esplanade L.L.C. to select Dynastar as the "developer of the project" notwithstanding common ownership between it and Esplanade L.L.C. *See* Lehigh-Esplanade Agreement, ¶ 1.3. However, the Lehigh-Esplanade Agreement granted Esplanade

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 4
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))**

L.L.C. the right to determine that the project was not feasible and to terminate its role.

Dynastar was a Louisiana limited liability company formed on December 27, 1996 and owned at its inception by Borne and Berthadele Mendoza, Borne's mother. Exh. P-48 Evid. Borne continuously managed Dynastar. In April 1999, the company became authorized to transact business and was registered as a foreign limited liability company in New Jersey. *See* Exh. D-10 Evid. Its operating agreement provided that the manager would be indemnified except for intentional torts and illegal acts. *See* Exh. P-48 Evid., at 4. Further, paragraph 6.3 provided that Dynastar's members would not be personally liable to any Dynastar creditor. *Id.* at 9, 285 N.E.2d 501.

As noted above, Esplanade L.L.C. was formed as a New Jersey limited liability company on February 10, 1998. Exh. P-50 Evid. Borne was designated to serve as the manager of this company. *Id.* at 12, 285 N.E.2d 501. Its operating agreement similarly provided that the manager would not be liable, responsible or accountable for damages so long as the manager was acting within the scope of his authority, except for any claims of fraud, gross negligence or an intentional breach of the operating agreement. Further, Esplanade L.L.C. was required to indemnify the manager for any acts performed by the manager within the scope of his authority, again except for fraud, gross negligence or an intentional breach of the operating agreement. *Id.* at 15, 285 N.E.2d 501. The members of Esplanade L.L.C. were Borne and Dynastar. *Id.* at 24, 285 N.E.2d 501.

*5 Evangeline was a Louisiana corporation formed in 1986, also with its principal place of business in Covington, Louisiana. Borne owned all of its stock. In 2000, a limited liability company called Gabriel Senior Services, L.L.C. somehow succeeded to Evangeline's interests. Borne, 6/15-16/04.

On or about June 23, 1999, while the developer of the project, Dynastar entered into a promissory note with Benjamin Zaitz to secure payment of a $351,995 loan. *See* Exh. P-52 Evid.

On or about June 28, 2002, Dynastar assigned to Borne all right, title and interest in certain plans or specifications created for the development of the property in West Windsor. Exh. P-53 Evid.

5. *Defendants' Use of Various Entities; Esplanade L.L.C.'s Separate Identity.*

Certain of Horton NJ's agents were subjectively unaware that Esplanade L.L.C. was Lehigh Corp.'s assignee under the PRRC Agreement. This state of mind was due in part to these agents' own inadvertence, inattention, and disinterest. It was also due in part to Borne's failure to identify the separate roles of Esplanade L.L.C ., Dynastar, and Evangeline, and his use of Dynastar as his principal vehicle for communicating with Horton NJ about the project as a whole. On the other hand, the court finds that Borne did not intend to hide Esplanade L.L.C.'s role, nor was Esplanade L.L.C. a sham or undercapitalized business entity. Moreover, any confusion by Horton NJ's employees about the respective roles of Borne's entities did not cause any harm; in other words, Horton NJ would not have done anything differently, had it known that not Dynastar, but Esplanade L.L.C. was the contractually responsible party under the PRRC Agreement.

A. *Borne's Actions*

Borne and Dynastar failed to correct false impressions about the role of Esplanade L.L.C. as the sole assignee of Lehigh Corp.'s obligations under the PRRC Agreement. However, the court does not find that Borne did so intending to mislead Horton NJ or hide Esplanade L.L.C.'s role.

Borne first met with Horton NJ representatives in the Spring of 1998. Borne attended this meeting with other persons from his companies. Borne handed out his Evangeline business card at this meeting. His associate, Henry Lugenbuhl, handed out a Dynastar business card. Borne did not expressly disclose the legal role of Esplanade L.L.C., even though it existed and had in February 1998 entered into the Lehigh-Esplanade Agreement. Rothman, 6/9/04; Schoor 6/10/04.

On numerous occasions, Barbara Schoor, who worked for SGS Entities and later Horton NJ, addressed requests for reimbursement under the PRRC Agreement to Borne at Evangeline. Exhs. P-8, -10, -13, -16, -17, -18, -19, -20, -23 Evid. Borne never advised Schoor that she had submitted the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 5
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

requests to the wrong company nor did he advise Horton NJ that its requests should have been addressed to Esplanade, L.L.C. as the contractually responsible party. Horton NJ never sought reimbursement from Esplanade, L.L.C. Schoor, 6/10/04; Borne 6/15-16/04. Moreover, when Borne responded to Schoor's correspondence, he used Dynastar letterhead. And, when he paid reimbursements, he did so through Dynastar. Exh. P-4 Evid. (check from Dynastar); Exh. P-5, -7 Evid. (Dynastar letters to Zaitz with copy to Rothman, approving reimbursement). In March 2000, he wrote to Rothman regarding a billing dispute, stating that "[b]efore Dynastar agreed to take on this project we were assured by Anthony Mazzuco [sic] and others that our share of the offsite improvements would be approximately $250,000."This apparently reinforced the impression that Dynastar was Lehigh Corp.'s assignee. On the other hand, the statement was not false, since Dynastar did agree to take on the project of developing the site for Esplanade L.L.C.

*6 It was undisputed that Dynastar, Evangeline and Esplanade, L.L.C. also shared corporate offices at 109 North Park Boulevard, Suite 310, Covington, Louisiana. They also shared common telephone and fax numbers, but the office was identified as that of a company called Gabriel Senior Services. Borne, 6/15-16/04. The companies had unified administrative control, common employees and central accounting. Borne, 6/15-16/04. Borne essentially controlled and directed all of them. Borne, 6/15-16/04.

Borne possessed and was using letterhead of The Esplanade at Bear Creek no later than April 2, 2001 and as early as the Fall of 2000. However, Borne never directed any correspondence to Horton NJ on letterhead of The Esplanade at Bear Creek. Borne, 6/15-16/04; Exh. P-73 Evid.

Borne testified that the architectural and development plans for Phase II of the CCRC Development (Buildings C, D and E) had a market value between $2 million to $3 million. Borne, 6/15-16/04. Pursuant to an Assignment and Quitclaim dated June 25, 2002, Borne, as Manager of Dynastar, transferred to himself in his individual capacity Dynastar's ownership interests in the Phase II architectural and development plans. Although this transfer was purportedly made for $10.00 and other consideration,

Borne did not recall whether he actually paid any consideration for this $2 million to $3 million asset transfer. Borne, 6/15-16/04; Exh. P-53 Evid.

On the other hand, Borne did not hide Esplanade L.L.C.'s role. Indeed, in formal written agreements between defendants and plaintiff, Esplanade L.L.C.'s role was clearly identified. And certain payments that Borne sought from plaintiff were made payable to Esplanade L.L.C.

In April 1999, documents were circulated to Rothman that expressly described Esplanade L.L.C.'s role as Lehigh Corp.'s successor and as the prospective title-owner once EDA financing closed. *See Amendment to Addendum to Revised Agreement,* Exh. D-2 Evid. at 2. Indeed, the agreement referred to the fact that Esplanade L.L.C. was thinly capitalized, and would not have the financial capacity to proceed with the whole continuing care community project at once."While the Esplanade has been designed as one integrated community, Buyer [Esplande L.L.C.] and Seller [The Zaitz Trust] recognize and acknowledge that because of funding limitations, the ability of Buyer to obtain sufficient funding to purchase and construct the entire project at one time is not possible."*Id.* at ¶ 3, 285 N.E.2d 501.

A proposed Declaration of Cross Easements, also sent to Rothman in April 1999, identified Esplanade L.L.C. as the prospective title owner of the property and the developer of the Esplanade project. *Id.* at Bates numbered page 001447. This document also referred to Esplanade L.L.C.'s funding limitations. *Id.* at ¶ 3, 285 N.E.2d 501. Rothman stated in a letter to the drafting attorney that he reviewed both documents. *Id.* (April 9, 1999 letter from Fred B. Rothman to Michael T. Hartsough).

*7 In or about November 1999, Borne expressly requested that reimbursements for investments made that benefited Horton NJ be made payable to Esplanade, L.L.C. Exh. P-41 Evid. Horton NJ complied. (Horton NJ's first request for reimbursement that was unpaid and is part of plaintiff's cause of action was sent in January 2000 to Dynastar. *See* discussion of stipulation below.)

In February 2000, plaintiff executed an agreement entitled, "Sewer Agreement By and Between D.R. Horton, Inc.-New Jersey (SGS Communities) and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                  Page 6
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

The Esplanade at Bear Creek, L.L.C., and Westminster Realty Corp. and K. Hovnanian at West Windsor, L.L.C." This agreement expressly described Esplanade L.L.C., along with SGS as the "developers of the Bear Creek community."It was executed by Borne and Rothman.

In September 2000, Borne sent to Rothman at Horton NJ a "Reservation of Rights" regarding an amendment of the affordable housing plan, because of delays in completing the CCRC-side's affordable units. Borne signed on behalf of both Esplanade L.L.C. and Dynastar, and both business entities were referenced throughout the agreement. The Esplanade L.L.C. obtained financing from the New Jersey Economic Development Authority, a matter of public record.

Moreover, the court finds that each of the Borne's three entities had a specific purpose: (i) Evangeline-a health care management firm, which would provide services to the continuing care facility once operational; (ii) Dynastar-to identify the opportunity, provide due diligence, negotiate contracts, own the architectural and development plans, and, through contractors, construct the facility; and (iii) Esplanade L.L.C.-to own the land and buildings A and B-"the bricks and sticks". Borne, 6/15-16/04.

The entities formalized their inter-company relationship. In June 1999, Dynastar and Esplanade L.L.C. entered into an inter-company agreement whereby Esplanade L.L.C. agreed to pay Dynastar a $350,000 fee for services. Exh. D-11 Evid. The sum would be payable when Esplanade L.L.C. received its EDA financing. *Id.*

Although Esplanade L.L.C. lacked capital initially, and depended on Dynastar to finance its operations, it ultimately secured financing through the EDA for the initial stage of the project. On the other hand, the plaintiff was on notice that Esplanade L.L.C. lacked sufficient capital to complete other stages. Thus, plaintiff should have been aware that it might not have had sufficient capital to complete the initial stage if overruns, delays, or other setbacks were experienced. Borne, 6/15-16/04.

B. *Horton NJ's Ignorance and Disinterest*

When asked if he became familiar with certain Borne-related companies, Fred Rothman stated, "I didn't focus on companies." *See* Rothman Tr. at 42. He did not recall being familiar with Dynastar, nor did he recall any discussions regarding Dynastar. *Id . at 48, 58, 285 N.E.2d 501.* Rothman associated Borne with a company called "Evangeline Homes" although the only Borne-entity to be involved in the New Jersey project was Evangeline Health Care, Inc. Rothman did not know the technical name notwithstanding that, as Rothman knew from personal experience, slight differences in names, as with SGS, could indicate a completely different corporate or business entity. *See* Rothman Tr. at 59.

**\*8** On the other hand, in a letter that Rothman wrote to Zaitz, he apparently reflected a belief that Dynastar was responsible for paying the reimbursements. He referred to "Dynastar's past and future payment obligations for shared improvements" and "Dynastar's share pursuant to the PRRC Agreement."He stated that "Dynastar became responsible for Lehigh's obligations" and "Dynastar purchased Lehigh's contract for the site."Exh. P-6 Evid. Borne received a copy of this letter, but did not correct Rothman's misstatements. The understanding reflected in this letter is inconsistent with Esplanade L.L.C. agreements that Rothman himself reviewed in April 1999. This discrepancy is best explained by Rothman himself, who conceded that he did not pay attention to the identity of the company on the other side of the transaction.

Nor did Schoor understand that Esplanade L.L.C. was Lehigh Corp.'s assignee under the PRRC Agreement. She sent correspondence to Borne at Evangeline. She received correspondence from Dynastar. Schoor, 6/10/04. Despite this inconsistency, she did not determine which entity was contractually bound under the PRRC Agreement.

There was no evidence that Horton NJ asked for a copy of the Lehigh-Esplanade Agreement. Nor did Horton NJ ever conduct a credit check on any Borne entity, according to Schoor.

Q: During your employment with SGS did SGS to your understanding have any reason to perform any credit check of Mr. Borne or any [of] his entities?

A: I have no knowledge of that.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Q: As you sit here today can you think of any reason why SGS would have done that?

A: No.

[Schoor 6/14/05 at 72.]

Nor did Horton NJ seek a written agreement with Dynastar-whom its agents apparently believed was responsible-evidencing its assignment of Lehigh Corp.'s responsibilities. This disinterest in a written agreement with a Borne entity, establishing its obligations to Horton NJ, was all the more surprising given that Horton NJ and SGS Inc. were sophisticated developers that formally documented other aspects of its development. Moreover, SGS Adult L.L.C.'s interest in written agreements was evidenced by the provision in the PRRC Agreement that barred oral modifications or amendments. PRRC Agreement, at 5.

Also, as sophisticated developers, Horton NJ's executives were familiar with, and experienced in the use of single-purpose entities in developing real estate. Rothman, as the president of SGS Inc., and later president of Horton NJ, was personally familiar with the use of single purpose entities. When asked to identify the entity that was first involved with the Bear Creek development, Rothman stated, "Well, it was SGS Communities, although I believe we probably formed an affiliated entity, as all of our acquisitions were done through a single-purpose entity at that time."*Id.* at 10, 285 N.E.2d 501. He then stated that SGS Inc. did not have direct ownership interest in these single-purpose entities, but instead had management contracts, according to "standard procedure." "The ownership would have lied with the principals of SGS Communities directly."*Id.* at 11, 285 N.E.2d 501. Indeed, in developing the project involved in this law suit, the principals formed SGS Adult, L.L.C. Rothman also testified that many of the people who worked for SGS Adult L.L.C. also worked for SGS Inc. and they did so out of the same office location.

**\*9** There were also numerous opportunities for Horton NJ to identify Esplanade L.L.C.'s role as the assignee of Lehigh Corp.'s responsibilities under the PRRC Agreement. As noted above, in April 1999, Rothman reviewed agreements that expressly identified Esplanade L.L.C. as the assignee. In

November 1999, when Borne claimed partial reimbursement for improvements that Dynastar installed that benefited Horton NJ's development, Borne expressly requested that the payment be made to Esplanade L.L.C., and Horton NJ obliged. Moreover, Horton NJ entered into a sewer agreement with Esplanade L.L.C. among others in February 2000. And Esplanade L.L.C. was also a signatory to the reservation of rights letter to Rothman in September 2000.

Nor was there evidence that any Horton NJ agents searched the public records to identify Esplanade L.L.C. as the property owner. Indeed, the recorded deed was returned to Richard Hamilton, at Stark & Stark, who was attorney for both Horton NJ and Esplanade L.L.C. Exh. D-3A Evid.

Moreover, as noted above, although SGS Entities and Horton NJ submitted requests for reimbursement to Evangeline, they apparently did not feel the need to inquire about the Borne entities' respective roles, even after Borne responded to Schoor's correspondence on Dynastar letterhead.

## C. *Lack of Causation*

Finally, there was no evidence that Borne's failure to correct Schoor's and Rothman's confusion caused Horton NJ to act to its detriment. Horton NJ would have made the same investments in off-site improvements even if Borne made it clear that Dynastar was performing services for Esplanade L.L.C., and Esplanade L.L.C. was the single purpose entity that owned the land and was Lehigh's assignee. One principal reason for this was that Horton NJ was obliged to West Windsor Township to install the off-site improvements. So stated Fred Mosesman, Horton NJ's vice president of operations, who reported directly to Fred Rothman.

Court: Is there anything that SGS Communities or DR Horton put in the ground ... that it would not have put in the ground if it had known that the Esplanade at Bear Creek, L.L.C. owned the property and knew everything then that it knows now about the interrelationship with Mr. Borne and his related entitites?

Mosesman: Under the agreement of approvals for the township, I think we would have been obligated,

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

Page 8

whether Mel Borne or any related company did the improvements on the Esplanade property. And we would have been obligated to continue those improvements, and then seek reimbursement from whomever, in the future.

[Mosesman, 6/14/04 at 163-64.]

Mosesman reiterated that other than seeking a change to the plans "nothing less could-would have been done" if the plaintiff knew, when it installed improvements and sought reimbursement, what it ultimately learned later about the interrelationship of the Borne entities. *Id.* at 164, 285 N.E.2d 501. And, as for a possible change of plans, there was no evidence that Horton NJ would have sought a change, or that the township would have approved it.

**\*10** Also reflective of the lack of causation was the fact that, according to Rothman, Lehigh Corp. was in financial trouble, even before Esplanade L.L.C. came on the scene. Rothman testified, "Mazzucca didn't have the financial capability [to complete the project] because he wasn't paying us our bills."Rothman Tr. 129:3-6. Notwithstanding that, Horton NJ did not seek formal assurances that Lehigh Corp.'s assignee was capable of performing. That was because it had not reserved any right to limit assignment, and Horton NJ was going to complete off-site improvements regardless of the identity and capacity of the CCRC developer.

*6. Breach of Contract*

Esplanade L.L.C. breached the PRRC Agreement and failed to reimburse Horton NJ for various offsite improvements that benefited its property. At trial, the parties stipulated that Horton NJ properly submitted the following requests for reimbursement under the PRRC Agreement for mutually beneficial off-tract improvements:

a. January 17, 2000 for $55,097.34. Exh. P-10 Evid.

b. February 2, 2000 for $7,012.50. Exh. P-13 Evid.

c. April 20, 2000 for $7,690.65. Exh. P-16 Evid.

d. May 9, 2000 for $335.78. Exh. P-17 Evid.

e. July 24, 2000 for $45,213.99. Exh. P-18 Evid.

f. November 14, 2000 for $133,810.26. Exh. P-19 Evid.

g. May 18, 2001 for $4,647.52. Exh. P-20 Evid.

h. July 11, 2002 for $109,710.36. Exh. P-23 Evid.

i. November 27, 2002 for $666.67. Exh. P-24 Evid.

Pursuant to the PRRC Agreement, where a request for reimbursement was not paid within 10 business days of presentment, the developer seeking reimbursement was entitled to a contractual rate of eighteen percent interest, as well as the recovery of all of its costs of collection, including attorneys' fees. Exh. P-1 Evid.

As of June 11, 2004, the total interest due on the reimbursement requests covered by the PRRC Agreement totaled $210,758.47, with interest accruing at a per diem rate of $179.80. Mosesman 6/14/04; Exh. P-26 Evid. Plaintiff was also entitled to attorneys' fees and costs of collection under the PRRC Agreement against the contracting party.

The court rejects Borne's allegation of an agreement or even a representation that the CCRC Developer's share of off-tract costs under the PRRC Agreement would not exceed $250,000. Borne presented no writing to that effect. Borne alleged that Mazzucca of Lehigh Corp., Ralph Orlando of Schoor DePalma, and Schoor of Horton NJ all told him that his costs would not exceed $250,000. Borne, 6/15-16/04. Defendants did not produce any of these persons to substantiate Borne's claim. In any event, defendants did not prove that Mazzucca and Orlando were authorized to bind Horton NJ, nor did Borne believe they were authorized to so bind. Borne, 6/15-16/04.

The court found persuasive Schoor's and Rothman's denials of the alleged representation. Indeed, Rothman was especially persuasive when he stated that a New Jersey developer, aware of the risks and contingencies involved in any large scale development in the state, would not make such an assurance. Even if someone stated an opinion as to what the offsite improvements might cost-an opinion likely to have come, if at all, from Orlando or

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))**

Mazzucca-it would not have been intended as a binding promise. Rothman, 6/9/04; Schoor, 6/10/04.

**\*11** The documentary evidence further contradicted Borne's contention. Borne knew that (1) Dynastar paid Horton NJ $23,713.16 on or about March 17, 1998, Exh. P-4 Evid.; (2) Zaitz paid Horton NJ on behalf of Dynastar $98,511.48 on or about December 21, 1998, Exh. P-7 Evid.; (3) Zaitz paid Horton NJ on behalf of Dynastar $249,681.21 on or about February 25, 1999, Exh. P-8, -9 Evid.; and (4) his additional shared expenses approximated $327,503.04. Exh. P-59 Evid. Thus, in reality, Borne was fully aware that his share of costs were approximately $700,000-far in excess of $250,000 as he claimed.

*7. Plaintiff Suffers Delay Damages.*

Plaintiff alleges that defendants failed to complete affordable housing units in a timely way. Rothman Tr. 70, 72-75. As a result of delays on the CCRC-side of the project, plaintiff was required to accelerate construction and marketing of affordable rate units, instead of more profitable market-rate units. *Id.* at 75-76, 285 N.E.2d 501.

As noted above, pursuant to the PRRC Agreement, the CCRC developer agreed to construct sixty affordable housing units as part of the CCRC project. The CCRC developer also acknowledged that fifteen of these affordable housing units would be credited and applied to affordable housing unit requirements for the VBC developer's project, that is, Horton NJ's project. The CCRC developer also agreed to timely construct its affordable housing units, to avoid delaying the VBC developer in procuring building permits and/or certificates of occupancy to complete the VBC project. PRRC Agreement at 2.

When Borne entered into the Purchase Agreement with Lehigh Housing, he was aware of these provisions in the PRRC Agreement, but ignored them as he did not understand them. Having no prior building experience in New Jersey, Borne was totally unfamiliar with New Jersey's affordable housing requirements. Borne, 6/15-16/04.

Due to Borne's ignorance of this very important issue, he mistakenly believed that he was not obligated to provide affordable housing units in what he referred to as his Phase 1 of the CCRC project-Buildings A

and B. Rothman, 6/9/00; Borne, 6/15-16/04. Borne conceded that he was wrong. Borne agreed with the findings of Gerald J. Muller, Esq., Planning Board Attorney, as set forth in Mr. Muller's August 1, 2000 memorandum to the West Windsor Planning Board. These findings included the following statements:

The basic problem is that The Esplanade has fallen considerably behind the staging schedule and will not be delivering the affordable units in the time frame originally expected. In response to that, SGS has accelerated the delivery of all 14 affordable units in The Villages and has moved up considerably the scheduled construction of The Hamlet, for which it now projects an opening date of July 31, 2001 for 24 units. In the original staging schedule, as discussed above, The Hamlet would come along much later. Treating Bear Creek as one development for affordable housing delivery purposes, as must be done unless the relief requested in the application before you is granted, even with the acceleration of the delivery of SGS's affordable units, SGS will be slightly out of compliance at the 25% trigger point (it needed to have 14 affordable units completed, but has 10 completed and 4 under construction), and it will not be able to meet the COAH delivery schedule at the 75% and 90% trigger points if The Esplanade has not delivered its affordable units.

**\*12** A second problem is that The Esplanade misconstrued its affordable housing delivery obligation and thought that the COAH cushion of 25% of the market units before the obligation to deliver an[y] affordable units triggers applied to The Esplanade alone.... The Esplanade had no cushion of market units, since SGS, rightfully, was using them all. Moreover, even if The Esplanade had that cushion-i.e., it was treated as an independent project for purposes of the affordable housing delivery schedule, it would still not comply with the COAH schedule.

[Exh. P-28 Evid.]

As a direct result of Borne's mistake, Horton NJ was forced to advance or accelerate the construction of four affordable housing units in order to stay current with the COAH triggers to obtain certificates of occupancy for its market rate units, which were then under contract with closing dates scheduled. Rothman, 6/9/04; Schoor, 6/10/04.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

Page 10

Horton NJ's damages suffered as a result of the advancement of the affordable housing units consisted of the carrying charges or time loss value of the money needed to construct the units. Horton NJ's total loss in this regard was $4,444.80. Mosesman, 6/14/04; Exh. P-29 Evid. The ultimate outcome of this was that the developers consented to the filing of an amendment to the General Development Plan and the Affordable Housing Plan for the Bear Creek Development. Consequently, the development was no longer treated as one project for affordable housing purposes. Rothman, 6/9/04; Borne, 6/15-16/04. In connection with the developers' consent, Borne wrote to Rothman on behalf of both Esplanade, L.L.C. and Dynastar. Borne acknowledged that by signing the consent, Horton NJ did not waive any rights or claims that it may have had against both entities. Exh. P-74 Evid.

8. *Sewer Fraud*

In August 1999, Dynastar requested reimbursement for storm sewer work to be done on Esplanade L.L.C.'s property. *See* Exh. P-35 Evid., (letter dated Aug. 20, 1999, seeking $169,797). Dynastar was not entitled to any reimbursement based on a strict reading of the PRRC Agreement, because all the work Dynastar proposed to do was on its site. Rothman Tr. at 78-79. However, Borne argued that Dynastar was forced to install pipes with greater capacity because the pipes would, when extended into the adjoining site, serve a larger area. *Id.* at 79, 285 N.E.2d 501. After negotiation, the parties agreed that SGS Adult L.L.C. would contribute twenty-four percent of the cost, based on the gross land area that would drain into the system. Thus, Horton NJ agreed to, and ultimately, reimbursed Esplanade L.L.C. $122,503.94. Exh. P-41 Evid.

The court finds that Borne, as agent for Dynastar, misrepresented the extent of improvements. Specifically, he led Horton NJ to believe that the improvements were more extensive than they in fact were. Indeed, Horton NJ was led to believe that the improvements included extension of a storm sewer pipe to the property line, so Horton NJ could connect up to it. In reliance on this misrepresentation, Horton NJ agreed to reimburse Esplanade L.L.C. $122,503.94. Exh. P-41 Evid. However, in late Fall 2000, after Horton NJ commenced construction of

The Hamlet (construction of The Esplanade was already underway), it discovered that the sanitary sewer and stormwater lines on Esplanade L.L.C.'s property did not extend to The Hamlet property line. That failure prevented the construction of the units in The Hamlet.

*13 Esplanade L.L.C. was required to build these utility improvements, but failed to do so. Rothman, 6/9/04; Mosesman, 6/14/04. In a Resolution of the West Windsor Township Planning Board granting approvals to Esplanade L.L.C. dated March 17, 1999, the Planning Board imposed upon Esplanade L.L.C. in Condition "w" the following obligation:

The applicant [The Esplanade] shall place a note on the plans indicating that the joint infrastructure serving The Hamlet and The Esplanade shall be built by the developer of whichever development proceeds first.

[Exh. P-30 Evid., at 16.]

Accordingly, Esplanade L.L.C. added the following note to the approved Site Plans:
THE DEVELOPER OF WHICHEVER PROJECT PROCEEDS FIRST SHALL BE REQUIRED TO INSTALL THE JOINT INFRASTRUCTURE IMPROVEMENTS. THESE IMPROVEMENTS SHALL INCLUDE, BUT ARE NOT LIMITED TO, THE RETENTION BASIN, STORM DRAINAGE WITHIN 'ESPLANADE DRIVE', SANITARY SEWER CONNECTION, PORTION OF 'ESPLANADE DRIVE' INSTALLATION, ETC.

[Exh. P-31 Evid.]

The Esplanade was the first project to proceed and it therefore had the obligation to build "the joint infrastructure improvements" set forth in its Site Plans, including the construction of sanitary sewer and storm drainage to the property line of The Esplanade and The Hamlet. Despite agreeing to construct these improvements, Esplanade L.L.C. breached its obligations. Rothman, 6/9/04; Mosesman, 6/14/04; Borne, 6/15-16/04.

However, that failure, if there had been nothing more, would not have rendered Borne or Dynastar liable for fraud, as discussed below. However, in seeking

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

Horton NJ's financial contribution to the storm sewer, Borne represented that the infrastructure was fully installed. In reliance thereon, Horton NJ voluntarily agreed to share in a fixed percentage-twenty-four percent of the cost of the storm sewer lines on Esplanade L.L.C.'s property that would service The Hamlet. Borne did not seek reimbursement for sanitary sewer. Exh. P-32 Evid.

On August 20, 1999, Dynastar asked Horton NJ to reimburse $169,797 pursuant to the parties' 76/24 agreement for the cost of storm sewer installation. Exh. P-35 Evid. By fax memo on August 23, 1999, Rothman questioned the request and asked for supporting invoices. Exh. P-36 Evid. On September 7, 1999, Dynastar responded that the charges were for "total installation" of the utility improvements. Moreover, Borne represented that the improvements had already been made by stating the costs had already been "incurred." He wrote on behalf of Dynastar:

The cost estimate that you included from Schoor DePalma acknowledged and identified all of the pipes that were required to complete the total installation of the site storm water sewer. Kay Construction gave me the cost *they incurred* for the *total storm water sewer* plus the retention pond and I multiplied it times the percentage you agreed to reimburse.

[Exh. P-37 Evid. (emphasis added)]

Based upon Borne's representation that (a) he was seeking reimbursement for "the total installation of the site storm water sewer" or the "total storm water sewer", and (b) that the costs were already incurred, Rothman and Schoor reasonably believed that a complete installation had occurred consistent with defendants' approved plans. Rothman, 6/9/04; Schoor, 6/10/04.

**\*14** In subsequent correspondence, Borne continued to misrepresent the status of the storm water sewer work. By letter dated September 9, 1999, Horton NJ addressed to Dynastar various issues concerning Dynastar's reimbursement request and again requested back-up documentation. Exh. P-38 Evid. Finally, on September 27, 1999, Dynastar "enclosed a detailed analysis of the cost *incurred* for the installation of the storm water sewer system for The

Esplanade at Bear Creek."Exh. P-39 Evid. (emphasis added). This letter plainly represented that the storm water sewer system had been installed on The Esplanade project and costs were incurred. There was no indication in this letter or any other from Borne on behalf of Dynastar that the system had been installed only to a certain point, or that the system was installed only for Buildings A and B of the project. Exh. P-39 Evid. Perhaps, when Borne represented that costs were incurred and systems installed, he hoped or intended that they would be. Indeed, the lack of completion could not be hidden for long. However, the representations were nonetheless intentionally and knowingly false when made.

On October 28, 1999, Horton NJ sent Borne its "shared drainage analysis" and indicated that it was willing to pay $122,503.93 in settlement of the reimbursement request. Exh. P-40 Evid. Based upon Borne's representation that the total stormwater sewer system had been installed, by letter dated November 16, 1999 and countersigned by Borne on November 17, 1999, Borne agreed to accept $122,503.93 as Horton NJ's share for installing the entire stormwater sewer. Exh. P-41 Evid.

The court is clearly and convincingly persuaded that Borne knowingly and intentionally misrepresented the extent of the improvements for which he sought reimbursement. The court carefully evaluated Borne's demeanor during trial. He was an engaging and persuasive witness. He was knowledgeable and instructive. On some issues, the court finds his testimony to have been truthful. But on other issues, such as the reimbursement request, the court finds that he was not truthful. In this regard, the court takes into account his recent convictions for pension and Medicare fraud, which were admitted into evidence, as discussed below, and which diminish his credibility.

As for reliance, the court is also convinced that Horton NJ would not have agreed to pay Esplande L.L.C. $122,503.93 if it did not reasonably believe that it was sharing in the cost of a utility improvement that extended to its property line. Rothman, 6/9/04; Schoor, 6/10/04. As a result of the failure to complete the total system, Horton NJ had to cease construction, because it had no outlet for its storm water. Mosesman, 6/14/04. Ultimately, Horton NJ was forced to enter the CCRC project and extend

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

the utilities to the property line at a cost of $71,868.65. Defendants do not contest the validity of these costs, which Horton NJ seeks to recover in full. Mosesman, 6/14/04; Exh. P-25 Evid.

**\*15** The court rejects Borne's assertion that Horton NJ got what it paid for. The court does not reject Borne's claims that substantial improvements were made on-site that ultimately benefited Horton. However, his writings represented that the total system was installed, and it was not.

The court also rejects Borne's defense that Esplanade L.L.C. never received credit for payments made by third parties, such as K. Hovnanian under the sewer agreement. Exh. P-62 Evid. Those claims, if well-founded, belonged to Esplanade L.L.C.

The court accepts Borne's testimony that Esplanade L.L.C.'s project failed substantially from delays by its general contractor Kay Construction. As a result, the project owner and the project were forced into bankruptcy. A bankruptcy claim was filed on behalf of Horton NJ in the bankruptcy case, but Borne was not aware of whether any payments had actually been received from the bankruptcy estate to or for the benefit of Horton NJ. Borne further testified that with respect to the bankrupt project, Dynastar had lost money even after it had been reimbursed for some of its advanced expenses. Borne had personally lost all the equity that he had injected into the project. However, none of these facts undermine plaintiff's fraud claim.

*The Pleadings and Procedural History.*

In its Fifth Amended Complaint, filed January 3, 2004, Horton NJ alleged that Dynastar, Evangeline, and Esplanade L.L.C. were jointly and severally liable for all damages arising out of breach of the PRRC Agreement. In count one, plaintiff alleged breach consisting of failure to reimburse for off-site improvements. Count two alleged unjust enrichment for the same failure. Count three alleged breach of the obligation to construct affordable housing units in a timely fashion. Count four alleged breach of the obligation to complete utilities on site. Count five alleged unjust enrichment related to plaintiff's reimbursement. Count six alleged legal fraud against the business entities regarding constructing the storm sewer on Esplanade L.L.C.'s site. Count seven

alleged a claim of piercing the corporate veil against Borne, based on Borne's alleged domination and control of Dynastar, Evangeline and Esplanade L.L.C., and his alleged fraudulent use of the business entities for his own personal benefit.

A default judgment was entered against Esplanade L.L.C. for the failure to pay plaintiff for off-site costs. However, Esplanade L.L.C. sought the protection of the bankruptcy court and plaintiff apparently obtained no recovery from it.

In their responsive pleading, Dynastar, Evangeline and Borne each denied all liability based upon the allegations of Horton NJ's pleadings. The defendants asserted that both Evangeline and Dynastar had a separate and valid business function and purpose with respect to the overall development, which benefited by the improvements that are the subject of Horton NJ's claim. Esplanade L.L.C. asserted counterclaims against Horton NJ and Pennington Corp. The other defendants did not assert counterclaims.

**\*16** By order dated October 12, 2001 (revising an order of July 23, 2001), the court granted partial summary judgment in favor of Horton NJ and against defendants Dynastar, Evangeline, and Esplanade, L.L.C. for $8,037.78 of the $55,097.34 sought in the January 17, 2000 reimbursement request, and for $7,690.95 from the April 20, 2000 reimbursement request.

By order dated November 21, 2003, the court granted Peckar & Abramson, P.C. leave to withdraw as counsel for the defendants. The business entities failed to obtain counsel within thirty days, as provided in the order. Thereafter, default was entered by order entered January 9, 2004 against Dynastar and Evangeline, because no attorney subsequently appeared for the business entities, which were not permitted to proceed *prose.SeeR.* 1:21-1(c) (generally requiring business entities to be represented by counsel). Also, the counterclaim by Esplanade L.L.C. was dismissed.

Dynastar, Evangeline and Borne retained their present counsel April 30, 2004. At the start of trial, the court granted Dynastar's and Evangeline's motion to vacate default, conditioned upon the payment of certain fees to plaintiff, which were later paid.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

The case was tried on June 9, 10, 14, 15, 16 and 17, 2004. Post-trial submissions were received in July 2004. Shortly thereafter, however, and before the court rendered its decision, plaintiff filed a motion dated July 9, 2004, seeking to supplement the record with evidence of a criminal conviction of Borne. For reasons stated more fully on the record in an oral decision, the motion was denied without prejudice July 23, 2004 generally because Borne was not yet convicted. The court reserved its decision to await the motion's renewal after Borne's conviction.

Plaintiff then renewed its motion on November 15, 2004 shortly after a judgment of conviction was actually entered against Borne for health care fraud and pension fraud. The parties' written submissions on the renewed motion were completed in December 2004. By written decision dated February 14, 2005, the court granted the motion and supplemented the record with Mr. Borne's convictions. The copy of the judgment of conviction, which was attached as Exhibit C to Jason Feinstein's November 15, 2004 certification in support of the renewed motion, is admitted into evidence as Exh. C-1.

*DISCUSSION*

Based on the foregoing findings of fact, applied to the conclusions of law discussed below, only Esplanade L.L.C. is liable for breaching the PRRC Agreement. The breach consists of not paying for off-site improvements, delaying completion of affordable housing units, and failing to complete on-site improvements. Horton NJ may not pierce Esplanade L.L.C.'s veil and assign liability to its members Borne and Dynastar, or to Borne's related entity, Evangeline.

The court predicates this result on the following conclusions of law: New Jersey law applies to a veil piercing claim, notwithstanding that two of the three entities are creatures of other states' laws; the "clear and convincing" standard of proof applies to Horton NJ's veil-piercing claim, but plaintiff has failed to satisfy even the lesser "preponderance of the evidence" standard; in a claim seeking to pierce the veil on a contract claim, the court should consider as a significant, if not essential factor, whether the defendant's conduct proximately caused the plaintiff's loss, and the plaintiff has failed to prove proximate causation; the standard for veil piercing for a limited

liability company should differ from the standard applicable to corporate veil piercing, to account for the peculiar attributes of L.L.C.s; and lastly, viewing the totality of circumstances, the limited liability of Esplanade L.L.C. need not be pierced in order to avoid injustice. Moreover, Horton NJ may not succeed on quasi-contractual claims against the defendants, as they were not unjustly enriched.

**\*17** On the other hand, the court is persuaded by clear and convincing evidence that Borne, while acting as an agent for Dynastar, defrauded Horton NJ. He intentionally and knowingly misrepresented that Dynastar had completed installation of Esplanade L.L.C.'s total storm sewer system. In reliance on that misrepresentation, Horton NJ reimbursed Esplanade L.L.C. over $122,000. Horton NJ suffered damages equal to the cost of completing the system.

*I. ONLY ESPLANADE L.L.C. IS LIABLE FOR BREACHING PRRC AGREEMENT.*

Only Esplanade L.L.C. is liable for breaching the PRRC Agreement. Only Esplanade L.L.C. assumed the obligation to reimburse SGS Adult L.L.C. and its assignee for offsite improvements. And only Esplanade L.L.C. assumed the obligation to produce affordable housing in a timely manner and to complete on-site improvements. Simply put, in this case, no party other than Esplanade L.L.C. was bound contractually to Horton NJ. The defendants on the contract claims, Dynastar and Evangeline, contracted directly neither with Horton NJ nor SGS Adult L.L.C. Nor did they accept assignment of the obligations of the company that did contract with plaintiff, Lehigh Corp.

It should be a non-controversial principle that nonparties to contracts cannot be held responsible for a breach. *FDIC Deposit Ins. Corp. v. Bathgate*, 27 *F*.3d 850, 876 (3d Cir.1994) (stating that under New Jersey law, non-parties to a contract cannot be held liable for a breach of a contractual duty). Of course, barring an express prohibition in the contract, a contract can be freely assigned. *SeeSomerset Orthopedic Assocs., P.A. v. Horizon BCBS of NJ*, 345 *N.J.Super.* 410, 415, 785 A.2d 457 (App.Div.2001). Lehigh Corp., the original contracting party responsible for developing the CCRC, assigned its obligations to Esplanade, L.L.C. and no other person

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

or entity. Moreover, Horton NJ was the assignee of SGS Adult, L.L.C. Horton NJ therefore could pursue breach of contract claims against either Esplanade L.L.C., as the assignee, or Lehigh Corp., as the assignor and original contracting party. See*Fusco v. City of Union City,* 261 N.J.Super. 332, 337, 618 A.2d 914 (App.Div.1993) ("An assignment does not discharge the original debtor, but merely transfers the duty to the assigned as an additional obligor.")

Given this court's finding on the breach of contract claim, the court rejects plaintiff's claim for attorney's fees. Although the PRRC Agreement made a breaching party liable for attorney's fees incurred by a party seeking collection, the only breaching party was Esplanade L.L.C. Otherwise, there is no right to fees. *See*R. 4:42-9.

## II. DYNASTAR AND EVANGELINE ARE NOT LIABLE ON A THEORY OF UNJUST ENRICHMENT.

Horton NJ has failed to prove that Dynastar or Evangeline was unjustly enriched by the construction of off-site improvements, or by Horton NJ's payment for the sewer improvements on Esplanade L.L.C .'s property. Horton NJ has failed to satisfy the predicates for this equitable claim. First, the only party enriched by Horton NJ's actions was Esplanade, L.L.C. Second, inasmuch as Horton NJ's rights were governed by an existing contract, the law will not imply an agreement on the same subject matter.

*18 Preliminarily, to clarify, plaintiff has not asserted an implied contract with Dynastar or Evangeline-that is, an actual agreement implied by the parties' actions. See*Callano v. Oakwood Park Homes Corp.,* 91 N.J.Super. 105, 108, 219 A.2d 332 (App.Div.1966) (distinguishing between implied contract, and quasi-contract, the latter being not a contract claim, but an equitable claim based on unjust enrichment). Rather, plaintiff effectively concedes that it had no contract with Dynastar or Evangeline. Instead, it asserts that it would be unjust to permit either to retain benefits conferred by Horton NJ.

There are two basic elements of an unjust enrichment claim. The plaintiff must "show both that defendant received a benefit and that retention of that benefit without payment would be unjust."*VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994). To establish the injustice, the plaintiff must further "show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."*Ibid.*

In *VRG Corp. v. GKN Realty Corp.,supra,* the Supreme Court rejected an unjust enrichment claim in part because, although the plaintiff conferred a benefit expecting remuneration, the benefit was conferred not on the defendant, but on another party. VRG Corp. performed real estate services for a shopping center owner, enhancing the center's value. The center's owner then sold the center to defendant without paying an expected commission to VRG Corp. The court held that the buyer, which paid fair market value, did not receive an unjust benefit even though its seller broke its promise to pay plaintiff.

Likewise, in this case, plaintiff may not recover from Dynastar or Evangeline on a claim of unjust enrichment, merely because Esplanade L.L.C. breached its contractual obligation. In this case, as in *VRG Corp. v. GKN Realty Corp.,* the defendant was not the party enriched. All of the off-site improvements for which Horton NJ seeks payment enhanced the value of the land, which was owned by Esplanade L.L.C. Moreover, Horton NJ's payment to Esplanade L.L.C. of over $122,000 did not enrich Dynastar or Evangeline. There was no proof that the payment was passed through to either entity.

Additionally, the equitable remedy of restitution for unjust enrichment is available only when there is no adequate remedy at law. *F. Bender, Inc. v. Jos. L. Muscarelle, Inc.,* 304 N.J.Super. 282, 285, 700 A.2d 374 (App.Div.1997); *Nat'l Amusements v. New Jersey Tpk. Auth.,* 261 N.J.Super. 468, 478, 619 A.2d 262 (Law Div.1992), aff'd,275 N.J.Super. 134, 645 A.2d 1194 (App.Div.), certif.denied,138 N.J. 269, 649 A.2d 1288 (1994). Thus, a plaintiff who has entered into an express contract may not obtain restitution from a non-contracting party. "[W]here it appears that there is in fact a legally subsisting express contract the law will not imply an agreement concerning the same subject matter."*Shapiro v. Solomon,* 42 N.J.Super. 377, 385, 126 A.2d 654 (App.Div.1956).*Seealso*Van Orman v. Am. Co.,* 680 F.2d 301, 310 (3d Cir.1982) (explaining that where a subsisting express agreement exists, unjust

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))**

enrichment claim barred).

**\*19** In this case, the plaintiff contracted with Lehigh Corp., which assigned the PRRC Agreement to Esplanade L.L.C. "A plaintiff is not entitled to employ the legal fiction of quasi-contract to 'substitute one promisor or debtor for another." ' *Callano v. Oakwood Park Homes Corp.,supra,* 91 *N.J.Super.* at 110, 219 A.2d 332. Horton NJ may not substitute Dynastar or Evangeline for the contracting party, Lehigh Corp., or the contracting party's assignee, Esplanade L.L.C.

Also, there is no unjust enrichment in this case because plaintiff would have performed, regardless of its expectations of payment. Presumably, it is unjust for a defendant to retain a benefit without paying as the plaintiff expected, because usually, the plaintiff would not have performed, but for the expectation of payment. But where the plaintiff would have performed, regardless of defendant's performance, the Appellate Division has held that the defendant has not been unjustly enriched. *SeeEssex County v. First Union Nat'l Bank,* 373 *N.J.Super.* 543, 549, 862 A.2d 1168 (App.Div.2004) (holding that bank was not unjustly enriched by payment of underwriting fees procured through bribery, because county would have paid essentially the same underwriting fees to a different underwriter). Similarly, in this case, as Mosesman testified, Horton NJ would have installed the off-site improvements regardless of its expectation of payment from Dynastar, because it was obliged to do so by its commitments to West Windsor Township.

In sum, the court denies plaintiff's claim of unjust enrichment.

III. *PLAINTIFF MAY NOT PIERCE ESPLANADE L.L.C.'S VEIL AND HOLD BORNE LIABLE.*

The court rejects plaintiff's claim that Esplanade L.L.C.'s "corporate veil" should be pierced, so that Borne, or Dynastar may be held liable. Under the facts of this case, equity does not require permitting plaintiff to pierce Esplanade L.L.C.'s veil and assign liability for its breach of contract to Borne or to any of his related entities. In reaching this conclusion, the court concludes that the issue of piercing the veil in this case is governed by New Jersey law, even though Dynastar and Evangeline are Louisiana business entities. The court also concludes that the plaintiff need prove its case for piercing the corporate veil by clear and convincing evidence. Nonetheless, even under a preponderance of evidence standard, the court is not persuaded that an injustice would be done by maintaining limited liability, given the court's conclusion that Borne's alleged misuse of the limited liability company form did not proximately caused plaintiff harm. Even if not an essential element of a veil piercing claim, causation necessarily must be a factor in the court's analysis of this claim for equitable relief. The court also concludes that the traditional factors for piercing the veil of a corporation must be modified in a case involving a limited liability company, to account for the special characteristics of that business entity. Applying that test, the court concludes that Esplanade L.L.C.'s veil need not be pierced, to avoid injustice, or to remedy fraud.

A. *Choice of Law.*

**\*20** The court initially raised the issue of which state's law applied to plaintiff's veil-piercing claim as it relates to the two foreign business entities created under Louisiana law, Dynastar, a limited liability company, and Evangeline, a corporation. Because, as a threshold matter, plaintiff's claim depends initially upon piercing Esplanade L.L.C.'s veil, and the court finds, as set forth in subsection C and D below, that Esplanade L.L.C.'s veil shall not be pierced, the court need not reach the choice-of-law issue. The parties do not dispute that New Jersey law determines whether to pierce the veil of Esplanade L.L.C.'s, which was formed under New Jersey law.

On the other hand, the New Jersey Limited Liability Company Act would appear to mandate application of a foreign state's veil-piercing law to a claim against a foreign L.L.C. *SeeN.J.S.A.* 42:2B-52 ("The laws of the state ... under which a foreign limited liability company is organized govern ... the liability of its members and managers...."). The apparent weight of authority agrees that veil-piercing analysis is governed by the law of the state of formation. *SeeStromberg Metal Works, Inc. v. Press Mech., Inc.,* 77 F.3d 928, 933 (7th Cir.1996) (stating that "[e]fforts to 'pierce the corporate veil' are governed by the law of the state of incorporation ... which for Press is Illinois.") (citing *Kern v. Chicago & Eastern Illinois R .R.,* 6 Ill.App.3d 247, 285 N.E.2d 501, 503-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

04 (Ill.App.1972); _Kalb, Voorhis & Co. v. Am. Fin. Corp.,_ 8 F.3d 130, 132 (2d Cir.1993) (applying New York choice of law principles to conclude that state of incorporation determines when corporate form will be disregarded, noting that that the formation state has the greater interest in determining when the insulation will be stripped away); _In re Tutu Wells Contamination Litig.,_ 909 F.Supp. 1005, 1009 (D.Vi.1995) (under Virgin Islands choice of law principles, law of incorporation state governs veil piercing); _Soviet Pan Am Travel Effort v. Travel Comm., Inc.,_ 756 F.Supp. 126, 131 (S.D.N.Y.1991) (applying formation state's law under New York choice of law principles); _Realmark Inv. Co. v. Am. Fin. Corp.,_ 171 B.R. 692, 695 (N.D.Ga.1994) (following _Restatement_ to apply debtor's incorporation state's law to veil piercing claim); _Gulf States Steel, Inc. v. Lipton,_ 765 F.Supp. 696, 703 n. 7 (N.D.Ala.1990) (assuming that Alabama choice of law rules require court to apply law of incorporation state to action to disregard corporate form); _Realco Servs., Inc. v. Holt,_ 513 F.Supp. 435, 442 n. 8 (E.D.Pa.1980) (applying New Jersey law to claim to disregard New Jersey corporation's form), _aff'd,_671 F.2d 495 (3d Cir.1981).See_also_Restatement (Second) of Conflicts of Laws § 307 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability ... to its creditors for corporate debts.").

**\*21** Although the court has found no New Jersey case directly on point, the Supreme Court has in another context adopted _Restatement (Second) of Conflicts of Laws § 307,_ which states that the law of the state of incorporation governs shareholders' liability. _See_Kelly v. Alstores Realty Corp.,_ 130 N.J. 313, 320 n. 1, 613 A.2d 1163 (1992) (stating that state of incorporation may control shareholder liability on dissolution). That may suggest a similar adoption of the incorporating state's law to a veil piercing claim.

Nonetheless, one might argue that New Jersey's governmental interest analysis would ultimately apply New Jersey's veil-piercing law, even to a foreign business entity, at least in certain cases. _See,e.g.,_Fantis Foods, Inc. v. North River Ins. Co.,_ 332 N.J.Super. 250, 253, 753 A.2d 176 (App.Div.) (applying governmental interest analysis of _Restatement (Second) of Conflict of Laws § 188 (1971)_ to contract claim), _certif. denied,_165 N.J. 677, 762 A.2d 658 (2000)."New Jersey has abandoned

'the mechanical and inflexible lex loci contractus rule in resolving conflict-of-law issues in liability-insurance contracts' in favor of 'a more flexible approach that focuses on the state that has the most significant connections with the parties and the transaction." ' _Boyson, Inc. v. Archer & Greiner, P.C.,_ 308 N.J.Super. 287, 297, 705 A.2d 1252 (App.Div.1998). As for section 52 of the New Jersey Limited Liability Act cited above, one might argue that it applies only to the extent that the L.L.C. is deemed to be a genuine existence and is not a sham, just as the statutory provision on limited liability itself does not override the court's equitable power to disregard the entity and impose liability on members. _N.J.S.A._ 42:2B-23.

An apparent minority of courts has suggested that the state with the most significant contacts would govern a veil-piercing dispute. _See_Cascade Energy & Metals Corp. v. Banks,_ 896 F.2d 1557, 1575 n. 18 (10th Cir.1990) (discussing but not deciding whether veil-piercing governed by law of incorporation-state or law of state where contract breached); _In re Hillsborough Holdings Corp.,_ 166 B.R. 461,468 (M.D.Fla.1994) (discussing but not deciding whether under choice of law principles of Florida, which follows the _Restatement,_ the "most significant contacts" test of section 145 would govern, or the place of incorporation test of _section 307_ would apply); _In re BYOC Int'l,_ 326 Or. 464, 952 P.2d 64, 1998 WL 78043 (10th Cir.1998) (applying veil-piercing law of state where foreign corporation had "significant contacts").Cf._RRX Indus., Inc. v. Lab-Con, Inc._ 772 F.2d 543, 545-46 (9th Cir.1985) (applying California law to veil piercing of Pennsylvania corporation).

Ultimately, the court need not resolve this issue, inasmuch as it concludes that the entity whose veil must be pierced as a threshold matter, Esplanade L.L.C., was both formed under New Jersey law, and maintained its most significant contacts here, and New Jersey certainly has the interest in this case to apply its veil-piercing law.

B. Standard of Proof.

**\*22** It is undisputed that the PRRC Agreement created the obligation to pay for offsite improvements, and to timely complete affordable housing units. The contract was first between SGS

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

Adult L.L.C. and Lehigh Corp. Then SGS assigned its rights and duties to Horton NJ, and Lehigh Corp. assigned its rights and duties to Esplanade, L.L.C. Thus, in asserting its veil-piercing claim, plaintiff seeks to avoid the limitations of an express written contract and assign liability to a non-contracting party, Borne. As discussed below, in order to obtain equity's aid in avoiding a duly executed contract, plaintiff needs to prove its claim by clear and convincing evidence.

The court has found no New Jersey court decision that expressly addresses the standard of proof in veil-piercing claims. However, the court finds that this standard of proof is consistent with binding precedent establishing the same standard of proof in equitable and legal fraud claims. It is consistent with the public policy underlying that higher standard of proof in cases in which a party seeks to avoid a written contract. It is also supported by the public policy for limited liability for business entities, at least as it relates to contractual claims by voluntary creditors. Lastly, it is consistent with what this court finds is the better reasoned view of other courts.

Determining the standard of proof is traditionally a judicial function, absent direction from the legislative branch to the contrary. See *Steadman v. SEC,* 450 U.S. 91, 95, 101 S.Ct. 999, 1004, 67 L. Ed.2d 69, 74 (1981) (stating that standard of proof is traditional left to judiciary to resolve).

Although limited liability is a statutory creation, the Legislature has not prescribed the standard of proof for piercing the veil. Indeed, piercing the veil is an equitable remedy, in derogation of the statute limiting liability. Thus, it is incumbent on this court to determine what our State's Supreme Court would deem the appropriate standard.

In choosing the standard of proof, the court must be mindful of the impact of a standard of proof in any proceeding. In setting a standard of proof, one must make a judgment about how convinced a fact-finder must be in his or her factual findings. See *State v. Oliver,* 162 N.J. 580, 590-91, 745 A.2d 1165 (2000) ( "The function of the standard of proof ... 'is to instruct the fact finder concerning the degree of confidence our society thinks he [or she] should have in the correctness of factual conclusions for a particular type of adjudication." ') (citations omitted).

The standard of proof also allocates the risk of an erroneous decision. *In re Winship,* 397 U.S. 358, 370-371, 90 S.Ct. 1068, 1076, 25 L. Ed.2d 368 (1970) (Harlan, J., concurring) (stating that the chosen standard of proof should reflect an assessment of the comparative social disutility of erroneous decisions favoring plaintiff or defendant); *Comas v. Comas,* 257 N.J.Super. 585, 591, 608 A.2d 1005 (Ch.Div.1992) ("The standard [of proof] serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.") (citation omitted).

**\*23** The preponderance standard imposes the risk of loss evenly between the two parties. The risk that a plaintiff will win an undeserved recovery is no greater than the risk that a defendant will escape liability for a wrong actually committed. This is the standard typically applied in civil cases involving monetary disputes between private parties. In criminal cases, the defendant's liberty interest is so weighty that the beyond-a-reasonable-doubt standard of proof is designed to avoid as much as possible the risk of an erroneous judgment of conviction, even if means a guilty defendant may go free.

The clear-and-convincing standard falls somewhere between the two extremes. *Aiello v. Knoll Golf Club,* 64 N.J.Super. 156, 162, 165 A.2d 531 (App.Div.1960) (stating that "[c]lear and convincing" evidence should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established...."). It is typically used "in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant." *Addington v. Texas,* 441 U.S. 418, 423-24, 99 S.Ct. 1804, 1808, 60 L. Ed.2d 323, 330 (1979) (describing the three standards, and applying clear-and-convincing standard to involuntary civil commitment of mentally ill). Our Supreme Court has defined "clear and convincing" to mean evidence "so clear, direct and weighty and convincing as to enable either to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Seaman,* 133 N.J. 67, 74, 627 A.2d 106 (1993).

Applying these considerations, the court concludes that a fact-finder should have a higher degree of confidence in a claim to pierce the veil on a private contract claim. The same considerations that call for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 18
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))**

a heightened level of proof in an equitable or legal fraud claim are at play in a corporate veil piercing claim.

This court does not address whether this standard of proof should apply to veil-piercing claims involving tort claimants. *See, e .g., Ross v. Pennsylvania R.R. Co.,* 106 *N.J.L.* 536, 148 A. 741 (E. & A.1930) (tort claimant permitted to pierce corporate veil). Indeed, a strong argument can be made that a different and heightened standard should apply to contract claimants because they are voluntary creditors, and tort claimants are not. *See* 1 Fletcher Cyc. Of Private Corp. § 41.85 (2004) ("[C]ourts usually apply more stringent standards to piercing the corporate veil in a contract case than they do in tort cases. This is because the party seeking relief in a contract case is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity, and is expected to suffer the consequences of the limited liability associated with the corporate business form, while this is not the situation in tort cases."). *Butsee* R. Thompson, *Piercing the Corporate Veil: An Empirical Study,* 76 Cornell L.Rev. 1036, 1058-59 (1991) (asserting, based on an empirical study, that courts actually pierce more often in the contract than tort context, notwithstanding that "commentators have noted that tort claimants have a better claim to piercing the veil because they did not choose to deal with the corporate enterprise that ultimately was unable to pay its obligation.")

**\*24** There is little doubt that both legal and equitable fraud must be proved by clear and convincing evidence. *See* *Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 611, 691 A.2d 350 (1997) (affirming finding of no common law fraud where trial court applied clear-and-convincing standard); *Bears v. Wallace,* 59 *N.J.* 444, 450, 283 A.2d 740 (1971) (stating that fraud must generally be proved by clear and convincing evidence); *Connelly v. Weisfeld,* 142 *N.J. Eq.* 409, 410 (E. & A.1948) ("Fraud, as a fact, will never be presumed; it must always be clearly and convincingly proved...."). Numerous appellate decisions agree. *Weil v. Express Container Corp.,* 360 *N.J.Super.* 599, 613, 824 A.2d 174 (App.Div.2003); *McConkey v. Aon Corp.,* 354 *N.J.Super.* 25, 45-46, 804 A.2d 572 (App.Div.2002), *certif. denied,* 175 *N.J.* 429 (2003); *Daibo v. Kirsch,* 316 *N.J.Super.* 580, 588, 720 A.2d 994 (App.Div.1998) (equitable fraud); *Stochastic*

*Decisions, Inc. v. DiDomenico,* 236 *N.J.Super.* 388, 395, 565 A.2d 1133 (App.Div.1989), *certif. denied,* 121 *N.J.* 607, 583 A.2d 309 (1990); *Albright v. Burns,* 206 *N.J.Super.* 625, 636, 503 A.2d 386 (App.Div.1986) (fraud "must be clearly and convincingly proven"); *Minter v. Bendix Aviation Corp.,* 26 *N.J.Super.* 268, 274, 97 A.2d 715 (App.Div.1953). *Butsee* *Armel v. Crewick,* 71 *N.J.Super.* 213, 218, 176 A.2d 532 (App.Div.1961) (stating that legal fraud may be proved by preponderance of the evidence).

The issue is whether the same standard should be applied to a veil-piercing claim, notwithstanding that some of the elements of an equitable or legal fraud claim need not be proved. The court concludes that it should, because many of the same reasons that support a heightened standard of proof for the legal or equitable fraud claim are at play in the veil-piercing claim.

The heightened standard apparently has its roots in equity and the desire to demand higher proof before setting aside written contracts.

A higher standard of proof apparently arose in courts of equity when the chancellor faced claims that were unenforceable at law because of the Statute of Wills, the Statute of Frauds, or the parol evidence rule. See Note, Appellate Review in the Federal Courts of Findings Requiring More than a Preponderance of the Evidence, 60 Harv.L.Rev. 111, 112 (1946). Concerned that claims would be fabricated, the chancery courts imposed a more demanding standard of proof. The higher standard subsequently received wide acceptance in equity proceedings to set aside presumptively valid written instruments on account of fraud....

[*Herman & MacLean v. Huddleston,* 459 *U.S.* 375, 388 n. 27, 103 *S.Ct.* 683, 690, 74 *L. Ed.* 2d 548, 559 (1983) (citation omitted).]

However, not only fear of fabrication was at work. Apparently, as the Note cited by *Huddleston* observed, the equity courts decided that if they were to set aside contracts based on flexible principles of equity and fairness, then they would demand a higher standard of proof as a counter-weight.

**\*25** The requirement in civil actions of more than a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 19
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

preponderance of the evidence was first applied in equity to claims which experience had shown to be inherently subject to fabrication, lapse of memory, or the flexibility of conscience. Conceding the validity of policies which the parol evidence rule and the Statutes of Wills and Frauds were designed to carry out, the chancery courts compromised between becoming a mecca for the trumped-up prayer for relief and refusing altogether to mitigate the stern fulfillment of these policies in the law court....

[Note, 60 *Harv. L.Rev.,* 111, 112 (1946) ].

This policy is evident in New Jersey's decisions. After reviewing ample authority for the proposition that fraud must be proved by clear and convincing evidence, Judge Clapp explained that the underlying purpose of the standard was not only to avoid fabrication, but to give due respect to the formality of written instruments.

The standard "clear and convincing proof," or some variant of it, seems to have had its origin in the practice of the English Court of Chancery in connection with suits for the reformation or rescission of a written instrument because of mistake or fraud. *Asternerstandardmayindeedbejustifiedwhendealingwi thwritteninstruments.*

[*Post v. Bacher,* 48 *N.J.Super.* 518, 520-21, 138 *A.2d* 538 (App.Div.1958) (emphasis added).]

The elements of a veil piercing claim are most akin to a claim of equitable, not legal fraud, inasmuch as a claim for equitable fraud, like a veil piercing claim, dispenses with proof of knowledge and intent. *See,e.g.,Jewish Ctr. of Sussex County v. Whale,* 86 *N.J.* 619, 625, 432 *A.2d* 521 (1981) (stating that equitable fraud does not require proof of scienter); *Daibo v. Kirsch,supra,* 316 *N.J.Super.* at 588, 720 *A.2d* 994 ("[U]nlike legal fraud which may give rise to money damages, equitable fraud does not require proof that the representation was made with 'knowledge of its falsity and an intention to obtain an undue advantage therefrom.' "). Thus, the traditional standard of proof of the courts of equity would seem especially fitting. *SeeBerman v. Gurwicz,* 189 *N.J.Super.* 89, 102, 458 *A.2d* 1311 (Ch.Div.1981) (stating that proof of fraud in Chancery must be by clear and convincing evidence), *aff'd,*189 *N.J.Super.*

49, 458 *A.2d* 1289 (App.Div.), *certif.denied,*94 *N.J.* 549, 468 *A.2d* 197 (1983).

Moreover, to the extent the veil-piercing claim requires fewer elements than a fraud claim, it would seem anomalous to lower the standard of proof as well. Indeed, if a contract is going to be set aside on the basis of fewer elements, the finder of fact should be firmly convinced that those elements have been proved.

As noted above, the reluctance to set aside written contracts based on claims of fraud is apparently based not only on the fear of fabrication, but on the interest in predictability and stability of contractual relationships, and respect for written undertakings. Before a contract obligation is imposed upon a non-contracting party based on a veil-piercing claim, a greater than normal showing should be made. If a party seeking to establish extra-contractual claims need meet only the same standard of proof as a party seeking to enforce the written contract, then the written contract-despite its formalities-would command no greater respect than extra-contractual claims.

**\*26** Although the court has found no New Jersey case expressly assigning a standard of proof to corporate-veil-piercing claims, it is consistent with the general reluctance of our courts to override a business entity's limited liability. "The test in New Jersey for piercing the corporate veil is stringent."Dreier and Rowe, *Chancery Practice* (2005) at 123.

Moreover, other courts have adopted an enhanced standard of proof, because of the similarity between a veil-piercing claim and a fraud claim. "Because alter ego is akin to and has elements of fraud, we think it too must be shown by clear and convincing evidence."*Kaplan v. First Options, Inc.,* 19 *F.*3d 1503, 1522 (3d Cir.1994) (apparently applying Pennsylvania law, court holds that clear and convincing standard governs assertion of alter ego theory).*Kaplan* has been followed by federal courts in New Jersey and Pennsylvania. *SeeTeamsters Health and Welfare Fund of Philadelphia and Vicinity v. World Trans., Inc.,* 241 *F.Supp.*2d 499 (E.D.Pa.2003); *United Food and Commercial Workers Union v. Fleming Foods East, Inc.,* 105 *F.Supp.*2d 379, 388 (D.N.J.2000) (following *Kaplan's* clear and convincing standard in piercing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))**

veil of New Jersey corporation on alter ego theory).

While not expressly adopting a clear and convincing standard, Delaware law has also been construed to require more than a mere preponderance of the evidence. This heightened standard of proof was based on expressions of Delaware courts, like New Jersey's, that a plaintiff seeking to pierce the veil carries a heavy burden.

(a) [T]he Hillsborough court ... held that 'those who seek to pierce the corporate veil ... carry a very heavy burden,'... (b) the Court finds it nonsensical to suggest that the most minimal evidentiary standard of a preponderance of the evidence is equivalent to 'a very heavy burden,' (c) the relevant cases construing Delaware law seem to uniformly suggest that the standard of proof for veil piercing is at least elevated relative to the minimal preponderance of the evidence standard if not a clear and convincing evidence standard.... Therefore, the court holds that the appropriate standard of proof by which one must prove a case for piercing the corporate veil under Delaware law is, if not a clear and convincing standard, at least somewhat greater than merely a preponderance of the evidence standard.

[*In re Foxmeyer Corp., 290 B.R. 229, 237 (Bankr.D.Del.2003)* ].

*See also* *Resolution Trust Corp. v. Latham & Watkins, 909 F.Supp. 923, 930 (S.D.N.Y.1995)* ("Plaintiffs who would pierce the corporate veil bear a heavy burden of proof under Florida law."); *Grayson v. R.B. Ammon & Assocs., Inc., 778 So.2d 1 (La.App.2000)* (applying clear and convincing standard of proof under Louisiana law).

While some other states' courts have applied a preponderance of the evidence standard, they do so without considering the factors addressed here. *Compare* *FDIC v. United States, 654 F.Supp. 794, 809 (N.D.Ga.1986)*; *Litchfield Asset Mgmt. Corp. v. Howell, 70 Conn.App. 133, 799 A.2d 298, 310 (Conn.App.Ct.2002)*; *J.L. Brock Builders, Inc. v. Dahlbeck, 223 Neb. 493, 391 N.W.2d 110 (Neb.1986)*; *Wyatt v. Bowers, 103 Nev. 593, 747 P.2d 881 (Nev.1970)* (all applying the preponderance of evidence standard of proof to veil piercing). These courts do not consider the similarity between a veil piercing claim and a fraud claim, nor the policy

underlying the heightened standard of proof for equitable fraud claims. In the final analysis, the court finds these decisions unpersuasive.

C. Traditional Corporate Veil Piercing Standard

**\*27** The court concludes that the traditional standard for piercing a corporation's veil must be modified to accommodate the special characteristics of a limited liability company. The court will first discuss the standard applicable to corporations. In the course of that discussion, the court will also explain why proximate cause is an appropriate and significant factor that the court must consider in a veil-piercing case involving contract. Then, in section D below, it will discuss how the standard should be modified.

1. *The Two-Part Test for Piercing the Corporate Veil.*

The Supreme Court described the standard for piercing a corporation's veil in *State Dep't of Environ. Prot. v. Ventron Corp., 94 N.J. 473, 500, 468 A.2d 150 (1983)*. A corporation is a separate entity from its shareholders. *Ibid.* One of the primary reasons for incorporation is to insulate shareholders from the liabilities of the corporate enterprise. *Ibid.* Except in cases of fraud, injustice, or the like, courts will not pierce a corporate veil. *Ibid.* The purpose of the doctrine is to "prevent an independent corporation from being used to defeat the ends of justice." *Ibid.*

The Supreme Court established a two-part test to determine if the business entity has been used to defeat the ends of justice. First, the plaintiff must prove that the subsidiary was a mere instrumentality or alter ego of its owner. That is, that the parent or owner so dominated the subsidiary that it had no separate existence but "was merely a conduit for the parent." *Id.* at 500-01, 468 A.2d 150 (citing *Mueller v. Seaboard Commercial Corp., 5 N.J. 28, 34, 73 A.2d 905 (1950)* (demonstrating dominance and control of a subsidiary evidences mere instrumentality).

Second, the plaintiff must prove that the parent or owner has abused the business form to perpetrate a fraud, injustice, or otherwise circumvent the law. "Even in the presence of dominance and control, liability will be imposed only where the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

otherwise to circumvent the law."*State Dep't of Environ. Prot. v. Ventron Corp.,supra, 94 N.J. at 501, 468 A.2d 150*. See*also*Major League Baseball Promotion Corp. v. Colour-Tex, Inc., 729 F.Supp. 1035, 1046 (D.N.J.1990) (suggesting that New Jersey has consistently followed and continues to follow this two-part test); *Irving Inv. Corp. v. Gordon, 3 N.J. 217, 223, 69 A.2d 725 (1949)* (declaring that "[i]t is where the corporate form is used as a shield behind which injustice is sought to be done by those who have control of it that equity penetrates the veil").

The first part of the test-pertaining to dominance and control-has been evidenced by facts that demonstrate the parent company's or owner's exercise of dominion and control over the subsidiary. In such instances, a subsidiary can properly be deemed an "alter ego" or "mere instrumentality" of the parent such that the entities operate as one. This requires proof of the complete domination and control of both the entity's policy and business practices.*Mueller v. Seaboard Commercial Corp.,supra, 5 N.J. at 34, 73 A.2d 905*. The alter ego or mere instrumentality factor is generally employed where two corporations or companies are realistically controlled as one entity because of common owners, officers, directors, members or lack of observance of corporate formalities between the two organizations. This test measures the separateness between the management of the corporation and its owners. See*generally*, Dreier and Rowe, *supra*, at 118 (noting that this factor measures "the unity of interest in ownership that the separate personalities of the corporation and the individual [owners] no longer exist ...").

**\*28** Indicia of dominance and control under the doctrine have traditionally been recognized by a corporation's failure to adhere to corporate formalities. For example, where the parent company's shareholders or managers have failed to keep separate book and records, failed to issue stock, commingled funds, or otherwise engaged in acts that would amount to daily dominance and control over the subsidiary, the first prong of the doctrine may be satisfied. See*State Dep't of Environ. Prot. v. Ventron Corp.,supra, 94 N.J. at 501, 468 A.2d 150* (stating that constant involvement in one firm's personnel in day-to-day business of another corporation was not sufficient to establish dominance); *Stochastic Decisions, Inc. v. DiDomenico,supra, 236 N.J.Super. at 393, 565 A.2d 1133* (piercing the corporate veil of

the parent corporation upon finding of pervasive commingling of corporate assets and identities); Dreier and Rowe, *supra*, at 118.

The second prong of the test-abuse of the privilege of incorporation consisting of fraud, injustice or circumvention of law-has been evidenced by facts that demonstrate some form of misrepresentation, deceit, undercapitalization, or other form of injustice. See*State Dep't of Environ. Prot. v. Ventron Corp.,supra, 94 N.J. at 500, 468 A.2d 150;OTR Assoc. v. IBC Services, Inc., 353 N.J.Super. 48, 51* (App.Div.) (stating that the "hallmarks of abuse of privilege of incorporation" are "typically the engagement of the subsidiary in no independent business of its own but exclusively the performance of a service for the parent and, even more importantly, the undercapitalization of the subsidiary rendering it judgment-proof."), *certif..denied,175 N.J. 78 (2002); MacFadden v. MacFadden, 46 N.J.Super. 242, 249, 134 A.2d 531 (Ch.Div.1957)* (articulating that "equity will not allow the doctrine of corporate entity to be used for the purpose of defeating justice"), *aff'd,49 N.J.Super. 356, 139 A.2d 774 (App.Div.), certif.denied,27 N.J. 155, 141 A.2d 828 (1958)*. Several courts have reasoned that in instances of fraud or equitable fraud, the fraudulent conduct must be perpetrated in the misuse of the corporate form. *State Dep't of Environ. Prot. v. Ventron Corp.,supra, 94 N.J. at 501, 468 A.2d 150;Mueller v. Seaboard Commercial Corp.,supra, 5 N.J. at 34-35, 73 A.2d 905;MacFadden v. MacFadden,supra, 46 N.J.Super. at 247-48, 134 A.2d 531*.

2. *Causation Is a Factor in Piercing the Veil*

In determining whether a plaintiff has satisfied the second prong of the *Ventron* test, New Jersey courts have considered whether the defendant's use or misuse of the business entity's form caused harm. Several states hold that proof of injury or loss is an express prerequisite for veil-piercing. See,e.g.,*Campisano v. Nardi, 212 Conn. 282, 562 A.2d 1, 6 (Conn.1989)* (stating that plaintiff must prove three elements: first, complete domination, second, that the control must have been used to commit fraud or wrong, and third, "that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.") (citation omitted); *Zipper v. Health Midwest, 978 S.W.2d 398, 413 (Mo.Ct.App.1998)* (stating the control and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 22
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))**

breach of duty must proximately cause injury or unjust loss); *Morris v. New York State Dep't of Taxation and Finance,* 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160-61 (N.Y.1993) ("Generally, however, piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff *which resulted in plaintiff's injury....*") (emphasis added); *Lowendahl v. Baltimore and Ohio R. Co.,* 247 A.D. 144, 287 N.Y.S. 62, 75-76 (App.Div.) (stating that veil may be pierced where the entity is a mere instrumentality of its owner, the control is used to commit fraud or unjust conduct, and "such fraud or wrong results in unjust loss and injury to plaintiff"), *aff'd,* 6 N.E.2d (N.Y.1936); *Glenn v. Wagner,* 313 N.C. 450, 329 S.E.2d 326, 330 (N.C.1985) (stating that control and breach of duty must proximately cause injury or unjust loss complained off).

*29 Including causation assures a proper balance between fulfilling the policy goals of limited liability, established by statute, and the policy goals of the veil-piercing doctrine, established in equity, to avoid injustice. Limited liability is said to promote investment, and allocate risk to more efficient risk-bearers. R. Thompson, *supra, 76 Cornell L.Rev.* at 1039. Limited liability also encourages markets for stocks in publicly traded firms. *Ibid.* In the contract setting, at least one not involving an unsophisticated consumer, it may be presumed that the parties are aware that they are dealing with limited liability entities. They have decided to allocate the risk of non-performance and limited liability among themselves. Indeed, often, a creditor dissatisfied with the limited liability of a closely held corporation may seek a personal guarantee, raise its price, or simply choose not to do business with the corporation. D. Leebron, *Limited Liability, Tort Victims and Creditors,* 91 Colum. L.Rev. 1565, 1627 n. 186 (1991) ("If the corporate creditor believes that the security is insufficient, it can always demand a personal guarantee from the shareholders.").

Thus, to override a private bargain, the courts generally demand a showing of fraud, misrepresentation, or some violation of the express or implicit bargain of the parties.

[F]or close corporations, piercing the corporate veil is strongly rooted in the bargain setting. Because the market-related reasons for limited liability are absent in close corporations and corporate groups, the most important justification for limited liability is permitting parties in a consensual relationship to use the corporate form to allocate the risks of the transaction and the enterprise. Thus the presumption of limited liability is strongest when the outside party adversely affected by the corporation's limited assets was aware of the corporation's separate existence at the time of the transaction. Conversely, courts will disregard limited liability for the same reasons that other bargains are not respected by courts. For example, misrepresentation is one of the most frequent factors listed by courts when they pierce the veil.

[R. Thompson, *supra, 76 Cornell L.Rev.* at 1071].

Absent the element of causation, a creditor would be granted a better bargain than it made for itself, simply because of the fortuity that the debtor, say, inadvertently commingled assets, ignored corporate formalities, or dominated the corporation. "Accordingly, absent very compelling equitable circumstances, courts should not rewrite contracts or disturb the allocation of risk the parties have themselves established." 1 *Fletcher Cyc. Of Private Corp.* § 41.85 (2004).

While this court has found no New Jersey case expressly stating that proof of causation is an essential element of a veil-piercing claim, neither has the court found a case expressly stating that causation is irrelevant. Rather, the causation factor has influenced our courts' decisions that a corporation was used as an instrument of injustice or fraud. For example, in *OTR Assoc. v. IBC Services, Inc., supra,* proof of causation was a persuasive factor that compelled piercing the veil. In that case, a plaintiff-landlord leased a store to IBC Services, Inc., a wholly-owned subsidiary of the national franchisor, Blimpie International, Inc. IBC in turn subleased the store to the individual franchisee. Unbeknownst to the landlord, IBC had virtually no assets, other than the lease, and no income, other than the rent of the sub-lessee.

*30 The court held that Blimpie International intentionally created the impression that it and IBC-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                           Page 23
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

the initials standing for International Blimpie Corporation-were one and the same. As a result, the landlord was led to believe that a substantial corporation was liable under the lease, not a thinly capitalized franchisee and an empty shell owned by the franchisor. "While there was no ... direct representation here, we are satisfied, based on the record ... that was such an implicit representation in Blimpie's conduct, which reasonably induced plaintiff to believe it and IBC were the same."*Id.* at 56, 329 S.E.2d 326.

The court distinguished the case at hand from one in which the tenant made the landlord aware that it was a thinly capitalized. In such a case, veil-piercing was not warranted to achieve justice. The landlord was able to negotiate a partial personal guarantee. *Id.* at 55, n. 3, 329 S.E.2d 326. Likewise, one can imagine that even without affirmative disclosure, sophisticated parties in commercial real estate transactions may be familiar with single-purpose entities and anticipate that contracting entities may be thinly capitalized or capitalized only with assets related to the specific project.

Of course, the same may not be true of say, an individual home buyer, purchasing a new home from a national home-builder's single-purpose subsidiary with a name misleadingly similar to the parent's. In that case, absent express disclosure, the plaintiff may well be misled, as was the plaintiff in *OTR Assoc. v. IBC Services, Inc.,supra.See*1 *Fletcher Cyc. of Private Corp.* § 41.85 (suggesting that a court should examine whether the creditor could be said to have assumed the risk of limited liability, noting that "trade creditors, consumers and employees are not normally in a position to do a full investigation or to negotiate guarantees.").

Likewise, in *Stochastic Decisions, Inc. v. DiDomenico,supra,* the trial court pierced the corporate veil in part because the plaintiff had in fact been misled by the defendants' intertwining and commingling of various corporate entities. The plaintiff insurance broker agreed to make premium payments for defendant, to avoid a lapse in coverage; defendant gave plaintiff five post-dated checks, drawn on various defendant entities.

Judge Garrenger pierced the veils of the corporate defendants after referring to a pervasive commingling

of corporate assets and identifies. He had no doubt in his mind that "Carol Coaches was holding itself out as one and the same as Eagle" and that Yagoda [the principal of the plaintiff] relied on this representation."

[*Id.* at 393, 565 A.2d 1133].

In affirming the trial court's decision, the Appellate Division also cited with approval a statement by the Massachusetts Supreme Court that common ownership or management alone will usually not justify veil piercing. It must be accompanied by additional facts such as " 'when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and *there is some fraudulent or injurious consequence of the inter-corporate relationship....*" ' *Id.* at 394, 565 A.2d 1133 (citing *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 233 *N.E.*2d 748, 752 (Mass.1968)) (emphasis added).*Seealso*AYR *Composition, Inc. v. Rosenberg,* 261 *N.J.Super.* 495, 506, 619 *A.*2d 592 (App.Div.1993) (piercing the corporate veil in case of fraudulent conveyance from debtor corporation); *Kugler v. Koscot Interplanetary, Inc.,* 120 *N.J.Super.* 216, 293 *A.*2d 682 (Ch.Div.1972) (piercing the veil and imposing personal liability in case of fraudulent pyramid scheme).

**\*31** Detrimental reliance was also implicit in *Macfadden v. Macfadden,supra,* where the court pierced the veil of a non-profit corporation that owned a house once occupied by the plaintiff wife and her defendant husband. In the 1932 settlement of their divorce, Mr. Macfadden promised that his wife could live in the marital home for her lifetime. However, at no time did Mr. Macfadden ever personally hold title. Rather, from the day he purchased the home with his own funds, he vested title in a string of entities that he controlled. The court found that the non-profit corporation that ultimately owned the property was Mr. Macfadden's alter ego and that it would be compelled to uphold Mr. Macfadden's agreement with his former wife.

Implicit in the court's holding was Ms. Macfadden's detrimental reliance. Ms. Macfadden counted on Mr. Macfadden fulfilling his bargain. Had she been made aware that Mr. Macfadden did not personally own the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))**

Page 24

property he promised to his wife, she surely would not have entered the agreement. "In reason and justice, Mrs. Macfadden is entitled to the benefit of the agreement made by Macfadden, irrespective of the form employed to veil his ownership."*Id.* at 249, 293 A.2d 682.

In sum, causation is an important, if not essential element, in determining, in a contract case, that an owner's domination of a corporation has been used as an instrument of fraud or injustice, or to circumvent the law.

D. Veil Piercing for L.L.C.'s

This court has found no New Jersey case in which the court has expressly addressed whether the corporate veil-piercing doctrine should be applied without change to a limited liability company. Therefore, this court must consider whether it should modify the *Ventron* two-part test in view of a limited liability company's special attributes. The court concludes that an adjustment is appropriate. Lesser weight should be afforded the element of domination and control and adherence to corporate formalities, because the statute authorizing limited liability companies expressly authorizes managers and members to operate the firm.

The court will begin its discussion by considering the statute itself, and then the views of commentators and out-of-state authority, which support a revised veil-piercing test for limited liability companies.

1. *Statutory Analysis.*

New Jersey's limited liability statute does not apply corporate veil-piercing doctrine to limited liability companies. Rather, it appears to endorse the evolution of court-made rules. These in turn may address this business form's special attributes.

Although the limited liability of an L.L.C. is identical to a corporation's, the L.L.C. is significantly different. *N.J.S.A.* § 42:2B-23 sets forth the limited liability principle:

Except as otherwise provided by this act, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or

otherwise, shall be solely the debts, obligations and liabilities of the limited liability company; and no member, manager, employer or agent of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company, or for any debt, obligation or liability of any other member, manager, employee or agent of the limited liability company, by reason of being a member, or acting as a manager, employee or agent of the limited liability company.

**\*32** New Jersey enacted the Limited Liability Company Act ("N.J.Act") to enable members and managers of a Limited Liability Company "to take advantage of both the limited liability afforded to shareholders and directors of corporations and the pass through tax advantages available to partnerships."Senate Commerce Committee Statement, *S.* 890 (June 14, 1993), *republished at*N.J.S.A. § 42:2B-1.

New Jersey's Limited Liability Company statute is distinct from its corporate counterpart. For example, to enjoy the tax advantages of a pass-through, an L.L.C. must have only two out of four corporate characteristics: (1) continuity of life; (2) centralization of management; (3) limited liability; and (4) free transferability of interests. *Ibid.* New Jersey has jettisoned continuity of life and free transferability of interests. *Ibid.See* David L. Cohen, *Theories of the Corporation and the Limited Liability Company: How Should Courts and Legislatures Articulate Rules for Piercing the Veil, Fiduciary Responsibility and Securities Regulation for the Limited Liability Company?,* 51 Okla. L.Rev. 427, 452 (2004) (explaining that the limited liability company form is popular because the entity is easy to create, has fewer mandatory rules, and offers flexibility to avoid corporate common law and transactional costs of doing business in the corporate form).

The statute expressly authorizes L.L.C. managers to engage in financial transactions with the company, including lending and borrowing money, and assuming obligations of the company. *N.J.S.A* § 42:2B-9. As will be discussed below, this is significant, when considering the "dominion and control" factor under *Ventron.*

Other states' statutes variously treat corporate veil-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

piercing doctrine. Some states expressly adopt the corporate veil-piercing doctrine and others expressly reject it, at least in part. For example, the statutes of Colorado and Minnesota apply corporate veil-piercing common law to L.L.C.'s in their jurisdictions. *SeeColo.Rev.Stat. Ann.* S 7-80-107 (West Supp.1996) (stating that courts shall apply the case law that interprets the conditions and circumstances under which the corporate veil of a corporation may be pierced under Colorado law); *Minn.Stat.* § 322B.303 subd. 2 (1994) (providing that "case law that states the conditions and circumstances under which the corporate veil of a corporation may be pierced under Minnesota law also applies to limited liability companies").

On the other hand, some states have expressly distinguished L.L.C .'s from corporations, dispensing with the corporate formalities factor in a veil-piercing analysis involving a **limitedliabilitycompany**. *See,e.g.,Cal. Corp.Code Ann.* § 17101 (West 2000) (stating that a L.L.C. member shall be subject to liability under the common law governing **alterego** liability to the same extent as a shareholder of a corporation, except failure to observe certain formalities is not a factor); 805 *Ill. Comp. Stat. Ann.* 180/10-10(c) (West 1996) (explicitly stating that failure to observe corporate formalities shall not be a basis to apply the piercing doctrine and impose personal liability on members and managers); *W. Va.Code* § 31B-3-303(b) (1996) ("[t]he failure of a limited liability to observe the usual company formalities or requirements ... is not a ground for imposing personal liability on the members or managers for liabilities of the company").

*33 Most states, however, do not explicitly and specifically address the issue of corporate veil-piercing doctrine by statute, and instead their laws only generally address member liability to third parties. *Seee.g.,*6 *Del.Code Ann.* § 18-303 (Supp.1994) (stating that "no member or manager of a limited liability company shall be obligated personally for any ... debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager ..."); *Fla. Stat. Ann.* § 608.436 (West 1996) (same).*Seegenerally,* Callison & Sullivan, *Limited Liability Companies: A State by State Guide To Law And Practice* § 5.1 (2004 ed.) (observing that all state L.L.C. statutes expressly state that members are not

personally liable for the L.L.C. debts, liabilities, and obligations).

Although the N.J. Act does not expressly address veil-piercing, an argument can be made that the Legislature implicitly intended that courts not mechanically apply corporate veil-piercing law to limited liability companies. The original, introduced version of the limited liability legislation provided that case law on piercing the corporate veil would apply to a limited liability company.

In any case in which a party seeks to hold the members of a limited liability company personally responsible for the alleged improper actions of the limited liability company, the court shall apply the case law which interprets the conditions and circumstances under which the shareholders of a corporation may be held liable under New Jersey law.

[*S.* 890, 205th Leg. § 6 (1992) ].

However, the Senate Committee Substitute that was ultimately passed and signed into law omitted that provision. *SeeS.* 890(SCS), 205th Leg. (1993), enacted as *L.* 1993, *c.* 210.

Indeed, rather than expressly address veil piercing doctrine, the Legislature apparently endorsed the continued evolution of the common law. "In any case not provided for in this act, the rules of law and equity, including the law merchant, shall govern."*N.J.S.A.* § 42:2B-67. This provision begs the question, what is the rule of law and equity on veil-piercing of a limited liability company. Apparently, it is for the courts to decide, grounded in the principles of equity, but mindful of the Legislature's expressed and implicit goals in creating this business form.

2. *Commentators and Other States' Decisional Law.*

As discussed below, persuasive authorities indicate that corporate veil-piercing doctrine should not be mechanically applied to cases involving limited liability companies. In particular, a court should view in a different light the factors of adherence to corporate formalities, and scrutiny of owners' dominion and control.

Certainly, one may find cases in which courts have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                     Page 26
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))**

presumed that a plaintiff may pierce the veil of an L.L.C. just as it may pierce the veil of a corporation. *See, e.g., Hollowell v. Orleans Regional Hosp. LLC, 217 F.3d 379, 385 n. 7* (5th Cir.2000) ("for **alterego** purposes, Louisiana would treat a **LLC** in the same manner as a corporation); *KLM Industries, Inc. v. Tylutki, 75 Conn.App. 27, 815 A.2d 688, 690 n. 2* (Conn.App.2003) (stating that L.L.C. veil-piercing requires same analysis as corporate veil piercing), *certif. denied, 263 Conn. 916, 821 A.2d 770* (Conn.2003).*Cf.In re Securities Investor Protection Corp. v. R.D. Kushnir & Co., 274 B.R. 768, 775* (Bankr.N.D.Ill.2002) (applying Illinois law and holding that mere failure to observe formalities was not a basis for piercing the veil, but "nothing in the statute bars piercing of the 'corporate veil' for other grounds on which that may be done for ordinary corporations.").

**\*34** However, courts that have expressly considered the differences between the two business forms have concluded that veil-piercing doctrine should be molded to accommodate the differences. In answering a certified question whether the veil-piercing remedy were available against a **limitedliabilitycompany**, the Wyoming Supreme Court answered in the affirmative, but recognized that the applicable factors would differ from those applied to a corporate veil-piercing-in particular, adherence to corporate formalities should not weigh as much. The court also left for another day the identification of other differences.

Certainly, the various factors which would justify piercing an **LLC** veil would not be identical to the corporate situation for the obvious reason that many of the organizational formalities applicable to corporations do not apply to **LLC's**. The **LLC's** operation is intended to be much more flexible than a corporation's. Factors relevant to determining when to pierce the corporate veil have developed over time in a multitude of cases. It would be inadvisable in this case, which lacks a complete factual context, to attempt to articulate all the possible factors to be applied to **LLCs** in Wyoming in the future.

[*Kaycee Land and Livestock v. Flahive, 46 P.3d 323, 328 (Wyo.2002)* ].

*Seealso In re Giampietro, 317 B.R. 841, 848 n. 10* (Bankr.D.Nev.2004) ("It may very well be that while

the same principles used in corporate **alterego** cases may apply to **limitedliabilitycompanies**, they may apply with different weight.").

Many commentators agree with the general principle that veil-piercing law for limited liability companies should be tailored to address that business form's special characteristics. *See,e.g.* D. Cohen, *supra, 51 Okla. L.Rev. 427, 457-58 (2004)* (arguing that the piercing veil doctrine should be adjusted to the L.L.C. and considered in light of the totality of the circumstance); J. Vandervoot, *Piercing the Veil of Limited Liability Companies: The Need For A Better Standard, 3 DePaul Bus. & Com. L.J. 51, 68-70 (2004);* R. Thompson, *The Limits of Liability in the New Limited Liability Entities, 32 Wake Forest L.Rev. 1, 14 (1997)* (recognizing that L.L.C.'s differ from corporations and a mechanical application of the corporate piercing doctrine will lead to nonsensical outcomes); E. Fox, *Piercing the Veil of Limited Liability Companies, 62 Geo. Wash. L.Rev. 1143 (1994).Seealso* J. Matheson and R. Eby, *The Doctrine of Piercing the Veil in an Era of Multiple Limited Liability Entitites: An Opportunity to Codify the Test for Waiving Owners' Limited-Liability Protection, 75 Wash. L.Rev. 147 (2000)* (proposing a model statute for veil-piercing of all limited liability entities pursuant to which plaintiff would need to show that the owner (1) misrepresented business's assets; (2) engaged in self-dealing; or (3) took assets from business rendering it insolvent).

**\*35** As noted by the Wyoming Supreme Court, adherence to formalities is one factor that should weigh differently in the case of a limited liability company. *Kaycee Land and Livestock v. Flahive,supra, 46 P.3d at 328.* Vandervoort concurs for two reasons. J. Vandervoot, *supra, 3 DePaul Bus. & Com. L.J. at 68-70 (2004).* First, a small-business owner's failure to adhere to formalities may simply reflect disregard of formalities "irrelevant to their actual operation", and lack of funds to hire lawyers and others to keep track of statutory obligations. None of that may evidence misuse of the statute.*Ibid.* Second, "LLC's have relatively few statutorily mandated formalities and have a considerable amount of freedom and flexibility as to the management structure of the entity."This informality, encouraged by statute, should not then be a basis to avoid statutory limited liability. *Ibid.See* D. Cohen, *supra, 51 Okla. L.Rev. at 457* ("[T]o allow piercing for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 27
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

disregarding LLC formalities ... will make the promise of limited liability for LLCs empty by definition.").

Reliance on dominance and control of the L.L.C. form also conflicts with the underlying policy of flexibility within the L.L.C. statute. *See* *In re Giampietro,supra,* 317 *B.R.* at 848, n. 10 (quoting with approval commentator's statement that the practice of veil-piercing because of domination by an owner may be inappropriate in the case of a **limitedliabilitycompany**).

**LLC's** are more often than not managed by the **LLC** members. In addition, generally speaking, members are normally authorized agents and/or managers of **LLC's** for the purpose of conducting its affairs. As such, it could be argued that the later ego factor is usually satisfied for **LLC's**. As one commentator noted, given the statutory authorization of flexible **LLC** management structures, domination of **LLC** management by members of the **LLC**, absent other equitable issues, would appear to be an 'inappropriate' factor for the courts to use to pierce the veil to the detriment of the interest holders. Thus, application of the **alterego** factor to **LLC's** will often lead to 'illogical' results.

[J. *Vandervoot,supra,* 3 *DePaul Bus. & Com. L.J.* at 70].

*See* also D. Cohen, *supra,* 51 *Okla. L.Rev.* at 457 (stating that dominance of the entity by owners has no application to **LLCs**); E. Fox, 62 *Geo. Wash. L.Rev.* at 1173-74 (concluding that "domination of an **LLC** by its members should not be given significant weight in **LLC** veil-piercing cases").

New Jersey law provides that the L.L.C. management shall be vested in its members in proportion to the member's present percentage or other interest in the L.L.C. profits unless the operating agreement otherwise vests management in whole or in part in a manager. *N.J.S.A.* § 42:2B-27. However, the statute also provides that when management is vested in its members, the decision of members owning more than fifty percent of the percentage or other interests in profit shall control. *Ibid.*

*\*36* Undercapitalization is another factor that should be weighed carefully in the L.L.C. context,

particularly involving a start-up. One court, addressing facts similar to those in this case, affirmed the trial court's refusal to pierce a limited liability company's veil. *Advanced Telephone Systems, Inc. v. Com-Net Prof. Mobile Radio, LLC,* 846 *A.*2d 1264, 1280-81 (Pa.Sup.Ct.2004) The court found no injustice in maintaining limited liability where the plaintiff knew it was dealing with a limited liability company that initially had no assets, but would only acquire those assets when a certain contract was entered and financing obtained; when that contract fell through the L.L.C. was undercapitalized. *Ibid.* Commentators agree that a limited liability company's undercapitalization-albeit still a highly relevant factor-should be considered in light of the circumstances. *See* D. Cohen, *supra,* 51 *Okla. L.Rev.* at 491 (suggesting that courts inquire whether the entity was formed with explicit intent of engaging in risky transactions and being undercapitalized given the risks, and then concluding that such facts would be evidence of unconscionable behavior toward involuntary creditors, but not toward voluntary creditors "unless the LLC's purpose was obscured or misrepresented.").

In sum, out-of-state authority and commentators agree that the veil-piercing formula for limited liability companies should be molded to account for that business form's special attributes. As the Wyoming Supreme Court aptly suggested *Kaycee Land and Livestock v. Flahive,supra,* the particular standard should be developed over time, as courts address concrete cases. It is not for this court, solely on the facts presented to it in this case, to formulate a generally-applicable standard. It is sufficient for this court to conclude that in this case, Borne's failure to scrupulously identify the entity through which he was acting, his dominion and control of Esplanade L.L.C., and the entity's undercapitalization should not loom as large as it might were the entity a corporation.

E. The Standard Applied to This Case

As noted above, under the *Ventron* two-part test, Horton NJ must prove that (1) Esplanade L.L.C. was a mere instrumentality or alter ego of Borne; and (2) Borne abused the business form to perpetrate a fraud, injustice, or otherwise circumvent the law. Particularly given the lesser weight assigned to the formalities, and dominion-and-control factors, Horton NJ has failed to prove the first prong.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))

Page 28

Moreover, given that Horton NJ's infrastructure investments were not caused by Borne's behavior, the court finds no injustice or circumvention of law, notwithstanding that Esplanade L.L.C. ultimately lacked sufficient capital to fulfill its obligations.

To prove the first prong of the *Ventron* test, Horton NJ relies on Borne's control of Esplanade L.L.C., and his failure to distinguish it from his Dynastar. As discussed above, there is no doubt that Borne failed to correct misimpressions of the entities' respective roles. He maintained control over all his entities, and used a central office, common employees, and common telephone lines. However, the separate entities served different functions. As discussed above, Borne did not intend to mislead. When entering formal contracts or obtaining payment, as opposed to informal correspondence, Borne was more careful to identify the correct entity. *See* Facts Section, Part 5(A) *supra.* Moreover, as discussed above, Fred Rothman was generally disinterested in the identity of Lehigh Corp.'s assignee. *See* Facts Section, Part 5(B) *supra.* Finally, Borne's failure to correct Schoor's and Rothman's confusion did not cause Horton NJ to act to its detriment. Horton NJ would have made the same investments in off-site improvements even if Borne made it clear that Dynastar was performing services for Esplanade L.L.C., and Esplanade L.L.C. was the single purpose entity that owned the land and was Lehigh's assignee. *See* Facts Section, Part 5(C) *supra.*

*37 Particularly given the lesser weight assigned to the formalities and dominion-and-control factors in an L.L.C. veil-piercing case, the court does not find that Borne's behavior justifies piercing Esplanade L.L.C.'s veil. Borne was a small-business owner. His lack of attention to detail-his misuse of stationery, for example-was not uncharacteristic of entrepreneurs and other L.L.C. owners. His operational efficiencies-in maintaining a central office for his various entities-was understandable. It presumably would have made little business sense for him to rent separate space, hire separate office-workers, and acquire separate phone lines for each of his related entities. To penalize him for rational economic behavior would be inconsistent with the business-promotion goals of the Limited Liability Act, and at odds with the specific provisions allowing member-management.

As for the second prong of the *Ventron* test, the court has found that Borne did not defraud in his use of the various entities. The court rejects plaintiff's argument that somehow, the transfer of the architectural and engineering plans for later phases of the project from Dynastar to Borne individually constitutes an act warranting veil-piercing. While the transfer of a Dynastar asset for insufficient value could constitute a fraudulent transfer, that is of no moment unless Horton NJ had a contract claim against Dynastar. And, as this court has found, Horton NJ's contract rights involved only Lehigh Corp. and Esplanade L.L.C. Only if Esplanade L.L.C.'s veil were pierced would the transfer of plans have been significant.

Nor did Borne use the limited liability form to perpetrate an injustice or a circumvention of the law. The court finds that Horton NJ has failed to establish by clear and convincing evidence-indeed, it has failed to establish by a preponderance of the evidence-that it has suffered an injustice by its failure to reach beyond the assets of Esplanade L.L.C. This is so because, as Horton NJ's own employees testified, it did not rely on its understandings of the identity of Lehigh Corp.'s assignee.

Rothman knew that Lehigh Corp. was in financial trouble. Horton NJ had no power to reject a Lehigh Corp. assignee. It was bound to complete infrastructure, regardless. Thus, it made no effort to conduct credit checks on Borne, Dynastar or Esplanade, L.L.C. Esplanade L.L.C. disclosed its funding limitations. Horton NJ had no idea whether Dynastar was better capitalized than Esplanade L.L.C., or whether it was the other way around. As Fred Mosesman testified, Horton NJ would have proceeded as it did, even if it knew in advance what it ultimately learned after-the-fact about Borne and his entities. *See* Facts Section, Part 5(C) *supra.*

To permit Horton NJ to reach beyond the parties who were liable under contract would not prevent an injustice, but create one. It would extend liability to parties with whom Horton NJ did not bargain and upon whose assets Horton NJ did not rely. Faced with similar facts, courts of other jurisdictions have likewise declined to pierce the veil. *See e.g., J.C. Compton Co., v. Brewster,* 185 Or.App. 382, 59 *P.3d* 1288, 1293 (Or.App.2002) (providing that because undercapitalization failed to cause damage to plaintiff, the court would not invoke the veil piercing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-10649-DFE    Document 45-3    Filed 06/13/2008    Page 12 of 13

Not Reported in A.2d                                                                              Page 29
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))**

doctrine to the defendant L .L.C.); *Advanced Telephone Systems, Inc. v. Com-Bet Professional Mobile Radio L.L.C.,supra,* 846 A.2d at 1281-82 (refusing to pierce the L.L.C. veil where plaintiff knew it dealt with a thinly capitalized L.L.C.).

**\*38** In sum, the court finds that Horton NJ has failed to establish a basis for piercing Esplanade L.L.C.'s veil.

IV.   *BORNE   AND   DYNASTAR-BUT   NOT EVANGELINE-COMMITTED   FRAUD   AGAINST HORTON   NJ,   BY   MISREPRESENTING   THE NATURE  OF  ON-SITE  IMPROVEMENTS  FOR WHICH  THEY  SOUGHT  REIMBURSEMENT  FROM HORTON NJ.*

The court is persuaded that Borne, acting for Dynastar,   committed   fraud   in   obtaining reimbursement for the storm sewer improvements to Esplanade L.L.C.'s site. However, there was no evidence that Borne was acting on behalf of Evangeline in obtaining such reimbursement. Thus, the claim against it shall be dismissed.

It is well-settled that, to prove legal fraud, a plaintiff must establish that the defendant made a material representation of a past or present fact, knowing it was false, with the intent that it be relied upon, and that the plaintiff detrimentally relied upon the representation. *Jewish Center of Sussex County v. Whale,supra,* 86 N.J. at 624, 432 A.2d 521. The claim must be proved by clear and convincing evidence, as noted above.

The court is convinced that Borne knowingly and intentionally misrepresented that the storm sewer improvements completed and extended to Hamlet's   property   line.   Those   were   false representations because the storm sewer line never extended beyond the facilities that they were to serve on Esplanade L.L.C's property. Dynastar, through Borne, affirmatively represented to Horton NJ in connection with its request for reimbursement for installation of the retention pond and storm sewer lines that a "total installation" had been performed by its general contractor, Kay Construction. Dynastar's September 7, 1999 letter to Horton NJ unequivocally indicated that the reimbursement request pertained to the "total installation" of the utility improvements.

The cost estimate that you included from Schoor DePalma acknowledged and identified *all of the pipes that were required to complete the total installation of the site storm water sewer.*Kay Construction gave me the cost they incurred for *the total storm water sewer plus the retention pond* and I multiplied it times the percentage you agreed to reimburse.

Subsequently, Dynastar's September 27, 1999 letter to Horton NJ "enclosed a detailed analysis of the cost incurred for the installation of the storm water sewer system for The Esplanade at Bear Creek."

The court is convinced that Borne knew that his general contractor, Kay Construction, had only installed the storm water lines through Phase I of The Esplanade Project and not to the property line between The Hamlet and The Esplanade. Borne also intended that Horton NJ rely on his representation, despite his claims at trial to the contrary. As noted above, the court found Borne ultimately not to be credible on this score. His intention to deceive on this point was proved by the letters themselves, and the circumstantial evidence. "[A] person's intentions ... may be inferred from all that he did and said, and from all the surrounding circumstances of the situation under investigation."*Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 254, 773 A.2d 1121 (2001) (citation omitted).

**\*39** When he sought the reimbursement, Borne was acting as an agent for Dynastar, which in turn was working   for   Esplanade   L.L.C.   under   the intercompany agreement. Although Borne sought the payment   for   Esplanade   L.L.C.,   Dynastar   is vicariously liable for its agent's fraud. *Baldasarre v. Butler,* 132 N.J. 278, 289, 625 A.2d 458 (1993) (stating that principal is vicariously liable for fraud of its agent).

Plaintiff relied to its detriment by paying over $122,000 believing that it would be able to simply tie into the storm sewer system at the Hamlet's property line. The court is convinced, based on the testimony of plaintiff's witnesses, that plaintiff anticipated the line would extend to the property's edge. And it is convinced that it would not have agreed to pay the $122,503.93 if it knew that it would have to complete the line. The evidence at trial demonstrated that Horton NJ would not have agreed to pay this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 30
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)
**(Cite as: Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.))**

reimbursement if it did not reasonably believe that it was sharing in the cost of a utility improvement that had been fully installed as represented. Horton NJ was forced to later enter Esplanade L.L.C.'s property to construct the utility improvements that it believed had already been constructed and which it already paid for. The cost of that extension constitutes the damage caused by the misrepresentation. Defendant does not dispute that the extension cost is the proper measure of damage, if fraud were found.

Plaintiff is entitled to $71,868.65, plus pre-judgment interest. *See R.* 4:42-11(b).

*CONCLUSION*

Plaintiff shall submit an appropriate order granting judgment in favor of plaintiff for $71,868.65, plus interest, solely on the claim of fraud against Borne and Dynastar.

N.J.Super.L.,2005.
D.R. Horton Inc. - New Jersey v. Dynastar Development, L.L.C.
Not Reported in A.2d, 2005 WL 1939778 (N.J.Super.L.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.